15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 0 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ALLEN FRY and | § | |
| MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-01-72 |
| | § | |
| AKAL SECURITY, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT AKAL SECURITY, INC.'s
## MOTION TO SEVER OR, IN THE ALTERNATIVE,
## FOR SEPARATE TRIALS WITH SUPPORTING AUTHORITIES

Akal Security, Inc. ("Akal"), Defendant in the above-styled and numbered cause, files

this Motion to Sever or, in the Alternative, for Separate Trials With Supporting Authorities,

pursuant to Rules 21 and 42(b) of the Federal Rules of Civil Procedure, and respectfully shows

the Court the following:

### I.  PRELIMINARY STATEMENT

Plaintiffs Allen Fry and Miguel Lopez were employed by Akal as court security officers

(CSOs) in the federal courthouse located in Brownsville, Texas.  In June of 1999, both Plaintiffs

were transferred, along with other court security personnel, to a newly-constructed courthouse.

Plaintiffs bring this action against Akal alleging age discrimination under the Age Discrimination

in Employment Act, ("ADEA") 29 U.S.C. § 621, *et seq.,* and the Texas Commission on Human

Rights Act, Texas Labor Code § 21.051, as well as a state law claim for intentional infliction of

emotional distress.

Akal has filed this Motion because the Plaintiff's claims are based on separate and

distinct facts and are not part of the same transaction or occurrence.  Accordingly, Akal asserts

that Plaintiffs' claims are misjoined and, pursuant to Fed. R. Civ. P. 21, should be severed into two separate actions. Severance will serve the interests of justice by avoiding jury confusion and eliminating prejudice to Akal. Alternatively, Akal requests, in the interest of justice and to prevent prejudice to Akal, that separate trials be had on the claims of Plaintiffs, pursuant to Fed. R. Civ. P. 42(b).

## II. ARGUMENT

**A.     Plaintiffs' Claims Are Misjoined and Should be Severed into Two Separate Actions.**

In order for Plaintiffs' claims to be properly joined in one lawsuit, they must satisfy the prerequisites of Fed. R. Civ. P. 20(a). This rule contains two requirements for proper joinder: (1) there must be a right to relief arising out of the same transaction or occurrence or series of transactions or occurrences; and (2) there must be a question of law or fact common to all of the plaintiffs which will arise in the action. Fed. R. Civ. P. 20(a). For proper joinder, both of these requirements must be met. *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 n.11 (5th Cir. 1995); *Grayson v. K-Mart Corp.*, 849 F. Supp. 785, 787 (N.D. Ga. 1994); *Smith v. N. Am. Rockwell Corp.-Tulsa Div.*, 50 F.R.D. 515, 522 (N.D. Okla. 1970). If Plaintiffs' claims fail to meet either of these two requirements, their claims are misjoined and should be severed by the court into separate actions under Fed. R. Civ. P. 21.[1]  *See, e.g., Bailey v. N. Trust Co.*, 196 F.R.D. 513, 516-17 (N.D. Ill. 2000) (holding that plaintiffs' race discrimination claims should be severed for failure to meet requirements of Rule 20(a)); *Grayson*, 849 F. Supp. at 787-89 (holding that plaintiffs' age discrimination claims must be severed because they did not arise out of a common transaction or occurrence and there was no common question of law or fact).

---

[1] Rule 21, entitled Misjoinder and Non-joinder of Parties, provides in pertinent part that "[a]ny claim against a party may be severed and proceeded with separately."

In this case, the Plaintiffs' claims do not meet either of the Rule 20(a) requirements for permissive joinder.   Therefore, their claims are misjoined and should be severed into two separate actions.

> **1.     No common transaction or occurrence.**

Where the complained of actions occur at different times and are based on different circumstances, the first prong of Rule 20(a) is not satisfied. *See Morris v. Northrup Grumman Corp.*, 37 F. Supp. 2d 556, 582 (E.D.N.Y. 1999) (severing race discrimination claims of two plaintiffs where facts underlying claims were different); *Johnson v. Indopco, Inc.*, 846 F. Supp. 670, 676 (N.D. Ill. 1994) (severing plaintiffs' race and sex discrimination claims where Title VII violations occurred at different times and other facts different); *Weir v. Litton Bionetics, Inc.*, 41 Fair Empl. Prac. Cas. (BNA) 1150, 1154-55 (D. Md. 1986) (severing age discrimination claims of two plaintiffs where facts were different, including ages at time of termination); *Anderson v. Phelps*, 655 F. Supp. 560, 565 (M.D. La. 1985) (court severed religious discrimination claims of two plaintiffs because only connection between claims was that both plaintiffs were employed by prison system, were Seventh-day Adventists and recovery was sought under same legal theory).

Plaintiffs' claims herein arise from distinct and unrelated circumstances surrounding their employment history as well as their separations from employment.  For example, with respect to their primary claims--that their work separations were because of their ages--it is undisputed that the facts and circumstances of their separations from employment occurred several months apart and were based on entirely different grounds.  Fry's separation occurred on August 20, 1999 when he was asked by the company to take a physical exam.  Rather than agree to the exam, he turned in his handgun, bullets, badge and handcuffs, and left the courthouse to seek the advice of

-3-

a lawyer. Fry Dep. 107:6-13; 108:2-5; 115:2-4.[2] Approximately five months later, on January 7, 2000, Plaintiff Lopez was terminated in connection with an incident in which he permitted armed federal agents to enter the courthouse, thereby violating numerous U.S. Marshall performance standards. (Lopez Dep. 145:18-20).

In this case, the Plaintiffs also complain about their assignments in the new Federal courthouse (*i.e.*, that they were assigned to guard the entrance of the courthouse rather than courtroom or other duties).[3] It is well settled, however, that "[a]bsent some causal link between a common and identifiable wrongful act on the part of the defendant and the **adverse action** taken with respect to each plaintiff, the first prong of Rule 20(a) is not satisfied." *Grayson*, 849 F. Supp at 788 (emphasis added). Plaintiffs' complaints about their assignments do not constitute adverse actions under the ADEA and thus are not cognizable claims. *See Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995) (only "ultimate employment decisions" can constitute "adverse employment actions."). Actions such as "hiring, granting leave, discharging, promoting and compensating" are examples of such actions. *See also Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997)("Undesirable work assignments are not adverse employment actions."); *Reno v. Metro. Transit Auth.*, 977 F. Supp. 812, 824-25 (S.D. Tex. 1997) (attempting to reassign plaintiff's work to other employees in an effort to eliminate her position was not an ultimate employment decision)).

---

[2] See Tab 2. (Attached at Tab 1 is an Affidavit from Defendant's attorney authenticating all deposition excerpts. Excerpts from Plaintiff Fry's deposition are attached under Tab 2; excerpts from Plaintiff Lopez' deposition are attached under Tab 3.)

[3] In both courthouses the CSOs could be assigned to a variety of locations throughout the building. For example, CSOs could be assigned to the front entrance to the building, jury duty, the control room, the courtrooms and to a "rover" position, in which the CSO monitored the hallways and was assigned to various duties on an "as needed" basis.

-4-

In this case, Plaintiff Lopez testified that there was no particular duty that was preferable, no aspect of the CSO job was more important than another, and that there was no difference in pay depending on whether he was at the front entrance station or other stations. (Lopez Dep. 90:9-11, 85:18-86:7). Plaintiff Fry testified that there was not anything "better" about being assigned to the courtroom as opposed to being assigned to the front entrance of the courthouse building. (Fry Dep. 95:7-11.) Plaintiff Fry also testified that (1) he did not ask to work either the control room or the courthouse shifts (Fry Dep. 97:20-98:1); (2) it did not matter to him whether he worked the control center or not (Fry Dep. 97:14-16); and (3) that he was "fine" working wherever he was asked to work. (Fry Dep. 98:6-8.) Accordingly, because the Plaintiffs' alleged complaints about their assignments do not constitute "adverse actions," they cannot establish the first prong of Rule 20(a) and the Court must sever their claims.

      **2.     No common questions of law or fact.**

Additionally, no common questions of law or fact exists between Plaintiffs' cases, within the meaning of the second prong of Rule 20(a). "It is, of course, true that plaintiffs have alleged against defendant claims based on the same general theories of law, but this is not sufficient." *Grayson*, 849 F. Supp. at 789 (quoting *North Am. Rockwell*, 50 F.R.D. at 524). *Accord Anderson*, 655 F. Supp. at 565; *Martinez v. Safeway Stores, Inc.*, 66 F.R.D. 446, 449 (N.D. Cal. 1975). *See also Fleming v. Home Depot U.S.A.*, 83 Fair Empl. Prac. Cas. (BNA) 1132, 1134 (S.D. Fla. 1988) (noting that although all of plaintiffs' claims were brought under § 1981, Title VII, and the Florida Civil Rights Act, "the fact that all of Plaintiffs' claims arise under the same general law does not necessarily establish a common question of law.").

While the Plaintiffs assert some similar legal claims, they also assert different legal claims. Specifically, Plaintiff Lopez also asserts a claim for failure to promote him to the lead CSO position. Plaintiff Fry does not. This difference in claims warrants severance of Plaintiffs'

claims into two separate actions. *See Bernardi v. City of Scranton*, 101 F.R.D. 411, 413 (M.D. Pa. 1983) (refusing to consolidate plaintiff's lawsuit with that of other employees where plaintiff asserted age discrimination claim in addition to claims similar to those of other employees).

Furthermore, the Plaintiffs' claims involve different questions of fact. As explained above, the Plaintiffs' separation from employment and Plaintiff Lopez' failure to promote claim, which underlie their age discrimination claims, were discrete events which occurred months apart. Moreover, the factual circumstances of the alleged complaints about their assignments are different. First, their complaints arose only after they moved to the new federal courthouse. Plaintiff Fry worked in the new courthouse approximately two months while Plaintiff Lopez worked in the new courthouse for seven months. Second, Plaintiff Lopez admitted that he worked in various courtrooms in the new building, including Judge Recio, Judge Schmidt and Judge Black's courtrooms (Lopez Dep. 109:17-110:10, 111:22-24). Fry testified that he regularly worked at the front entrance. Finally, while Lopez complained about the assignments, Fry testified that he was fine working wherever he was asked to work. (Fry Dep. 98:6-8). The Plaintiffs' intentional infliction of emotional distress claims also involve different questions of fact because they are premised on their terminations, which, as noted above, involve distinct and unrelated circumstances. (Lopez Dep. 207:15-26, 208:1-9; Fry Dep. 158:22-160:10). Because the factual and legal questions surrounding the Plaintiffs' claims are based upon wholly distinct circumstances with respect to each Plaintiff, there is consequently a complete lack of common questions of fact or law, the second element required by Rule 20(a), and the actions must be severed on this ground as well. *Bailey*, 196 F.R.D. at 517; *Grayson*, 849 F. Supp. at 789; *North Am. Rockwell*, 50 F.R.D. at 524.

**B.**     **Alternatively, Plaintiffs' Claims Should be Tried Separately to Avoid Jury Confusion and to Eliminate Prejudice to Akal.**

Moreover, it would be highly prejudicial to Akal for Plaintiffs' cases to be presented to one jury.  Accordingly, in the alternative, Defendant requests separate trials.  In this regard, Rule 42(b) provides, in pertinent part:

> **Separate Trials.**  The court, in furtherance of convenience *or to avoid prejudice*, . . . may order a separate trial of *any claim*, cross-claim, counterclaim, or of *any separate issue or any number of claims*, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right to trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed. R. Civ. P. 42(b) (emphasis added).  Akal submits that separate trials on Plaintiffs' claims are warranted because trying both cases together would substantially prejudice Akal and confuse the jury.

Each Plaintiff must prove liability on the part of Akal with respect to the alleged adverse actions Akal is alleged to have taken with respect to him.  "It is precisely this need to focus the jury's attention on the merits of each individual plaintiff's case that counsels against proceeding with these cases in one consolidated trial."  *Grayson*, 849 F. Supp. at 790.  *Accord Bailey*, 196 F.R.D. at 518.  Plaintiffs complain about their terminations, which occurred at different times and for different reasons.  Furthermore, Plaintiff Lopez asserts a failure to promote claim which is completely different from, and unrelated to, any of the claims asserted by Plaintiff Fry. Finally, each Plaintiff will also be required to prove that he met the administration prerequisites for bringing suit under the ADEA and TCHR (i.e., filed a timely charge of discrimination and received a notice of right to sue).   This will also involve complete different factual circumstances.

The facts and circumstances of each Plaintiffs' separation from employment would need to be heard and analyzed by the jury.  "A single trial would require the jury to keep separate each

plaintiff's individualized claim and work history, presenting the jury with the 'hopeless task of trying to discern who did and said what to whom and for what reason.'" *Bailey*, 196 F.R.D. at 518 (quoting *Moorhouse v. Boeing Co.*, 501 F. Supp. 390, 392 (E.D. Pa. 1980)). The jury may simply resolve the confusion by considering all the evidence to pertain to both plaintiffs' claims, even when it is relevant to only one plaintiff's case. *Bailey*, 196 F.R.D. at 518. There is a substantial danger that the variety of facts and circumstances would confuse the jury or that the circumstances of one of the Plaintiffs could bias the jury, thus prejudicing Akal with respect to the other Plaintiff's claims. *Id.*

Because of the different factual situations and legal claims asserted by Plaintiffs:

> it would be prejudicial to defendant were the claims of [the plaintiffs] to be tried at the same time. The work history of each plaintiff was quite different, and the claims and defenses of each can be fairly considered only in light of the separate work history of each. . . . [P]laintiffs' claims will be tried before a jury, and it is highly likely that confusion will result when the different facts pertaining to these different claims are presented at a single trial. No prejudice can result to each plaintiff if each claim is tried separately, but the same cannot be said insofar at the defendant is concerned. . . . [I]n view of the different facts which are pertinent to each of these . . . claims, defendant would suffer prejudice if the claims were tried together.

*Weir*, 41 Fair Empl. Prac. Cas. (BNA) at 1155 (granting defendant's motion for severance of two employees' age discrimination claims under Rule 21). *See also Bailey*, 196 F.R.D. at 578 (recognizing that separate trials of plaintiffs' discrimination claims were appropriate to avoid prejudice to defendant). To avoid prejudice to Akal, the claims of each Plaintiff should be tried in separate trials.

### III.  CONCLUSION

For the foregoing reasons, Akal respectfully requests that Plaintiffs' claims be severed into two separate actions or, alternatively, that the claims of each Plaintiff be tried in separate trials.

Dated:  February 1, 2002          Respectfully submitted,

Raquel G. Pérez
Attorney-in-Charge
State Bar No. 00784746
Southern District Bar No. 19187
J. Tullos Wells
State Bar No. 21146500
Southern District Bar No. 8337
Bracewell & Patterson, L.L.P.
106 South St. Mary's Street
Suite 800
San Antonio, Texas 78205
Telephone:  (210) 226-1166
Facsimile:  (210) 226-1133

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

## CERTIFICATE OF CONFERENCE

Defendant's counsel conferred with Plaintiffs' counsel's office regarding the substance of this motion, who indicated that he is opposed to the motion.

Raquel G. Pérez

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendant's Motion to Sever or, in the Alternative, for Separate Trials with Supporting Authorities has been sent by certified mail, return receipt requested, to counsel of record for Plaintiff, Michael Raphael Cowen, 765 East 7th Street, Suite A, Brownsville, Texas 78520 on the 1st day of February, 2002.

Raquel G. Pérez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and | § | |
| MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-01-72 |
| | § | |
| AKAL SECURITY, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF DEFENDANT'S ATTORNEY

1.    My name is Raquel G. Perez and I am an attorney of record for Akal Security, Inc., Defendant in the above-entitled and numbered action.  On behalf of Defendant, I took the oral deposition of Plaintiff Allen Fry on December 10, 2001, and the oral deposition of Plaintiff Miguel Lopez on December 11, 2001, before a certified shorthand court reporter and notary public in and for the state of Texas.

2.    We have received copies of the court reporter's transcripts of the oral depositions of Allen Fry and Miguel Lopez together with the exhibits attached thereto.

3.    Attached to Defendant Akal Security, Inc's Motion to Sever or, in the Alternative, for Separate Trials with Supporting Authorities, are excerpted portions and selected exhibits of the deposition of Allen Fry and excerpted portions and selected exhibits of the deposition of Miguel Lopez.  I certify that the excerpts and selected deposition exhibits attached to Defendant Akal Security, Inc.'s Motion to Sever or, in the Alternative, for Separate Trials with Supporting Authorities are true and correct copies of the transcription and exhibits of said depositions provided to us by the court reporter.

4.      I have read the foregoing Declaration consisting of two pages, including this page,

and I declare, under penalty, that the foregoing is true and correct.

Executed on January 31, 2002.

Raquel G. Perez

1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                   BROWNSVILLE DIVISION

3

4    ALLEN FRY AND MIGUEL LOPEZ,  *
         Plaintiffs,               *
5

6    VS.                           *    CASE NO. B-01-CV-72

7

8    AKAL SECURITY, INC.,          *
         Defendant.                *
9

10

11

12

13

14                       ORAL DEPOSITION

15                            OF

16                        ALLEN FRY

17                    DECEMBER 10, 2001

18

19

20

21

22

23

24

25

```
09:48:03    1              (Time 9:48.)

            2              ALLEN FRY, the witness, being duly

            3    cautioned and sworn to tell the truth, the whole truth

            4    and nothing but the truth, testified as follows:

            5                         EXAMINATION

09:48:07    6    BY MS. PEREZ:

09:48:07    7         Q.    Good morning, Mr. Fry.

            8         A.    Morning.

09:48:09    9         Q.    My name is Raquel Perez.  I'm one of the

09:48:12   10    attorneys for Akal Security, and I'm going to be

09:48:16   11    asking you some questions today in connection with your

09:48:17   12    lawsuit; okay?

           13         A.    Okay.

J9:48:20   14         Q.    And as the court reporter noted before we went

09:48:22   15    on the record, this deposition is being taken pursuant

09:48:26   16    to the federal rules.  Can you please tell me your full

09:48:29   17    name?

09:48:30   18         A.    Allen, A-l-l-e-n, H. Fry, F-r-y.

09:48:38   19         Q.    What is your current address, Mr. Fry?

09:48:44   20         A.    My current address 102 South Clubhouse Road,

09:48:53   21    Brownsville, Texas.

09:48:54   22         Q.    What is the zip code there?

09:48:57   23         A.    78120.

09:49:00   24         Q.    78120?

09:49:03   25         A.    No.  781 -- it was 120 -- I think it's still
```

| | | |
|---|---|---|
| 13:59:18 | 1 | Q.   Okay.   Is working in the courtroom preferable |
| 13:59:21 | 2 | to working in the front? |
| 13:59:31 | 3 | A.   It would -- yes, it would be, I guess, if |
| 13:59:34 | 4 | you -- depending on -- I can't actually answer that.   I |
| 13:59:40 | 5 | mean, I -- I don't know what -- what we're getting at |
| 13:59:43 | 6 | here. |
| 13:59:45 | 7 | Q.   Is it -- I mean, is there anything better about |
| 13:59:49 | 8 | being assigned to the courtroom as opposed to being |
| 13:59:53 | 9 | assigned to the front entrance of the courthouse |
| 13:59:55 | 10 | building? |
| 13:59:57 | 11 | A.   No, not as far as I know.   I don't know. |
| 14:00:26 | 12 | Q.   Do you know Louis McDaniel? |
| | 13 | A.   Yes. |
| 14:00:29 | 14 | Q.   Who is he? |
| 14:00:30 | 15 | A.   He was the -- I think his title was on-site |
| 14:00:36 | 16 | supervisor or something.   He came down and set up the |
| 14:00:41 | 17 | new court. |
| 14:00:42 | 18 | Q.   He set up the new courthouse? |
| 14:00:44 | 19 | A.   Yeah. |
| 14:00:45 | 20 | Q.   Did you get along with him? |
| | 21 | A.   Yes. |
| 14:00:48 | 22 | Q.   No complaints about him? |
| 14:01:01 | 23 | A.   No, no complaint. |
| 14:01:24 | 24 | Q.   Tell me about the -- there was something called |
| 14:01:26 | 25 | the control center? |

Case 1:01-cv-00072   Document 15   Filed in TXSD on 02/01/2002   Page 15 of 44

| | | |
|---|---|---|
| '4:02:31 | 1 | Q. What was happening? |
| 14:02:33 | 2 | A. Yeah. |
| 14:02:34 | 3 | Q. Kind of who was coming in and who was going |
| 14:02:36 | 4 | out? |
| 14:02:37 | 5 | A. Yeah. Well, anything that was happening inside |
| 14:02:40 | 6 | the cameras, of course, you know. |
| 14:02:41 | 7 | Q. Okay. And was it your understanding that that |
| 14:02:43 | 8 | was to better secure -- to increase security? |
| 14:02:45 | 9 | A. Well, yes, it's better security. It's |
| 14:02:48 | 10 | necessary now days. |
| 14:02:58 | 11 | Q. Did you want to work the control center? |
| 14:03:01 | 12 | A. Well, I -- I would have worked it if they'd |
| 14:03:07 | 13 | assigned -- if they'd assigned me on it. |
| 14:03:09 | 14 | Q. But did it matter to you whether you worked the |
| 14:03:12 | 15 | control center? |
| 14:03:15 | 16 | A. Well, it didn't really matter to me, no. |
| 14:03:20 | 17 | Q. Was there any difference in pay as far as you |
| 14:03:22 | 18 | know for working the control center? |
| 14:03:25 | 19 | A. No, there wasn't any difference in the pay. |
| 14:03:28 | 20 | Q. Did you ever ask to work the control center? |
| 14:03:31 | 21 | A. Never did. |
| 14:03:33 | 22 | Q. Never did? |
| | 23 | A. No. |
| 14:03:38 | 24 | Q. After you moved to the new courthouse, did you |
| 14:03:41 | 25 | ever ask to work in the -- in the courtrooms? |

A. FRY - BY MS. PEREZ

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
|            | 1  | A.    No.                                                    |
| 14:03:50   | 2  | Q.    It didn't make a difference to you.  You just          |
| 14:03:52   | 3  | worked where they asked you to work; right?                  |
| 14:03:57   | 4  | A.    I just wanted to do my job and earn my pay.            |
| 14:04:01   | 5  | That's what I was there for.                                 |
| 14:04:02   | 6  | Q.    Okay.  So wherever they asked you to work, you         |
| 14:04:04   | 7  | were fine with working there?                                |
| 14:04:06   | 8  | A.    Right.                                                 |
| 14:04:07   | 9  | Q.    Is that correct?                                       |
| 14:04:08   | 10 | A.    Well, that's right.                                    |
| 14:04:52   | 11 | Q.    At some point, you had a stroke; correct?              |
| 14:04:56   | 12 | A.    Yes.                                                   |
| 14:04:57   | 13 | Q.    Tell me about that.                                    |
| 14:05:03   | 14 | A.    It was in March or April.                              |
| 14:05:07   | 15 | Q.    Of 1999?                                               |
|            | 16 | A.    Yes.                                                   |
| 14:05:11   | 17 | Q.    And what had happened?  How did the stroke             |
| 14:05:16   | 18 | manifest the itself?                                         |
| 14:05:18   | 19 | A.    Well, I had a clot in the -- that went to my           |
| 14:05:23   | 20 | brain, I guess.                                              |
| 14:05:25   | 21 | Q.    You had a clot in your -- in your brain?               |
| 14:05:28   | 22 | A.    Yeah, uh-huh.                                          |
| 14:05:33   | 23 | Q.    So how did you know you had had a stroke?  Did         |
| 14:05:37   | 24 | you have difficulty breathing or did you faint or what       |
| 14:05:41   | 25 | happened?                                                    |

A. FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 14:16:29 | 1 | you were aware that you had hepatitis C? |
| 14:16:35 | 2 | A.    Yes.  Well, I learned I had it during that |
| 14:16:41 | 3 | time. |
| 14:17:22 | 4 | Q.    Okay.  And after you returned and, in fact, |
| 14:17:25 | 5 | after you were already at the new courthouse -- let me |
| 14:17:38 | 6 | scratch -- scratch that.  Tell me about the date in |
| 14:17:45 | 7 | which you left, August 20th of 1999 when you left work. |
| 14:17:54 | 8 | A.    I came into the office at 11:30 to check in, |
| 14:18:09 | 9 | and I was in the locker room putting on my pistol and |
| 14:18:18 | 10 | my credentials and everything.  And Mr. -- the LCSO |
| 14:18:29 | 11 | handed me a fax from Houston from McDaniel, and it said |
| 14:18:37 | 12 | that I needed to go to their doctor and have a |
| 14:18:42 | 13 | physical.  And I asked him -- I talked to Mr. McDaniel |
| 14:18:50 | 14 | and asked him what was the -- the complaint.  And he |
| 14:18:54 | 15 | said, "Well, you're not kicking quite as high as you |
| 14:18:58 | 16 | used to."  And I said, "Well, I don't kick."  And he |
| 14:19:07 | 17 | says -- in a nasty way, he says, "Well, read the second |
| 14:19:16 | 18 | paragraph of the letter I sent down there.  It will |
| 14:19:20 | 19 | explain."  I said, "Well, who made the complaint |
| 14:19:24 | 20 | against me?"  And he wouldn't tell me.  He said it came |
| 14:19:28 | 21 | from up above.  And I read the letter there.  And it |
| 14:19:32 | 22 | says that they couldn't keep me if I became a danger to |
| 14:19:39 | 23 | myself and the people around me.  I assume that -- by |
| 14:19:53 | 24 | that I shouldn't have assumed, but I -- he's not going |
| 14:20:01 | 25 | to let me work because I can't carry a pistol if I was |

| | | |
|---|---|---|
| 14:20:07 | 1 | injuring myself and the people around me.  So I said |
| 14:20:16 | 2 | I'm -- I want -- I said, "I want a couple hours off to |
| 14:20:22 | 3 | talk to a lawyer."  And I don't know whether he said |
| 14:20:34 | 4 | okay or not, but -- or what he said.  But anyway, I |
| 14:20:39 | 5 | left.  And I came back at 3:00 o'clock.  And he said -- |
| 14:20:54 | 6 | no, I did say when I -- when I took my gear off, I |
| 14:20:58 | 7 | said, "You can -- you know, you can inventory this |
| 14:21:09 | 8 | stuff."  In other words, because I wasn't going to be |
| 14:21:13 | 9 | using it for the time being until I cleared up this |
| 14:21:18 | 10 | mess I was in.  And then I told him I would be back at |
| 14:21:21 | 11 | 3:00.  And I came back at 3:00.  And he said, "No, |
| 14:21:27 | 12 | you -- said something about -- "I talked to Mike |
| 14:21:31 | 13 | Daniel, and he said you -- by you turning your gear in |
| 14:21:41 | 14 | he said you -- you resigned."  And I told him before |
| 14:21:44 | 15 | that, as I left, I said, "I'm not resigning."  And |
| 14:21:49 | 16 | before I left and walked out, you know, to take the two |
| 14:21:53 | 17 | hours of leave without pay, I said, "I'm not resigning. |
| 14:21:56 | 18 | I'm going to be back in a couple of hours," I said. |
| 14:22:02 | 19 | And when I came back at 3:00, he said, "No, you're -- I |
| 14:22:06 | 20 | just talked to McDaniel and he says that you -- you |
| 14:22:10 | 21 | resigned, and you're not with us anymore."  And I tried |
| 14:22:18 | 22 | to talk to him.  That was on Friday.  And I said, "I |
| 14:22:24 | 23 | didn't resign.  And I'll take the physical."  But I |
| 14:22:33 | 24 | said, "We can -- I'll be back Monday morning to work, |
| 14:22:41 | 25 | if we can get this thing straightened out." |

1    A.    Yeah, uh-huh.

14:31:29    2    Q.    So the handgun, the bullets, the badge, and the

14:31:33    3    handcuffs, you put all that down on the table; correct?

14:31:36    4    A.    Yeah.

14:31:36    5    Q.    And you told him he could inventory it;

6    correct?

14:31:39    7    A.    Yes.

14:31:40    8    Q.    Isn't it true, Mr. Fry, that when people in law

14:31:43    9    enforcement-type jobs resign, they simply put -- they

14:31:49    10    simply turn in their credentials and their badge and

14:31:54    11    their -- and their gun?  Isn't that typically how it's

14:31:58    12    done?  Is that true?

14:32:01    13    A.    They -- well, I guess they take the -- you turn

14:32:06    14    in your equipment, yeah.

14:32:07    15    Q.    You turn in your equipment; right?

14:32:09    16    A.    Yeah.

14:32:10    17    Q.    When you resign?

14:32:11    18    A.    But by me saying that I was going to consult a

14:32:19    19    lawyer that sounds like -- in other words, I didn't

14:32:28    20    realize that -- that I had any -- that they were going

14:32:32    21    to just cut me off like that.  In other words, if I was

14:32:36    22    going to see a lawyer about the situation, I think that

14:32:40    23    they -- it was right to let me have a couple of hours

14:32:44    24    after 14 years before they -- before they cut me off.

14:32:52    25    Of course, I had worked different situations and this

| | | |
|---|---|---|
| 16:03:08 | 1 | Q.   But you remember getting that correspondence? |
| 16:03:11 | 2 | A.   Huh?  No, I don't -- |
| 16:03:19 | 3 | MR. WOOD:  Yes.  He's already said that. |
| 16:03:19 | 4 | A.   I don't remember. |
| 16:03:19 | 5 | MR. WOOD:  You don't remember getting this. |
| 16:03:19 | 6 | THE WITNESS:  Huh-uh. |
| | 7 | BY MS. PEREZ: |
| 16:03:21 | 8 | Q.   Have you seen that document before? |
| 16:03:24 | 9 | A.   I don't remember it. |
| 16:03:27 | 10 | Q.   But you did have lots of correspondence with |
| 16:03:29 | 11 | the EEOC; correct? |
| 16:03:31 | 12 | A.   Yes, I did. |
| 16:04:17 | 13 | MS. PEREZ:  You about ready for a short break |
| 16:04:19 | 14 | or do you want to keep going? |
| 16:04:21 | 15 | MR. WOOD:  I'm ready for a break. |
| 16:04:23 | 16 | MS. PEREZ:  Why don't we all take a short |
| 16:04:25 | 17 | break. |
| 16:04:27 | 18 | (Recess taken between 4:04 and 4:12.) |
| 16:12:42 | 19 | BY MS. PEREZ: |
| 16:13:15 | 20 | Q.   Ready to go back on the record? |
| | 21 | A.   Yes. |
| 16:13:19 | 22 | Q.   Did Akal -- did either Akal or anybody working |
| 16:13:23 | 23 | for Akal do anything that you considered outrageous? |
| 16:13:30 | 24 | MR. WOOD:  Object to form. |
| 16:13:37 | 25 | A.   I can't recall right at the moment. |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | BY MS. PEREZ:                                             |
| 16:13:43 | 2  | Q.   Do you think asking you to take a physical was      |
| 16:13:46 | 3  | outrageous?                                              |
|          | 4  | A.   No.                                                 |
| 16:13:53 | 5  | Q.   Do you think that when you were told you were       |
| 16:13:56 | 6  | history on August 23rd of 1999, that that was            |
| 16:14:00 | 7  | outrageous?                                              |
| 16:14:03 | 8  | A.   I felt it wasn't a nice thing to tell anybody       |
| 16:14:07 | 9  | that was ending their career.                            |
| 16:14:18 | 10 | Q.   And I understand that you don't think it was a      |
| 16:14:21 | 11 | nice thing.  But do you believe that was outrageous?     |
| 16:14:25 | 12 | A.   What?                                               |
| 16:14:25 | 13 | Q.   I understand you said that it wasn't a nice         |
| 16:14:28 | 14 | thing to tell people.  But do you believe that it was    |
| 16:14:30 | 15 | outrageous?                                              |
| 16:14:54 | 16 | A.   You're going to have to run that one by me          |
| 16:14:57 | 17 | again.                                                   |
| 16:14:58 | 18 | Q.   Do you think that when you were -- you              |
| 16:15:00 | 19 | testified earlier that you were told you were history    |
| 16:15:04 | 20 | on August 23rd?                                          |
| 16:15:05 | 21 | A.   That's right.                                       |
| 16:15:06 | 22 | Q.   Do you believe that that was -- that act of         |
| 16:15:07 | 23 | telling you you were history was outrageous?             |
| 16:15:14 | 24 | A.   Yes, I think it was an outrageous thing for one     |
| 16:15:20 | 25 | person to say to another one.                            |

A FRY - BY MS PEREZ

'6:15:21   1    Q.    And why is that?

16:15:26   2    A.    Why is that?

16:15:28   3    Q.    Yes.

16:15:30   4    A.    It's just -- it didn't -- isn't decent to talk

16:15:34   5  to anybody like that.

16:15:36   6    Q.    Is there anything else you believe was

16:15:40   7  outrageous?

16:15:42   8    A.    No, nothing outrageous that's --

16:15:49   9    Q.    Sir, so nothing else?

          10    A.    No.

          11    Q.    Is that correct?

16:15:51  12    A.    I can't think of anything right at the moment.

16:16:09  13    Q.    So after your separation from Akal, were you

16:16:13  14  able to continue going on with your life?

16:16:17  15    A.    Well, I managed to.

16:16:22  16    Q.    And, again, you were able to continue being a

16:16:26  17  good husband and a good father?

16:16:29  18    A.    Well, may have been awhile sometimes, otherwise

16:16:38  19  I'm okay.

16:16:39  20    Q.    Otherwise you were okay.

16:16:42  21    A.    Yeah.

16:16:43  22    Q.    I'm sorry.  Was that a "yeah"?

16:16:45  23    A.    Otherwise I was okay, I guess.

16:17:34  24    Q.    I'm handing you what I'm marking as Deposition

16:17:38  25  Exhibit Number 14.  This is some type of certificate of

193

# ERRATA SHEET

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| 42/24 | FROM KINGSVILLE TO KING CITY | I DIDN'T SAY KINGSVILLE |
| 47/19 | SETTING TO SITTING | MISUNDERSTOOD PRONUNCIAT. |
| 76/24 | 11:30 TO 10:30 | GAVE THE WRONG TIME |
| 90/9 | 11:30 TO 10:30 | I AGAIN GAVE WRONG TIME |
| 106/11 | 1975 TO 1985 | I WAS SHOT IN 1975 BUT DEVELOPED DIABETES IN 1985 |
| 107/8 | 11:30 TO 10:30 | I CAME IN AT 10:30 DAILY |
| 108/12 | MIKE TO M$^C$ | PART OF A NAME "M$^C$ DANIEL" |
| 133/2 | READ TO RID | |
| 160/18 | AWHILE TO A LITTLE WILD | COURT REPORTER MIS-UNDERSTOOD WHAT I SAID. |
| 180/15 | THEM TO HIM | |

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West   (210) 698-2727   San Antonio, Texas 78257

1       I HEREBY CERTIFY that I have read the

2  foregoing deposition; and that this deposition,

3  together with any corrections noted on the errata

4  sheet, is a true record of my testimony given at this

5  deposition and all answers are within my personal

6  knowledge and are true and correct.

7

8

9                  ALLEN FRY

10

11       BEFORE ME the undersigned authority,

12  personally appeared ALLEN FRY who, upon his oath,

13  states that all answers given by him in the foregoing

14  deposition are within his personal knowledge and are

15  true and correct.

16       SUBSCRIBED AND SWORN TO BEFORE ME, this

17  __16th__ day of __January__, A.D. 2002.

18

19

20                  NOTARY PUBLIC IN AND FOR

JOSIE O. LUCIO
Notary Public,
State of Texas
My Comm. Exp. 08-22-2004

21                  THE STATE OF TEXAS

22

23  MY COMMISSION EXPIRES __08-22-2004__.

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3

 4   ALLEN FRY AND MIGUEL LOPEZ,  *
         Plaintiffs,             *
 5

 6   VS.                         *   CASE NO.  B-01-CV-72

 7

 8   AKAL SECURITY, INC.,        *
         Defendant.              *
 9
```

STATE OF TEXAS          *
COUNTY OF BEXAR         *

I, SHAN MORRIS BLANCHARD,

Certified Shorthand Reporter in and for the State of

Texas, do hereby certify that the facts stated and set

forth on the caption hereto are true; that after the

witness, ALLEN FRY, had been by me first duly cautioned

and sworn to tell the truth, the whole truth and

nothing but the truth, the foregoing questions were

propounded to him by the attorneys named in the caption

hereto, and that the foregoing answers were made by

said witness at said time in response to said questions

so propounded to him; that the said questions so

propounded to the said witness and the said answers in

response thereto were by me, at said time and place,

taken down in shorthand on the 10th day of December

A.D. 2001, and that the foregoing is a true record of

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West  (210) 698-2727  San Antonio, Texas 78257

1    the testimony given by the witness.

2              Pursuant to information given at the time

3    said testimony was taken, the following includes all

4    parties of record and the amount of time used by each

5    party at the deposition:

6        Ms. Raquel G. Perez          5 hours 17 minutes
         Mr. Rick Wood                0 hours 0 minutes
7              I do further certify that the said

8    deposition, along with all exhibits, was delivered on

9    the _17th_ day of _December_, A.D. 2001 to MR.

10   WOOD for review and signature of the witness, with

11   instructions that the deposition be returned to me

12   within ~~20~~ 30 days of receipt thereof, and that said

13   deposition ~~was/~~was not returned, along with the changes

14   annotated by the witness on the attached errata sheet,

15   and that the charge for the completed deposition is

16   $_____, charged to MS. PEREZ, who has been

17   furnished a true and correct copy of said deposition,

18   along with any exhibits thereto.

19             Said original deposition, ~~having~~

20   ~~been/~~having not been returned to us, ~~was/~~was not

21   forwarded to the custodial attorney for safekeeping on

22   the _17th_ day of _January_, A.D. 2002, and that

23   notification of such action was forwarded to all

24   parties.

25

197



```
 1              WITNESS MY HAND AND SEAL OF OFFICE this the
 2    17th day of January , A.D. 2002.
 3
 4
 5                              Shan Morris Blanchard
      DLF                       SHAN MORRIS BLANCHARD
 6    Certificate No. 3863      Certified Shorthand Reporter
      Exp. Date: 12/31/02       in and for the State of Texas
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3

4    ALLEN FRY AND MIGUEL LOPEZ,  *
          Plaintiffs,             *
5

6    VS.                          *   CASE NO. B-01-CV-72

7

8    AKAL SECURITY, INC.,         *
          Defendant.              *
9

10

11

12

13

14                        ORAL DEPOSITION

15                             OF

16                        MIGUEL LOPEZ

17                      DECEMBER 11, 2001

18

19

20

21

22

23

24

25

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West  (210) 698-2727  San Antonio, Texas 78257

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | (Time 9:36.)                                             |
|          | 2  | **MIGUEL LOPEZ**, the witness, being duly               |
|          | 3  | cautioned and sworn to tell the truth, the whole truth  |
|          | 4  | and nothing but the truth, testified as follows:       |
|          | 5  | EXAMINATION                                              |
| 09:36:11 | 6  | BY MS. PEREZ:                                            |
| 09:36:11 | 7  | Q.   Good morning, Mr. Lopez?                            |
| 09:36:11 | 8  | A.   Good morning, Ms. Perez.                            |
| 09:36:11 | 9  | Q.   I was going to say my name is Raquel Perez.  We    |
| 09:36:11 | 10 | met as you walked in the room this morning.  I am one  |
| 09:36:15 | 11 | of the attorneys for Akal, and I'm going to be asking   |
| 09:36:15 | 12 | you some questions today.  Okay?                         |
| 09:36:17 | 13 | A.   Yes, ma'am.                                         |
| 09:36:17 | 14 | Q.   And as we noted earlier, the deposition is         |
| 09:36:19 | 15 | being taken pursuant to the federal rules.  Can you     |
| 09:36:23 | 16 | please state your name for the record?                  |
| 09:36:26 | 17 | A.   Miguel, M-i-g-u-e-l, Lopez, L-o-p-e-z.             |
| 09:36:33 | 18 | Q.   Do you have a middle initial?                       |
| 09:36:36 | 19 | A.   S for Solis.                                        |
| 09:36:41 | 20 | Q.   What is your current address?                       |
| 09:36:44 | 21 | A.   418 Winnepeg, W-i-n-n-e-p-e-g, Avenue              |
| 09:36:51 | 22 | Brownsville, Texas, 78526.                              |
| 09:36:58 | 23 | Q.   How long have you lived there?                      |
| 09:37:00 | 24 | A.   About 18 years.                                     |
| 09:37:02 | 25 | Q.   Do you own it or rent it?                           |

```
13:26:22   1        Q.    So were you assigned to one position more than
13:26:26   2    another?
13:26:28   3        A.    No, ma'am.  I think it equally all over.
13:26:31   4        Q.    Just kind of depended on what was needed?
13:26:36   5        A.    On what was needed.
13:26:41   6        Q.    Is one aspect of the job more important than
13:26:52   7    another?
13:26:53   8        A.    No, ma'am.
13:26:53   9        Q.    So if you were at the entrance, that wasn't
13:26:56  10    more or less important than being in the courtroom?
13:27:01  11        A.    No, ma'am, not to my thinking.  No.
13:27:06  12        Q.    Or walking judges out, that wasn't more
13:27:09  13    important than being at the entrance?
13:27:12  14        A.    No, ma'am.
13:27:13  15        Q.    There were just different duties and they were
13:27:16  16    all equal; is that correct?
13:27:18  17        A.    Yes, ma'am.
13:27:18  18        Q.    Was there any difference in pay depending on
13:27:21  19    which -- whether you were at the entrance or you were
13:27:24  20    at the courtroom or you were walking judges out?
13:27:28  21        A.    No, ma'am.
13:27:29  22        Q.    No difference in pay?
13:27:31  23        A.    No, ma'am.
13:27:33  24        Q.    And when I ask for no difference in pay, either
13:27:37  25    at the old courthouse or the new courthouse?
```

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:27:41 | 1 | A.   Correct. |
| 13:27:42 | 2 | Q.   And the same thing with the duties at -- either |
| 13:27:45 | 3 | at the old courthouse or the new courthouse, one aspect |
| 13:27:48 | 4 | of the CSO job was not more important than another? |
| 13:27:52 | 5 | A.   No, ma'am. |
| | 6 | Q.   Is that correct? |
| 13:27:53 | 7 | A.   Correct. |
| 13:28:09 | 8 | Q.   There -- can you tell me were there different |
| 13:28:16 | 9 | names for the positions?  Was something called a |
| | 10 | "rover"? |
| 13:28:19 | 11 | A.   In the new courthouse, yes. |
| 13:28:20 | 12 | Q.   They didn't have those different names in the |
| 13:28:23 | 13 | old courthouse? |
| 13:28:24 | 14 | A.   No, ma'am. |
| 13:28:24 | 15 | Q.   What other names did they have in the new |
| 13:28:26 | 16 | courthouse? |
| 13:28:27 | 17 | A.   In the new courthouse, they had rover; they had |
| 13:28:31 | 18 | jury duty; and they had command center, what they |
| 13:28:35 | 19 | called the command center. |
| | 20 | Q.   Okay. |
| 13:28:39 | 21 | A.   And I believe court duty. |
| 13:28:48 | 22 | Q.   And did they have a different -- for entrance, |
| 13:28:51 | 23 | was that a different name? |
| 13:28:54 | 24 | A.   The entrance security, I think.  I'm not sure. |
| 13:28:58 | 25 | Q.   What is a rover? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:33:18 | 1 | of about half hour or so with the magistrate courts. |
| 13:33:23 | 2 | Then I would have to come back to my duty. |

13:33:25  3      Q.   To the front entrance?

13:33:26  4      A.   Yes, ma'am.

13:33:30  5      Q.   Well, was there any particular portion of the

13:33:35  6  job of the job in the new federal courthouse that you

13:33:38  7  wanted to do more than the front entrance?

13:33:41  8      A.   I just wanted a variety of duties.

13:33:43  9      Q.   So there was no one particular duty that was

13:33:46  10  preferable?

13:33:48  11      A.   No, ma'am.  No.  I just wanted to change around

13:33:50  12  and move around.

13:33:57  13      Q.   The U.S. marshals keep coming up today.  What

13:34:30  14  is the relationship as you understand it between Akal

13:34:35  15  and the U.S. marshals?

13:34:38  16      A.   The way I understand it is, Akal has a contract

13:34:42  17  with the marshal service, and the marshal's office kind

13:34:47  18  of oversees the operation.  And I don't know what

13:34:52  19  oversee the operation means, but we have a supervisor

13:34:58  20  for Akal.

13:35:01  21      Q.   But you were not employed by the marshal

13:35:06  22  service?

13:35:08  23      A.   No, ma'am.  I don't think so, unless somewhere

13:35:11  24  it says that I was.  I would like to see that.

13:35:15  25      Q.   As far as you know, you were employed by Akal

| | | |
|---|---|---|
| 14:19:01 | 1 | make me a copy. |
| 14:19:01 | 2 | MR. COWEN:  Okay. |
| 14:19:01 | 3 | MS. PEREZ:  Let's go off the record for a |
| 14:19:01 | 4 | minute. |
| 14:19:02 | 5 | (Recess taken between 2:19 and 2:21.) |
| 14:21:11 | 6 | BY MS. PEREZ: |
| 14:21:13 | 7 | Q.   Okay.  Mr. Lopez, I just handed you Deposition |
| 14:21:16 | 8 | Exhibit Number 13.  These are daily assignments.  Do |
| 14:21:19 | 9 | you recall these documents? |
| 14:21:20 | 10 | A.   Yes, ma'am. |
| 14:21:27 | 11 | Q.   And I'm not going to go through -- these are |
| 14:21:29 | 12 | several pages of documents.  I'm not going to go |
| 14:21:32 | 13 | through each page, but I am going to ask you questions |
| 14:21:36 | 14 | about some of them.  Were these the assignments to |
| 14:21:41 | 15 | where people were stationed? |
| 14:21:43 | 16 | A.   Correct. |
| 14:21:44 | 17 | Q.   And the first page says August 31st of 1999. |
| 14:21:49 | 18 | Do you see that? |
| 14:21:51 | 19 | A.   At the very top, yes, ma'am. |
| 14:21:56 | 20 | Q.   So these are the assignments for that day; |
| 14:21:59 | 21 | right? |
| 14:21:59 | 22 | A.   Correct. |
| 14:21:59 | 23 | Q.   And on that day, you were assigned to |
| 14:22:02 | 24 | magistrate court; correct? |
| 14:22:07 | 25 | A.   Are you looking here or here? |

| | | |
|---|---|---|
| 14:22:12 | 1 | Q.   I'm looking at the bottom. |
| 14:22:14 | 2 | A.   At the bottom part, okay.  Yes. |
| 14:22:17 | 3 | Q.   In Judge Recio's court? |
| 14:22:21 | 4 | A.   Correct. |
| 14:22:22 | 5 | Q.   And on the next page, it says September 9th of |
| 14:22:26 | 6 | '99.  Do you see that? |
| 14:22:27 | 7 | A.   Yes, ma'am. |
| 14:22:27 | 8 | Q.   And on that day, you were assigned to Judge |
| 14:22:33 | 9 | Schmidt's court; is that correct? |
| | 10 | A.   Yes, ma'am.  Correct. |
| 14:22:36 | 11 | Q.   He was a visiting bankruptcy judge? |
| 14:22:38 | 12 | A.   Correct. |
| 14:22:39 | 13 | Q.   The next page of Exhibit 13 says October 6 of |
| 14:22:44 | 14 | '99; correct? |
| 14:22:44 | 15 | A.   Correct. |
| 14:22:46 | 16 | Q.   And that date you worked bankruptcy court; |
| | 17 | correct? |
| 14:22:50 | 18 | A.   Correct. |
| 14:22:53 | 19 | Q.   Now, looking at October 18th of '99, that day |
| 14:22:59 | 20 | you were assigned to Magistrate Recio's court; correct? |
| 14:23:04 | 21 | A.   Yes, ma'am. |
| 14:23:07 | 22 | Q.   Looking at October, looks like, 25th of '99, do |
| 14:23:11 | 23 | you see that? |
| 14:23:13 | 24 | A.   Yes, ma'am. |
| 14:23:16 | 25 | Q.   And that day, it says either you or Zepeda were |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:23:20 | 1 | assigned to Judge Recio's court; correct? |
| 14:23:24 | 2 | A.   Correct. |
| 14:23:24 | 3 | Q.   Looking at the next page, that says November |
| 14:23:30 | 4 | 3rd of '99.  Do you see that? |
| 14:23:32 | 5 | A.   Yes, ma'am. |
| 14:23:33 | 6 | Q.   And that says you were assigned to the |
| 14:23:35 | 7 | bankruptcy Judge Schmidt's court; correct? |
| 14:23:37 | 8 | A.   Correct. |
| 14:23:38 | 9 | Q.   And so you worked there that day; right? |
| 14:23:40 | 10 | A.   Yes, ma'am. |
| 14:23:41 | 11 | Q.   Did you work wherever they asked you to work? |
| 14:23:44 | 12 | A.   Yes, ma'am. |
| 14:23:47 | 13 | Q.   I'm taking you again to November 4th of 1999, |
| 14:23:51 | 14 | the next page.  And that says you were assigned, again, |
| 14:23:56 | 15 | to Judge -- bankruptcy Judge Schmidt's court? |
| 14:23:59 | 16 | A.   Correct. |
| 14:24:03 | 17 | Q.   Next page, November 5th of '99? |
| 14:24:05 | 18 | A.   Uh-huh, yes, ma'am. |
| 14:24:06 | 19 | Q.   That day you worked in Judge Recio's court; |
| 14:24:11 | 20 | correct? |
| 14:24:12 | 21 | A.   Correct. |
| 14:24:13 | 22 | Q.   November 15th of '99, that day you worked in |
| 14:24:17 | 23 | Judge Recio's court and also Judge Black's court? |
| 14:24:21 | 24 | A.   Correct. |
| 14:24:28 | 25 | Q.   I take you to November 16th of '99.  And, |

Case 1:01-cv-00072  Document 15   Filed in TXSD on 02/01/2002  Page 36 of 44

| | | |
|---|---|---|
| 15:36:33 | 1 | A.    No, ma'am, I didn't. |
| 15:37:08 | 2 | Q.    Did you fail to advise Mr. Zepeda when you were |
| 15:37:13 | 3 | late -- going to be late for work? |
| 15:37:18 | 4 | A.    I don't remember ever being late for work, |
| 15:37:20 | 5 | ma'am. |
| 15:37:23 | 6 | Q.    You don't remember telling Bill Sherrill |
| 15:37:25 | 7 | instead of Zepeda? |
| 15:37:27 | 8 | A.    No, ma'am, I don't. |
| 15:37:36 | 9 | Q.    Did you ever tell Paul Infante to stay an hour |
| 15:37:41 | 10 | after his shift? |
| 15:37:42 | 11 | A.    No, ma'am.  It was not my position to do it. |
| 15:37:45 | 12 | Q.    You didn't do it or you don't remember doing |
| 15:37:48 | 13 | it? |
| 15:37:49 | 14 | A.    I don't remember doing it. |
| 15:39:12 | 15 | Q.    Okay.  And you were eventually -- and you were |
| 15:39:14 | 16 | terminated by Akal; correct? |
| 15:39:16 | 17 | A.    Correct. |
| 15:39:17 | 18 | Q.    You were terminated on January 7th of 2000; is |
| | 19 | that correct? |
| 15:39:22 | 20 | A.    Yes, ma'am. |
| 15:39:26 | 21 | Q.    And why do you believe you were terminated by |
| 15:39:29 | 22 | Akal? |
| 15:39:38 | 23 | A.    Well, they claimed that I allowed three FBI |
| 15:39:45 | 24 | agents to come into the building with their weapons, |
| 15:39:56 | 25 | and I believe that's the reason why. |

17:21:44  1      Q.   Do you have any reason to believe that you

17:21:46  2  would think of something else later?

17:21:49  3      A.   I don't know.

17:21:50  4      Q.   Do you have any reason to believe that you

17:21:52  5  would?

17:21:52  6      A.   Could be.

17:21:54  7      Q.   I realize that it could be.  But do you have

17:21:56  8  any reason to believe that it would, that there's

17:21:59  9  something that you haven't --

17:22:00  10      A.   Not right now.  I don't know if I can -- if I

17:22:02  11  will remember something.

17:22:06  12      Q.   You don't know one way or the other whether

17:22:08  13  you'll remember something?

17:22:10  14      A.   No, ma'am, I can't.  I'm sorry.  But I can't.

17:22:30  15      Q.   Did Akal do anything that you consider

17:22:32  16  outrageous?

17:22:41  17      A.   Except firing me?

        18      Q.   Right.

17:22:44  19      A.   And all this.

17:22:45  20      Q.   When you say "all this," you mean the

17:22:46  21  investigation?

17:22:47  22      A.   The whole thing, yes.  Besides that and the

17:22:50  23  firing, no.

17:22:51  24      Q.   Okay.  So the investigation of the December

17:22:53  25  14th incident and the firing; correct?

17:22:57  1      A.    And the responses to all the letters and

17:22:59  2   complaints and all that, all that's something to one.

17:23:03  3   Besides that, I don't have any.

17:23:05  4      Q.    Okay.  When you say "the responses to the --

17:23:07  5   you mean to the EEOC?

17:23:10  6      A.    No, no.  The talks that I had with McDaniel and

17:23:14  7   Robert Cervantes and what happened to the FBI agent and

17:23:20  8   everything in one lump.  Besides that and my

17:23:24  9   termination, no, I don't have.

17:23:27  10     Q.    Okay.  During your discussions with McDaniel,

17:23:30  11  was he -- was he nice to you?

17:23:37  12     A.    Yes, ma'am.

17:23:38  13     Q.    And you were nice to him; right?

17:23:40  14     A.    Yes, ma'am.

17:23:41  15     Q.    And during your discussions with R.C.

17:23:45  16  Cervantes, were you nice to him?

17:23:47  17     A.    Yes, ma'am.

17:23:47  18     Q.    And was he nice to you?

17:23:48  19     A.    Yes, ma'am.

17:23:49  20     Q.    And during your discussions with the FBI

17:23:51  21  agents, were you nice to them?

17:23:53  22     A.    Yes, ma'am.

17:23:53  23     Q.    Were they nice to you?

17:23:54  24     A.    No, ma'am.

17:23:55  25     Q.    The FBI agents were not?

1    ERRATA SHEET

2  PAGE/LINE      CHANGE                REASON

3   21   6      Emmy to M.          correction

4   32   4      Cried to Tried          "

5   35   5      with not for            "

6   34   2      of Service not Serviced   " '

7   58   2      Glyneo not Lincoln       "

8   69   24     Gun locker not County locker  "

9   89   23     mag Court instead of MAIN Court  "

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            I HEREBY CERTIFY that I have read the
 2      foregoing deposition; and that this deposition,
 3      together with any corrections noted on the errata
 4      sheet, is a true record of my testimony given at this
 5      deposition and all answers are within my personal
 6      knowledge and are true and correct.
 7
 8
 9                              _Miguel Lopez_____
10                              MIGUEL LOPEZ
11            BEFORE ME the undersigned authority,
12      personally appeared MIGUEL LOPEZ who, upon his oath,
13      states that all answers given by him in the foregoing
14      deposition are within his personal knowledge and are
15      true and correct.
16            SUBSCRIBED AND SWORN TO BEFORE ME, this
17      _10th_ day of _January_____, A.D. 2002.
                                             2001
18
19
20      JOSIE O. LUCIO          _Josie O. Lucio_____
        Notary Public,
        State of Texas         NOTARY PUBLIC IN AND FOR
21      My Comm. Exp. 08-22-2004  THE STATE OF TEXAS
22
23      MY COMMISSION EXPIRES _08-22-2004_.
24
25
```

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3

4   MIGUEL LOPEZ AND MIGUEL LOPEZ,    *
        Plaintiffs,                   *
5

6   VS.                              *  CASE NO. B-01-CV-72

7

8   AKAL SECURITY, INC.,             *
        Defendant.                   *
9   _____*_____
    STATE OF TEXAS          *
10  COUNTY OF BEXAR         *

11                          I, SHAN MORRIS BLANCHARD,

12  Certified Shorthand Reporter in and for the State of

13  Texas, do hereby certify that the facts stated and set

14  forth on the caption hereto are true; that after the

15  witness, MIGUEL LOPEZ, had been by me first duly

16  cautioned and sworn to tell the truth, the whole truth

17  and nothing but the truth, the foregoing questions were

18  propounded to him by the attorneys named in the caption

19  hereto, and that the foregoing answers were made by

20  said witness at said time in response to said questions

21  so propounded to him; that the said questions so

22  propounded to the said witness and the said answers in

23  response thereto were by me, at said time and place,

24  taken down in shorthand on the 10th day of December

25  A.D. 2001, and that the foregoing is a true record of
```

 1  the testimony given by the witness.

 2          Pursuant to information given at the time

 3  said testimony was taken, the following includes all

 4  parties of record and the amount of time used by each

 5  party at the deposition:

 6     Ms. Raquel G. Perez          5 hours 17 minutes
       Mr. Rick Wood                0 hours 0 minutes
 7          I do further certify that the said

 8  deposition, along with all exhibits, was delivered on

 9  the _19th_ day of _December_, A.D. 2001 to MR.

10  COWEN for review and signature of the witness, with

11  instructions that the deposition be returned to me

12  within ~~20~~ 30 days of receipt thereof, and that said

13  deposition was/~~was not~~ returned, along with the changes

14  annotated by the witness on the attached errata sheet,

15  and that the charge for the completed deposition is

16  $_____, charged to MS. PEREZ, who has been

17  furnished a true and correct copy of said deposition,

18  along with any exhibits thereto.

19          Said original deposition, having

20  been/~~having not been~~ returned to us, was/~~was not~~

21  forwarded to the custodial attorney for safekeeping on

22  the _14th_ day of _January_, A.D. 2002, and that

23  notification of such action was forwarded to all

24  parties.

25

1      WITNESS MY HAND AND SEAL OF OFFICE this the

2   __14___ day of _January__, A.D. 2001.

3

4

5                        Shan Morris Blanchard

6   DLF                  SHAN MORRIS BLANCHARD
    Certificate No. 3863  Certified Shorthand Reporter
    Exp. Date: 12/31/02   in and for the State of Texas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and | § | |
| MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-01-72 |
| | § | |
| AKAL SECURITY, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING DEFENDANT
AKAL SECURITY, INC.'S MOTION TO SEVER**

On this day came on for consideration Defendant Akal Security, Inc. Motion to Sever or,
in the Alternative, for Separate Trials with Supporting Authorities, and this Court, having
considered all matters before it, is of the opinion that Akal Security, Inc.'s Motion is well taken
and that the claims of Plaintiffs Fry and Lopez should be severed into two separate actions.

Accordingly, it is hereby ORDERED that Defendant Akal Security, Inc.'s Motion to
Sever is GRANTED.

It is further ORDERED that the claims of Plaintiffs Fry and Lopez be severed into two
separate actions and assigned different docket numbers, and that the cases shall proceed
separately and independently.

SIGNED this _____ day of _____, 2002.

_____
Judge Filemon B. Vela
UNITED STATES DISTRICT JUDGE

SA:583136