*l9*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 1 5 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendant. | § | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## ON CLAIMS ASSERTED BY PLAINTIFF MIGUEL LOPEZ

---

Raquel G. Pérez
Attorney-in-Charge
State Bar No. 00784746
Southern District Bar No. 19187
J. Tullos Wells
State Bar No. 21146500
Southern District No. 8337
BRACEWELL & PATTERSON, L.L.P.
106 South St. Mary's Street, Suite 800
San Antonio, Texas 78205-3603
Telephone: (210) 226-1166
Facsimile: (210) 226-1133

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## ON CLAIMS ASSERTED BY PLAINTIFF MIGUEL LOPEZ

NOW COMES Defendant, Akal Security, Inc. ("Akal"), and pursuant to Fed. R. Civ.

P. 56 respectfully moves the Court to enter judgment in its favor on all of Plaintiff's claims on

the ground that there is no genuine issue of material fact and Akal is entitled to judgment as a

matter of law. In support of this Motion, Akal respectfully shows the court the following:

I.

### PRELIMINARY STATEMENT

Plaintiff Miguel Lopez ("Lopez") was a Court Security Officer in the United States

District Court for the Southern District of Texas, Brownsville Division, and subject to a

Collective Bargaining Agreement ("CBA") between Akal and the United Government Security

Officers of America, Local 108 ("Union").

Lopez failed to bring a grievance in accordance with the CBA, but instead, brought this

lawsuit, asserting claims for (1) age discrimination under the Age Discrimination in Employment

Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and under the Texas Commission on Human Rights Act,

Texas Labor Code § 21.001 *et seq.* ("TCHRA"); and (2) intentional infliction of emotional

distress.  Lopez' claims of age discrimination are three-fold:  (1) that he was terminated because

of his age; (2) that after the new federal courthouse opened in mid-June 1999, he was assigned to

guard the front entrance because of his age; and (3) that he was not given a promotion to a "lead"

CSO position because of his age.

Akal is entitled to judgment on a matter of law on all of Lopez' claims because (1) Lopez'

state law claims under the TCHRA and for intentional infliction of emotional distress are

preempted by Section 301 of the Labor Management Relations Act; (2) Lopez' promotion claim

under the TCHRA is barred by limitations; (3) Lopez cannot establish a *prima facie* case of age

discrimination under the ADEA or TCHRA; (4) Lopez has no evidence that Akal's legitimate,

nondiscriminatory reason for terminating his employment (*i.e.*, the December 14, 1999 incident)

is a pretext for age discrimination; and (5) Lopez has failed to come forward with any evidence

that Akal's conduct was extreme and outrageous or that he suffered severe emotional distress.

## II.

## STATEMENT OF UNDISPUTED FACTS[1]

**A.      Nature of Akal's Business and Relationship With U.S. Marshal Service.**

Akal is a security company that provides security services primarily to government

facilities throughout the United States.  One of Akal's primary contracts is with the United States

Marshall Service ("USMS") and the Department of Justice ("DOJ") to provide security for

federal buildings and courthouses all over the nation.   Under its contract with the USMS/DOJ,

Akal has the responsibility of providing security personnel, i.e. Court Security Officers ("CSO"),

for the United States District Court for the Southern District of Texas, including the Brownsville

---

[1] These facts are deemed undisputed for purposes of this Summary Judgment Motion
only.

Division. This contract states that the primary function of a CSO is to ensure the safety and security of those individuals inside the courthouse. *See* affidavit of Louis McDaniel at ¶ 2, attached at Tab 6.

The USMS takes an active role in Akal's employment decisions with respect to CSOs. For example, the USMS must approve all CSO applications before an individual can begin providing services to the USMS. The USMS may also direct Akal to reject a CSO application, remove a CSO from his or her position or impose discipline on a CSO. This direction from the Marshal Service may be formal or informal. In this regard, in the event the USMS directs Akal to remove a CSO from a contract, Akal is required to do so in order to comply with its contractual obligations. Significantly, if the USMS determines that Akal is not performing under one of its contracts, the USMS has the authority to remove Akal from its contracts in all eight judicial circuits, which constitutes approximately 85 percent of Akal's business. *See* affidavit of Sat Nirmal Khalsa at ¶ 3, attached at Tab 7.

**B.     Court Security Officers.**

To achieve total security of the courthouse, CSOs are assigned to different posts including – the front entrance, the courtrooms, roving patrols inside the building, and roving patrols outside the building. Additionally, CSOs are assigned to the control room to monitor surveillance cameras. (P. Dep. 48:4-11; 59:11-23, at Tab 2).[2] All assignments are equal and necessary for the safe protection of the courts. There is no difference in pay or status between the different assignments in the courthouse. (P. Dep. 85:6-86:1, at Tab 2). All areas are dependent upon the other to insure the safety of all persons working in or having business within the courthouse. (McDaniel Aff. at ¶ 4, attached at Tab 6).

---

[2] All references to Plaintiff's deposition are attached at Tab 2.

Due to the extensive experience and training levels required to qualify for the position of CSO, a majority of the CSOs hired by Akal are retired or former federal, state, local and military law enforcement officers. In fact, during the 1999 calendar year, of the approximately eleven CSOs assigned to the Brownsville Division, two were over the age of 40, three were over the age of 50, three were over the age of 60, and three were age 70 or above. (McDaniel Aff. at ¶ 6, attached at Tab 6).

**C.      Plaintiff's Employment With Akal.**

Plaintiff began working for Akal in 1995 as a CSO. (P. Dep. 58:16-59:5, at Tab 2). He was sixty-six at the time he was hired. (P. Dep. 15:15-18, at Tab 2). Pursuant to the contract between Akal and the USMS, all CSOs must comply with performance standards. During his employment, Plaintiff received a copy of the CSO standards of performance certification and was aware that he had to comply with them. (P. Dep. 95:22-96:4; 96:19-24; at Tab 2). Plaintiff also received a copy of Akal's Equal Employment Opportunity Policy which prohibits discrimination on the basis of age. (P. Dep. 99:12-25, at Tab 2; Dep. Exh. 11, attached at Tab 3). Plaintiff enjoyed his job with Akal. (P. Dep. 76:20-22, at Tab 2). He enjoyed the people he worked with, the pay he received and the hours that he worked. (P. Dep. 76:23-79:6; 88:13-89:8, at Tab 2).

**D.      Plaintiff's Assignment at the New Federal Courthouse in Brownsville.**

A new federal courthouse building opened in Brownsville in mid-June of 1999. (P. Dep. 92:14-18, at Tab 2). The majority of Plaintiff's complaints arose after the opening of the new federal courthouse. (P. Dep. 92:7-13, at Tab 2). At the new federal courthouse, Plaintiff was frequently scheduled to guard the front entrance although he was scheduled for courtroom duty as well. (P. Dep. 89:21-90:4; 118:20-119:8, at Tab 2). Plaintiff was assigned to work in courtrooms at the new federal courthouse on at least the following dates: August 31, 1999;

September 9, 1999; October 6, 1999; October 18, 1999; October 25, 1999; November 3, 1999; November 4, 1999; November 5, 1999; November 15, 1999; November 16, 1999; November 17, 1999; November 18, 1999; November 23, 1999; November 30, 1999; December 1, 1999; December 7, 1999; December 13, 1999; December 14, 1999; December 16, 1999; December 27, 1999; January 5, 2000; and January 7, 2000. (P. Dep. 109:7-114:22, at Tab 2; Dep. Exh. 13, attached at Tab 4). There was no duty at the new federal courthouse that was preferable to the Plaintiff. However, Plaintiff wanted a variety of duties. (P. Dep. 90:5-12, at Tab 2).

**E.      Lead Court Security Officer Position.**

One of the CSOs at the Brownsville, Texas federal courthouse is designated as a "lead CSO." A lead CSO heads up the operations at the courthouse and prepares schedules for the CSOs. (P. Dep. 101:24-102:16, at Tab 2). In the summer of 1999, a lead CSO position became available. Plaintiff did not apply for the position. (P. Dep. 137:13-20, at Tab 2). Roy Zepeda was selected for the vacant lead CSO position on June 7, 1999, based on the recommendation of the USMS and his experience. (P. Dep. 103: 5-14, at Tab 2; McDaniel Aff. at ¶ 5, attached at Tab 6).

**F.      Plaintiff's Termination From Employment.**

While Plaintiff was employed with Akal, Akal had orders posted which stated, "No one is to be permitted past security screening with a firearm except United States Marshall Service, United States Probation and Federal Protective Service," and Plaintiff was aware of this policy. (P. Dep. 163:15-164:22, at Tab 2).

On December 14, 1999, three FBI agents entered the federal courthouse in Brownsville, Texas. (P. Dep. 148:5-7, at Tab 2). That same day Robert Cervantes, a U.S. Marshal Representative, informed Akal that the Plaintiff had wrongfully allowed three FBI agents to enter into the federal courthouse in Brownsville, Texas, without first ensuring that their weapons were

secured in designated lockers. Mr. Cervantes further reported to Akal that when he asked Mr. Lopez whether the agents had entered the courthouse with weapons, Mr. Lopez replied, "No, they are FBI agents going to the AUSA office for a meeting." Mr. Cervantes also told Akal that one of the FBI agents later told him that Mr. Lopez had permitted the FBI agents to enter the building with their weapons. Mr. Cervantes also sent Akal a letter detailing the information regarding the incident. (McDaniel Aff. at ¶ 7; letter from Mr. Cervantes is attached at Tab 6A). Finally, the USMS representative, Mr. Cervantes, also informed Akal that he no longer trusted Mr. Lopez to be employed as a CSO in the Brownsville federal courthouse. Based on Akal's understanding of the USMS, Akal understood this statement to be a directive to remove Mr. Lopez from his position as a CSO. (McDaniel Aff. at ¶ 7, attached at Tab 6).

Akal investigated this situation by discussing the situation with Mr. Cervantes, obtaining a written statement from Mr. Cervantes, obtaining a written statement from the FBI and obtaining a statement from Mr. Lopez. (Khalsa Aff. at ¶ 4, statements obtained from Mr. Cervantes, the FBI and Mr. Lopez attached at Tabs 7A, 7B and 7C, respectively). Significantly, in connection with Akal's investigation, an FBI representative provided a written statement indicating that the FBI agents were at the courthouse to arrest a DEA agent on a murder-for-hire charge and that Lopez permitted them to enter the courthouse with their weapons because he believed that they were only going to the U.S. Attorney's Office. The FBI statement also provides that the agents became concerned because if they had been permitted to enter with their weapons, the DEA agent may also have been permitted to keep his weapon. Accordingly, the FBI agents reported the incident to the USMS Representative, Robert Cervantes. *See* FBI statement attached at Tab 7B.

In connection with Akal's investigation, Akal's Chief Executive Officer, Sat Nirmal Khalsa, determined that Mr. Lopez violated several CSO performance standards which were sufficient grounds for termination. Accordingly, based on the direction of the U.S. Marshal representative, Robert Cervantes, Ms. Khalsa terminated Mr. Lopez' employment with Akal. (Khalsa Aff. at ¶ 6, attached at Tab 7).

## G.    Collective Bargaining Agreement.

Akal and the International Government Security Officers of America, Local 108, entered into a collective bargaining agreement which governs the employment of all CSOs at the Brownsville federal courthouse. Plaintiff did not use the grievance procedure to complain about the selection of Mr. Zepeda, about being assigned at the front entrance, or about his termination. (P. Dep. 100:8-101:2; 133:25-134:3, at Tab 2; McDaniel Aff. at ¶ 8, attached at Tab 6).

## III.

## ARGUMENT AND AUTHORITIES

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment in federal court. The United States Supreme Court has clarified the burdens that a party must meet to obtain summary judgment under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 2552-53 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88, 106 S. Ct. 1348, 1356-57 (1986). The Supreme Court stated in *Celotex* that Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. The moving party must demonstrate that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law. "[T]he plaintiff must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514 (1986) (emphasis added). Speculation, conjecture and surmise by the non-moving party do not constitute the requisite affirmative evidence and cannot serve to defeat a motion for summary judgment. According to the Supreme Court, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S. Ct. at 2555 (citation omitted).

A.    **AKAL'S MOTION FOR SUMMARY JUDGMENT MUST BE GRANTED ON LOPEZ' STATE LAW CLAIMS FOR AGE DISCRIMINATION UNDER THE TCHRA AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE SUCH CLAIMS ARE PREEMPTED BY SECTION 301 OF THE LMRA.**

In the seminal case of *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962), the Supreme Court held that federal law preempts state law in matters involving CBAs:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might some day be invoked in enforcing the contract.

*Id.* at 103.

Subsequently, in *Allis*-Chalmers *Corp. v. Lueck*, 471 U.S. 202, 105 S. Ct. 1904, 1916 (1985), the Supreme Court held that § 301 preemption applied to a tort action by an employee against an employer and insurer for alleged bad faith in handling a claim under a non-occupational disability insurance plan that was included in a CBA. The Court held "that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a

§ 301 claim, or dismissed as pre-empted by federal labor contract law." *Id.* (citation omitted).

The Court explained its holding with the following comments:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* 471 U.S. at 211, 105 S. Ct. at 1911. *See also Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987) ("Inasmuch as federal law must control the uniform meaning given to contract terms in a collective-bargaining agreement, however, an employee's state law tort action that necessarily rests on an interpretation of those terms is pre-empted by § 301.").

Here Lopez' claims for intentional infliction of emotional distress and under the TCHRA arise in part from his allegation that Akal terminated him due to his age. The resolution of these claims necessarily requires the court to resolve whether Akal violated the terms of the CBA that prohibits discrimination based on age and governs Akal's treatment of its employees.

Section 1.6 of the CBA specifically governs Akal's obligations to its employees with respect to equal employment opportunities and prohibits age-based discrimination as follows:

> The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representative nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. *Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.*
>
> *The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union*

> *philosophy, and the parties agree to work sincerely and wholeheartedly toward*
> *the accomplishment of this objective.*

(McDaniel Aff.; Collective Bargaining Agreement attached at Tab 6B).

Section 1.6 specifically provides the manner in which Akal must conduct itself with respect to equal employment opportunities. Under the terms of the CBA, Akal is strictly prohibited from discriminating against any employee on the basis of age. Because the Court is required to resolve whether Akal engaged in intentional discrimination to resolve Fry's state law claims, it necessarily requires an application of the CBA's non-discrimination provisions. Accordingly, such claims are preempted by § 301 and Akal is entitled to summary judgment on these claims as a matter of law. *See Barrow v. New Orleans S.S. Ass'n.*, 10 F.3d 292. 300 (5th Cir. 1994) (concluding that intentional infliction claim preempted by the LMRA because plaintiff's alleged emotional distress "derived from the age discrimination [plaintiff] says he suffered at the hands of defendants."); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635-36 (5th Cir. 1994) (to determine whether plaintiff had proven intentional infliction claim, court must examine management's conduct under the circumstances, which were contractual, not merely factual; therefore claim preempted by § 301 of LMRA because collective bargaining agreement is crucial component of circumstances to be considered); *Bagby v. Gen. Motors Corp.*, 976 F.2d 919, 921-22 (5th Cir. 1992) (defamation and intentional infliction claims based on employer's investigation of alleged theft preempted by LMRA because employer's actions taken in accordance with provisions of the collective bargaining agreement); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 488 (5th Cir. 1996) (claim for race discrimination under the TCHRA preempted under § 301 because analysis of discrimination claim necessarily required application of the provision set forth in the CBA governing management's conduct).

**B.    AKAL IS ENTITLED TO SUMMARY JUDGMENT ON LOPEZ' AGE DISCRIMINATION CLAIMS UNDER THE ADEA AND TCHRA.**

Additionally, Akal remains entitled to summary judgment on Lopez' claims of age discrimination. Lopez asserts three allegations of age discrimination in this action under both the ADEA and the TCHRA -- that he was assigned to the entrance of the new federal courthouse because of his age, that he did not receive the lead CSO position because of his age, and that he was terminated because of his age. Each of these claims fails under the ADEA and the TCHRA.[3] The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a) (1). To prevail under the ADEA, the plaintiff must prove that the defendant intentionally discriminated against him. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 149 (5th Cir. 1995).

The evidentiary burdens in an ADEA case are well established. *See Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001) (Title VII and ADEA claims are evaluated within same burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). *See also Reeves*, 530 U.S. at 142-43, 120 S. Ct. at 2105-06. The plaintiff must first present a *prima facie* case of employment discrimination. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350. If the plaintiff meets this burden, the employer must rebut

---

[3] The analysis applicable to Plaintiff's ADEA claims is identical to the analysis applicable to Plaintiff's TCHRA claims. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001). Accordingly, in analyzing the merits of Plaintiff's ADEA claims this section simultaneously analyzes Plaintiff's TCHRA claims and thus provides a basis for summary judgment under both the ADEA and TCHRA.

the presumption of age discrimination by articulating a legitimate nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350. If the employer meets this burden, the plaintiff must prove by a preponderance of the evidence that the employer's articulated reason is a pretext for age discrimination. *Reeves*, 530 U.S. at 142-43, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350.

In an ADEA case, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision (citation omitted). That is, the plaintiff's age must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141, 120 S. Ct. at 2105 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 1706 (1993)).

To establish a *prima facie* case of age discrimination, a plaintiff must show that: (i) he was a member of the class protected by the ADEA (ii) he was otherwise qualified for the position; (iii) he was discharged or subject to an adverse employment action; and (iv) he was replaced by someone significantly younger or outside his protected class. *O'Connor v. Consol. Coin Catereres Corp.*, 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999); *Evans*, 246 F.3d at 350; *See also Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106.

> *1.    In this case, Lopez cannot establish a prima facie case with respect to his assignment claim because he cannot establish that he experienced an adverse employment action.*

Lopez contends that he was discriminated against on account of his age because he was assigned to guard the front entrance of the new federal courthouse. Even taking Lopez' allegations as true, however, Lopez' assignment to the front entrance of the courthouse is not an "adverse employment action" and thus Lopez cannot establish a *prima facie* case as a matter of law.

To satisfy the adverse employment action prong of the *prima facie* case, the plaintiff must show that the defendant took an ultimate employment action against him. *Id.; Jeffrey v. Dallas County Med. Exam'r*, 37 F. Supp. 2d 525, 529 (N.D. Tex. 1999) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705-07 (5th Cir. 1997)); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1060 n.10 (5th Cir. 1998). Examples of ultimate employment actions include: (1) hiring; (2) firing; (3) granting leave; (4) discharging; (5) promoting; and (6) compensating. See 37 F. Supp. 2d at 529. The statute does not reach "other employment-related decisions." For example, undesirable work assignments do not, as a matter of law, constitute adverse employment actions where they have no effect on pay, schedule, or status. *Watts v. Kroger Co.*, 170 F.3d 505, 511-12) (5th Cir. 1999); *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 123-24 (5th Cir. 1990); *Harrington v. Harris*, 108 F.3d 598, 604 (5th Cir. 1997); *Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 555 (5th Cir. 1997).

Here, Lopez admits that his assignment to the front entrance of the courthouse had no effect on his pay, schedule, or status. Moreover, Lopez admits that all of the assignments in the courthouse are equal. During his deposition, Lopez testified as follows:

Q.  Is one aspect of the job more important than another.

A.  No, ma'am.

Q.  So if you were at the entrance, that wasn't more or less important than being in the courtroom?

A.  No, ma'am, not to my thinking. No.

Q.  Or walking judges out, that wasn't more important than being at the entrance?

A.  No, ma'am.

Q.  There were just different duties and they were all equal; is that correct?

A.  Yes, ma'am.

Q. Was there any difference in pay depending on which -- whether you were at the entrance or you were at the courtroom or you were walking judges out?

A. No, ma'am.

Q. No difference in pay?

A. No, ma'am.

(P. Dep. 85:6-23, at Tab 2).

\*    \*    \*

Q. Well, was there any particular portion of the job of the job in the new federal courthouse that you wanted to do more than the front entrance?

A. I just wanted a variety of duties.

Q. So there was no one particular duty that was preferable?

A. No, ma'am. No. I just wanted to change around and move around.

(P. Dep. 90:5-12, at Tab 2).

Accordingly, even if the Court accepts his testimony as true (i.e., that he was assigned to guard the front entrance of the courthouse), Lopez' unequivocal testimony establishes that his assignment was not an adverse employment action. Thus, Plaintiff cannot establish a *prima facie* case on this claim, and Akal is entitled to summary judgment under both the ADEA and the TCHRA as a matter of law.[4]

---

[4] Moreover, Plaintiff admitted that he had been assigned to work in courtrooms in the new federal courthouse on at least twenty-two separate days between August 31, 1999 and his separation from employment on January 7, 2000. (*See* P. Dep. 109:7-114:22, at Tab 2; Dep. Exh. 13, attached at Tab 4). Lopez also admits that he never asked to work in the command center. (P. Dep. 181:12-14, at Tab 2).

**2.     *Defendant is Also Entitled to Summary Judgment on Plaintiff's Claim That He Was Not Selected for the Lead CSO Position.***

      **a.     Plaintiff's complaint that he did not receive the lead CSO position is untimely under the TCHRA.**

Under the TCHRA, a plaintiff has 180 days from the alleged discriminatory conduct to file a charge of discrimination with the TCHR.   Tex. Lab. Code Ann. § 21.202(a).   Plaintiff signed the charge of discrimination on January 7, 2000.   (P. Dep. 180:20-25, at Tab 2; Dep. Exh. 24, attached at Tab 5).   Accordingly, Plaintiff can only bring claims under the TCHRA for any actions that occurred up to 180 days prior to January 7, 2000, or July 12, 2000.   It is undisputed that Roy Zepeda was selected for the lead CSO position on June 7, 1999, more than 180 days before Plaintiff signed his charge.   *See* McDaniel Aff. at ¶ 5, attached at Tab 6.   Since the filing of a timely charge of discrimination is a jurisdictional prerequisite to maintaining a lawsuit under the TCHRA, Plaintiff's failure to promote claim under the TCHRA is barred by his failure to file a timely charge.   *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 486 (Tex. 1991); *Green v. Aluminum Co. of Am.*, 760 S.W.2d 378, 380 (Tex. App.—Austin 1988, no writ).[5]

      **b.     Plaintiff's claims under the ADEA and TCHRA fail because Akal has articulated legitimate, nondiscriminatory reasons for selecting Roy Zepeda for the lead CSO position and there is no evidence of pretext.**

For purposes of this Motion, Defendant will assume that Plaintiff has established a *prima facie* case under the ADEA and TCHRA on his promotion claim.   Even assuming that Plaintiff could establish a *prima facie* case, however, Defendant has articulated a legitimate, nondiscriminatory reason for the selection of Roy Zepeda and Plaintiff has no evidence that such reason is a pretext for age discrimination.   Specifically, the undisputed evidence establishes that Louis McDaniel selected Mr. Zepeda for the lead CSO position based on a recommendation

---

[5] Furthermore, Plaintiff wholly failed to obtain a notice of right to sue from the TCHR.

from the USMS Representative, Robert Cervantes, as well as Mr. Zepeda's experience with the
Cameron County Sheriff's Department. (McDaniel Aff. at ¶ 5, attached at Tab 6). It is also
undisputed that as a result of the contractual relationship between Akal and the USMS, the
USMS can direct some of Akal's actions with respect to CSOs. (Khalsa Aff. at ¶ 3, attached at
Tab 7). Even when the USMS does not provide an express directive to Akal, the USMS's
preferences are given substantial weight. In fact, during his deposition, Plaintiff admitted that
the USMS Representative, Mr. Cervantes, has a "big influence on who will be promoted" and
that Akal must work in accordance with the U.S. Marshal's wishes. (P. Dep. 136:6-137:8, at
Tab 2). Furthermore, during his deposition, Plaintiff has admitted that he has no evidence to
support this claim.

> Q.    Did any supervisor or manager at Akal ever tell you that Mr. Zepeda was
>        selected because he was younger?
>
> A.    No, ma'am.
>
> Q.    Did any supervisor or manager of Akal ever give you anything any writing
>        that indicated that Mr. Zepeda was selected for the position of lead CSO
>        because he was younger?
>
> A.    No, ma'am.
>
> Q.    What facts or basis do you have to believe that Mr. Zepeda was selected
>        for the position of lead CSO because he was younger?
>
> A.    Because he was hired.
>
> Q.    Other than the fact that he was hired, do you have any other facts or basis
>        to believe that the reason he was selected for the position of lead CSO was
>        because he was younger?
>
>                                   *    *    *
>
> A.    No, ma'am.

(P. Dep. 106:10-107:4, at Tab 2).

Accordingly, because there is absolutely no evidence of pretext or that age played any role in Akal's decision to select Mr. Zepeda for the lead CSO position, Defendant is entitled to summary judgment on Plaintiff's promotion claim under both the ADEA and TCHRA.

**3.     *Akal Is Entitled to Summary Judgment on Plaintiff's Termination Claim Because Akal Has Articulated a Legitimate, Nondiscriminatory Reason for Plaintiff's Termination and There Is No Evidence of Pretext.***

Plaintiff's claim that he was terminated because of his age likewise fails under the ADEA and TCHRA.   For purposes of this Motion, Defendant will assume that Plaintiff can establish a *prima facie* case with respect to his discriminatory termination claim.   However, Defendant is still entitled to summary judgment because it has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff has no evidence that such reason is a pretext for age discrimination.

It is undisputed that on December 14, 1999, three FBI agents entered the federal courthouse in Brownsville.   It is also undisputed that the U.S. Marshal Representative at the courthouse that day, Robert Cervantes, reported to Akal that three FBI agents had been permitted to enter the courthouse without securing their weapons.   (McDaniel Aff. at ¶ 7, attached at Tab 6).   It is further undisputed that Akal conducted an investigation into the incident and obtained statements from both USMS Representative, Robert Cervantes, and from the FBI. (Khalsa Aff. at ¶ 4, attached at Tab 7).   It is also undisputed that the USMS Representative indicated that he no longer trusted Lopez to be a CSO at the Brownsville federal courthouse and that Akal interpreted this statement as a directive to terminate Lopez' employment.   (McDaniel Aff. at ¶ 7, attached at Tab 6; Khalsa Aff. at ¶ 5, attached at Tab 7).   Finally, it is undisputed that the individual who terminated Plaintiff's employment was the Chief Executive Officer of Akal, Sat Nirmal Khalsa, and that Ms. Khalsa terminated Plaintiff's employment based on the December 14, 1999 incident and after receiving direction from the USMS Representative.   (*See*

Khalsa Aff. at ¶ 6, attached at Tab 7; P. Dep. 203:23-25, at Tab 2).   In this regard, during his

deposition, Plaintiff admitted that he had absolutely no facts or basis to believe that Ms. Khalsa

would take any action against him based on his age.

> Q:    You don't have any reason to believe that Sat Nirmal Khalsa would take
>       any action against you because of your age; do you?
>
> A.    No.

(P. Dep. 203:15-18, at Tab 2).

Furthermore, Lopez expressly admitted that he has no evidence of pretext:

> Q.    And if Akal states that the reason you were terminated is because of the
>       incident on December 14th of 1999 with the FBI agent, what facts do you
>       have to show that that is not true?
>
> A.    I don't have any facts.

(P. Dep. 211:8-12, at Tab 2).

Lopez has, therefore, failed to meet his evidentiary burden on the issue of pretext, and

Akal is entitled to summary judgment on his discriminatory termination claim under both the

ADEA and TCHRA.

### 4.    *The undisputed evidence establishes that Akal does not make employment decision based on age.*

The undisputed evidence in this case weighs against a finding of age discrimination.

First, Lopez was hired by Akal when he was 66 years old.  (P. Dep. 15:15-18, at Tab 2).  This

provides strong evidence that age is not a factor in Akal's employment decisions. *See, e.g.,*

*Bennett,* 138 F.3d at 1062 (fact that employer hired plaintiff at age 50 and promoted him at ages

52 and 54 weighs against a finding of age discrimination).  Situations such as this "give rise to

the an inference that age discrimination [is] not the motive behind . . .  termination." *Brown v.*

*CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996) (no pretext where employee hired at age 54,

then terminated only four years later when 60 years old).

Second, the make-up of the CSOs employed in the Brownsville courthouse further demonstrates that Akal does not make any decisions on the basis of age. In the 1999 calendar year, which immediately preceded the Plaintiff's termination, there were approximately eleven CSOs assigned to the Brownsville Division. Of these CSOs, two were over the age of 40, three were over the age of 50, three were over the age of 60, and three were 70 or above. (McDaniel Aff. at ¶ 6, attached at Tab 6). Accordingly, all CSOs were above protected age status and over half of the CSOs were over the age of 60. Given that Akal hired Lopez at the age of 66 and that a majority of Akal's workforce in Brownsville were over the age of 60, a finding that Plaintiff was terminated because of his age is without legal or factual basis.

## C.    AKAL IS ENTITLED TO SUMMARY JUDGMENT ON LOPEZ' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

As shown above, Lopez' state law claim for intentional infliction of emotional distress is preempted by § 301 of the LMRA. However, even if Lopez was entitled to bring his state law claim, Akal would still be entitled to summary judgment because Lopez has failed to come forward with sufficient summary judgment evidence to prove the requisite elements of the claimed tort. To establish a *prima facie* case of intentional infliction of emotional distress, Lopez must prove the following elements: (i) the defendant acted intentionally or recklessly; (ii) the conduct was *extreme and outrageous*; (iii) the actions of the defendant caused Lopez *emotional distress*; and (iv) the emotional distress was *severe*. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999); *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). In the instant case, Lopez' claim for intentional infliction of emotional distress fails because he cannot establish that Akal's conduct was outrageous or that he suffered severe emotional distress.

## *1.  The Complained of Conduct Was Not Extreme or Outrageous.*

Liability for intentional infliction of emotional distress is imposed only where the conduct has been so outrageous in character, and so extreme in degree, as "'[to go] beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993) (quoting RESTATEMENT SECOND OF TORTS § 46, cmt. d. (1965)).  Such extreme conduct exists only in the most unusual of circumstances. *Bruce*, 998 S.W.2d at 613.  Liability does not extend to insensitive or rude behavior, mere insults, indignities, threats, annoyances, or petty oppressions.  *Id.* at 612; *Horton v. Montgomery Ward & Co., Inc.*, 827 S.W.2d 361, 369 (Tex. App.--San Antonio 1992, writ denied).  *See also Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994) ("Rude behavior does not equate to outrageousness . . .").  Even conduct which may be illegal in an employment context may not constitute extreme and outrageous conduct.  *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993).  *See also Southwestern Bell Mobile Sys. v. Franco*, 971 S.W.2d 52, 54-55 (Tex. 1998) (termination of employees for complaining of sexual harassment not extreme and outrageous); *Natividad*, 875 S.W.2d at 699 ("[B]ehavior is not outrageous simply because it may be tortious.").  In this regard, it is well established that termination from employment, in itself, cannot as a matter of law, constitute outrageous conduct.  *See Sebesta v. Kent Elecs. Corp.*, 886 S.W.2d 459, 463 (Tex. App.--Houston [1st Dist.] 1994, writ denied).

In the present action, Lopez has completely failed to establish that Akal's behavior constituted extreme and outrageous conduct.  Lopez testified that the incident with the FBI, his discussion with Louis McDaniel, his discussion with Robert Cervantes and his termination were outrageous.  (P. Dep. 208:6-9, at Tab 2).  First, Akal cannot be held liable for the actions of the FBI or U.S. Marshal representative Robert Cervantes because it is undisputed that they are not

Akal employees. Even if Akal could be held liable for their conduct, there is no evidence that their behavior was outrageous. Second, Plaintiff's conversations with Louis McDaniel are simply not extreme or outrageous. In the first conversation, Plaintiff asked Mr. McDaniel why the assignments were not being switched around and Mr. McDaniel replied, "Wait until things quiet down." (P. Dep. 121:1-24, at Tab 2). In Plaintiff second discussion with McDaniel, McDaniel asked Plaintiff what had happened on December 14, 1999 and asked Plaintiff to write a statement. (P. Dep. 174:10-17, at Tab 2). Significantly, Plaintiff admits that Mr. McDaniel was nice to him during these conversations. (P. Dep. 208:10-12, at Tab 2). Plaintiff also admits that he got along with Mr. McDaniel. (P. Dep. 79:4-6, at Tab 2). Under these circumstances, Plaintiff's conversations with Mr. McDaniel, as a matter of law, are not outrageous. Finally, as shown above, Plaintiff's termination itself, as a matter of law, cannot constitute outrageous conduct. *See Sebesta*, 886 S.W.2d at 463. Accordingly, since none of the actions complained of by Plaintiff constitute outrageous conduct, Defendant is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim as a matter of law.

### 2.   *Lopez Did Not Experience Severe Emotional Distress.*

Plaintiff's intentional infliction of emotional distress claim also fails because there is no evidence that Lopez suffered "severe" emotional distress. To establish a claim for intentional infliction of emotional distress, Lopez must also establish that he suffered "severe" emotional distress. *See Twyman*, 855 S.W.2d at 621; *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 668 (Tex. App.--Corpus Christi 1997, no pet.). "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it without undergoing considerable suffering. *Huerta*, 964 S.W.2d at 668; *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex. App.--Corpus Christi 1992, writ denied). Any party seeking recovery for mental anguish, even when advancing a cause of action that does not require the "severe" damages required for

intentional infliction of emotional distress, must prove more than "mere worry, anxiety, vexation, embarrassment or anger." *Huerta*, 964 S.W.2d at 668. "Severity of distress is an element of the cause of action, not simply a matter of damages." *Moore*, 848 S.W.2d at 195. "The court determines whether the evidence produced establishes a fact question for the jury." *Id.*

In this case, Lopez has presented no evidence that he has suffered severe emotional distress. While Lopez testified generally that he had nightmares for a brief period of time, he admits that he never sought professional counseling for any emotional distress and continued to have a good relationship with his family and friends. (P. Dep. 20:8-21:1; 35:19-23; 36:8-16, at Tab 2). Given this undisputed evidence, Lopez has failed to come forward with sufficient summary judgment evidence that she suffered "severe" emotional distress and Akal is entitled to summary judgment on Lopez' claim for intentional infliction of emotional distress. *See id.* at 195-96 (where plaintiff admitted that she had not consulted any mental health professionals and that she was dealing with the anguish and stress herself showed that her distress was not severe).

**D.    AKAL IS ENTITLED TO SUMMARY JUDGMENT ON LOPEZ' CLAIM FOR LOST WAGES BECAUSE HE FAILED TO SEEK EMPLOYMENT.**

A plaintiff in an employment discrimination case claiming lost wages has a duty to mitigate those damages by making a good faith effort to obtain and retain employment. *Huerta*, 964 S.W.2d at 669 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-34, 102 S. Ct. 3057, 3065-67 (1982)). To satisfy this duty, the plaintiff must exercise reasonable diligence to find other suitable employment. *Ford Motor Co.*, 458 U.S. at 230-31, 102 S. Ct. at 3065; *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex. 1983). The law prohibits recovery of damages that could have been avoided or were incurred as a result of the failure to mitigate. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 581 (Tex. App.--Houston [1st Dist.] 1992, no writ).

Normally, to meet its burden of showing a plaintiff's failure to mitigate, an employer must "demonstrate that substantially equivalent work was available and that the . . . claimant did not exercise reasonable diligence to obtain it." *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). However, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *Id. See also Badeen v. Burns Int'l Sec. Servs., Inc.*, 765 F. Supp. 341, 349 (E.D. Tex. 1991).

Courts have found a failure to satisfy the duty of mitigation based on the fact that the plaintiff only completed a small number of employment application over a period of months. *See, e.g., Sellers*, 902 F.2d at 1194-96; *Coleman v. Lane*, 949 F. Supp. 604, 611-12 (N.D. Ill. 1996).

In this case, Lopez admits that after leaving Akal, he looked for a job for about six months, that he worked at a bail bonds company from which he voluntarily quit and has not looked for another job since that time. (P. Dep. 196:1-13; 197:24-198:3; 201:18-202:6, at Tab 2). Accordingly, Lopez' own testimony establishes that he failed to make reasonable efforts to obtain work. Therefore, Akal is entitled to summary judgment on Lopez' claim for lost wages.

## IV.

## CONCLUSION

For the foregoing reasons, Akal respectfully submits that summary judgment should be granted in its favor and Plaintiff's lawsuit dismissed in its entirety.

Dated:  February 14, 2002

Respectfully submitted,

Raquel G. Pérez
Attorney-in -Charge
State Bar No. 00784746
Southern District Bar No. 19187
J. Tullos Wells
State Bar No. 21146500
Southern District No. 8337
BRACEWELL & PATTERSON, L.L.P.
106 South St. Mary's Street, Suite 800
San Antonio, Texas 78205-3603
Telephone:  (210) 226-1166
Facsimile:  (210) 226-1133

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Miguel Lopez is being sent by certified mail, return receipt requested, to counsel of record for Plaintiffs, Michael R. Cowen, 765 East 7th Street, Suite A, Brownsville, Texas 78520 on the 15th day of February, 2002.

Raquel G. Pérez

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ALLEN FRY and MIGUEL LOPEZ,        §
                                   §
                   Plaintiffs,     §
                                   §
v.                                 §        CIVIL ACTION NO. B-01-CV-72
                                   §
AKAL SECURITY, INC.,               §
                                   §
                   Defendants.     §

## AFFIDAVIT OF RAQUEL G. PÉREZ

STATE OF TEXAS       §
                     §
COUNTY OF BEXAR      §

I, Raquel G. Pérez, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.      I am an attorney of record for Akal Security, Inc., Defendant in the above-entitled and numbered action. On behalf of Defendant, I took the oral deposition of Plaintiff Miguel Lopez on December 11, 2001, before a certified shorthand court reporter and notary public in and for the state of Texas.

2.      We have received copies of the court reporter's transcript of the oral deposition of Miguel Lopez together with the exhibits attached thereto.

3.      Attached to Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Miguel Lopez are excerpted portions of the transcript and selected exhibits of the deposition of Miguel Lopez. I certify that the transcript excerpts and selected deposition exhibits attached to Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Miguel

Lopez are true and correct copies of the transcription and exhibits of said deposition provided to us by the court reporter.

I have read this affidavit which consists of two pages, including this page, and have been given an opportunity to make any corrections. I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.



Date

Raquel G. Pérez

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Raquel G. Pérez on this the 14th day of February, 2002, to certify which witness my hand and seal of office.

Notary Public, in and for the State of Texas

**JANET WILLSON**
Notary Public, State of Texas
My Commission Expires 09-01-2002

My commission expires: _9 - 1 - 02_

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2            BROWNSVILLE DIVISION

3

4  ALLEN FRY AND MIGUEL LOPEZ,  *
        Plaintiffs,              *
5

6  VS.                          *   CASE NO. B-01-CV-72

7

8  AKAL SECURITY, INC.,         *
        Defendant.              *
9

10

11

12

13

14              ORAL DEPOSITION

15                    OF

16              MIGUEL LOPEZ

17            DECEMBER 11, 2001

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2

 3   MR. MICHAEL R. COWEN
     ATTORNEYS AT LAW
 4   SUITE A
     765 EAST 7TH STREET
 5   BROWNSVILLE, TEXAS  78520       FOR THE PLAINTIFFS

 6

 7   BRACEWELL & PATTERSON, L.L.P.
     ATTORNEYS AT LAW
 8   106 SOUTH ST. MARY'S STREET
     SUITE 800
 9   SAN ANTONIO, TEXAS  78205
     BY: MS. RAQUEL G. PEREZ        FOR THE DEFENDANT
10

11
     MIGUEL LOPEZ                   WITNESS
12

13
     SHAN MORRIS BLANCHARD         CERTIFIED SHORTHAND
14                                 REPORTER

15               ORAL ANSWERS AND DEPOSITIONS of the

16   witness, MIGUEL LOPEZ, who resides in Brownsville,

17   Cameron County, Texas, in answer to questions

18   propounded to him in the above styled and numbered

19   cause, taken on behalf of the Defendant, before SHAN

20   MORRIS BLANCHARD, a Certified Shorthand Reporter in and

21   for the State of Texas, on DECEMBER 11, 2001, in the

22   offices of Michael R. Cowen, P.C., Suite A, 765 E. 7th

23   Street, Brownsville, Texas, 78520, between the hours of

24   9:36 o'clock a.m. and 5:44 o'clock p.m. of said day,

25   pursuant to notice and the Rules.
```

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | (Time 9:36.)                                           |
|          | 2  | **MIGUEL LOPEZ**, the witness, being duly              |
|          | 3  | cautioned and sworn to tell the truth, the whole truth |
|          | 4  | and nothing but the truth, testified as follows:       |
|          | 5  | EXAMINATION                                            |
| 09:36:11 | 6  | BY MS. PEREZ:                                          |
| 09:36:11 | 7  | Q.   Good morning, Mr. Lopez?                          |
| 09:36:11 | 8  | A.   Good morning, Ms. Perez.                          |
| 09:36:11 | 9  | Q.   I was going to say my name is Raquel Perez.  We   |
| 09:36:11 | 10 | met as you walked in the room this morning.  I am one  |
| 09:36:15 | 11 | of the attorneys for Akal, and I'm going to be asking  |
| 09:36:15 | 12 | you some questions today.  Okay?                       |
| 09:36:17 | 13 | A.   Yes, ma'am.                                       |
| 09:36:17 | 14 | Q.   And as we noted earlier, the deposition is        |
| 09:36:19 | 15 | being taken pursuant to the federal rules.  Can you    |
| 09:36:23 | 16 | please state your name for the record?                 |
| 09:36:26 | 17 | A.   Miguel, M-i-g-u-e-l, Lopez, L-o-p-e-z.            |
| 09:36:33 | 18 | Q.   Do you have a middle initial?                     |
| 09:36:36 | 19 | A.   S for Solis.                                      |
| 09:36:41 | 20 | Q.   What is your current address?                     |
| 09:36:44 | 21 | A.   418 Winnepeg, W-i-n-n-e-p-e-g, Avenue             |
| 09:36:51 | 22 | Brownsville, Texas, 78526.                             |
| 09:36:58 | 23 | Q.   How long have you lived there?                    |
| 09:37:00 | 24 | A.   About 18 years.                                   |
| 09:37:02 | 25 | Q.   Do you own it or rent it?                         |

| | | |
|---|---|---|
| 09:46:30 | 1 | A.    Yes.  It was an incident report that I made |
| 09:46:32 | 2 | when the case -- |
| 09:46:37 | 3 | Q.    Okay.  When you were working with Akal? |
| 09:46:39 | 4 | A.    When I was working, yes, ma'am. |
| 09:46:45 | 5 | Q.    Did you review your complaint? |
| 09:46:49 | 6 | A.    I believe I read it, yes. |
| 09:46:56 | 7 | Q.    Okay.  Other than the incident report and the |
| 09:47:00 | 8 | complaint, what other documents did you review? |
| 09:47:03 | 9 | A.    I don't remember.  I went through several |
| 09:47:06 | 10 | pieces of paper.  I believe the letter of dismissal. |
| 09:47:12 | 11 | And I believe the letter that Louis from Houston sent |
| 09:47:21 | 12 | me.  And let's see.  I believe that's it. |
| 09:47:38 | 13 | Q.    You say Louis, do you mean -- is that McDaniel? |
| 09:47:42 | 14 | A.    McDaniel. |
| 09:47:47 | 15 | Q.    When were you born? |
| 09:47:51 | 16 | A.    Where? |
| 09:47:52 | 17 | Q.    When? |
| 09:47:53 | 18 | A.    When?  May the 8th, 1929. |
| 09:48:00 | 19 | Q.    Where were you born? |
| 09:48:01 | 20 | A.    In -- outside of Brownsville.  It was -- but it |
| 09:48:04 | 21 | was Brownsville, but it was in the outskirts. |
| 09:48:08 | 22 | Q.    Where were you raised? |
| 09:48:11 | 23 | A.    Brownsville. |
| 09:48:13 | 24 | Q.    Have you ever lived anywhere other than |
| 09:48:16 | 25 | Brownsville? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 09:53:24 | 1 | A.   She's a CNA, and she works for a doctor.  But I |
| 09:53:29 | 2 | don't know the doctor's name. |
| 09:53:34 | 3 | Q.   She work in the office or is she a nurse? |
| 09:53:36 | 4 | A.   Yes.  No, no.  She's works -- working in the |
| 09:53:41 | 5 | office. |
| 09:53:44 | 6 | Q.   Does she live in Brownsville? |
| 09:53:47 | 7 | A.   Yes, ma'am. |
| 09:54:02 | 8 | Q.   And do you have good marriage with Edie? |
| 09:54:04 | 9 | A.   Yes, ma'am. |
| 09:54:04 | 10 | Q.   Do you consider her a good wife? |
| 09:54:06 | 11 | A.   Yes, ma'am. |
| 09:54:07 | 12 | Q.   Are you a good husband to her? |
| 09:54:09 | 13 | A.   Yes, ma'am. |
| 09:54:09 | 14 | Q.   Are your kids good kids? |
| 09:54:11 | 15 | A.   Yes, ma'am. |
| 09:54:11 | 16 | Q.   Do you have a good relationship with your son, |
| 09:54:14 | 17 | Miguel? |
| 09:54:15 | 18 | A.   Yes, ma'am. |
| 09:54:15 | 19 | Q.   Do you have a good relationship with your |
| 09:54:16 | 20 | daughter, Debra? |
| 09:54:18 | 21 | A.   Yes, ma'am. |
| 09:54:18 | 22 | Q.   Have you always had a good relationship with -- |
| 09:54:20 | 23 | A.   Yes, ma'am. |
| 09:54:21 | 24 | Q.   I'm sorry, if you'll let me finish.  Have you |
| 09:54:24 | 25 | always had a good relationship with Miguel and Debra? |

M. LOPEZ - MS. PEREZ

| 09:54:27 | 1 | A. Yes, ma'am. |
| 09:54:28 | 2 | Q. Okay. What about brothers and sisters, do you |
| 09:54:30 | 3 | have brothers and sisters? |
| 09:54:32 | 4 | A. I have a brother and three sisters. |
| 09:54:36 | 5 | Q. Okay. What's your brother's name? |
| 09:54:38 | 6 | A. Jose Emmy Lopez. |
| 09:54:43 | 7 | Q. Jose? |
| | 8 | A. Emmy. |
| 09:54:48 | 9 | Q. Emmy Lopez? |
| 09:54:48 | 10 | A. Lopez. |
| 09:54:49 | 11 | Q. And you say you have three sisters? |
| 09:54:56 | 12 | A. Matilde Galvan, Irma Lopez. And I can't think |
| 09:55:04 | 13 | of the other one. |
| 09:55:07 | 14 | Q. The other sister? |
| 09:55:08 | 15 | A. My other sister. If I think about her, I'll |
| 09:55:15 | 16 | tell you later. |
| 09:55:18 | 17 | Q. Okay. Jose, your -- is he old -- how old is |
| 09:55:21 | 18 | Jose Lopez? |
| 09:55:22 | 19 | A. He's older than I am by about four or five |
| 09:55:25 | 20 | years. |
| 09:55:26 | 21 | Q. What does he do? |
| 09:55:28 | 22 | A. He's retired. |
| 09:55:31 | 23 | Q. What does Matilde Galvan do? |
| 09:55:34 | 24 | A. She's retired too. |
| 09:55:36 | 25 | Q. How old is she? |

| | | |
|---|---|---|
| 10:12:43 | 1 | Q.   Now, when you said earlier about ten |
| 10:12:45 | 2 | children -- |
| 10:12:46 | 3 | A.   Uh-huh. |
| 10:12:47 | 4 | Q.   -- you haven't had ten children? |
| 10:12:48 | 5 | A.   No, ma'am.  But I've put in a lot of time for |
| 10:12:52 | 6 | government. |
| 10:12:53 | 7 | Q.   Okay.  That was just when you said an example? |
| 10:12:55 | 8 | A.   An example, a lot of good times. |
| 10:12:59 | 9 | Q.   A lot of good times for the government? |
| 10:13:03 | 10 | A.   Yes, ma'am. |
| 10:13:03 | 11 | Q.   Okay.  Did you generally enjoy your job? |
| 10:13:06 | 12 | A.   Yes, ma'am, very much. |
| 10:13:07 | 13 | Q.   And we'll get to that in just a few minutes. |
| 10:13:10 | 14 | Let me ask you a few more questions.  Do you have |
| 10:13:36 | 15 | friends? |
| 10:13:37 | 16 | A.   Friends? |
| | 17 | Q.   Yes. |
| 10:13:40 | 18 | A.   Yes, ma'am, I think I do. |
| 10:13:41 | 19 | Q.   Are your relationships with your friends |
| 10:13:44 | 20 | generally good? |
| | 21 | A.   Yes. |
| 10:13:46 | 22 | Q.   Do you generally lead a normal life? |
| 10:13:49 | 23 | A.   Yes, ma'am. |
| 10:13:51 | 24 | Q.   Other than the condition you told me about this |
| 10:13:54 | 25 | morning, the high blood pressure, do you have any other |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 10:13:57 | 1 | conditions that you're aware of? |
| 10:13:59 | 2 | A.   My cholesterol is a little bit on the |
| 10:14:03 | 3 | borderline, but I keep that in check with my diet. |
| 10:14:08 | 4 | Q.   Okay.  Other than borderline cholesterol and |
| 10:14:12 | 5 | high blood pressure, do you have any other conditions |
| 10:14:14 | 6 | that you're aware of? |
| 10:14:15 | 7 | A.   No, ma'am. |
| 10:14:16 | 8 | Q.   Have you ever seen a psychiatrist? |
| 10:14:18 | 9 | A.   No, ma'am. |
| 10:14:18 | 10 | Q.   Have you ever seen a psychologist? |
| 10:14:20 | 11 | A.   No, ma'am. |
| 10:14:20 | 12 | Q.   Have you ever seen any type of counselor? |
| 10:14:22 | 13 | A.   No, ma'am. |
| 10:14:23 | 14 | Q.   Have you ever been diagnosed as having any |
| 10:14:25 | 15 | mental illness or disorder? |
| 10:14:28 | 16 | A.   No, ma'am. |
| 10:14:28 | 17 | Q.   Has there any period of time since January 7th |
| 10:14:32 | 18 | of 2000 during which you have been unable to work |
| 10:14:34 | 19 | because of a physical condition? |
| | 20 | A.   No. |
| 10:14:35 | 21 | Q.   Any period between January 7th of 2000 and the |
| 10:14:39 | 22 | present that you've been able -- unable to work because |
| 10:14:41 | 23 | of an emotional condition? |
| 10:14:45 | 24 | A.   No, ma'am. |
| 10:14:46 | 25 | Q.   Any period between January 7th of 2000 and the |

| | | |
|---|---|---|
| 10:30:07 | 1 | Q.    Okay.  And at Pinkerton, what was your job |
| 10:30:10 | 2 | title? |
| 10:30:11 | 3 | A.    Same thing. |
| 10:30:11 | 4 | Q.    And what were your duties at Wackenhut? |
| 10:30:21 | 5 | A.    Well, man the -- the entrance; see that nobody |
| 10:30:28 | 6 | came in with any weapons; and help with the juries, |
| 10:30:35 | 7 | help with the grand juries; help inside the courtroom |
| 10:30:42 | 8 | to see that everything was okay; assist with the |
| 10:30:50 | 9 | prisoners; man the halls; make sure that nobody that |
| 10:31:00 | 10 | wasn't supposed to be there was there; the outside of |
| 10:31:11 | 11 | the building. |
| 10:31:13 | 12 | Q.    What, patrol the outside of the building? |
| 10:31:16 | 13 | A.    Yes.  Yes, ma'am. |
| 10:31:20 | 14 | Q.    Told you you would be forgetting. |
| | 15 | A.    Yes. |
| 10:31:24 | 16 | Q.    Okay.  When you forget, I'll remind you so we |
| 10:31:27 | 17 | can get it on the record. |
| 10:31:28 | 18 | A.    Okay.  And take care of the alley also, see |
| 10:31:40 | 19 | that it was open for the judges to come in. |
| 10:31:59 | 20 | Q.    Any other duties? |
| 10:32:01 | 21 | A.    And also be alert to see when the judges would |
| 10:32:04 | 22 | come in so we could go out to the back and escort them |
| 10:32:10 | 23 | in, and also escort them out when they would go out. |
| 10:32:14 | 24 | Q.    Escort the judges in and out? |
| 10:32:17 | 25 | A.    Yes, ma'am. |

| | | |
|---|---|---|
| 11:01:35 | 1 | A. It says several with GSA and finally CSO |
| 11:01:42 | 2 | Lincoln, Georgia, 1984, with Vinson Security School. |
| 11:01:54 | 3 | Q. What does it say after Vinson Security School? |
| 11:01:57 | 4 | A. It says in August 1994, qualified with weapon. |
| 11:02:00 | 5 | Q. Is that when you were able to use a weapon on |
| 11:02:03 | 6 | the job? Is that what it means, qualified with weapon? |
| 11:02:07 | 7 | A. I don't remember. |
| 11:02:12 | 8 | Q. When you say several with GSA, does that mean |
| 11:02:15 | 9 | several classes? What do you mean when you say |
| 11:02:20 | 10 | several? |
| 11:02:20 | 11 | A. Trainings. |
| 11:02:46 | 12 | Q. When you started with -- and so you applied |
| 11:02:50 | 13 | with Akal -- well, I guess your application doesn't |
| 11:02:54 | 14 | have the year. When did you apply with Akal? |
| 11:03:01 | 15 | A. In '95, I believe. |
| 11:03:03 | 16 | Q. When did you start working with Akal? |
| 11:03:06 | 17 | A. In 1995. |
| 11:03:08 | 18 | Q. Do you remember the month? |
| | 19 | A. No, I don't. |
| 11:03:32 | 20 | Q. So when you -- after your 2-1/2 years and you |
| 11:03:35 | 21 | went back to work and you started with Akal -- |
| 11:03:38 | 22 | A. Correct. |
| 11:03:39 | 23 | Q. -- that was still at the -- at the old federal |
| 11:03:41 | 24 | courthouse; correct? |
| 11:03:43 | 25 | A. Correct. |

11:03:46  1      Q.   And the -- and your title when you started with

11:03:50  2   Akal was what?

11:03:53  3      A.   Federal court security officer.

11:03:57  4      Q.   A CSO, court security --

          5      A.   Yes.

11:03:59  6      Q.   Court security officer?  Whenever we say "CSO,"

11:04:04  7   that's what you referred to; is that right?

11:04:07  8      A.   Correct.  I believe it's correct.  I don't

11:04:09  9   remember now if it was CSO or what it was, but I

11:04:13  10  imagine so.

11:04:14  11     Q.   CSO.  You had described to me the duties that

11:04:18  12  you had had as a court security officer when you worked

11:04:22  13  with Wackenhut and then for Pinkerton.  When you

11:04:26  14  started working with Akal, were those duties the same?

11:04:31  15     A.   Yes, ma'am.

11:04:33  16     Q.   There weren't any new or different duties with

11:04:40  17  Akal?

11:04:40  18     A.   Not that I can recall.

11:04:41  19     Q.   Because it was the same federal courthouse?

11:04:44  20     A.   Same federal courthouse.

11:04:47  21     Q.   Doing essentially the same thing you had done

11:04:49  22  before; right?

11:04:50  23     A.   Correct.

11:04:51  24     Q.   When you talked about the CSO duties before --

11:04:55  25     A.   Yes, ma'am.

| | | |
|---|---|---|
| 13:12:05 | 1 | BY MS. PEREZ: |
| 13:12:09 | 2 | Q. Let's go back on the record. Mr. Lopez, did |
| 13:12:23 | 3 | you have a good lunch? |
| 13:12:24 | 4 | A. Yes, ma'am. |
| 13:12:26 | 5 | Q. You ready to continue? |
| 13:12:27 | 6 | A. Yes, ma'am. |
| 13:12:28 | 7 | Q. If at any point you feel that you cannot |
| 13:12:31 | 8 | continue or that you can't give me truthful or complete |
| 13:12:34 | 9 | answers, I'd like you to let me know; okay? |
| 13:12:41 | 10 | A. Correct, okay. |
| 13:12:49 | 11 | Q. Earlier in the day, you had been telling me |
| 13:12:51 | 12 | about your CSO duties. |
| 13:12:54 | 13 | A. Yes, ma'am. |
| 13:12:54 | 14 | Q. And how they remained the same at Wackenhut, |
| 13:12:58 | 15 | Pinkerton, and Akal -- |
| 13:13:00 | 16 | A. Yes, ma'am. |
| 13:13:00 | 17 | Q. -- at the -- did you enjoy your job? |
| 13:13:07 | 18 | A. Yes, ma'am. And I enjoyed the people I was |
| 13:13:09 | 19 | working with. |
| 13:13:10 | 20 | Q. And when I say "did you enjoy your job," you |
| 13:13:13 | 21 | enjoyed your job when you were working at Akal? |
| 13:13:16 | 22 | A. Yes, ma'am. |
| 13:13:17 | 23 | Q. You said you enjoyed the people who you were |
| 13:13:20 | 24 | working with. Who were you working with? |
| 13:13:23 | 25 | A. Everybody in the building. |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:13:29 | 1 | Q.   Okay.   Who worked with you as CSOs?   Mr. Fry |
| 13:13:33 | 2 | worked with you? |
| 13:13:34 | 3 | A.   Correct. |
| 13:13:35 | 4 | Q.   And you enjoyed Mr. Fry? |
| | 5 | A.   Yes. |
| 13:13:38 | 6 | Q.   No complaints about Mr. Fry? |
| | 7 | A.   No. |
| 13:13:41 | 8 | Q.   There's a Mr. Oakley? |
| 13:13:43 | 9 | A.   Yes, ma'am. |
| 13:13:43 | 10 | Q.   Did you enjoy working with Mr. Oakley? |
| 13:13:45 | 11 | A.   Yes, ma'am. |
| 13:13:46 | 12 | Q.   No complaints about Mr. Oakley? |
| 13:13:47 | 13 | A.   No, ma'am. |
| 13:13:49 | 14 | Q.   There was a Sherrill, Bill Sherrill? |
| 13:13:52 | 15 | A.   Bill Sherrill. |
| 13:13:53 | 16 | Q.   Did you enjoy working with Mr. Sherrill? |
| 13:13:56 | 17 | A.   Yes, ma'am. |
| 13:13:56 | 18 | Q.   No complaints about Mr. Sherrill? |
| 13:13:59 | 19 | A.   No, ma'am. |
| 13:14:02 | 20 | Q.   There was someone named Infante? |
| 13:14:05 | 21 | A.   Correct. |
| 13:14:06 | 22 | Q.   Did you enjoy working with Mr. Infante? |
| 13:14:09 | 23 | A.   Yes, ma'am. |
| 13:14:09 | 24 | Q.   No complaints about Mr. Infante? |
| | 25 | A.   (Witness shaking head negatively.) |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:14:12 | 1 | Q.  Can you give me an answer? |
| 13:14:14 | 2 | A.  No, ma'am. |
| 13:14:15 | 3 | MR. COWEN:  Not even an a salute?  Mr. Infante |
| 13:14:19 | 4 | was famous for the one-fingered salute or the |
| | 5 | one-fingered wave in the courtroom. |
| | 6 | THE WITNESS:  One-finger wave.  One finger. |
| | 7 | MS. PEREZ:  Okay.  Not salute, but wave? |
| | 8 | MR. COWEN:  Well, a salute too.  He'd go |
| 13:14:31 | 9 | (demonstrating) -- he liked to give the law clerks -- |
| 13:14:33 | 10 | try to make the law clerks laugh during trials. |
| | 11 | BY MS. PEREZ: |
| 13:14:46 | 12 | Q.  Who else -- who else was there while you were |
| 13:14:49 | 13 | there?  What about Mr. Zepeda? |
| 13:14:52 | 14 | A.  He wasn't there in the old courthouse. |
| 13:14:55 | 15 | Q.  Not in the old courthouse.  He was there in the |
| 13:14:59 | 16 | new courthouse? |
| 13:15:00 | 17 | A.  Yes, ma'am. |
| 13:15:00 | 18 | Q.  Did you enjoy working with Mr. Zepeda? |
| 13:15:04 | 19 | A.  Yes, ma'am. |
| 13:15:05 | 20 | Q.  You have any complaints about Mr. Zepeda? |
| 13:15:08 | 21 | A.  Except for the complaints about discrimination, |
| 13:15:12 | 22 | otherwise he was all right. |
| 13:15:16 | 23 | Q.  Okay.  Except for the complaints that we'll |
| 13:15:18 | 24 | talk about in a few minutes of discrimination, that was |
| 13:15:20 | 25 | towards the end of your employment with Akal; right? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:15:25 | 1 | A. Correct. |
| 13:15:25 | 2 | Q. What about a Mr. McDaniel? |
| 13:15:29 | 3 | A. Did I like him? |
| 13:15:30 | 4 | Q. Yeah. Did you get along with the with |
| 13:15:33 | 5 | Mr. McDaniel? |
| | 6 | A. Yes. |
| 13:15:36 | 7 | Q. Do you have any complaints about Mr. McDaniel? |
| 13:15:39 | 8 | A. Except for the same case, no. |
| 13:15:41 | 9 | Q. And, again, you said the discrimination? |
| 13:15:44 | 10 | A. Yes, ma'am. |
| 13:15:44 | 11 | Q. Which you're going to tell me about later; |
| 13:15:47 | 12 | right? |
| 13:15:47 | 13 | A. Yes, ma'am. |
| 13:15:48 | 14 | Q. When I ask you? |
| 13:15:50 | 15 | A. Well, if you do. |
| 13:15:53 | 16 | Q. Right. Okay. Who else was there? There was |
| 13:15:58 | 17 | somebody named Cervantes? |
| 13:16:04 | 18 | A. No, he's with the marshal service. |
| 13:16:05 | 19 | Q. He was not employed by Akal? |
| 13:16:08 | 20 | A. No, ma'am. |
| 13:16:09 | 21 | Q. But did he work there at the courthouse? |
| 13:16:11 | 22 | A. Yes. He was the -- I believe the officer in |
| 13:16:15 | 23 | charge of the office. |
| 13:16:16 | 24 | Q. Did you get along with Mr. Cervantes? |
| 13:16:19 | 25 | A. Yes, ma'am, very well. |

Case 1:01-cv-00072 Document 19 Filed in TXSD on 02/15/2002 Page 43 of 154

13:26:22 Q. So were you assigned to one position more than another?
13:26:28 A. No, ma'am. I think it equally all over.
13:26:31 Q. Just kind of depended on what was needed?
13:26:36 A. On what was needed.
13:26:41 Q. Is one aspect of the job more important than another?
13:26:53 A. No, ma'am.
13:26:53 Q. So if you were at the entrance, that wasn't more or less important than being in the courtroom?
13:27:01 A. No, ma'am, not to my thinking. No.
13:27:06 Q. Or walking judges out, that wasn't more important than being at the entrance?
13:27:12 A. No, ma'am.
13:27:13 Q. There were just different duties and they were all equal; is that correct?
13:27:18 A. Yes, ma'am.
13:27:18 Q. Was there any difference in pay depending on which -- whether you were at the entrance or you were at the courtroom or you were walking judges out?
13:27:28 A. No, ma'am.
13:27:29 Q. No difference in pay?
13:27:31 A. No, ma'am.
13:27:33 Q. And when I ask for no difference in pay, either at the old courthouse or the new courthouse?

| | | |
|---|---|---|
| 13:27:41 | 1 | A.    Correct. |
| 13:27:42 | 2 | Q.    And the same thing with the duties at -- either |
| 13:27:45 | 3 | at the old courthouse or the new courthouse, one aspect |
| 13:27:48 | 4 | of the CSO job was not more important than another? |
| 13:27:52 | 5 | A.    No, ma'am. |
| | 6 | Q.    Is that correct? |
| 13:27:53 | 7 | A.    Correct. |
| 13:28:09 | 8 | Q.    There -- can you tell me were there different |
| 13:28:16 | 9 | names for the positions?  Was something called a |
| | 10 | "rover"? |
| 13:28:19 | 11 | A.    In the new courthouse, yes. |
| 13:28:20 | 12 | Q.    They didn't have those different names in the |
| 13:28:23 | 13 | old courthouse? |
| 13:28:24 | 14 | A.    No, ma'am. |
| 13:28:24 | 15 | Q.    What other names did they have in the new |
| 13:28:26 | 16 | courthouse? |
| 13:28:27 | 17 | A.    In the new courthouse, they had rover; they had |
| 13:28:31 | 18 | jury duty; and they had command center, what they |
| 13:28:35 | 19 | called the command center. |
| | 20 | Q.    Okay. |
| 13:28:39 | 21 | A.    And I believe court duty. |
| 13:28:48 | 22 | Q.    And did they have a different -- for entrance, |
| 13:28:51 | 23 | was that a different name? |
| 13:28:54 | 24 | A.    The entrance security, I think.  I'm not sure. |
| 13:28:58 | 25 | Q.    What is a rover? |

| 13:30:31 | 1 | A. No, ma'am. |
| 13:30:32 | 2 | Q. But you worked? |
| 13:30:40 | 3 | A. Probably 8:30 to 5:00.  I'm not sure. |
| 13:30:40 | 4 | Q. Okay.  At various times in your career with |
| 13:30:40 | 5 | Akal, you had those different shifts? |
|  | 6 | A. Yes. |
| 13:31:00 | 7 | Q. I asked you earlier if you enjoyed your job, |
| 13:31:02 | 8 | and you said yes? |
| 13:31:04 | 9 | A. Yes, ma'am. |
| 13:31:04 | 10 | Q. I asked you what you enjoyed about it, and you |
| 13:31:06 | 11 | indicated that you enjoyed the people you worked with? |
| 13:31:10 | 12 | A. Correct. |
| 13:31:10 | 13 | Q. Is there anything else you enjoyed about your |
| 13:31:12 | 14 | job? |
| 13:31:18 | 15 | A. Besides working with the people that I worked |
| 13:31:20 | 16 | with? |
| 13:31:22 | 17 | Q. Yes. |
| 13:31:23 | 18 | A. The pay. |
| 13:31:24 | 19 | Q. How much was your pay? |
| 13:31:26 | 20 | A. I don't remember. |
| 13:31:27 | 21 | Q. Was it good pay? |
| 13:31:29 | 22 | A. Yes, ma'am. |
|  | 23 | Q. Okay. |
| 13:31:30 | 24 | A. Fairly good.  And I think I enjoyed the hours. |
| 13:31:39 | 25 | Normally, you wouldn't -- wouldn't work the 24-hour |

| | |
|---|---|
| 13:31:45 | 1 |
| 13:31:49 | 2 |
| 13:31:53 | 3 |
| 13:31:56 | 4 |
| 13:32:02 | 5 |

13:31:45  1  shifts, you know, unless there was some danger of some

13:31:49  2  kind that they -- then we would be scheduled to work in

13:31:53  3  certain hours around the clock.  But most of the time,

13:31:56  4  it was just maybe 7:00 in the morning to 7:00 in the

13:32:02  5  evening.

13:32:05  6      Q.   Anything else you enjoyed other than the

13:32:07  7  people, the pay, and the hours?

13:32:15  8      A.   No, ma'am, not that I can think of right now.

13:32:26  9      Q.   Did you enjoy any -- doing any of the

13:32:31  10  particular duties?  For instance, did you enjoy manning

13:32:36  11  the halls more than manning the entrance or patrolling

13:32:40  12  the outside?  Were any of those preferable to you?

13:32:44  13      A.   You're talking about the old courthouse?

13:32:46  14      Q.   Let me go ahead and ask you that.  Right now,

13:32:48  15  the old courthouse.

13:32:49  16      A.   They all seemed all right.  I had a little bit

13:32:53  17  of everything.

13:32:54  18      Q.   And so it was all equal in your eyes?

13:32:58  19      A.   Yes, ma'am.

13:32:58  20      Q.   What about at the new courthouse?

13:33:01  21      A.   New courthouse, they had me scheduled for the

13:33:04  22  front entrance.  And once in awhile, they would

13:33:06  23  schedule me for court, for the main court.  But I was

13:33:09  24  still assigned to the front.  They would schedule me to

13:33:15  25  the front entrance, except for maybe a court appearance

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:33:18 | 1 | of about half hour or so with the magistrate courts. |
| 13:33:23 | 2 | Then I would have to come back to my duty. |
| 13:33:25 | 3 | Q.   To the front entrance? |
| 13:33:26 | 4 | A.   Yes, ma'am. |
| 13:33:30 | 5 | Q.   Well, was there any particular portion of the |
| 13:33:35 | 6 | job of the job in the new federal courthouse that you |
| 13:33:38 | 7 | wanted to do more than the front entrance? |
| 13:33:41 | 8 | A.   I just wanted a variety of duties. |
| 13:33:43 | 9 | Q.   So there was no one particular duty that was |
| 13:33:46 | 10 | preferable? |
| 13:33:48 | 11 | A.   No, ma'am.  No.  I just wanted to change around |
| 13:33:50 | 12 | and move around. |
| 13:33:57 | 13 | Q.   The U.S. marshals keep coming up today.  What |
| 13:34:30 | 14 | is the relationship as you understand it between Akal |
| 13:34:35 | 15 | and the U.S. marshals? |
| 13:34:38 | 16 | A.   The way I understand it is, Akal has a contract |
| 13:34:42 | 17 | with the marshal service, and the marshal's office kind |
| 13:34:47 | 18 | of oversees the operation.  And I don't know what |
| 13:34:52 | 19 | oversee the operation means, but we have a supervisor |
| 13:34:58 | 20 | for Akal. |
| 13:35:01 | 21 | Q.   But you were not employed by the marshal |
| 13:35:06 | 22 | service? |
| 13:35:08 | 23 | A.   No, ma'am.  I don't think so, unless somewhere |
| 13:35:11 | 24 | it says that I was.  I would like to see that. |
| 13:35:15 | 25 | Q.   As far as you know, you were employed by Akal |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:37:37 | 1 | A.    Because I knew I was the best; best trained, |
| 13:37:40 | 2 | best performance, in every way.  Best trained. |
| 13:37:50 | 3 | Q.    And would that be the training you had received |
| 13:37:57 | 4 | with Pinkerton or Wackenhut -- or what training are you |
| 13:38:00 | 5 | talking about when you say best trained? |
| 13:38:03 | 6 | A.    Mainly as a federal police officer. |
| 13:38:19 | 7 | Q.    Okay.  So you don't have any complaints in this |
| 13:38:31 | 8 | lawsuit about your employment with Akal at the old |
| 13:38:34 | 9 | federal courthouse; is that correct? |
| 13:38:37 | 10 | A.    Correct. |
| 13:38:37 | 11 | Q.    Your complaints arise out of the new federal -- |
| 13:38:41 | 12 | when it moved to the new federal courthouse; correct? |
| 13:38:45 | 13 | A.    Yes, ma'am. |
| 13:38:55 | 14 | Q.    When did the new federal courthouse open? |
| 13:38:59 | 15 | A.    I don't remember.  June 9 through 11th of |
| | 16 | '99 -- |
| 13:39:05 | 17 | Q.    Could it be June 17th? |
| 13:39:09 | 18 | A.    No.  9th, I believe, or 11th. |
| 13:39:11 | 19 | Q.    So June 9 or -- |
| 13:39:12 | 20 | A.    Or 11. |
| 13:39:13 | 21 | Q.    Of 1999? |
| 13:39:14 | 22 | A.    1999.  And I'm not sure on that; okay? |
| 13:39:24 | 23 | Q.    But that's the best you can recall this |
| | 24 | morning? |
| 13:39:33 | 25 | A.    That's the best I can recollect this morning. |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:43:23 | 1 | Q.   I'm going to hand you what I've marked as |
| 13:43:27 | 2 | Deposition Exhibit Number 2.  It's entitled "Personnel |
| 13:43:31 | 3 | Qualifications Statement."  I'm going to ask you to |
| 13:43:36 | 4 | look at that and tell me if that's your document. |
| 13:44:17 | 5 | MR. COWEN:  Let me see that. |
| 13:45:32 | 6 | THE WITNESS:  You need to see this? |
| 13:45:34 | 7 | MR. COWEN:  I've seen it. |
| | 8 | BY MS. PEREZ: |
| 13:45:36 | 9 | Q.   Did you fill out that document? |
| 13:45:39 | 10 | A.   Yes, ma'am. |
| 13:45:41 | 11 | Q.   Okay.  That's all the questions I have on that. |
| 13:45:50 | 12 | I'm going to hand you what I'm marking as Deposition |
| 13:45:58 | 13 | Exhibit Number 3.  It says "Deadly Force Policy |
| 13:46:01 | 14 | Certification."  Can you tell me if that's your |
| 13:46:04 | 15 | signature on that document? |
| 13:46:13 | 16 | A.   Yes, ma'am. |
| 13:46:13 | 17 | Q.   You received the policy on deadly force; |
| 13:46:17 | 18 | correct? |
| 13:46:17 | 19 | A.   Yes, ma'am. |
| 13:46:17 | 20 | Q.   What date did you certify that you received it? |
| 13:46:22 | 21 | A.   On May the 5th, 1998. |
| 13:46:26 | 22 | Q.   I'm handing you what I'm marking as Deposition |
| 13:46:30 | 23 | Exhibit Number 4.  This document is entitled "Standards |
| 13:46:36 | 24 | of Performance Certification."  I'm going to ask you, |
| 13:46:40 | 25 | did you -- is that your signature on that document? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:46:58 | 1 | A.    Yes, ma'am. |
| 13:46:59 | 2 | Q.    So you signed certifying that you received the |
| 13:47:01 | 3 | Standards of Performance; correct? |
| 13:47:04 | 4 | A.    Correct. |
| 13:47:06 | 5 | Q.    You knew that any violations of the rules and |
| 13:47:09 | 6 | regulations could result in an indefinite suspension |
| 13:47:14 | 7 | from performing as a CSO? |
| 13:47:18 | 8 | A.    Yes, ma'am. |
| 13:47:18 | 9 | Q.    I'll hand you what I've marked as Deposition |
| 13:47:21 | 10 | Exhibit Number 5.  Are those the standards of |
| 13:47:22 | 11 | performance? |
| 13:47:24 | 12 | A.    Uh-huh. |
| 13:47:26 | 13 | Q.    I'm sorry? |
| 13:47:29 | 14 | MR. COWEN:  You have seen that? |
| 13:47:31 | 15 | A.    Yes, ma'am. |
| | 16 | BY MS. PEREZ: |
| 13:47:34 | 17 | Q.    And you received that document; right? |
| 13:47:37 | 18 | A.    Yes, ma'am. |
| 13:47:37 | 19 | Q.    And you're aware that you had to comply with |
| 13:47:40 | 20 | that document, with the standards in the document? |
| 13:47:45 | 21 | A.    I complied. |
| 13:47:47 | 22 | Q.    And my question is, you were aware that you had |
| 13:47:49 | 23 | to comply? |
| 13:47:51 | 24 | A.    Yes, ma'am. |
| 13:47:54 | 25 | Q.    I'm handing you Deposition Exhibit Number 6. |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 13:55:18 | 1 | Q.   Okay. |
| 13:55:18 | 2 | MS. PEREZ:   Let's go off the record. |
| 13:55:20 | 3 | ˙(Recess taken between 1:55 and 2:01.) |
| 14:01:03 | 4 | BY MS. PEREZ: |
| 14:01:04 | 5 | Q.   Is there a union? |
| 14:01:54 | 6 | A.   I believe there is or was at one time.  I don't |
| 14:01:59 | 7 | know. |
| 14:01:59 | 8 | Q.   There was a union while you were employed with |
| 14:02:02 | 9 | Akal; correct? |
| 14:02:04 | 10 | A.   Correct. |
| 14:02:30 | 11 | Q.   I would like to hand you what has been marked |
| 14:02:34 | 12 | as Deposition Exhibit Number 12.  These are a few pages |
| 14:02:41 | 13 | from the union contract, in effect.  You see that the |
| 14:02:46 | 14 | first title on Deposition Exhibit Number 12, it says |
| 14:02:53 | 15 | "Grievance Procedure"? |
| 14:02:55 | 16 | A.   Correct. |
| 14:02:55 | 17 | Q.   You didn't use the grievance procedure to |
| 14:02:59 | 18 | complain about the selection of Mr. Zepeda; did you? |
| 14:03:03 | 19 | A.   No, ma'am. |
| 14:03:03 | 20 | Q.   And you didn't use an a grievance procedure to |
| 14:03:07 | 21 | complain about being assigned at the front of the |
| 14:03:11 | 22 | courthouse; did you? |
| 14:03:13 | 23 | A.   No, ma'am. |
| 14:03:13 | 24 | Q.   And you didn't use a grievance procedure to |
| 14:03:16 | 25 | complain about your termination; did you? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:03:18 | 1 | A.   No, ma'am. |
| 14:03:18 | 2 | Q.   Why not? |
| 14:03:21 | 3 | A.   Because we did not belong to the union. |
| 14:03:25 | 4 | Q.   Well, you weren't -- you didn't pay dues to the |
| 14:03:27 | 5 | union; did you? |
| | 6 | A.   No. |
| 14:03:29 | 7 | Q.   But the union still governed your employment |
| 14:03:32 | 8 | there; didn't it? |
| 14:03:33 | 9 | MR. COWEN:   Objection, calls for a legal |
| 14:03:35 | 10 | conclusion.   You can answer. |
| 14:03:37 | 11 | A.   No. |
| | 12 | BY MS. PEREZ: |
| 14:03:37 | 13 | Q.   Do you know whether one way or the other |
| 14:03:41 | 14 | whether it governed your employment? |
| 14:03:43 | 15 | A.   I don't know. |
| 14:03:51 | 16 | Q.   You complained about the -- you said Zepeda was |
| 14:03:55 | 17 | put in a position.   That's Roy Zepeda; correct? |
| 14:03:59 | 18 | A.   Roy Zepeda, correct. |
| 14:04:00 | 19 | Q.   And what position was he given? |
| 14:04:05 | 20 | A.   Lead CSO. |
| 14:04:08 | 21 | Q.   Lead CSO, so lead court security officer; is |
| | 22 | that correct? |
| 14:04:13 | 23 | A.   Correct. |
| 14:04:20 | 24 | Q.   What did a lead CSO do? |
| 14:04:27 | 25 | A.   Supervise the CSOs, schedule them, assign them |

14:04:43   1   and I -- I mean, he has duties with the office in

14:04:50   2   Houston.

14:04:51   3       Q.   Now, do you know that or is that just

14:04:53   4   speculation?

14:04:54   5       A.   Well, he has to go to his next higher -- higher

          6   up.

14:04:57   7       Q.   Okay.  What duties does he have in Houston?

14:05:00   8       A.   No, no.  He has to comply or talk to somebody

14:05:03   9   in Houston, his supervisor.

14:05:07  10       Q.   Okay.  So the lead CSO is supervised out of

14:05:11  11   Houston?

14:05:13  12       A.   Out of Houston, the way I understand it.

14:05:23  13       Q.   Is there anything else that the lead CSO does

14:05:26  14   that you're aware of?

14:05:32  15       A.   No.  I think that covers everything that I can

14:05:35  16   think of right now.

14:05:36  17       Q.   Does the lead CSO issue disciplinary actions?

14:05:43  18       A.   I don't know.

14:05:51  19       Q.   Was there only one lead CSO at a time in

14:05:55  20   Brownsville?

14:05:58  21       A.   When I was there, yes.

14:06:23  22       Q.   Is there a difference in pay between a lead CSO

14:06:28  23   and a CSO?

14:06:29  24       A.   I believe so, but I don't know how much.

14:06:34  25       Q.   Is there a difference in working hours between

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:06:37 | 1 | a lead CSO and a regular CSO? |
| 14:06:40 | 2 | A.   There could be, yes. |
| 14:06:41 | 3 | Q.   Do you know what those were? |
| 14:06:44 | 4 | A.   No, I don't know. |
| 14:06:48 | 5 | Q.   So when was Roy Zepeda placed in the lead CSO |
| 14:06:56 | 6 | position? |
| 14:06:59 | 7 | A.   I don't remember. |
| 14:07:10 | 8 | Q.   Was it before or after you moved to the new |
| 14:07:13 | 9 | courthouse? |
| 14:07:15 | 10 | A.   I imagine a little bit before.  I don't know |
| 14:07:18 | 11 | how many days or how many weeks or -- |
| 14:07:23 | 12 | Q.   But by the time you moved to the new |
| 14:07:25 | 13 | courthouse, you knew that he was the lead CSO? |
| 14:07:30 | 14 | A.   Correct. |
| 14:07:35 | 15 | Q.   And what is your complaint about Mr. Zepeda |
| 14:07:48 | 16 | being placed in the lead CSO position? |
| 14:07:58 | 17 | A.   He had never worked at federal court, to my |
| 14:08:02 | 18 | knowledge. |
| 14:08:09 | 19 | Q.   Okay.  Do you have any other complaints about |
| 14:08:12 | 20 | him being placed in the lead CSO position? |
| 14:08:25 | 21 | A.   I don't know if this would go under that |
| 14:08:28 | 22 | category or not.  He's -- he's younger than I am and he |
| 14:08:32 | 23 | is much more handsome. |
| 14:08:36 | 24 | Q.   He's younger and more handsome? |
| | 25 | A.   Yes. |

| 14:11:51 | 1 | Q. When you said it -- it had to be a combination |
| 14:11:53 | 2 | that he was younger and his experience as a supervisor? |

14:11:51  1      Q.    When you said it -- it had to be a combination

14:11:53  2  that he was younger and his experience as a supervisor?

14:11:57  3      A.    I imagine so.

14:11:58  4      Q.    What had to be a combination?

14:12:04  5      A.    His selection.

14:12:05  6      Q.    So you believe he was selected because he was

14:12:09  7  younger and because he had an experience as a

14:12:13  8  supervisor?

14:12:14  9      A.    I believe so, yes.

14:12:17  10     Q.    Did any supervisor or manager at Akal ever tell

14:12:21  11 you that Mr. Zepeda was selected because he was

14:12:28  12 younger?

14:12:29  13     A.    No, ma'am.

14:12:30  14     Q.    Did any supervisor or manager of Akal ever give

14:12:34  15 you anything any writing that indicated that Mr. Zepeda

14:12:37  16 was selected for the position of lead CSO because he

14:12:40  17 was younger?

14:12:42  18     A.    No, ma'am.

14:12:43  19     Q.    What facts or basis do you have to believe that

14:12:47  20 Mr. Zepeda was selected for the position of lead CSO

14:12:52  21 because he was younger?

14:12:55  22     A.    Because he was hired.

14:12:57  23     Q.    Other than the fact that he was hired, do you

14:13:00  24 have any other facts or basis to believe that the

14:13:02  25 reason he was selected for the position of lead CSO was

| | | |
|---|---|---|
| 14:13:07 | 1 | because he was younger? |
| 14:13:14 | 2 | A.   Will you repeat the question again, please? |
| 14:13:30 | 3 |         (Question read by reporter.) |
| | 4 | A.   No, ma'am. |
| | 5 | BY MS. PEREZ: |
| 14:13:43 | 6 | Q.   I'm sorry.  When you said "no, ma'am," you were |
| 14:13:45 | 7 | responding to question I had just asked; correct? |
| 14:13:49 | 8 | A.   Correct. |
| 14:13:50 | 9 | Q.   You said he was younger.  How old is |
| 14:13:53 | 10 | Mr. Zepeda? |
| 14:13:55 | 11 | A.   I don't know. |
| 14:14:12 | 12 | Q.   Who selected Mr. Zepeda for the position? |
| 14:14:15 | 13 | A.   I don't know. |
| 14:14:37 | 14 | Q.   Do you know one way or the other whether |
| 14:14:40 | 15 | Bill Sherrill recommended Zepeda for the position? |
| 14:14:43 | 16 | A.   I don't know. |
| 14:14:44 | 17 | Q.   Do you know one way or the whether R.C. |
| 14:14:49 | 18 | Cervantes recommended Zepeda for the position? |
| 14:14:51 | 19 | A.   I don't know. |
| 14:15:15 | 20 | Q.   Do you have any other complaints with respect |
| 14:15:17 | 21 | to Mr. Zepeda being selected for the lead CSO position? |
| 14:15:24 | 22 | A.   No, ma'am. |
| 14:15:55 | 23 | Q.   You also said you had a complaint about your |
| 14:15:58 | 24 | assignment at the front entrance. |
| 14:16:00 | 25 | A.   Yes, ma'am. |

| | | |
|---|---|---|
| 14:19:01 | 1 | make me a copy. |
| 14:19:01 | 2 | MR. COWEN:   Okay. |
| 14:19:01 | 3 | MS. PEREZ:   Let's go off the record for a |
| 14:19:01 | 4 | minute. |
| 14:19:02 | 5 | (Recess taken between 2:19 and 2:21.) |
| 14:21:11 | 6 | BY MS. PEREZ: |
| 14:21:13 | 7 | Q.   Okay.  Mr. Lopez, I just handed you Deposition |
| 14:21:16 | 8 | Exhibit Number 13.  These are daily assignments.  Do |
| 14:21:19 | 9 | you recall these documents? |
| 14:21:20 | 10 | A.   Yes, ma'am. |
| 14:21:27 | 11 | Q.   And I'm not going to go through -- these are |
| 14:21:29 | 12 | several pages of documents.  I'm not going to go |
| 14:21:32 | 13 | through each page, but I am going to ask you questions |
| 14:21:36 | 14 | about some of them.  Were these the assignments to |
| 14:21:41 | 15 | where people were stationed? |
| 14:21:43 | 16 | A.   Correct. |
| 14:21:44 | 17 | Q.   And the first page says August 31st of 1999. |
| 14:21:49 | 18 | Do you see that? |
| 14:21:51 | 19 | A.   At the very top, yes, ma'am. |
| 14:21:56 | 20 | Q.   So these are the assignments for that day; |
| 14:21:59 | 21 | right? |
| 14:21:59 | 22 | A.   Correct. |
| 14:21:59 | 23 | Q.   And on that day, you were assigned to |
| 14:22:02 | 24 | magistrate court; correct? |
| 14:22:07 | 25 | A.   Are you looking here or here? |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:22:12 | 1 | Q.   I'm looking at the bottom. |
| 14:22:14 | 2 | A.   At the bottom part, okay.  Yes. |
| 14:22:17 | 3 | Q.   In Judge Recio's court? |
| 14:22:21 | 4 | A.   Correct. |
| 14:22:22 | 5 | Q.   And on the next page, it says September 9th of |
| 14:22:26 | 6 | '99.  Do you see that? |
| 14:22:27 | 7 | A.   Yes, ma'am. |
| 14:22:27 | 8 | Q.   And on that day, you were assigned to Judge |
| 14:22:33 | 9 | Schmidt's court; is that correct? |
| | 10 | A.   Yes, ma'am.  Correct. |
| 14:22:36 | 11 | Q.   He was a visiting bankruptcy judge? |
| 14:22:38 | 12 | A.   Correct. |
| 14:22:39 | 13 | Q.   The next page of Exhibit 13 says October 6 of |
| 14:22:44 | 14 | '99; correct? |
| 14:22:44 | 15 | A.   Correct. |
| 14:22:46 | 16 | Q.   And that date you worked bankruptcy court; |
| | 17 | correct? |
| 14:22:50 | 18 | A.   Correct. |
| 14:22:53 | 19 | Q.   Now, looking at October 18th of '99, that day |
| 14:22:59 | 20 | you were assigned to Magistrate Recio's court; correct? |
| 14:23:04 | 21 | A.   Yes, ma'am. |
| 14:23:07 | 22 | Q.   Looking at October, looks like, 25th of '99, do |
| 14:23:11 | 23 | you see that? |
| 14:23:13 | 24 | A.   Yes, ma'am. |
| 14:23:16 | 25 | Q.   And that day, it says either you or Zepeda were |

| | | |
|---|---|---|
| 14:23:20 | 1 | assigned to Judge Recio's court; correct? |
| 14:23:24 | 2 | A.   Correct. |
| 14:23:24 | 3 | Q.   Looking at the next page, that says November |
| 14:23:30 | 4 | 3rd of '99.  Do you see that? |
| 14:23:32 | 5 | A.   Yes, ma'am. |
| 14:23:33 | 6 | Q.   And that says you were assigned to the |
| 14:23:35 | 7 | bankruptcy Judge Schmidt's court; correct? |
| 14:23:37 | 8 | A.   Correct. |
| 14:23:38 | 9 | Q.   And so you worked there that day; right? |
| 14:23:40 | 10 | A.   Yes, ma'am. |
| 14:23:41 | 11 | Q.   Did you work wherever they asked you to work? |
| 14:23:44 | 12 | A.   Yes, ma'am. |
| 14:23:47 | 13 | Q.   I'm taking you again to November 4th of 1999, |
| 14:23:51 | 14 | the next page.  And that says you were assigned, again, |
| 14:23:56 | 15 | to Judge -- bankruptcy Judge Schmidt's court? |
| 14:23:59 | 16 | A.   Correct. |
| 14:24:03 | 17 | Q.   Next page, November 5th of '99? |
| 14:24:05 | 18 | A.   Uh-huh, yes, ma'am. |
| 14:24:06 | 19 | Q.   That day you worked in Judge Recio's court; |
| 14:24:11 | 20 | correct? |
| 14:24:12 | 21 | A.   Correct. |
| 14:24:13 | 22 | Q.   November 15th of '99, that day you worked in |
| 14:24:17 | 23 | Judge Recio's court and also Judge Black's court? |
| 14:24:21 | 24 | A.   Correct. |
| 14:24:28 | 25 | Q.   I take you to November 16th of '99.  And, |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:24:33 | 1 | again, this says that on November 16th, you either |
| 14:24:37 | 2 | worked Judge Black or Judge Recio's court; correct? |
| 14:24:42 | 3 | A.    Correct. |
| 14:24:46 | 4 | Q.    November 17th of '99, this day you worked Judge |
| 14:24:50 | 5 | Black's court; correct? |
| 14:24:52 | 6 | A.    Correct. |
| 14:24:53 | 7 | Q.    November 18th of '99, you worked Judge Recio's |
| 14:24:58 | 8 | court and Judge Black's court; correct? |
| 14:25:00 | 9 | A.    Correct. |
| 14:25:02 | 10 | Q.    November 23rd of '99, you worked Judge Recio's |
| 14:25:06 | 11 | court twice? |
| 14:25:08 | 12 | A.    Correct. |
| 14:25:14 | 13 | Q.    November 30th of '99, you worked Judge Recio's |
| 14:25:20 | 14 | court; correct? |
| 14:25:21 | 15 | A.    Correct. |
| 14:25:23 | 16 | Q.    December 1st of '99, you worked Judge Recio's |
| 14:25:27 | 17 | court; correct? |
| 14:25:28 | 18 | A.    Correct. |
| 14:25:29 | 19 | Q.    And, in fact, it looks like you worked his |
| 14:25:32 | 20 | court twice that day? |
| 14:25:33 | 21 | A.    Correct. |
| 14:25:34 | 22 | Q.    December 7th of '99, you were assigned to work |
| 14:25:40 | 23 | Judge Black's court? |
| 14:25:41 | 24 | A.    Correct. |
| 14:25:43 | 25 | Q.    December 13th of '99, you worked Judge Recio's |

M. LOPEZ – MS. PEREZ

| | | |
|---|---|---|
| 14:25:48 | 1 | court? |
| 14:25:49 | 2 | A.   Correct. |
| 14:25:52 | 3 | Q.   December 14th of '99, you worked Judge Black's |
| 14:25:55 | 4 | court? |
| 14:25:56 | 5 | A.   Correct. |
| 14:25:58 | 6 | Q.   December 16th of '99, you were assigned to work |
| 14:26:01 | 7 | the grand jury? |
| 14:26:18 | 8 | A.   I'm not sure about this one. |
| 14:26:20 | 9 | Q.   Are you looking at the one that says December |
| 14:26:23 | 10 | 16th of '99? |
| 14:26:25 | 11 | A.   Correct. |
| 14:26:25 | 12 | Q.   Certainly this document says that you were |
| 14:26:27 | 13 | assigned to work grand jury; correct? |
| 14:26:30 | 14 | A.   It says, but I know I have never worked the |
| 14:26:34 | 15 | grand jury in the new federal building.  And if I did, |
| 14:26:37 | 16 | I worked it with somebody else.  And that's what I was |
| 14:26:40 | 17 | looking for here. |
| 14:26:42 | 18 | Q.   You're not disputing that this document had you |
| 14:26:46 | 19 | scheduled to work the grand jury; are you? |
| 14:26:50 | 20 | A.   I'm disputing the authenticity of the document, |
| 14:26:54 | 21 | yes. |
| 14:26:54 | 22 | Q.   You're saying that this document is not |
| 14:26:57 | 23 | authentic? |
| 14:26:59 | 24 | A.   Yes, ma'am. |
| 14:27:00 | 25 | Q.   You're saying you were never assigned to work |

| 14:27:02 | 1 | the grand jury? |
|---|---|---|

14:27:04   2      A.   Never assigned to work the grand jury.  And if

14:27:06   3   I did, I just went over there a little while until

14:27:12   4   somebody else came in.

14:27:16   5      Q.   Okay.  Are you saying somebody made this

14:27:18   6   document up?

14:27:20   7      A.   I don't know.

14:27:21   8      Q.   You don't know one way or the other?

14:27:23   9      A.   I don't know one way or the other.

14:27:28  10      Q.   I'm taking you to December 15th of '99.  You

14:27:34  11   were assigned to work Magistrate Black's court that

14:27:38  12   day; right?

14:27:39  13      A.   Correct.

14:27:48  14      Q.   And on December 27th of '99, you were assigned

14:27:52  15   to work Judge Recio's court?

14:27:55  16      A.   Correct.

14:28:10  17      Q.   And on January 5th of 2000, you were assigned

14:28:19  18   to work Judge Black's court?

14:28:19  19      A.   Correct.

14:28:19  20      Q.   And on January 7th of 2000, you were assigned

14:28:23  21   to work Judge Black's court?

14:28:35  22      A.   Correct.

14:29:43  23      Q.   I'm going to ask you to glance through

14:29:47  24   different -- through the various pages in Deposition

14:29:54  25   Exhibit 13.

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 14:38:57 | 1 | A.    I really don't know.  He's younger than I am. |
| 14:39:01 | 2 | Q.    Do you know how much younger? |
| 14:39:04 | 3 | A.    Maybe about ten years. |
| 14:39:06 | 4 | Q.    But you're not -- you're guessing when you say |
| 14:39:09 | 5 | ten years? |
| 14:39:09 | 6 | A.    I'm guessing, yes, ma'am. |
| 14:39:23 | 7 | Q.    And you still switched with Mr. Fry? |
| 14:39:27 | 8 | A.    Yes, we did. |
| 14:39:29 | 9 | Q.    Do you know one way or the other whether there |
| 14:39:30 | 10 | was a meeting with Judge Vela? |
| 14:39:35 | 11 | A.    No, ma'am.  Not for sure, I don't.  Just |
| 14:39:38 | 12 | hearsay. |
| 14:39:45 | 13 | Q.    And other than what Mr. Zepeda said, do you |
| 14:39:51 | 14 | know why you were assigned -- assigned at the front? |
| 14:39:54 | 15 | A.    No, ma'am, not that I can recall. |
| 14:39:58 | 16 | Q.    And as we just went through Exhibit 13 -- |
| 14:40:01 | 17 | A.    Yes, ma'am. |
| 14:40:02 | 18 | Q.    -- you said this meeting had taken place when? |
| 14:40:06 | 19 | A.    I don't know. |
| 14:40:09 | 20 | Q.    We went through Exhibit 13, which demonstrates |
| 14:40:14 | 21 | that you worked in the courts; right, Mr. Lopez? |
| 14:40:19 | 22 | A.    Yes, ma'am. |
| 14:40:19 | 23 | Q.    And that was after your meeting -- |
| 14:40:23 | 24 | A.    Yes, ma'am. |
| 14:40:23 | 25 | Q.    -- with Mr. Zepeda? |

| | | |
|---|---|---|
| 14:40:24 | 1 | A.    Yes, ma'am. |
| 14:40:25 | 2 | Q.    That you just described? |
| 14:40:27 | 3 | A.    Yes, ma'am. |
| 14:40:27 | 4 | Q.    So you did work courts? |
| 14:40:29 | 5 | A.    Yes, ma'am. |
| 14:40:31 | 6 | Q.    So you worked other than the front entrance; |
| | 7 | right? |
| 14:40:36 | 8 | A.    Yes, ma'am, at different times, I did. |
| 14:40:41 | 9 | Q.    Did you ask him again to be moved or did you |
| 14:40:44 | 10 | just start getting assigned to work courts or do you |
| 14:40:48 | 11 | know what happened there? |
| 14:40:49 | 12 | A.    Yes, ma'am. |
| 14:40:49 | 13 | Q.    What happened? |
| 14:40:50 | 14 | A.    I believe that he was short in help and he |
| 14:40:53 | 15 | would call on me. |
| 14:40:54 | 16 | Q.    You said "I believe" -- |
| | 17 | A.    Yes. |
| 14:40:56 | 18 | Q.    -- are you guessing? |
| 14:40:57 | 19 | A.    I don't know for -- I'm guessing. |
| 14:41:12 | 20 | Q.    I'm trying to determine when this meeting would |
| 14:41:15 | 21 | have happened with Mr. Zepeda.  It was at the beginning |
| 14:41:21 | 22 | before you were actually working at the federal |
| 14:41:24 | 23 | courthouse; right? |
| 14:41:25 | 24 | A.    Yes. |
| 14:41:26 | 25 | Q.    It was before y'all had transferred over there |

| 14:43:32 | 1 | Q. What did you tell Louis McDaniel? |

14:43:32    1    Q.   What did you tell Louis McDaniel?

14:43:36    2    A.   That "How come we're not being switched

14:43:40    3    around?"

14:43:41    4    Q.   What was his response?

14:43:45    5    A.   His response was "Wait until things quiet down

14:43:49    6    a little bit more, Mike."  And I don't know what he

14:43:54    7    meant by that.  He wouldn't clarify.

14:44:01    8    Q.   Do you know one way or the other whether you

14:44:07    9    would have been working other CSO positions if you had

14:44:10   10    continued to be employed there?

14:44:12   11    A.   I don't understand the question.  I'm sorry.

14:44:17   12    Q.   Do you know whether or not you would have been

14:44:20   13    permitted to work other CSO positions if you continued

14:44:25   14    to be employed there?

14:44:28   15    A.   I don't know.

14:44:31   16    Q.   So you talked to Mr. McDaniel this one time,

14:44:39   17    and he said "Wait until things quiet down"?

14:44:42   18    A.   Yes, ma'am.

14:44:42   19    Q.   But you don't know what he meant by that?

14:44:44   20    A.   No, ma'am.

           21    Q.   When did you talk to Mr. McDaniel?

           22    A.   I don't remember.

14:44:48   23    Q.   But you only talked to him one time about it?

           24    A.   Yes.

14:44:51   25    Q.   And you also said you talked to Mr. Cervantes?

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 15:04:27 | 1 | letter from Louis McDaniel that you're talking about? |
| 15:04:31 | 2 | A. Yes, ma'am. |
| 15:04:39 | 3 | Q. And in this letter, he's advising you who you |
| 15:04:43 | 4 | can complain to if you don't like the decisions that |
| 15:04:45 | 5 | he's making; right? |
| 15:04:46 | 6 | A. Yes, ma'am. |
| 15:04:47 | 7 | Q. And he's indicated that you went out of your |
| 15:04:50 | 8 | chain of command? |
| 15:04:50 | 9 | A. That's what he indicates, yes. |
| 15:04:53 | 10 | Q. And do you know what your chain of command is? |
| | 11 | A. Yes. |
| 15:05:00 | 12 | Q. Who were you supposed to complain to? |
| | 13 | A. To my supervisor. |
| | 14 | Q. Who was who? |
| 15:05:02 | 15 | A. Or go to the union. He suggested go to the |
| 15:05:03 | 16 | union, but we were not in the union. So I didn't go to |
| 15:05:05 | 17 | the union. |
| 15:05:06 | 18 | Q. You didn't go to the union because you didn't |
| 15:05:08 | 19 | pay union dues? |
| 15:05:10 | 20 | A. Correct. We didn't have a union in our office. |
| 15:05:13 | 21 | Everybody elected not to belong to the union. |
| 15:05:16 | 22 | Q. I thought you said earlier that there was a |
| 15:05:19 | 23 | union there in the southern district? |
| 15:05:21 | 24 | A. Could be, but not in our office. |
| 15:05:27 | 25 | Q. So do you know one way or the other whether the |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 15:05:32 | 1 | union in the southern district was also over your |
| 15:05:35 | 2 | office? |
| 15:05:36 | 3 | A.   No, I don't know. |
| 15:05:54 | 4 | Q.   Do you have any complaints about this letter? |
| 15:06:01 | 5 | A.   Complaints? |
| 15:06:03 | 6 | Q.   Yeah. |
| 15:06:12 | 7 | A.   Of what he tells me? |
| | 8 | Q.   Yes. |
| 15:06:15 | 9 | A.   Well, I complained about Roy Zepeda being -- |
| 15:06:18 | 10 | okay -- and he says something about Roy Zepeda, so -- I |
| 15:06:21 | 11 | don't understand your question.  I'm sorry. |
| 15:06:23 | 12 | Q.   Do you have any complaints about the fact that |
| 15:06:25 | 13 | he sent this letter to you? |
| | 14 | A.   No. |
| 15:06:29 | 15 | Q.   Okay.  When I say "this letter," I'm referring |
| 15:06:31 | 16 | to Deposition Exhibit 16. |
| 15:06:33 | 17 | A.   Correct. |
| 15:07:47 | 18 | Q.   I'm going to hand you what I've marked as |
| 15:07:50 | 19 | Deposition Exhibit Number 17.  And tell me, is that a |
| 15:07:52 | 20 | document that you wrote? |
| 15:07:55 | 21 | A.   Yes, ma'am. |
| 15:07:56 | 22 | Q.   And you wrote that document on what day? |
| 15:08:00 | 23 | A.   It says here July the 6th, '99. |
| 15:08:04 | 24 | Q.   And you sent that document to whom? |
| 15:08:06 | 25 | A.   I sent it to Akal Security, Richard Wimberly. |

| | | |
|---|---|---|
| 15:09:26 | 1 | A. No, ma'am, I don't. |
| 15:09:31 | 2 | Q. Let me see. I'm talking right here. |
| 15:09:36 | 3 | A. Okay. |
| 15:09:37 | 4 | Q. Do you see that word "although"? |
| 15:09:40 | 5 | A. Although. |

15:09:41  6   Q.   "Although I gave him the go ahead to talk to
15:09:44  7  Mr. McDaniels, I do know that he has big influence on
15:09:47  8  who is to be promoted." Is that R.C. Cervantes has a
          9  big influence?
15:09:52 10   A.   Yes, ma'am.
15:09:53 11   Q.   Why do you believe he has a big influence?
15:09:56 12   A.   Because I understand he is the overseer of the
15:09:58 13  contract.
15:09:58 14   Q.   He's with the U.S. Marshals?
15:10:02 15   A.   With the marshals, yes, ma'am.
15:10:05 16   Q.   And as far as you know, Akal has to act in
15:10:15 17  accordance with the U.S. Marshals' wishes; right?
15:10:15 18   A.   Not to break the law, no, ma'am.
15:10:16 19   Q.   Well, not to break the law, but otherwise?
15:10:18 20   A.   Otherwise, yes.
15:10:19 21   Q.   They try and work with the U.S. Marshals to
15:10:23 22  please them; correct?
15:10:24 23   A.   But how far can you go?
15:10:26 24       MR. COWEN: Just answer the questions. We can
15:10:27 25  argue when we get to trial.

| | | |
|---|---|---|
| 15:10:33 | 1 | A. Okay. Now, what was the question? |
| | 2 | BY MS. PEREZ: |
| 15:10:34 | 3 | Q. As far as you know, Akal had the contract with |
| 15:10:36 | 4 | the U.S. Marshals; correct? |
| 15:10:38 | 5 | A. Correct. |
| 15:10:39 | 6 | Q. And they had to keep the U.S. Marshals -- they |
| 15:10:43 | 7 | had to work in accordance with their wishes? |
| 15:10:46 | 8 | A. Yes, ma'am. |
| 15:10:47 | 9 | Q. As far as you know? |
| 15:10:48 | 10 | A. As far as I know. |
| 15:10:50 | 11 | Q. It was their client, as far as you know? |
| 15:10:52 | 12 | A. Yes, ma'am. |
| 15:11:02 | 13 | Q. In the next paragraph, you said, "What happened |
| 15:11:05 | 14 | to the posting of vacancies?" |
| 15:11:09 | 15 | A. Okay. |
| 15:11:09 | 16 | Q. Are you talking about the lead CSO position at |
| 15:11:12 | 17 | that point? |
| 15:11:13 | 18 | A. Yes, ma'am, I believe so. |
| 15:11:14 | 19 | Q. So as far as you know, they didn't post it? |
| 15:11:18 | 20 | A. As far as I know, they didn't post it. |
| 15:11:29 | 21 | Q. In the next paragraph, you say about Mr. |
| 15:11:32 | 22 | Zepeda's appointment, "I feel that Mr. McDaniel is |
| 15:11:35 | 23 | diluting the credibility and importance of the Federal |
| 15:11:37 | 24 | Court Security Program." |
| 15:11:38 | 25 | A. Yes, ma'am. |

| | | |
|---|---|---|
| 15:12:49 | 1 | Q. Because you did swap with Fry? |
| | 2 | A. Yes. |
| 15:12:53 | 3 | Q. Okay. Again, when you say "he didn't have any |
| 15:12:56 | 4 | pride in what he was doing in the way he was managing |
| 15:12:59 | 5 | the new installation," other than the schedule, what |
| 15:13:02 | 6 | are you talking about? |
| 15:13:04 | 7 | A. I felt he wanted to get rid of the older |
| 15:13:08 | 8 | people, the older CSOs. |
| 15:13:10 | 9 | Q. Who wanted to get rid of the older CSOs? |
| 15:13:14 | 10 | A. I think we're talking about Louis McDaniel. |
| 15:13:17 | 11 | Q. So you felt Louis McDaniel wanted to get rid of |
| 15:13:20 | 12 | the older CSOs? |
| 15:13:23 | 13 | A. Yes, ma'am. |
| 15:13:23 | 14 | Q. Anything else that you're talking about when |
| 15:13:25 | 15 | you say he doesn't have any pride in what he's doing? |
| 15:13:28 | 16 | A. And that's all I can think of at this time. |
| 15:13:31 | 17 | Q. When you say you felt that he wanted to get rid |
| 15:13:34 | 18 | of the older CSOs, what fact -- did he ever tell you he |
| 15:13:38 | 19 | wanted to get -- when I say "he," did Louis McDaniel |
| 15:13:42 | 20 | ever tell you he wanted to get rid of the older CSOs? |
| 15:13:45 | 21 | A. No, ma'am. Not in words, no. |
| 15:13:47 | 22 | Q. Did he tell you that in any words? |
| 15:13:50 | 23 | A. No, ma'am. |
| 15:13:50 | 24 | Q. Did Louis McDaniel ever give you anything in |
| 15:13:54 | 25 | writing that indicated that he wanted to get rid of the |

| | | |
|---|---|---|
| 15:13:58 | 1 | older CSOs? |
| 15:13:59 | 2 | A. No, ma'am. |
| 15:14:00 | 3 | Q. What facts or basis do you have to believe that |
| 15:14:01 | 4 | Louis McDaniel wanted to get rid of the older CSOs? |
| 15:14:06 | 5 | A. The scheduling. |
| 15:14:06 | 6 | Q. Other than scheduling, what facts or basis do |
| 15:14:09 | 7 | you have to believe that Louis McDaniel wanted to get |
| | 8 | rid of the older CSOs? |
| 15:14:11 | 9 | A. He wouldn't let the CSOs rove or go to the |
| 15:14:14 | 10 | other posts. |
| 15:14:16 | 11 | Q. That's -- that's a scheduling; right? |
| | 12 | A. Okay. |
| 15:14:17 | 13 | Q. Other than the scheduling, what facts or basis |
| 15:14:19 | 14 | do you have to believe that Louis McDaniel wanted to |
| 15:14:22 | 15 | get rid of the older CSOs? |
| 15:14:25 | 16 | A. That's all, and the fact that I was fired. |
| 15:14:28 | 17 | Q. Okay. Other than the scheduling and the fact |
| 15:14:30 | 18 | that you were fired, what facts or basis do you have to |
| 15:14:32 | 19 | believe that Louis McDaniel wanted to get rid of the |
| 15:14:36 | 20 | older CSOs? |
| 15:14:41 | 21 | A. None more that I can remember. |
| 15:14:44 | 22 | Q. Well, if there was something big, you would |
| 15:14:46 | 23 | remember it; right? |
| 15:14:47 | 24 | A. Probably so. |
| 15:14:48 | 25 | Q. You understood that that's what you were here |

| 15:45:36 | 1 | Q.   Okay.  I'm going to ask you to tell me about |

15:45:36  1    Q.   Okay.  I'm going to ask you to tell me about
15:45:38  2    the -- there was an incident with some FBI agents;
          3    right?
15:45:42  4    A.   Yes, ma'am.
15:45:44  5    Q.   And that incident occurred on December 14th of
15:45:52  6    1999; correct?
15:45:55  7    A.   Yes, ma'am.
15:46:18  8    Q.   Okay.  Explain to me what happened on December
15:46:21  9    14th.  And I'd like you to go step by step with respect
15:46:26  10   to the FBI agents.
15:46:30  11   A.   Okay.  I was stationed at the front entrance,
15:46:36  12   and three FBI agents came in.
15:46:40  13   Q.   Was it morning or evening?
15:46:43  14   A.   It was in the morning, maybe about 10:30, 11:00
15:46:47  15   o'clock.  I'm not sure.  And before they got to the
15:46:54  16   desk where I was at, they started to get their IDs out.
15:47:00  17   And I told them if they had any weapons, and I showed
15:47:06  18   where the gun locker was.  And then I started to check
15:47:12  19   their IDs, and then I told them if they had any
15:47:16  20   beepers, pagers, telephones, or recorders that would
15:47:19  21   either have to put them with their guns in the gun
15:47:22  22   locker or I would keep them there.  But if they were
15:47:30  23   going to the U.S. Attorney's office only, they could
15:47:33  24   take them to the U.S. Attorney's office only.
15:47:38  25   Q.   Okay.  I want to take you back, and I know you

M. LOPEZ - MS. PEREZ

| 16:08:13 | 1 | it was a test? |
|---|---|---|

16:08:14   2       A.    It was a test.  So I called upstairs and I

16:08:17   3   said, "Those agents that went upstairs, if they're

16:08:21   4   armed, tell them to come down an place their weapons in

16:08:25   5   the gun locker."

16:08:34   6       Q.    I hand you what I'm marking as Deposition

16:08:36   7   Exhibit Number 20.  Have you seen that document before?

16:08:42   8       A.    Uh-huh.  Yes, ma'am, I have.

16:08:44   9       Q.    Tell me what it is.

16:08:48   10      A.    Your court security post orders.

16:08:51   11      Q.    And this the post orders talk about who can

16:08:56   12  have weapons, who can have firearms in the courthouse;

          13  correct?

16:09:01   14      A.    Yes, ma'am.

16:09:09   15      Q.    And under number three, it says, "No one is to

16:09:12   16  be permitted past security screening with a firearm

16:09:16   17  except United States Marshal Service, United States

16:09:19   18  Probation and Federal Protective Service; correct?

16:09:23   19      A.    Yes, ma'am.

          20      Q.    Is that correct?

16:09:25   21      A.    That's correct.

16:09:25   22      Q.    And is that consistent with your understanding

16:09:27   23  of who could walk --

16:09:29   24      A.    Yes, ma'am.

16:09:29   25      Q.    -- of who could go in with firearms?

| | | |
|---|---|---|
| 16:09:32 | 1 | A.   Yes, ma'am. |
| 16:09:39 | 2 | Q.   Okay.  The next paragraph under the bottom of |
| 16:09:42 | 3 | page 1, it says, "Any law enforcement officer after |
| 16:09:45 | 4 | passing through the magnetometer who presents proper |
| 16:09:48 | 5 | credentials will be allowed to check their weapon and |
| 16:09:53 | 6 | proceed without further screening." |
| | 7 | A.   Correct. |
| 16:09:54 | 8 | Q.   Is that consistent with your understanding? |
| 16:09:57 | 9 | A.   Correct. |
| 16:09:58 | 10 | Q.   Of what had to be done with respect to people |
| 16:10:02 | 11 | who -- with respect to law enforcement officers who had |
| 16:10:04 | 12 | weapons? |
| 16:10:06 | 13 | A.   Yes, ma'am. |
| 16:10:07 | 14 | Q.   Looking on the next page of that exhibit, |
| 16:10:18 | 15 | paragraph 5, can you look at paragraph 5? |
| 16:10:21 | 16 | A.   Yes, ma'am.  Correct. |
| 16:10:37 | 17 | Q.   And is that consistent with your understanding |
| 16:10:40 | 18 | of the policy in place on December 14th of '99? |
| 16:10:43 | 19 | A.   Yes, ma'am. |
| 16:10:44 | 20 | Q.   That they had to have prior approval to have |
| 16:10:47 | 21 | any of those prohibited items? |
| 16:10:51 | 22 | A.   Yes, ma'am. |
| 16:10:51 | 23 | Q.   Those FBI agents on December 14th of '99, |
| 16:10:55 | 24 | Gutierrez, Nava, and Munoz as far as you know did not |
| 16:10:59 | 25 | have prior approval to have those weapons; correct? |

parПо

| 16:38:23 | 1 | Q. Do you know who Roderick Beverly is? |
| 16:38:28 | 2 | A. Robert who. |
| 16:38:30 | 3 | Q. Roderick Beverly? |
| 16:38:31 | 4 | A. No, ma'am. |
| 16:38:31 | 5 | Q. Do you know who Carl Whitehead is? |
| 16:38:34 | 6 | A. No, ma'am, I don't. I see in the letter his |
| 16:38:39 | 7 | position, but I've never met him. |
| 16:41:08 | 8 | Q. I'm going to hand you what I'm marking as |
| 16:41:12 | 9 | Deposition Exhibit Number 23; and ask you to look |
| 16:41:14 | 10 | through this document and just tell me if this is a |
| 16:41:17 | 11 | document in your writing and whether that is your |
| 16:41:21 | 12 | signature on the last page of Exhibit 23. |
| 16:43:21 | 13 | A. Yes, ma'am, this is my signature. |
| 16:43:26 | 14 | Q. Is that your signature -- is that -- did you |
| 16:43:28 | 15 | write that up? |
| 16:43:29 | 16 | A. Yes, ma'am. |
| 16:43:30 | 17 | Q. You wrote that up -- you sent that to the Texas |
| 16:43:34 | 18 | Workforce Commission? |
| 16:43:35 | 19 | A. Yes, ma'am. |
| 16:43:46 | 20 | Q. I hand you what I'm marking as Deposition |
| 16:44:07 | 21 | Exhibit Number 24. Is that the charge of |
| 16:44:18 | 22 | discrimination you filed with the EEOC? |
| 16:44:25 | 23 | A. Yes, ma'am, that is my signature. |
| 16:44:28 | 24 | Q. And you signed that on what date? |
| 16:44:31 | 25 | A. On January the 7th, 2000. |

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 16:44:34 | 1 | Q.  Did you sign that at the EEOC or did you mail |
| 16:44:39 | 2 | that to the EEOC? |
| 16:44:41 | 3 | A.  I mailed it to the EEOC, I believe. |
| 16:44:44 | 4 | Q.  And when you signed this document, you didn't |
| 16:44:46 | 5 | have it notarized; right? |
| 16:44:50 | 6 | A.  No, ma'am. |
| 16:44:51 | 7 | Q.  In the first paragraph of this charge, you say |
| 16:44:54 | 8 | "I've been denied two different assignments; denied |
| 16:44:58 | 9 | roving patrol position and control center position." |
| 16:45:00 | 10 | That's what we talked earlier; correct? |
| 16:45:02 | 11 | A.  Correct. |
| 16:45:02 | 12 | Q.  Did you ever specifically ask for the control |
| 16:45:04 | 13 | center position? |
| 16:45:08 | 14 | A.  Not specifically for that, no. |
| 16:45:14 | 15 | Q.  You also in the next paragraph say, "On June |
| 16:45:17 | 16 | 11th, 1999 Roy Zepeda gave us our new work schedule for |
| 16:45:24 | 17 | the federal courthouse."  And you talk about the swaps. |
| 16:45:26 | 18 | That second paragraph, we've already discussed earlier |
| 16:45:28 | 19 | today; correct? |
| 16:45:30 | 20 | A.  Yes. |
| 16:45:36 | 21 | Q.  And there you claim you've been discriminated |
| 16:45:40 | 22 | against because of your age? |
| 16:45:42 | 23 | A.  Correct. |
| 16:47:06 | 24 | Q.  I hand you what I'm marking as Deposition |
| 16:47:10 | 25 | Exhibit Number 25.  Tell me if that's a document that |

M. LOPEZ – MS. PEREZ

| 16:57:58 | 1 | Q. Is that what you were saying? |
| 16:58:00 | 2 | A. No. I think that's why we're going to court. |
| 16:58:02 | 3 | Q. Okay. Well, you said something about I don't |
| 16:58:03 | 4 | have any proof, and what were you referring to? |
| 16:58:14 | 5 | A. I don't have any proof that McDaniel came right |
| 16:58:17 | 6 | out and said, "Mike, I'm going to terminate you because |
| 16:58:20 | 7 | of your age," or I don't have any proof about Roy |
| 16:58:23 | 8 | Zepeda coming down with a statement saying, "Mike, I'm |
| 16:58:25 | 9 | going to terminate you because of your age." But I'm |
| 16:58:29 | 10 | out. |
| 16:58:31 | 11 | Q. And you believe it was because of your age? |
| 16:58:33 | 12 | A. And I'm a lot happier than some of the guys |
| 16:58:37 | 13 | that stayed behind. |
| 16:58:38 | 14 | Q. Okay. Other than what you've already told |
| 16:58:40 | 15 | me -- |
| 16:58:41 | 16 | THE WITNESS: Sorry about that. Sorry, Chief. |
| 16:58:43 | 17 | MR. COWEN: Every time you do that, she's going |
| 16:58:45 | 18 | to ask you questions about that and you're going to be |
| 16:58:48 | 19 | here longer. You know that. |
| | 20 | BY MS. PEREZ: |
| 16:58:49 | 21 | Q. Other than what you just told me, do you have |
| 16:58:51 | 22 | any other facts or basis that you believe that you were |
| 16:58:53 | 23 | terminated because of your age? |
| 16:58:55 | 24 | A. No, not that I can remember. |
| 16:58:56 | 25 | Q. No other -- no Akal supervisor ever told you |

| 16:59:00 | 1 | you were terminated because of your age; correct? |
| 16:59:02 | 2 | A.   No, ma'am, correct. |
| 16:59:03 | 3 | Q.   No Akal supervisor or manager ever told you -- |
| 16:59:07 | 4 | ever gave you anything in writing that indicated that |
| 16:59:09 | 5 | you were terminated because of your age? |
| 16:59:13 | 6 | A.   No, ma'am. |
| 16:59:19 | 7 | Q.   When you talked about complaining to R.C. and |
| 16:59:21 | 8 | telling McDaniel, you already told me what you meant |
| 16:59:24 | 9 | about complaining to R.C.  Which conversation are you |
| 16:59:26 | 10 | referring to with McDaniel? |
| 16:59:33 | 11 | A.   Can you read that question again, please? |
| 16:59:36 | 12 | Q.   Yes.  When I asked you the facts or basis you |
| 16:59:40 | 13 | have to believe that you were terminated because of |
| 16:59:42 | 14 | your age, the first thing you said was complaining to |
| 16:59:44 | 15 | R.C. |
| 16:59:45 | 16 | A.   Okay. |
| 16:59:46 | 17 | Q.   And you've already explained to me which |
| 16:59:48 | 18 | conversation you were referring to; correct? |
| 16:59:49 | 19 | A.   Uh-huh, correct. |
| 16:59:51 | 20 | Q.   The second thing you said was telling McDaniel. |
| 16:59:54 | 21 | A.   I complained to McDaniel also. |
| 16:59:57 | 22 | Q.   And which conversation are you referring to |
| 16:59:59 | 23 | when you complained to McDaniels? |
| 17:00:01 | 24 | A.   The date, I don't remember right off. |
| 17:00:04 | 25 | Q.   What did you complain about to McDaniels? |

17:06:31  1    Q.   Where have you worked since leaving Akal?

17:06:40  2    A.   I worked for Castaneda Bail Bonds.

17:06:49  3    Q.   And where are they located?

17:06:51  4    A.   In McAllen.

17:06:55  5    Q.   And are you still working for them?

17:06:57  6    A.   No, ma'am.

17:06:57  7    Q.   How long did you work there?

17:06:59  8    A.   About three months.

17:07:00  9    Q.   Have you worked for anyone else since leaving

17:07:05  10   Akal?

17:07:05  11   A.   No, ma'am.

17:07:06  12   Q.   Why did you leave Castaneda Bail Bonds?

17:07:14  13   A.   I didn't like the job.

17:07:20  14   Q.   What was wrong with it?

17:07:23  15   A.   I didn't feel good about it.  Bond people up,

17:07:31  16   out, and the messages coming back from the people were

17:07:37  17   that --

17:07:43  18   Q.   I'm sorry?  Messages coming back from the

17:07:45  19   people were what?

17:07:46  20   A.   Were that the bail bond company would not

17:07:49  21   return their money after they have completed all their

17:07:52  22   requirements.  But this was hearsay.  But you -- but I

17:07:57  23   didn't want to be in a situation like that.

17:08:05  24   Q.   So you left them voluntarily?

17:08:08  25   A.   Yes, ma'am.

| | | |
|---|---|---|
| 17:08:09 | 1 | Q. How much were you getting paid there? |
| 17:08:13 | 2 | A. 250 a week plus commission. |
| 17:08:16 | 3 | Q. How many hours were you working? |
| 17:08:20 | 4 | A. About -- at the camp, about 20, but I would |
| 17:08:24 | 5 | work maybe about another eight hours. About 28 hours a |
| 17:08:32 | 6 | week. |
| 17:08:33 | 7 | Q. And where were you working the eight hours? |
| 17:08:37 | 8 | A. At the immigration camp, detention office. |
| 17:08:41 | 9 | Q. And why were you working there? |
| 17:08:44 | 10 | A. Because these bail bondsmen would go to the |
| 17:08:48 | 11 | camp and try and get illegals out on bond. |
| 17:08:56 | 12 | Q. So were you working on bonding them out? |
| 17:09:00 | 13 | A. Bonding them out, yes. |
| 17:09:03 | 14 | Q. What -- when did you work for Castaneda Bail |
| 17:09:08 | 15 | Bonds? |
| 17:09:09 | 16 | A. I do not remember exactly. |
| 17:09:11 | 17 | Q. Was it like a long time ago, a few weeks ago, a |
| 17:09:14 | 18 | few months ago? |
| 17:09:16 | 19 | A. Oh, no, no, no. I believe I started in about |
| 17:09:22 | 20 | middle of May. And I worked June, July, and part of |
| 17:09:27 | 21 | August; about three months. |
| 17:09:32 | 22 | Q. Of 2000 or 2001? |
| 17:09:36 | 23 | A. 2001. |
| 17:09:42 | 24 | Q. Have you looked for any other jobs since |
| 17:09:44 | 25 | leaving? |

M. LOPEZ – MS. PEREZ

| 17:09:45 | 1 | A. No, ma'am. |
| 17:09:45 | 2 | Q. Why not? |
| 17:09:47 | 3 | A. Well, I've got plenty to do at home. |
| 17:09:51 | 4 | Q. And are you receiving any kind of income?  Let |
| 17:09:55 | 5 | me ask you this.  What income have you received since |
| 17:09:57 | 6 | your separation from Akal? |
| 17:10:00 | 7 | A. I received unemployment compensation for about |
| 17:10:04 | 8 | six months.  And I receive a retirement check from the |
| 17:10:12 | 9 | government and I receive Social Security. |
| 17:10:21 | 10 | Q. How much Social Security do you receive? |
| 17:10:24 | 11 | A. I'm not sure.  I think right now it's at 517 a |
| 17:10:28 | 12 | month. |
| 17:10:29 | 13 | Q. Per month? |
| 17:10:30 | 14 | A. Per month. |
| 17:10:31 | 15 | Q. How much do you get in your retirement check? |
| 17:10:33 | 16 | A. Retirement check is about $1200.00. |
| 17:10:36 | 17 | Q. Per month? |
| 17:10:37 | 18 | A. Per month. |
| 17:10:38 | 19 | Q. And how much were you receiving in |
| 17:10:40 | 20 | unemployment? |
| 17:10:46 | 21 | A. I don't remember.  About $250.00 a week, I |
| 17:10:52 | 22 | believe, or $300.00 a week and they take income tax out |
| 17:10:58 | 23 | of that. |
| 17:11:07 | 24 | Q. I may have asked you this earlier, but do you |
| 17:11:11 | 25 | know anything about a contract between Akal and the |

| 17:13:33 | 1 | A. Yes, ma'am. |

17:13:33　1　　A.　Yes, ma'am.

17:13:34　2　　Q.　And why is that?

17:13:36　3　　A.　Because my -- my trade or my vocation in

17:13:43　4　security outside hardly pays any money, pays 5.25, 5.50

17:13:51　5　an hour, so I just gave up.

17:13:53　6　　Q.　And did you try doing any -- did you think

17:13:57　7　about doing anything other than security?

17:13:59　8　　A.　No, ma'am.

17:14:03　9　　Q.　You said you applied about three or four

17:14:07　10　places.　Do you know where those places are?

17:14:10　11　　A.　For security, I -- I don't remember.

17:14:12　12　　Q.　Did you look in the newspaper to see what jobs

17:14:15　13　were available?

17:14:16　14　　A.　Yes, ma'am.

17:14:17　15　　Q.　Was that just for a period of time that you did

17:14:19　16　that?

17:14:19　17　　A.　Yes, ma'am.

17:14:20　18　　Q.　Did you give up pretty early on, if you only

17:14:25　19　made three or four applications?

17:14:34　20　　A.　Pretty early, maybe six months afterwards.

17:14:39　21　Maybe.

17:14:39　22　　Q.　Okay.　So about six months after your

17:14:41　23　termination from Akal, you gave up and stopped looking

17:14:44　24　for jobs; right?

17:14:46　25　　A.　Correct.　Until I found the one for -- as a

M. LOPEZ - MS. PEREZ

| 17:14:52 | 1 | bail bondsman. |

17:14:52    1  bail bondsman.
17:14:53    2      Q.    And then you worked there for a short while,
17:14:54    3  and you haven't looked for any job since; correct?
17:15:02    4      A.    No, ma'am, I haven't.
17:15:03    5      Q.    I'm sorry.  So that's correct?
17:15:06    6      A.    Correct.
17:15:07    7      Q.    I'm going to hand you what I'm marking as
17:15:10    8  Deposition Exhibits 30 and 31.  And ask if you this is
17:15:13    9  a letter that you received, and that's Exhibit 30.
17:15:16   10      A.    Yes, ma'am.
17:15:17   11      Q.    Showing you Exhibit 31.  Is that your response
17:15:19   12  to the letter?
17:15:38   13      A.    Does this have another page to go with it or --
17:15:40   14  or is this the way it was and who got it?  What was the
17:15:43   15  date?
17:15:43   16      Q.    That's the page I've got.  My -- do you
17:15:45   17  remember that document?
17:15:47   18      A.    Part of it, yes.  What says in here -- but
17:15:51   19  there's supposed to be another --
17:15:52   20      Q.    You think there's another page attached to
17:15:54   21  that?
           22      A.    Yes.
17:15:55   23      Q.    And is that document a response to -- is
17:16:00   24  Exhibit 31 a response to Exhibit 30?
17:16:07   25      A.    I believe so, yes.

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West  (210) 698-2727  San Antonio, Texas 78257

M. LOPEZ - MS. PEREZ

| 17:16:08 | 1 | Q.   Is that why you numbered -- on Exhibit 30, you |
| 17:16:10 | 2 | have numbered one through ten; correct? |
| 17:16:12 | 3 | A.   Correct. |
| 17:16:13 | 4 | Q.   And then on Exhibit 31, you've done the |
| 17:16:16 | 5 | response one through ten; correct? |
| 17:16:18 | 6 | A.   Correct. |
| 17:16:19 | 7 | Q.   And in there, you say what you think is the |
| 17:16:25 | 8 | response to the allegations; is that right? |
| 17:16:28 | 9 | A.   Yes, ma'am. |
| 17:16:30 | 10 | Q.   And who did you receive that letter from |
| 17:16:33 | 11 | Exhibit 30? |
| 17:16:38 | 12 | A.   I believe it was Roy Zepeda gave it to me. |
| 17:16:45 | 13 | Q.   Who is the author of the letter? |
|  | 14 | A.   Sat Nirmal Khalsa. |
| 17:16:54 | 15 | Q.   You don't have any reason to believe that Sat |
| 17:16:57 | 16 | Nirmal Khalsa would take any action against you because |
| 17:16:59 | 17 | of your age; do you? |
| 17:17:00 | 18 | A.   No. |
| 17:17:01 | 19 | Q.   You don't have any facts or basis to believe |
| 17:17:03 | 20 | that Sat Nirmal Khalsa knew that you had complained |
| 17:17:08 | 21 | about age discrimination; do you? |
| 17:17:10 | 22 | A.   I don't have any facts to prove. |
| 17:17:15 | 23 | Q.   Do you know who decided that you would be |
| 17:17:18 | 24 | terminated? |
| 17:17:21 | 25 | A.   I don't have the slightest idea. |

| | | |
|---|---|---|
17:22:57  1    A.    And the responses to all the letters and
17:22:59  2  complaints and all that, all that's something to one.
17:23:03  3  Besides that, I don't have any.
17:23:05  4    Q.    Okay.  When you say "the responses to the --
17:23:07  5  you mean to the EEOC?
17:23:10  6    A.    No, no.  The talks that I had with McDaniel and
17:23:14  7  Robert Cervantes and what happened to the FBI agent and
17:23:20  8  everything in one lump.  Besides that and my
17:23:24  9  termination, no, I don't have.
17:23:27  10    Q.    Okay.  During your discussions with McDaniel,
17:23:30  11  was he -- was he nice to you?
17:23:37  12    A.    Yes, ma'am.
17:23:38  13    Q.    And you were nice to him; right?
17:23:40  14    A.    Yes, ma'am.
17:23:41  15    Q.    And during your discussions with R.C.
17:23:45  16  Cervantes, were you nice to him?
17:23:47  17    A.    Yes, ma'am.
17:23:47  18    Q.    And was he nice to you?
17:23:48  19    A.    Yes, ma'am.
17:23:49  20    Q.    And during your discussions with the FBI
17:23:51  21  agents, were you nice to them?
17:23:53  22    A.    Yes, ma'am.
17:23:53  23    Q.    Were they nice to you?
17:23:54  24    A.    No, ma'am.
17:23:55  25    Q.    The FBI agents were not?

M. LOPEZ - MS. PEREZ

| | | |
|---|---|---|
| 17:26:01 | 1 | happening to him at this moment.  I was not in -- in |
| 17:26:06 | 2 | the room with him. |
| 17:26:07 | 3 | Q.  Okay.  You didn't personally hear the |
| 17:26:08 | 4 | conversation -- |
| 17:26:09 | 5 | A.  No, ma'am, that's correct. |
| 17:26:10 | 6 | Q.  -- in which he was asked to take a physical? |
| | 7 | A.  Yes. |
| 17:26:16 | 8 | Q.  And if Akal states that the reason you were |
| 17:26:18 | 9 | terminated is because of the incident on December 14th |
| 17:26:21 | 10 | of 1999 with the FBI agent, what facts do you have to |
| 17:26:25 | 11 | show that that is not true? |
| 17:27:09 | 12 | A.  I don't have any facts. |
| 17:27:21 | 13 | Q.  I'm going to hand you what I'm marking as |
| 17:27:24 | 14 | Deposition Exhibit Number 32.  These are your responses |
| 17:27:30 | 15 | these are your responses to interrogatories and request |
| 17:27:34 | 16 | for production.  Have you seen that document before? |
| 17:27:40 | 17 | A.  Yes, ma'am. |
| 17:27:43 | 18 | Q.  I'm going to take you to a page that's not |
| 17:27:46 | 19 | numbered, but if you'll turn to page 3 of the document |
| 17:27:49 | 20 | where it says "interrogatory number 1." |
| 17:27:51 | 21 | A.  Okay. |
| 17:27:52 | 22 | Q.  Other than what is listed and what we have |
| 17:27:57 | 23 | already discussed about the people today, I'm going to |
| 17:28:00 | 24 | ask you if you have listed these people as witnesses |
| 17:28:03 | 25 | for any other reason; okay?  Do you understand that -- |

```
ERRATA SHEET
```

| PAGE/LINE | CHANGE | REASON |
|-----------|--------|--------|
| 21  6 | Emmy to M. | correction |
| 32  4 | Cried to Tried | " |
| 35  5 | with not for | " |
| 34  2 | of Service not Serviced | " |
| 58  2 | Glyneo not Lincoln | " |
| 69  24 | Gun locker not County locker | " |
| 89  23 | mag Court instead of MAIN Court | " |

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West   (210) 698-2727   San Antonio, Texas 78257

```
 1            I HEREBY CERTIFY that I have read the

 2    foregoing deposition; and that this deposition,

 3    together with any corrections noted on the errata

 4    sheet, is a true record of my testimony given at this

 5    deposition and all answers are within my personal

 6    knowledge and are true and correct.

 7

 8

 9                        _____
                                MIGUEL LOPEZ
10

11            BEFORE ME the undersigned authority,

12    personally appeared MIGUEL LOPEZ who, upon his oath,

13    states that all answers given by him in the foregoing

14    deposition are within his personal knowledge and are

15    true and correct.

16            SUBSCRIBED AND SWORN TO BEFORE ME, this

17    __10th__ day of __January__, A.D. ~~2001~~ 2002.

18

19

20                        _____
                          NOTARY PUBLIC IN AND FOR
21                        THE STATE OF TEXAS

22

23    MY COMMISSION EXPIRES __08-22-2004__.

24

25
```

JOSIE O. LUCIO
Notary Public,
State of Texas
My Comm. Exp. 08-22-2004

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION


 3


 4   MIGUEL LOPEZ AND MIGUEL LOPEZ,     *
         Plaintiffs,                    *
 5

 6   VS.                               *   CASE NO. B-01-CV-72

 7


 8   AKAL SECURITY, INC.,              *
         Defendant.                    *
 9
     _____*_____
     STATE OF TEXAS             *
10   COUNTY OF BEXAR            *

11                         I, SHAN MORRIS BLANCHARD,

12   Certified Shorthand Reporter in and for the State of

13   Texas, do hereby certify that the facts stated and set

14   forth on the caption hereto are true; that after the

15   witness, MIGUEL LOPEZ, had been by me first duly

16   cautioned and sworn to tell the truth, the whole truth

17   and nothing but the truth, the foregoing questions were

18   propounded to him by the attorneys named in the caption

19   hereto, and that the foregoing answers were made by

20   said witness at said time in response to said questions

21   so propounded to him; that the said questions so

22   propounded to the said witness and the said answers in

23   response thereto were by me, at said time and place,

24   taken down in shorthand on the 10th day of December

25   A.D. 2001, and that the foregoing is a true record of
```

224

1  the testimony given by the witness.

2          Pursuant to information given at the time

3  said testimony was taken, the following includes all

4  parties of record and the amount of time used by each

5  party at the deposition:

6      Ms. Raquel G. Perez          5 hours 17 minutes
       Mr. Rick Wood                0 hours 0 minutes
7          I do further certify that the said

8  deposition, along with all exhibits, was delivered on

9  the _19th_ day of __December__, A.D. 2001 to MR.

10 COWEN for review and signature of the witness, with

11 instructions that the deposition be returned to me

12 within ~~20~~ 30 days of receipt thereof, and that said

13 deposition was/~~was not~~ returned, along with the changes

14 annotated by the witness on the attached errata sheet,

15 and that the charge for the completed deposition is

16 $_____, charged to MS. PEREZ, who has been

17 furnished a true and correct copy of said deposition,

18 along with any exhibits thereto.

19          Said original deposition, having

20 been/~~having not been~~ returned to us, was/~~was not~~

21 forwarded to the custodial attorney for safekeeping on

22 the _14th_ day of __January__, A.D. 2002, and that

23 notification of such action was forwarded to all

24 parties.

25

```
 1                WITNESS MY HAND AND SEAL OF OFFICE this the

 2   __14__ day of January___, A.D. 200⁄.

 3

 4

 5                              Shan Morris Blanchard
     DLF                        SHAN MORRIS BLANCHARD
 6   Certificate No. 3863       Certified Shorthand Reporter
     Exp. Date: 12/31/02        in and for the State of Texas
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## AKAL SECURITY IS AN EQUAL OPPORTUNITY EMPLOYER

It is the policy of Akal Security, Inc. to provide employment, training, compensation levels, transfer or promotion opportunities, and all other aspects of employment without regard to sex, race, color, religion, national origin, age or for qualified handicapped individuals, disabled veterans or Vietnam era veterans

When hiring or promotion activity occurs, and in those job categories where we have identified underutilization, we will take affirmative action to seek out qualified applicants without regard to sex, race, color, religion, national origin, age, handicap, or veteran status.

At Akal Security, Inc. all terms and conditions of employment are and will continue to be established on the basis of the individual's qualifications and ability to perform the job

I hereby appoint Sat Nirmal Kaur as the Equal Employment Opportunity Officer of Akal Security, Inc  I have charged her with the responsiblity for communicating and implementing this policy

Akal Security affirms to all employees that discrimination in the workplace by supervisors, managers, company agents or fellow employees is not tolerated  Any form of harassment of one individual by another that is rooted in the victim's race, color, sex, age, mental or physcial disability, national origin or religious affiliation is an offense against every employee in this organization and will not be tolerated. This includes acts of sexual harassment  Charges of discrimination or harassment are addressed by swift and corrective action

Complaints of discrimination or harassment will be investigated immediately and impartially  The investigation is kept as confidential as possible  If formal investigation finds an accused person guilty of discrimination or harassment as charged, appropriate disciplinary action will be taken

Sexual harassment on the basis of sex is defined as follows  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working enviornment

An employee who wishes to make a formal complaint about harassment or discrimination should contact the Lead CSO (LCSO) at his/her facility. If there is no designated LCSO, the employee should contact the contract manager. If the LCSO or contract manager is the subject of the employee's complaint, then the employee should call the corporate headquarters of Akal Security at 505-753-7832 and contact the Director of Administration. To protect victims and accused alike, Akal Security will use the utmost discretion in investigating complaints.

No notation of a complaint will be included in a complainant's personnel file. All records and documentation will be kept separately, and the complaint will receive immediate attention.

_Siri Karm Kaur Khalsa_

Siri Karm Kaur Khalsa, Chief Executive Officer

I have read the above and understood its contents.

_(signature)_

Applicant signature                                    Date

DEPOSITION
EXHIBIT

_11_

EDDIE MORRIS
COURT REPORTERS, INC.

08-31-99

## DAILY ASSIGNMENTS
MON TUE WED THUR FRI

| ROVERS | | LOBBY | | COMMAND CENTER | |
|---|---|---|---|---|---|
| 7:00 | ZEPEDA | 06:30 | SHERRILL | 06:30 | BESTEIRO |
| 7:30 | | 07:30 | INFANTE | 07:00 | |
| 3:00 | | 08:00 | | 09:00 ~~10:30~~ | LONGORIA |
| 8:00 | OAKLEY | 08:30 | | | |
| 8:30 | SALINAS | 08:30 | | | |
| 8:30 | | 10:30 | LOPEZ | | |
| 8:30 | | | | | |

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VELA | DIST. | RE-ARRGN JURY TRIAL | 08:30 — 09:00 | SALINAS (JURY) + OAKLEY ~~LONGORIA~~ (GALLERY) | 8A | 3P | | 6 | CV CR |
| TAGLE | DIST. | MOTIONS MOTIONS | 09:30 10:30 | ZEPEDA | ~~11:00~~ Court | | | | CV CR |
| BLACK | MAG. | BENCH TRIAL | 09:00 | LONGORIA | 8:45 | 11 | 2.15 | | CV CR |
| RECIO | MAG. | INITIALS | 10:30 | LOPEZ | 10:30 | 12 | 1.5 | | CV CR |
| TAGLE | DIST. | RE-ARRGN MOTIONS MOTIONS | 13:30 14:30 15:30 | ZEPEDA | 7:30 | 4 | 7.25 | | CV CR |
| RECIO | MAG. | HEARING + RE-ARRGN | 14:00 | OAKLEY | 2:50 | 3 | 1 hr | | CV CR |
| ~~SCHMIDT~~ GRAND JURY ( ~~GALVESTON ??? ???~~ ) ~~WAITING HEARING~~ 09:00 | | | | ZEPEDA | 8:30 | | 5 | 9.5 | | CV CR |

NFORMATION: _____

_____

_____

_____

_____

DEPOSITION
EXHIBIT
13
EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

09-09-99

# DAILY ASSIGNMENTS
MON TUE WED (THUR) FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 06:45 ~~07:00~~ de la Rosa | 06:30 ~~07:00~~ Sherrill | 06:30 ~~07:00~~ Bestion |
| 07:30 | 07:30 Infante | 07:00 |
| 08:00 Zepeda | 08:00 | 10:30 Longoria |
| 08:30 Oakley | 08:30 Lopez | |
| 08:30 | 08:30 | |
| 08:30 | | |
| 0:30 ~~08:30~~ Salinas | | |

## COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | CV |
| VELA | Dist. | Sent. | 08:00A | de la Rosa | 8A | 9A | | 1 | | CR |
| | | | | Oakley | | | | | | CV |
| VELA | Dist. | Jury Trial | 08:30A | de la Rosa | | | | | | CR |
| | | | | | 8:45 | 10 | | 1.15 | | CV |
| Schmidt | Visiting | Bankruptcy | 09:00A | Lopez | | | | | | CR |
| | | | | | | | | | | CV |
| Recio | Mag. | Arregn | 09:00A | Zepeda ~~Oakley~~ | | | | 3 hrs | | CR |
| | | | | Zepeda | | | | | | CV |
| Recio | Mag. | Initials | 10:30A | ~~Oakley~~ | | | | | | CR |
| | | | | | | | | | | CV |
| | | | | | | | | | | CR |
| | | | | | | | | | | CV |
| | | | | | | | | | | CR |

INFORMATION: _____

_____
_____
_____
_____
_____

10-06-99

## DAILY ASSIGNMENTS
MON TUE WED THUR FRI
LOBBY

| ROVERS | | LOBBY | | COMMAND CENTER | |
|---|---|---|---|---|---|
| :30 | Zepeda | 06:30 | Sherill | 06:30 | Bestine |
| 30 | | 07:30 | Lopez | 07:00 | |
| 00 | Adiana | 08:00 | | 10:30 | Longoria |
| 30 | Oakley | 08:30 | | | |
| 30 | | 08:30 | | | |
| 30 | | 10:30 | Infante | | |
| 30 | | | | | |

## COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | CV |
| Relio | MAG. | ARRGN | 08:00 | Zepeda | 8 | 9¾ | | 1.5 | | CR |
| | | | | | | | | | | CV |
| Bankruptcy | Court | | 09:00 | Adiana | 9A | 12N | | 3 | | CR |
| | | | | | 2 | 5 | 3 | /6 | | CV |
| Tagle | Dist. | Sent. | 13:30 | Oakley | 130 | 5 | 3½ | | | CR |
| | | | | | | | | | | CV |
| Relio | MAG. | Initials | 14:30 | Zepeda / Lopez | 2p | 3p | | 1 | | CR |
| | | | | | | | | | | CV |
| Bankruptcy | Court | | 2:00 | Lopez | 2 | 4 | 2 | | | CR |
| | | | | | | | | | | CV |
| | | | | | | | | | | CR |
| | | | | | | | | | | CV |
| | | | | | | | | | | CR |

FORMATION: _____

10-18-99

## DAILY ASSIGNMENTS
### (MON) TUE WED THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| :30 ~~:00~~ Zepeda | 06:30 ~~07:00~~ Sherrill | 06:30 ~~07:00~~ Beitira |
| :30 _____ | 07:30 Infante | 07:00 _____ |
| :00 Salinas | 08:00 _____ | 10:30 Longoria |
| :30 Oakley | 08:30 _____ | |
| :30 _____ | 08:30 _____ | |
| :30 _____ | 10:30 Lopez | |
| :30 _____ | | |

## COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| | | Bench | | | | | | CV |
| Black | MAy | Trial | 9A | Oakley | 9A | 5p | 9 | CR |
| | | Ser. | | | | | | CV |
| Vela | Dist | | 1:30 p | Salinas | 1:15 | 3:45 | 2.5 | CR |
| | | Ini. | | Lopez | | | | CV |
| Recio | MAy | | 2p | Oakley | 2p | 3p | 1 | CR |
| | | | | | | | | CV |
| | | | | | | | | CR |
| | | | | | | | | CV |
| | | | | | | | | CR |
| | | | | | | | | CV |
| | | | | | | | | CR |
| | | | | | | | | CV |
| | | | | | | | | CR |

FORMATION: No schedule was made by USMS for courts today.

_____
_____
_____
_____

10/25/99

## DAILY ASSIGNMENTS
### MON TUE (WED) THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|--------|-------|----------------|
| 6:30A 07:00 ZEPEDA | 6:30A 07:00 Sheril | 6:30A 07:00 Salinas |
| 07:30 | 07:30 INFante | 07:00 |
| 08:00 | 08:00 | 10:30 RAY |
| 08:30 Oakley | 08:30 | |
| 08:30 | 10:30A 08:30 Lopez | |
| 08:30 | 1:30A Escobedo | |
| 08:30 | | |

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | |
|-------|-------|------|------|-----|------|------|------|
| Black | MAg | ARR. | 8A | ZEPEDA | 8 | 8:30 | .5 |
| Black | MAg | Civil Trial | ? | Oakley | 9A | 4:30 | 8.5 |
| | | | | | 100 Cont | | |
| Tagle | Dist | Rev. Hea. | 1:30P | Salinas | 1:30 | 6p | 5.5 |
| Recio | MAg | Motion Hearing | 2P | ZEPEDA or Lopez | 2P | 3P | 1 |
| BANKruptcy | ? | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

INFORMATION: _____

_____

_____

_____

_____

_____

11-03-99

**DAILY ASSIGNMENTS**
MON TUE (WED) THUR FRI

| ROVERS | | LOBBY | | COMMAND CENTER | |
|---|---|---|---|---|---|
| 6:30 ~~7:00~~ | Zepeda | 06:30 ~~07:00~~ | Sherrill | 06:30 ~~07:00~~ | Bertero |
| 7:30 | | 07:30 | Lafonte | 07:00 | |
| 8:00 | Escobedo | 08:00 | | 10:30 | Longoria |
| 8:00 ~~30~~ | Oakley | 08:30 | | | |
| :30 | | 08:30 | | | |
| :30 | | 09:00 | Lopez | | |
| :30 | | | | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VELA | DIST. | HRNGS SENTEN. | 08:15 | Zepeda | 8¹⁵ | 9¹⁵ | | | CV / CR |
| VELA | DIST. | JURY TRIAL | 08:30 | Oakley and Escobedo | 9 | 10 | | 1 | CV / CR |
| RECIO | M.A.G. | RE-ARRGN | 09:00 | Zepeda | 9 | 10⁵⁰ | | 1.⁵ | CV / CR |
| RECIO | M.A.G. | INITIALS ~~MOTION~~ HRNGS | 10:30 | Zepeda | 10⁵⁰ | 11³⁰ | | 1 | CV / CR |
| RECIO | M.A.G. | MOTION HRNGS | 13:30 | Zepeda | 1³⁰ | 2³⁵ | | 1 | CV / CR |
| RECIO | M.A.G. | MOTION HRNGS | 14:30 | Zepeda | 2³⁰ | 3³⁵ | | 1 | CV / CR |
| Schmidt | | BANKRUPTCY | 09:00 | Lopez | 9 | 2 | | 5HRS | CV / CR |

FORMATION:

11-4-99

**DAILY ASSIGNMENTS**
MON TUE WED (THUR) FRI

### ROVERS

6³⁰ ~~07:00~~ ZEPEDA

07:30 _____

08:00 Salinas

08:30 _____

08:30 OAKley

08:30 _____

08:30 _____

### LOBBY

6³⁰ᴬ ~~07:00~~ B. Sheriel

07:30 INFante

08:00 _____

08:30 _____

~~08:30~~ 9ᴬᴹ Lopez

### COMMAND CENTER

07:00 E. Escobedo

07:00 _____

10:30 Ray Longoria

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|-------|-------|------|------|-----|------|------|------|---|
| Recio | MAg | Det. Hearg. | 8³⁰ᴬ | Salinas | 8³⁰ | 9ᴬ | .5 | C |
| Recio | MAg | Arrg. | 9ᴬ | Salinas | 9ᴬ | 10ᴬ | 1 | C |
| Recio | MAg | INT-Opp. | 10³⁰ᴬ | OAKley | 10³⁰ | 11³⁰ | 1 | C |
| Skmiet | Bankrtg | Bankrtg | 9ᴬ | mile Lopez | 9 | 12 | 3 | C |
| TAgIE | Dist. | FPT | 1³⁰ᴾ | OAKley | 1³⁰ | 5 | 35 | C |
| Vela | Dist | Bench Trial | 1³⁰ᴾ | Salinas | | | | |

INFORMATION: Note ① Judge Vela might have a Bench Trial Today in the morning, unknown for sure.

② Judge TAgIE might have Something in the morning it as unknown at this time, she will For sure he Something at 1:30 pm.

**DAILY ASSIGNMENTS**
MON TUE WED THUR FRI

11-5-99

**ROVERS**
6:30
07:00 ZEPEDA
07:30
08:00
08:30 OAKLey
08:30
08:30
08:30

**LOBBY**
6:31A
07:00 Sherril
07:30 INFante
08:00
9
08:30 Lopez
10:30
08:30
SALINAS

**COMMAND CENTER**
07:00 Escobedo
07:00
10:30 Ray L.

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | | |
|-------|-------|------|------|-----|------|---|---|---|---|---|
| VELA | Dist | Sent. | 8³⁰A | ZEPEDA | 8³³ | 9³⁰ | | 1 | C | |
| TAGLE | Dist | S.nT. | 9A | OAKLey | 9 | 10 | | 1 | C | |
| VELA | Dist | Bench Trial | 10A | ZEPEDA | 10 | 10³⁰ | .5 | C | | |
| RECIO | MAG | INT. app. | 10A | M. Lopez | 10 | 11 | 1 | C | | |
| TAGLE | Dist | Sent. | 1³⁰ | SALINAS | 1:15A | 5:45 | 4.5 | C | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

INFORMATION:

11-15-9

## DAILY ASSIGNMENTS
### MON TUE WED THUR FRI

| ROVERS | | LOBBY | | COMMAND CENTER | |
|---|---|---|---|---|---|
| 6:30 07:00 | ZEPEDA | 6:3:A 07:00 | Sheriel | C:3c 07:00 | Bestewi |
| 07:30 | | 07:30 | Infante | 07:00 | |
| 08:00 | SALINAS | 08:00 | | 10:30 | Langoria |
| 8:15 08:30 | OAKley | 9:00 08:30 | Lopez | | |
| 8:00 08:30 | Escobedo | 08:30 | Danny Figueroa | | |
| 08:30 | | | | | |
| 08:30 | | | | | |

## COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| Tagle | Dist | Jury til Trial cont. | 8A | Zepeda | 8A | 6P | | 10hr |
| Tagle | Dist | Jury Trial new | 9A | Salina | 9A | 6p | | 9h |
| Vela | Dist. | crvl Trial | 9A | Oakley (Escobedo) | 9A | 5 | | 8h |
| Recio | Mag | Rearrign | 9A | Lopez | 9A | 10A | | 1 |
| Black | Mag | Dt. Hrg. in Its | 10:3c A | Lopez (OR) Longoria | 10:30 | 12 | 1:5 | |
| Black | Mag | " " | 2P | Lopez | 2P | 3:30p | 1:5 | |

INFORMATION: _____

_____

_____

_____

_____

**DAILY ASSIGNMENTS**
MON TUE WED THUR FRI
LOBBY

11-16-99

### ROVERS

6:30
~~07:00~~ ZEPEDA

07:30 SALINAS

08:00 OAKley

~~8:00~~
~~08:30~~ Escobedo

08:30 _____

08:30 _____

08:30 _____

### LOBBY

6:30A
~~07:00~~ Skevil

07:30 DuFente

08:00 _____

08:30 _____

~~08:30~~ 9 Lopez

10:30A Longoria

### COMMAND CENTER

6:30A
~~07:00~~ Bertoni

07:00 _____

10:30 Figueroa

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | |
|-------|-------|------|------|-----|------|------|------|
| TAGLE | Dist | Crst-Jury Sel. | 8:30 | Escobedo | 8:30 | 12 | 3.5 |
| TAGLE | Dist | " | " | Salinas | 8A | 12N | 4 | C |
| TAGLE | Dist. | New Jury Trial | 10A | ZEPEDA | 10 | 11 | 11 |
| Vela | Dist | Cont'g Civ Trial | 10A ? | OAKley | 10 | 6 | 8 |
| BLACK or Recio | Mty | Dist. App | 10A | Lopez | 10A | 11A | 1 |
| | | | | | | | |
| | | | | | | | |

INFORMATION: _____

_____

_____

_____

_____

**DAILY ASSIGNMENTS**
MON TUE (WED) THUR FRI

11-17-99

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6³⁰A 07:00 ZEPEDA | 6³⁰A 07:00 Sheriel | 6³⁰A 07:00 Bastens |
| 07:30 _____ | 07:30 DeForte | 07:00 _____ |
| 08:00 Salinas | 08:00 _____ | 10:30 Figueroa |
| 08:30 Oakley | 9A 08:30 Lopez | |
| 08:30 _____ | 10:30 08:30 Escobedo | |
| 08:30 _____ | Longoria | |
| 08:30 _____ | | |

COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | |
|---|---|---|---|---|---|---|---|
| Black | Mag | Argen | 8 A | Zepeda | 8A | 9A | 1. |
| Vela | Dist. | Civil Hearing | 8³⁰A | Salinas | 8.15 | 9A | .4 |
| Vela | Dist | Re Arrgd. | 8³⁰A | Salinas | 8³⁰ | 9 | .5 |
| Vela | Dist. | Civil Trial Cont. | 9A | Oakley ~ Salinas | 9A | 6p | 9. |
| Black | Mag. | Init. Hearing | 10³⁰A | Lopez | 10³⁰ | 11³⁰ | 1 |
| | | | | | | | |
| | | | | | | | |

INFORMATION: _____
_____
_____
_____
_____

## DAILY ASSIGNMENTS
### MON TUE WED THUR FRI

11-18-99

| ROVERS | LOBBY | COMMAND CENTER |
|--------|-------|----------------|
| 6:30A 07:00 ZEPEDA | 6:30A 07:00 Sherill | 6:30 07:00 Basteri |
| 07:30 | 07:30 INForte | 07:00 |
| 08:00 Salinas | 08:00 Lopey | 10:30 E Figueroa |
| 08:30 Oakley | 08:30 | |
| 08:30 | 08:30 | |
| 08:30 | 1030 Longeira | |
| 10:30A 08:30 Escobedo | | |

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|-------|-------|------|------|-----|---|---|---|---|
| Vela | Dist. | Rev. Hrg's | 8³⁰ A | Salinas | 8³⁰ 7 | 9³⁴ 7 | | 1( |
| Black | MAG | ARRgn | 9 A | ZEPEDA | 9 | 10 | | 1 |
| Recio | MAG | Bond Hrg's | 9³⁰ A | Lopez | 9³⁰ | 10³⁰ | | 1 |
| Tagle | Dist. Tagle | Pre-Trials Status Con. | 9:15A to 3PM | Salinas or ZEPEDA | | | | |
| Black | MAG | Dist. Re-Arrn | 10³⁰ A | Lopez | 10³⁰ | 11³⁰ | | 1 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

INFORMATION: _____

_____
_____
_____
_____
_____

**DAILY ASSIGNMENTS**
**MON TUE WED THUR FRI**

11-23-99

| ROVERS | | LOBBY | | COMMAND CENTER | |
|---|---|---|---|---|---|
| 6³⁰ᴬ ~~07:30~~ | ZEPEDA | 6³⁰ᴬ ~~07:00~~ | Sheriel | 6³⁰ᴬ ~~12:00~~ | Bestard |
| 07:30 | | 07:30 | INFonti | 07:00 | |
| 08:00 | Salinas | 08:00 | | 10:30 | Figueroa |
| 08:30 | OAKley | 9ᴬ ~~08:30~~ | Lopez | | |
| 08:30 | | 08:30 | | | |
| 08:30 | | 10³⁰ | Longoria | | |
| 10³⁰ᴬ ~~08:30~~ | Escobedo | | | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| Vela | Dist | Sent. Re-arraign | 8³⁰ᴬ | ZEPEDA | 8³⁰ | 9 | | .5 |
| Tagle | Dist | Civil Motions | 9ᴬ | OAKley | 9ᴬ | 10 | | 1 |
| Grand Jury | | | 9ᴬ | Salinas ~~ZEPEDA~~ | 8ᴬ | 12 | | 4 |
| Recio | MAG | Motion Hrg. | 9ᴬ | Lopez | 9ᴬ | 10 | | 1 |
| Recio | MAG | Init. Apps | 10³⁰ᴬ | Lopez | 10³⁰ | 11³⁰ | | 1 |
| Tagle | Dist. | Motion Hrg | 1¹⁵ᴾ | OAKley | 1¹⁵ | 3¹⁵ | | 2 |
| | | | | | | | | |
| | | | | | | | | |

INFORMATION: _____
_____
_____
_____
_____

11-26-99

DAILY ASSIGNMENTS
MON TUE WED THUR (FRI)

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| ~~6:50~~ ~~:30~~ Zepeda | 06:30 ~~07:00~~ Sherrill | 06:30 ~~07:00~~ Bestein |
| :30 | 07:30 Infante | 07:00 |
| :00 Salinas | 08:00 | 10:30 Figueroa |
| :30 | 08:30 | |
| :30 (oakley - off) | 08:30 (Lopez - off) | |
| :30 | 10:30 Longoria | |
| 0:30 ~~:30~~ Escobedo | | |

COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |

ORMATION

## DAILY ASSIGNMENTS

MON TUE WED THUR FRI   11-30-99

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6³⁰ ~~07:00~~ ZEPEDA | 6³⁰ ~~07:00~~ Sheriff | 07:00 ESCobedo |
| 07:30 | 07:30 INFanto | 07:00 |
| 08:00 Salinas | 08:00 | 10:30 FIGUEROA |
| 08:30 | 9⁵⁰ ~~08:30~~ Lopez | |
| 08:30 OAKley | 10³⁰ ~~08:30~~ Longoria | |
| 08:30 | | |
| 08:30 | | |

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vela | Dist | Sentencj | 8³⁰ A | ZEPEDA | 8³⁰ | 9³⁰ | | 1 | |
| Vela | Dist. | Mock Trial | 9A | Salinas | 9A | 12N | | 3 | |
| Tagle | Dist. | Sentencj | 9A | OAKley | 9A | 11 | | 2 | |
| Recio | MAG | Init. APP. | 10³⁰ A | Lopez | 10³⁰ | 11³⁰ | | 1 | |
| Tagle | MAG | Civil Hearings | 11A | OAKley | 11A | 12 | | 1 | |
| Tagle | MAG | Civil Hearings | 1³⁰ P | Salinas | 2P | 3³⁰P | | 1.5 | |

INFORMATION: _____
_____
_____
_____
_____

**DAILY ASSIGNMENTS**
MON TUE (WED) THUR FRI

*12-1-99*

### ROVERS

6³⁰ ~~07.00~~ ZEPEDA

07:30

08:00 SALINAS

08:30

08:30 OAKley

08:30

08:30

### LOBBY

6³⁰ ~~07.00~~ Shinel

07:30 INFante

08:00

9A ~~08:30~~ Lopez

10³⁰ ~~08:30~~ Longoria

### COMMAND CENTER

~~07:00~~ Escobedo

6³⁰ ~~07.00~~ Bertwd -OFF

10:30 Figueroa

COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| Recio | MAG | ARRgN | 8A | Salinas | 8A | 8³⁰A | .5 | |
| Tagle | Dist. | Sent. | 9A | Oakley | 9A | 12 | 3 | |
| Recio | MAG | INT. App. | 10³⁰ | Lopez | 10³⁰ | 11³⁰ | 1 | |
| Vela | Dist. | Sent. | 1³⁰ | Salinas | 1³⁰ | 2³⁰ | 1 | |
| Vela | Dist | Bond Hearing | 2P | Salinas | 2³⁰ | 3³⁰ | 1 | |
| Tagle | Dist | mist. hearing | 2P | Oakley | 2P | 4P | 2 | |
| Recio | MAG | misd plea | 3P | Lopez | 3P | 5P | 2 | |
| Schmidt | Dist | Bankruptcy | 9A | Salinas | 9A-11³⁰ 1³⁰p-4³⁰ | 2.5 3 | | |

INFORMATION:

DAILY ASSIGNMENTS    12-7-99
MON TUE WED THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6:30A/07:00 ZEPEDA | 6:30/07:00 Sheriff | 6:30/07:00 Botello |
| 07:30 | 07:30 InFate | 07:00 |
| 08:00 Salinas | 08:00 | 10:30 Figueroa |
| 08:30 Oakley | 9A/08:30 Lopez | |
| 08:30 Escobedo | 10:30/08:30 Longoria | |
| 08:30 | | |
| 08:30 | | |

COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| BLACK | MAG | Grand Jury | 8:30 A | Oakley | 8:30 | 11 | 4 | 5 |
| TAGLE | Dist | Grand Jury cont'nd | 8:30cA/9A | Salinas Escobedo | 8A | 11:30 4A | | 3 |
| NEWBLATT | Dist. | Mtg. Motions | 10 A | Zepeda | 10 | 11 | | |
| BLACK | MAG | Init. App. | 10:30 A | Lopez | 10:30 | 11:30 | | |
| BLACK | MAG | Cnl Hearing | 1:30 P | Lopez | 1:30 | 2:30 | | |
| Recio | MAG | Cnl Hearing | 2 P | Longoria | 2 | 3 | | |
| | | | | | | | | |

INFORMATION:

**DAILY ASSIGNMENTS** 12-13-99

MON TUE WED THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|--------|-------|----------------|
| 6³⁰ ~~07:00~~ ZEPEDA | 6³⁰A ~~07:00~~ Daniel | 6³⁰ ~~07:00~~ Bastews - Sc |
| 07:30 _____ | 07:30 Infante | 07:00 _____ |
| 08:00 Schra - OFF | 08:00 _____ | 10:30 Figuero |
| 08:30 Escobedo - School | 9:00 ~~08:30~~ Lopez | |
| 08:30 OAKley | 10:30 ~~08:30~~ Longoria | |
| 08:30 _____ | | |
| 08:30 _____ | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|-------|-------|------|------|-----|------|------|------|------|
| Recio OR ? BLACK ? | MAG | INT. APP. | 10ᴬ | OAKley | 10 | 12 | | 2 |
| Recio | MAG | STATUS CONF. | 2P | Lopez | 2P | 3P | | |
| Vela | D.ST | [unclear] | 1³⁰ 2P | Longoria | 1³⁰ | 4 | | 2 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

INFORMATION: _____

_____

_____

_____

_____

# DAILY ASSIGNMENTS 12/14/99
## MON TUE WED THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| ~~07:00~~ 6:30 ZEPEDA | ~~07:00~~ 6:30 Shuvill | ~~07:00~~ Bestens - Sc |
| 07:30 | 07:30 Infanta | ~~07:00~~ 8^A Figueroa |
| 08:00 SALINAS - OFF | 08:00 | 10:30 |
| 08:30 OAKley | ~~08:30~~ 9^A Lopez | |
| 08:30 Escobede - School | ~~08:30~~ 10:30 Lonsoun | |
| 08:30 | | |
| 08:30 | | |

## COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| Vela | Dist. | Sent. Re-Pre. | 8³⁰A | OAKley | 8³⁰ | 9³⁰ | | 1 |
| Black | MAG | Init. Re-Arraig | 10³⁰A | Lopez | 10³⁰ | 11³⁰ | | 1 |
| Tagle | Dist. | Sent. | 1³⁰ | OAKley | 1³⁰ | 2³⁰ | | 1 |
| Vela | Dist | Civil Jury | 10³⁰A | Lonsoun | 10³⁰ | 5 | 6³⁰ | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

INFORMATION: _____

_____

_____

_____

_____

12-16-99

**DAILY ASSIGNMENTS**
MON TUE WED (THUR) FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 5:30 Zepeda – School | 06:30 07:00 Sherrill | 06:30 07:00 Besteiro |
| :30 | 07:30 Infante – OFF | 07:00 |
| :00 Salinas | 08:00 | 10:30 Figueroa |
| :30 Oakley | 09:00 08:30 Lopez | |
| :30 Escobedo | 08:30 | |
| :30 | 10:30 Longoria | |
| :30 | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VELA | DIST. | RE-ARRN SENT. HRNGS | 08:30 | Salinas | 8:34 | 9:00A | | 5 | CV CR |
| TAGLE | DIST. | REV. + CIVIL HRNGS | 0900 | Oakley | 9 | 12 | | 3 | CV CR |
| RELIO | MAG. | ARRGNS MOTION HRNGS | 0900 10:30 | Escobedo | 9 | 12 | | 3 | CV CR |
| GRAND | JURY | | 0900 | Lopez | 9 | 2 | | 5 | CV CR |
| BLACK | MAG. | BENCH TRIAL INITIALS | 10:00 10:30 | Salinas | 10A | 11P | | 1 | CV CR |
| VELA | DIST | RE-ARRGN | 1330 | Oakley | 1:30 | 2:30 | | 1 | CV CR |
| RELIO | MAG. | CIVIL HRNG | 1400 | Escobedo | 1450 | 1500 | | 1 | CV CR |

FORMATION: _____

PAGE 1 of 2

**DAILY ASSIGNMENTS** 12-15-99
MON TUE (WED) THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6³⁰ᴬ 07:00 ZEPEDA | 6³⁰ 07:00 Sherril | 6³⁰ 07:00 Berteau - Sc |
| 07:30 | 07:30 Infante | 07:00 |
| 08:00 SALINAS - off² | 08:00 | 7³⁰ᴬ 10:30 Figuers |
| 08:30 | 8:00 10³⁰ Lopez | |
| 08:30 Escobedi - School | 10³⁰ 08:30 Longoria | |
| 08:30 OAKley | | |
| 08:30 | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | |
|---|---|---|---|---|---|---|---|---|
| BLACK | MAG | ARRGN | 8A | ZEPEDA | 8 | 9 | | |
| Vela | Dist. | Sent. Re-ARRGN | 8³⁰A | OAKley | 8³⁰ | 9³⁰ | | |
| BLACK | MAG | INIT. APP. | 10³⁰A | Lopez | 10³⁰ | 11³⁰ | | |
| TAgle | Dist | Hear | 10A | ZEPEDA | 10 | 12 | | |
| TAgle | Dist | " | 11³⁰A | Longoria | 12 | 2 | | |
| Black | MAG | Arrgn | 2:30p | (Longoria) Mike | 2³⁰ | 3³⁰ | | |
| | | | | | | | | |

INFORMATION:

1-5-2000

**DAILY ASSIGNMENTS**
MON TUE WED THUR FRI

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6:30A 07:00 ZEPEDA | 6:30 07:00 Sherrill | 6:30 07:00 Bateus -0; |
| 7A 07:30 Escobedo | 07:30 INForte | 07:00 |
| 08:00 Selina | 08:00 | 10:30 Figueroa |
| 08:30 OAKLey | 9 08:30 Lopez | |
| 08:30 | 10:30 10:30 Longoria | |
| 08:30 | | |
| 08:30 | | |

### COURTS

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | |
|---|---|---|---|---|---|---|---|
| TAGLE | DIST | Motion Hgns | 10A | Selinas | 10A | 11³⁴A | .5 |
| BLACK | MAG | Init. App. | 10³⁰A | Lopez | 10³⁰ | 11³⁰ | 1 |
| TAGLE | DIST. | Motion Hgns | 11A | Selina | 11A | 12N | 1 |
| TAGIE | DIST | Motion Hgns | 1³⁰ | OAKLey | 1³⁰ | 3 | 1.5 |
| TAGIE | DIST. | Civil Hgns | 1³⁰ | OAKLey | | | 1 |
| BLACK | MAG | Det Hgns | 2p | Lopez | | | |
| TAGle | DIST | Probation Hearing | 2³⁰p | Selina | 2³⁴ | 4³⁴ | 2 |

INFORMATION:

**DAILY ASSIGNMENTS**
**MON TUE WED THUR FRI**

1·7·2000

| ROVERS | LOBBY | COMMAND CENTER |
|---|---|---|
| 6:30 ~~6:00~~ Zepeda | 6:50 ~~07:00~~ Merrill | 6:30 ~~07:00~~ Besteiro |
| 7:30 ~~7:00~~ Oakley | 07:30 Infante | 07:00 |
| 8:00 Salinas | 08:00 | 10:30 Figueroa |
| 8:30 Escobedo | 08:30 | |
| 10 | 09:00 ~~08:30~~ Lopez | |
| 10 | 10:30 Longoria | |
| 0 | | |

**COURTS**

| JUDGE | COURT | TYPE | TIME | CSO | COURTROOM HRS WORKED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | CV |
| VELA | DIST. | JURY SELECTION ~~0-8-3~~ | 08:30 | Salinas Escobedo | 9:30 | 11 | | 3.5 | CR |
| | | REV. HRNG. | | | | | | | CV |
| TAGLE | DIST. | SENT. | 09:00 | OAKLEY | 9 | 11 | | 2 | CR |
| | | | | | | | | | CV |
| BLACK | MAG. | INITIALS | 10:30 | LOPEZ | 10:30 | 11:30 | | 1. | CR |
| | | SENT. REV. HRNG. | | | | | | | CV |
| TAGLE | DIST. | | 13:30 | OAKLEY | 1:30 | 3 | | 1.5 | CR |
| | | | | | | | | | CV |
| TAGLE | DIST | Bench Trial | 3P | Escobedo | 3P | 4P | | 1 | CR |
| | | | | | | | | | CV |
| Black | MAG | Status Conf. | 2P | Salinas | 1:45P | 2:15P | | .5 | CR |
| | | | | | | | | | CV |
| | | | | | | | | | CR |

IRMATION: _____

_____

_____

_____

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA ☒ EEOC | 360A00569 |

<u>Texas Commission on Human Rights</u> _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Miguel Lopez | (956) 831-2949 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 418 Winnipeg, Brownsville, TX 78526 | | 05/08/1929 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Akal Security, Inc | Cat B (101-200) | (956) 548-2519 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| P.O. Box 1197, Santa Cruz, NM 87567 | | 049 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ OTHER *(Specify)* | EARLIEST  m-t  LATEST  m-t  06/12/1999  06/12/1999 ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

On or about June of 1995, I was hired as a Federal Court Security Officer by Akal Security. I was hired to work at he federal court house in Brownsville ,Texas. I have been denied two different work assignments. I was denied the roving patrol position and control center position.

On June 11, 1999, Roy Zepeda, Immediate Supervisor gave us our new work schedule for the new federal court house. He approved swaps between the Court Security Officers. I swapped with a co-worker Federal Court Security Officer Allen Fry because I did not want the late shift. Then Karl Oakley, another Federal Court Security Officer and I swapped because he wanted to work the entrance and I wanted to come in at 8:30 or around that time. I ended up with post #8 as a rover. But however that same afternoon Roy Zepeda told me that I would have to take the entrance post because "I was to old, to serve in the courts." Roy indicated to me that there had been a meeting with Akal and federal court house management where it was decided not to assign the older Federal Court Security Officers to these positions.

I believe that I have been discriminated against because of my age in violation of the Age Discrimination in Employment Act of 1967,as amended.

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. <br><br> *Miguel Lopez* <br> X _____ <br> Date 1/7/2000  Charging | SIGNATURE OF COMPLAINANT <br><br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |

EEOC FORM 5 (Rev. 06/99)

DEPOSITION EXHIBIT 24

EDDIE MORRIS COURT REPORTERS, INC. (210) 698-2727

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF LOUIS MCDANIEL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

I, Louis McDaniel, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.      My name is Louis McDaniel and I am employed by Akal Security, Inc., as the District Site Supervisor for the United States District Courts in the Southern District of Texas. In that capacity, I oversee the Court Security Officers in the Southern District of Texas, including the Brownsville Division.

2.      Akal is a security company that provides security services primarily to government facilities throughout the United States. One of Akal's primary contracts is with the United States Marshall Service ("USMS") and the Department of Justice ("DOJ") to provide security for federal buildings and courthouses all over the nation. Under its contract with the USMS/DOJ, Akal has the responsibility of providing security personnel, i.e., Court Security

Officers ("CSO"), for the United States District Court for the Southern District of Texas, including the Brownsville Division. This contract states that the primary function of a CSO is to ensure the safety and security of those individuals inside the courthouse.

3.       After the new federal courthouse officially opened in mid-June, 1999, all CSOs from the old courthouse were moved to the new Courthouse. Additionally, several new CSOs were hired due to the additional staffing needs of the new Courthouse.

4.       To achieve total security of the courthouse, CSOs are assigned to different posts including – the front entrance, the courtrooms, roving patrols inside the building, and roving patrols outside the building. Additionally, CSOs are assigned to the command center to monitor surveillance cameras. All assignments are important and necessary for the safe protection of the courts. All areas are dependent upon the other to insure the safety of all persons working in or having business within the courthouse.

5.       In the summer of 1999, former lead CSO Bill Sherrill informed me that he wanted to step down from the lead CSO position in Brownsville to become a regular CSO. At that time, I asked him whether he had a recommendation for a replacement. Mr. Sherrill suggested Roy Zepeda. Because I did not work in Brownsville and was not familiar with Mr. Zepeda, I later talked to the Supervisor Deputy U.S. Marshal ("SDUSM"), Robert Cervantes, to ask him whether he knew Mr. Zepeda. Mr. Cervantes informed me that he had known Mr. Zepeda for approximately twenty years and recommended him for the position because he agreed that Mr. Zepeda had the appropriate background and experience for the lead CSO position. Mr. Cervantes informed me that Mr. Zepeda had been with the Cameron County Sheriff's Department for over twenty years and had held the position of sergeant. I later discussed the position with Mr. Zepeda and ultimately hired him for the position on June 7, 1999. At the time

I made the decision to hire Mr. Zepeda for the lead CSO position, I was not aware that Miguel Lopez was interested in the position. Mr. Lopez had not informed me that he was interested in the position. I selected Mr. Zepeda for the lead CSO position based on the recommendation I received from Mr. Cervantes and the suggestion of Mr. Sherrill as well as Mr. Zepeda's experience with the Cameron County Sheriff's Department. Age played no role in my decision to select Mr. Zepeda for the lead CSO position.

6.     Due to the extensive experience and training levels required to qualify for the position of Court Security Officer, a majority of the CSOs hired by Akal are retired or former federal, state, local or military law enforcement officers. In fact, during the time period relevant to this lawsuit, of the approximately eleven CSOs assigned to the Brownsville Division, two were over the age of 40, three were over the age of 50, three were over the age of 60, and three were age 70 or above.

7.     In December of 1999, I received a telephone call from Robert Cervantes, SDUSM, in which he informed me of a situation in which CSO Miguel Lopez had wrongfully allowed three FBI agents to enter into the federal courthouse in Brownsville, Texas, without first ensuring that their weapons were secured in designated lockers. Mr. Cervantes indicated that when he asked Mr. Lopez whether the agents had entered the courthouse with weapons, Mr. Lopez replied, "No, they are FBI agents going to the AUSA office for a meeting." Mr. Cervantes also informed me that one of the FBI agents later told him that Mr. Lopez had permitted the FBI agents to enter the building with their weapons. Mr. Cervantes also sent me a letter detailing the information regarding the incident. A copy of the letter from Mr. Cervantes is attached hereto. Near the time that I received the complaint from Mr. Cervantes, lead CSO Roy Zepeda also contacted me about the incident. I immediately reported the incident to my

superiors so that Akal could begin an investigation. I later had another discussion with the USMS representative, Mr. Cervantes, at the Brownsville courthouse in which he informed me that he no longer trusted Mr. Lopez to be employed as a CSO in the Brownsville federal courthouse. Based on my understanding of the requirements of the USMS, I understood this statement to be a directive to remove Mr. Lopez from his position as a CSO. I reported this information to my superiors as well.

8.    Akal and the International Government Security Officers of America, Local 108, entered into a collective bargaining agreement which governs the employment of all CSOs at the Brownsville federal courthouse. Mr. Lopez did not file a grievance with the Union as required by Article 5 of the Collective Bargaining Agreement, a true and correct copy of which is attached hereto.

I have read this affidavit which consists of four pages, including this page, and have been given an opportunity to make any corrections. I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.

_____2/12/02_____
Date


Louis McDaniel

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Louis McDaniel on this the 12th day of February, 2002, to certify which witness my hand and seal of office.

Notary Public, in and for the State of Texas

My commission expires: _10/8/03_

ANA MARIE GONZALEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-08-2003

# UNITED STATES MARSHALS SERVICE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**DATE:**   December 16, 1999

**TO:**   Louis McDaniels
Court Security Site Supervisor
Houston, Texas

**FROM:**   Robert Cervantes, SDUSM

**SUBJECT:**   Court Security Officer Miguel LOPEZ


On December 14th, 1999, I observed Court Security Officer Miguel LOPEZ allow three FBI agents entry to the U.S. Courthouse without first ensuring that their weapons were secured in the designated gun lockers nearby.

At approximately 1:15pm, CSO LOPEZ was assigned to the lobby, front entrance security post when FBI Agent Orlando Munoz and two other Agents arrived enroute to the United States Attorney's Office (AUSA). FBI was there to arrest a DEA Agent on a murder for hire charge. I observed the Agents identify themselves to CSO LOPEZ and proceed to walk through the magnetometer. As the Agents walked through, I heard the magnetometer sound off. All three Agents continued on their way unchallenged. One of the agents recognized me and walked over to greet me. As all this occurred, I was in the lobby area on my way back to the USMS office from the snack bar. All three Agents proceeded to the stairwell headed towards the United States Attorney's Office. I immediately approached CSO LOPEZ and asked him if the Agents had any weapons on them. His response was "NO, they are FBI Agents going to the AUSA office for a meeting".

At approximately 1:30pm, agent MUNOZ walked over to the USMS office and advised me that CSO LOPEZ had allowed them to enter the building with their weapons. I immediately advised Agent MUNOZ that their weapons had to be secured in a gun locker and under no circumstance would they be allowed to carry their weapons in the courthouse. Agent MUNOZ went on to say that CSO LOPEZ did ask them if they were armed but then stated "since your going to the AUSA office, I guess it's OK".

I advised Lead CSO Roy ZEPEDA of what occurred and to report this matter to his site supervisor Louis McDaniels in Houston.

cc: USM Contreras, Chief Greason
Court Security CoOrdinator Wanda Price


Akal/Fry/Lopez
Docs Produced 000601

# ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1 RECOGNITION-BARGAINING UNIT

A.  The Employer hereby recognizes the Union as the sole and exclusive bargaining agent for the purpose of collective bargaining as outlined in this Agreement, with respect to wages, hours, overtime, leaves of absence, uniform allowances and any and all other conditions of employment for all full-time and regular shared position USMS credentialed court security officers (CSOs), lead court security officers, and assistant lead court security officers assigned to the federal courthouses and other United States Justice Department related office buildings pursuant to the Employer's contract(s) with the United States Marshals Service for security within the jurisdictional boundaries of the Southern District of Texas, excluding all managers, supervisors as defined by the NLRB, office and/or clerical Employees, temporarily assigned Employees and substitute Employees and all other Employees of the Employer.

B.  The term "Employee" when used in this Agreement shall refer to the Employees in the bargaining unit described in Article 1, Section 1.1 of this Agreement.

### SECTION 1.2 NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of three members and one alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3 STEWARD SYSTEM

The Company agrees to recognize a steward system.

The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to all the business of the Grievance Procedure as outlined in Article 5 of this Agreement.

If the Employee requests, the Company will call for a steward prior to any disciplinary action taken whether it be written or verbal. The supervisor at the request of the Employee will release the steward as soon as possible. The Company will not be responsible for paying the steward for time spent in this regard.

### SECTION 1.4 MANAGERS AND SALARIED PERSONNEL

Managerial and salaried Employees shall not perform the duties of the Employees in the bargaining unit, except as necessary to fulfill the work under the US Marshals Service contract.

Local #108  -  May 1998-September 2001 CBA



DEPOSITION
EXHIBIT
19
EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

## SECTION 1.5 DUES CHECK-OFF

The Company agrees to deduct monthly dues and lawful assessments as designated by the Union on a monthly basis from the paycheck of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. The Employee upon 30 days' written notice served upon the Company and the Union may revoke such authorization. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to what the Union membership dues are.

The Company will remit all such deductions to the Financial Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name and amount of dues and initiation fees within seven (7) days of each remittance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for Check-Off Dues. The Company shall accept no other form unless the parties mutually agree to the substitution.

## SECTION 1.6 INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representatives nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.

The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

# ARTICLE 2

## SENIORITY

### SECTION 2.1 SENIORITY DEFINED

Union seniority shall be the length of continuous service from the Employee's last date of hire or transfer to all sites within Local #108 as a Special Deputy US Marshal Court Security Officer for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the employee has successfully completed his/her probationary period. Seniority shall be applicable in determining the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose his/her union seniority as it applies to the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

### SECTION 2.2 SENIORITY LISTS

Seniority Lists shall be furnished by the Company to the proper Union officials within a reasonable time, upon written request by the Union, each March and September of each contract year. The Union President or the President's designated representative must make the request for these lists to the Company in writing. The updated and current Seniority List shall be posted and maintained by the Company at each work location. An Employee's standing on the posted Seniority List will be final unless protested in writing to the Site Supervisor or Contract Manager in districts where a "Site Supervisor" is not authorized, no later than thirty (30) calendar days after the list has been posted.

### SECTION 2.3 PERSONAL DATA

Employees shall notify the Employer in writing, on the company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

### SECTION 2.4 TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is promoted to a non-bargaining unit position for more than four (4) weeks shall lose his/her union seniority. If he/she returns to the bargaining unit at a later date, his/her seniority will start on that return date.

### SECTION 2.5 PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a ninety (90) day period after their hire date. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers,

suspensions, discipline, layoffs or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement. Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The ninety (90) day period referred to in this section may be extended if the Company encounters a delay in the US Marshals Service performing background checks and granting written authorization on newly hired Employees.

## SECTION 2.6 TERMINATION OF SENIORITY

The seniority of an Employee shall be terminated for any of the following reasons:

a) the Employee quits or retires;

b) the Employee is discharged;

c) a settlement with an Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;

d) the Employee is laid off for a continuous period of one hundred eighty (180 ) days; or the Government terminates the Employee's credentials as a Special Deputy Marshal, or the Employee is otherwise asked to be removed from working under the Employer's contract with the Government.

e) Employee is permanently transferred out of the bargaining unit.

# ARTICLE 3

## JOB OPPORTUNITIES

## SECTION 3.1 FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of three (3) working days (excluding Saturdays, Sundays and holidays). Shared position Employees at the site where an opening occurs will be notified in writing at their last known address. The Site Supervisor will notify the Union President in writing of such openings. The Union President will then verify that all shared position CSOs have been notified. When a vacancy occurs, the Employer will fill the position with the senior-most Employee, who will be trained if required to fill any necessary qualifications for the new position.

Should the filling of a vacancy under this Article create a second vacancy, that vacancy will be filled under this Article as well. Any Employee who wishes to apply for the open position shall do so in writing. Vacancy postings and vacancy notifications will be site specific, however union posting at other sites in the Local is permitted. i.e., only Employees at the site where the vacancy occurs will be required to be notified.

## SECTION 3.1A SHARED POSITION EMPLOYEES

Shared positions will be filled as described in Section 3.1

## SECTION 3.1B LAYOFF AND RECALL

In the event of layoff or recall, when full-time or shared positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by calling the last laid off Employee first and so on.

## SECTION 3.2 TEMPORARY ASSIGNMENTS

In the interest of maintaining continuous operations, the Employer may temporarily assign an Employee to a vacant or new position until the job is filled in accordance with Articles 2 and 3, including temporarily assigning an Employee to a work site within or outside of the area defined by this Agreement; to the extent feasible the assignment shall be a voluntary selection based on seniority. In the absence of volunteers, assignments shall be made on a reverse seniority basis. Employees so assigned will receive the higher of the base hourly wage available to Employees regularly assigned to the site to which they are being transferred, or their regular hourly wage they receive at their regular site under this Agreement.

Due to the changing work environment, all Employees are subject to assignment anywhere within the district on an as-needed basis from present on-duty personnel. Failure to comply with the aforementioned schedule changes may lead to disciplinary action up to and including dismissal.

## SECTION 3.3 APPOINTMENT OF LEAD CSOs

*May 1*

The US Government in its contract with the Company creates specific guidelines for the selection of Lead CSOs. Based on these criteria, all appointments of Lead CSOs will be made on the basis of ability. Ability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.

## ARTICLE 4

## MANAGEMENT RIGHTS

Except as limited by the specific undertakings expressed in this Agreement, the Company shall continue to have the right to take any action it deems appropriate in the management of the business in accordance with its judgement.

# ARTICLE 5

## GRIEVANCE PROCEDURE

### SECTION 5.1 INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any disciplinary action directed by the US Marshals Service or by Judicial personnel. This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties. In addition, the grievance procedures outlined herein shall not apply to any situation where the Company is acting under the directives of the US Marshals Service or any member of the judiciary. In any such situation, however, the Employee will be provided with copies of any written complaints or existing transcripts of verbal complaints that require the Company to take any form of disciplinary action towards the Employee, if the Employee requests such materials. The term "days" shall not include Saturdays, Sundays, or holidays when used in this Article

### SECTION 5.2 GENERAL PROVISIONS

The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.

### SECTION 5.3 GRIEVANCE PROCEDURE

All grievances shall be presented and processed in accordance with the following procedures:

Informal Step - Both the Company and the Union agree that the Employee will first discuss his/her complaint with his/her immediate supervisor within five working (5) days of the incident being grieved to start the informal procedure. If the informal procedure is not invoked within five working days of Employee's knowledge of a grieveable issue, then is agreed by both parties that no further action can be taken. If, during the course of this discussion either the Employee or the supervisor deems it desirable, a steward or other Union representative will be called in. If the complaint is not satisfactorily adjusted within three (3) working days of the informal discussion, it may be submitted in writing to the Contract Manager or his/her designee in accordance with Step One.

Step One - If the matter is not resolved informally, the Employee shall, not later than ten (10) days after the informal discussion with the immediate supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved Employee and the steward, and shall be submitted to the Contract Manager or his/her designee. The Contract Manager or his/her designee shall have ten (10) days from the date the grievance was presented to him/her to return his/her decision in writing with a copy to the aggrieved Employee and the steward.

Step Two - If the grievance is not settled in Step One, the grievance may be appealed in writing to the Director of Human Resources or his/her designee not later than ten (10) days from the denial by the Contract Manager or his/her designee. The Director of Human Resources or his/her designee will have ten (10) days from the date the grievance was presented to him/her, to return his/her decision, in writing, with a copy to the aggrieved Employee and the Steward.

Grievance for Discipline - Any grievance involving discharge or other discipline may be commenced at Step One of this procedure. The written grievance shall be presented to the Contract Manager through the Site Supervisor or his/her designee within ten (10) days after the occurrence of the facts giving rise to the grievance.

## SECTION 5.4 ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Akal Director of Human Resources written notice of its desire to proceed to arbitration not later than fifteen (15) days after rejection of the grievance in Step Two. Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:

Pre-Arbitration Hearing – The parties agree to hold a pre-arbitration hearing requiring a senior manager of the Company and Union President (or designee) to make a final effort to settle the grievance before arbitration.

Selection of an Arbitrator - Within fifteen (15) days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet or telephonically jointly attempt to agree upon the selection of a neutral arbitrator. If, within fifteen (15) days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Mediation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

Decision of the Arbitrator - The arbitrator shall commence the hearing at the earliest possible date. The decision of the arbitrator shall be final and binding upon the parties to the Agreement. Any decision shall be complied with, without undue delay after the decision is rendered. It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

Arbitration Expense - The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each party to the arbitration will be responsible for its own expenses and compensation incurred in bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

Time Limits - The decision of the arbitrator shall be rendered as soon as possible after the dispute has been submitted to him/her.

## SECTION 5.5 CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6 INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1 GROUNDS FOR DISMISSAL

After completion of the probationary period, no Employee shall be dismissed or suspended without just cause, unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service. The Company's contract with the US Government sets out performance standards for CSOs and all employees are required to comply with these standards.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

## SECTION 7.1 WORKDAY AND WORKWEEK

For the purposes of this Article, a regular workweek of forty (40) hours of work, excluding lunch periods, shall constitute a normal full-time workweek for full-time Employees. Employees working a minimum of eight (8) consecutive hours shall normally receive an unpaid lunch period of at least thirty (30) minutes unless work conditions preclude scheduling of this period. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

## SECTION 7.2 OVERTIME

An overtime rate of time and one-half (1 1/2) of an Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of forty (40) hours in a work week.

## SECTION 7.3 OVERTIME REQUIREMENT

If requested to work overtime (i.e. over forty [40] hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice, the Employee shall be required to do so unless the Employee is excused for good cause.

## SECTION 7.4 OVERTIME DISTRIBUTION

Overtime will be distributed as equitably and fairly as practicable among Employees regularly assigned to the particular work location (including shared position Employees), subject to the direction of the judges and/or Marshals Service. Seniority shall be used in the assignment of overtime, except when the Employer is directed by the US Marshals Service or judges, or in situations dictated by availability of personnel and amount of notice given for overtime.

Excluding: Site Supervisors cannot be assigned to cover CSO overtime positions or posts except in emergency situations, or when directed by the US Marshal Service or judiciary, or in situations dictated by availability of personnel and amount of notice given for overtime. The Company will permit Site Supervisors to work overtime assignments only when there is no bargaining unit member available or in situations described above due to the rapidly changing court environment. The Employer will attempt to rectify overtime inequalities through the future scheduling of overtime work. Overtime records will be made available to the Union by the Company upon request.

## SECTION 7.5 SHARED POSITION EMPLOYEES

Hours of work for shared position Employees shall be determined by the Employer, to insure the orderly and efficient operation of court security services. Shared position Employees shall be required to work all scheduled work hours, unless the Employee is excused for good cause. Shared position Employees will be required to sign the Akal Shared Officer Agreement.

## SECTION 7.6 REST PERIODS

There shall be two (2) fifteen (15) minute paid rest periods when properly relieved and one (1) thirty (30) minute unpaid lunch for each eight (8) hour shift. One rest period shall be in the first half of the shift and the second rest period shall be in the last half of the shift. On occasion, due to exceptional authorized work requirements, Employees may have to work through their unpaid lunch breaks, and, if so, they will be compensated at the appropriate rate of pay. The Company recognizes the requirement to provide regularly scheduled breaks. It is not the intent of the Company to deny, avoid, or abuse this requirement.

## SECTION 7.7 CALL-IN PAY

An Employee called in to work will be guaranteed a minimum of three (3) hours of work or pay.

# ARTICLE 8

## WAGES

### SECTION 8.1 WAGE SCHEDULE

The base rate of pay for Court Security Officers Southern Texas, Local #108 will be, by site:

**For Houston**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.72 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $16.12 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $16.57 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.88 | $16.25 |

**For Galveston**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.25 |

**For Corpus Christi**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $15.42 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.81 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $16.25 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $16.55 | $15.88 |

**For McAllen, Laredo and Brownsville**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.88 |

| For Victoria | | |
|---|---|---|
| Year | CSO Wage | Lead CSO Wage |
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.50 |
| October 1, 1999-September 30, 2000 | $14.64 | $14.89 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.33 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.63 |

## SECTION 8.2 PAYDAY

Payday for all hourly Employees will be after 11 a.m. on Friday following the pay period ending on Saturday, subject to change by mutual agreement.

## SECTION 8.3 UNDISPUTED ERROR

In case of an undisputed error on the part of the company as to an Employee's rate of pay, proper adjustment will be made from the date the error occurred.

## SECTION 8.4 LEAD CSO RATES

If additional Lead CSOs are added to the contract any time after this Agreement goes into effect, they will be paid the base rate set out above in Section 8.1, based on the location.

## ARTICLE 9

## HOLIDAYS

## SECTION 9.1. HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day.

## SECTION 9.2 MISCELLANEOUS HOLIDAY PROVISIONS

A. A full-time Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift or premium for that holiday. The Employee will be paid holiday pay only if the Employee is not laid off, or on an unpaid leave of absence.

B. Any full-time Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked and in addition shall receive eight (8) hours holiday pay at the straight time rate, providing the Employee meets the requirements above in Section 9.2A.

C. Any shared position Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked plus prorated holiday pay up to 8 hours based on their average weekly hours for the previous four weeks' work.

D. Holiday pay for shared position Employees who do not work on a holiday and meet the eligibility requirements set out in Section 9.2A above shall be paid a proration of the full-time benefit based on their average weekly hours for the previous four weeks' work.

## ARTICLE 10

## VACATIONS

### SECTION 10.1 ELIGIBLE FULL-TIME EMPLOYEES

Eligible full-time Employees shall be entitled to annual vacation pay, based on their continuous years of service with the Employer at their individual hourly rate at the time payment is made in accordance with the following schedule:

| | |
|---|---|
| Upon completion of one year of service: | 80 hours |
| Upon completion of five years of service: | 120 hours |
| Upon completion of 15 years of service: | 160 hours |

### SECTION 10.1a ELIGIBLE SHARED POSITION EMPLOYEES

A. Eligible shared position Employees who work a regular half-time schedule shall be entitled to one-half the full-time vacation benefit at their individual hourly rate.

B. Eligible shared position Employees who work other than a regular part-time schedule shall be entitled to a prorated vacation pay at their individual hourly rate based on the number of hours worked in the previous contract year.

### SECTION 10.2 SCHEDULING VACATIONS

Each Employee who qualifies for a vacation in accordance with the provisions of this Article shall notify his/her Lead CSO, in writing, prior to April 1st of each year of his or her first and second choice for desired vacation periods, if any. If vacation time is required to be used differently than as per requested prior to April 1, Employee must give their immediate supervisor a written request at least seven (7) days prior to the requested vacation time.

** TX STATUS REPORT **                    AS OF    FEB 23 '00 16:12    PAGE.01

USMS BROWNSVILLE

|    | DATE  | TIME  | TO/FROM        | MODE  | MIN/SEC | PGS | CMD# | STATUS |
|----|-------|-------|----------------|-------|---------|-----|------|--------|
| 19 | 02/23 | 16:12 | 956 550 7221   | EC—S  | 00'26"  | 001 |      | OK     |

( )                                              )

# PREAMBLE

THIS AGREEMENT is made and entered into on _____July 8, 1998_____ by and
between AKAL SECURITY, INCORPORATED, a New Mexico corporation, and its successors,
hereinafter referred to as the "Employer" or "Company," and UNITED GOVERNMENT
SECURITY OFFICERS OF AMERICA, LOCAL #108 hereinafter referred to as the "Union." All
non-economic provisions of this contract shall be in effect as of May 1, 1998. All economic
provisions of this contract shall be in effect as of 11:45 p.m. on September 30, 1998, including, but
not limited to compensation and fringe benefits.

1-800-572-6103

303-650-8515

2

FEB 24 '00 07:34 FR   MS-COMMAND CENTER  713 718 4828 TO   565747490   P.01/11

The Employer will recognize union seniority when scheduling Employees for vacation in accordance with Section 2.1. The Employer will allow the maximum amount of personnel off at any one time for vacation that allows the Company to maintain efficient operations. The final allocation of vacation periods shall rest exclusively with the Employer in order to insure orderly and efficient operations and meet Government contract requirements.

## SECTION 10.3 PAY OPTIONS

Earned vacation pay shall be paid on the pay day following the Employee's return to the job after his/her vacation.

## SECTION 10.4 UNUSED VACATION

Vacations shall not be cumulative from one year to the next. Any earned but unused vacation time remaining at the end of a year of service (i.e. anniversary date of employment) shall be paid to the Employee.

## SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

Any time during the year, Employees may request in writing to be paid for earned vacation pay in lieu of taking actual vacation leave.

## SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employee will be paid at their individual hourly rate for any legally accrued but unused vacation time, as entitled by the Service Contract Act.

## SECTION 10.7 VACATION - LAID OFF EMPLOYEES

Length of service with the Employer shall not accrue for the purposes of vacation benefits while an Employee is on laid-off status.

## SECTION 10.8 VACATION INCREMENTS

Vacation days may be used in one (1) day increments, if so desired by the Employees and approved by the Employer.

## ARTICLE 11

## LEAVES OF ABSENCE

## SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30

Case 1:01-cv-00072  Document 19  Filed in TXSD on 02/15/2002  Page 138 of 154

days, unless approved by the Employer. Employee on any unpaid leave of absence may be required to use available vacation or personal leave time. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over 30 days. The Employer will make every reasonable effort to maintain an Employee's position while on a non-statutory unpaid leave of absence.

## SECTION 11.2 MEDICAL LEAVE

An Employee shall be granted an unpaid medical leave of absence for a specified period not to exceed 16 weeks within a 12-month period. Employee's disability must be made known to the Employer in accordance with the provisions of this Article, and be supported by a doctor's certificate showing the nature of the illness and the estimated length of time the Employee will be unable to perform his/her job.

The 16-week period may be extended at the discretion of the Employer. During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Employee will be required to use accrued vacation or personal leave time during the medical leave. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work.

## SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated or drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or the Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

## SECTION 11.4 UNION LEAVE

A Union officer or delegate will be granted an unpaid leave of absence upon written request for the purpose of attending Union conventions or other meetings of vital interest to the United Government Security Officers of America. The maximum number of days given for union leave is not to exceed five (5) days per contract year and the maximum number of union officers or delegates to be granted leave of absence is not to exceed two (2) Employees per Local Union.

## SECTION 11.5 FAMILY MEDICAL LEAVE

The Family and Medical Leave Act of 1993 is incorporated herein by reference.

## SECTION 11.6 PERSONAL LEAVE

Each full-time seniority Employee shall be eligible to use a maximum of six (6) days of personal leave (forty-eight hours) per 12-month Government contract year worked. Employees who begin

employment after the inception of the contract year will be eligible to use a prorated amount of personal leave, based upon the following rate (see **Personal Leave Eligibility Table** below):

| Personal Leave Eligibility Table | | |
|---|---|---|
| **START DATE** | **RATE OF PERSONAL LEAVE ELIGIBLE TO USE** | |
| (Date Employee begins working on the contract, based on an October 1 contract start date.) | **FULL-TIME** | **SHARED POSITION** |
| October 1-31 | 48 hours | 24 hours  3 days |
| November 1-30 | 44 hours | 22 hours  2day 4 Hes |
| December 1-31 | 40 hours | 20 hours  2days 4 HR |
| January 1-31 | 36 hours | 18 hours  2Days 2 He |
| February 1-29 | 32 hours | 16 hours  2 days |
| March 1-31 | 28 hours | 14 hours  1day 6 Hes |
| April 1-30 | 24 hours | 12 hours  1day 4 Hes |
| May 1-31 | 20 hours | 10 hours  1day 2 HR |
| June 1-30 | 16 hours | 8 hours  1day |
| July 1-31 | 12 hours | 6 hours |
| August 1-31 | 8 hours | 4 hours  - |
| September 1-30 | 4 hours | 2 hours |

A. Personal days shall be used in not less than four-hour increments and shall be paid when taken by the Employee as approved in advance by the Site Supervisor or District Supervisor.

B. Shared position Employees will receive one-half the full-time personal leave per full contract year worked. At the end of the contract year, any shared position Employee who worked more than half the full-time hours (1,040 hours) will receive additional prorated personal leave based upon the number of actual hours Employee worked during that contract year. Therefore, for each additional 87 hours worked over 1,040 hours during the contract year, Employee will receive an additional 2 hours of personal leave, up to a possible maximum of 48 hours total personal leave for the contract year.

C. Unused personal days shall not be cumulative from year to year. Any unused, earned personal leave pay will be paid to Employee at the end of the contract year.

D. Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that contract year. (Example: An Employee who terminates work after six months at the full-time rate during the current contract year and earns three (3) days personal leave, but only uses two (2) days, would be eligible upon termination to be paid for the third, unused personal day.) If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract (4 hours per full month worked), the amount of the overage will be

deducted from the Employee's final paycheck. (Example: If Employee works only six months and therefore earns three days (24 hours) personal leave, but actually uses four days personal leave, the extra 8 hours' pay will be deducted from Employee's final paycheck.)

E. Personal leave (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least two (2) hours prior to the beginning of his/her regular shift in order to be eligible for paid personal leave benefits. Disciplinary action may result from excessive, unapproved absenteeism.

## SECTION 11.7 PROCESSING LEAVES OF ABSENCE

A leave of absence must be processed in the following manner:

A. All requests for any unpaid leaves of absence shall be submitted in writing to the Site Supervisor at least ten (10) calendar days prior to the date that the leave will take effect, except in cases of emergencies, and shall include:

1. The reasons for such leave;
2. The effective dates of such leave;
3. The estimated date of return to work.

B. The written request for leave of absence shall be submitted to the Contract Manager by the Site Supervisor for final approval.

C. If the request for the leave of absence is approved by the Contract Manager, a copy of the approved leave of absence will be given to the Employee involved.

D. Extensions of the leave of absence may be granted at the discretion of the Employer upon written request by the Employee within ten (10) calendar days prior to the expiration of the leave of absence when feasible. Extensions when granted shall not total more than thirty (30) days.

## SECTION 11.9 BEREAVEMENT LEAVE

All non-probationary Employees shall be entitled to three days unpaid bereavement leave per full Government contract year for purposes of attending, on a day normally scheduled to work, the funeral of a parent, parent-in-law, spouse, child, sibling, or sibling-in-law. Employee will notify Lead CSO, whenever possible, of the need for bereavement leave.

## SECTION 11.10 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of Article 2 of this Agreement.

# ARTICLE 12

## HEALTH, WELFARE AND UNIFORM ALLOWANCES

### SECTION 12.1 PAYMENTS

For the life of this Agreement, the Employer will make health and welfare payments to Employees on all hours paid up to forty (40) hours per week in accordance with the following schedule at the hourly rate:

| | |
|---|---|
| Effective October 1, 1998 through September 30, 1999 | $1.41/hour |
| Effective October 1, 1999 through September 30, 2000 | $1.66/hour |
| Effective October 1, 2000 through September 30, 2001 | $1.91/hour |
| Effective October 1, 2001 through September 30, 2002 | $2.00/hour |

### SECTION 12.2 MINIMUM BENEFITS

The amounts required by Section 12.1 shall serve as the minimum health and welfare benefits for Employees.

### SECTION 12.3 OTHER BENEFITS

The Employer will offer Employees the opportunity to participate in other Employee-paid fringe benefit programs made available to all Court Security Officers employed by the Company. These programs include cafeteria plans, payroll deduction plans, retirement plans, insurance plans, 401(k) plans, and any other plan mentioned in this Agreement.

### SECTION 12.4 UNIFORM MAINTENANCE

The Employer will pay the Employee $.10625 per hour worked up to 40 hours per week for uniform maintenance allowance. A shoe allowance of $62.50 per contract year will be sent with uniforms annually for the purchase of USMS-required CSO uniform shoes.

### SECTION 12.5 GROUP DISABILITY INSURANCE

The Company agrees to deduct any fees or premium payments and lawful assessments designated by the Union for a Group Disability Insurance plan set up by and administered by the Union from the first paycheck of each month of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. Such authorization may be revoked by the Employee upon 30 days' written notice served upon the Company and the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to amount of fees, and any other costs for this insurance.

The Company will remit all such deductions to the International Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit would be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the International Secretary/Treasurer with a deduction list, setting forth the name and amount of fees, and any other costs for this insurance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are corrective and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for insurance deductions. The Company shall accept no other form unless the parties mutually agree to a substitute.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

## SECTION 13.1 BULLETIN BOARDS

The Employer will make its best effort to obtain a space from the government for the use of the CSOs to locate a Union-provided bulletin board that will be used by the Union for posting notices pertaining to Union affairs. The providing of these facilities is the prerogative of the US Government.

## SECTION 13.2 PHYSICAL EXAMINATIONS

The Employer shall pay for all physical/medical examinations that are required by the Employer at Employer designated clinic(s) or physicians. In those selected areas where there is not a designated clinic or physician, the Employer will provide an allowance to the Employee of up to a maximum of eighty dollars ($80) per examination. Receipts must be furnished by Employee in order to process reimbursement.

Physical/medical exams may be required by operation of the government contract or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic, at its discretion. Employer shall pay Employee up to two hours for time spent taking an employer-requested medical examination.

## SECTION 13.3 TRAVEL EXPENSES

The Company will provide advance payments for approved travel expenses if requested by an Employee. Any hours to include travel over twelve (12) hours will require the Employee to stay

overnight and the appropriate per diem will be paid. All hours in travel will be counted as work hours with the appropriate overtime wages provided for under Article 7 of this Agreement. Employees will be reimbursed for all authorized expenditures of any authorized travel within twenty (20) days from the day Employer receives the travel voucher and all required receipts.

## SECTION 13.4 BREAK ROOMS

The Employer will make its best effort to obtain from the government break rooms for CSOs for breaks and lunch without management using the room as an office and will make its best effort to have the government equip the room with water. The providing of these facilities is the prerogative of the US Government.

## SECTION 13. 5 LOCKERS

The Employer will make its best effort to obtain lockers from the government for the use of the CSOs. The providing of these facilities is the prerogative of the US Government.

## SECTION 13.6 UNION MEETINGS

Neither Union officials nor Union members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings of any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances to the extent such work time activity is specifically allowed by the Employer.

## ARTICLE 14

## 401 (k) PLAN

## SECTION 14.1 401 (K) PLAN

The Company shall provide a 401(k) plan to which Court Security Officers are eligible to contribute, whether Union or Non-Union. Employees shall be subject to the eligibility requirements and rules of the Plan.

## ARTICLE 15

## TRAINING

## SECTION 15.1 TRAINING

The Company will make its best effort to implement its advanced CSO training program to enhance the professional capabilities of the Employees. Actual scheduling of training is subject to approval by the US Government and may be subject to funding by the US Government.

# ARTICLE 16

## SAFETY

### SECTION 16.1 SAFETY POLICY

It is the policy of the Company to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. The Company agrees to permit one (1) bargaining unit member selected by the Union to participate in any locally scheduled safety meetings.

### SECTION 16.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any government provided CSO work stations and break rooms.

# ARTICLE 17

## CONTINUITY OF OPERATIONS

### SECTION 17.1 NO STRIKES

Both the Company and the Union agree that continuity of operations is of utmost importance to the Company's security operations. Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns or secondary boycotts during the term of this Agreement and that the Union will not cause, nor permit its members to cause, nor will any member of the Union take part in, any strike, including a sympathy strike, slowdown, stoppage of work, planned inefficiency or any other curtailment of work or restriction or interference with the Employer's or Government's operations for any reason whatsoever. Nor will the Union authorize or sanction the same.

Upon hearing of any unauthorized strike, slowdown, stoppage or work, planned inefficiency or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such activity to a prompt termination. Any Employee who violates this provision may be immediately discharged. Furthermore, it is agreed and understood that in addition to other remedies, the provisions of this Article may be judicially enforced including specific performance by way of injunctive relief.

### SECTION 17.2 LOCKOUTS

During the life of this Agreement, the Employer shall not lockout any Employees covered in this Agreement.

# ARTICLE 18

## SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, such parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to the decree or government statutes so long as they shall remain legally effective. It is the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

# ARTICLE 19

## SERVICE CONTRACT PROCEDURES AND OBLIGATIONS

The parties recognize that they are providing a service to the Unites States Government. Therefore, the terms of this agreement are subject to the directives of the Government, and, except as provided herein, there shall be no recourse against the Employer with regard to its actions taken to comply with those directives. In the event a directive necessitates a deviation from the obligations or procedures contained in this Agreement, the Union may request that the parties hereto meet and confer with regard to the effects, if any, of the deviation necessitated by the Government's directive. A copy of a written directive covered by this provision shall be provided to the International UGSOA president upon request.

# ARTICLE 20

## ENTIRE AGREEMENT

The parties acknowledge that during the negotiation which resulted in the Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and all understandings and agreements reach by the parties are set forth in this Agreement. Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the term of this Agreement except as specifically provided for in other provisions of this Agreement.

## ARTICLE 21

### DURATION

This Agreement shall be effective upon its execution by both parties and supersedes any and all prior agreements or understandings between the parties. The Agreement shall remain in force until 2400 hours on September 30, 2002 with the provision that should either party desire to terminate this Agreement or any provision thereof, it shall give written notice to the other party of not less than sixty (60) days and not more than seventy-five (75 days) prior to the expiration. In the event such notice is given, the existing Agreement may be continued by mutual consent of both parties until an Agreement is reached. This Agreement may also be changed or amended by agreement of both parties.

IN WITNESS WHEREOF, the parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _Nathan McKoy Jr_

TITLE: _President_

DATE: _July 8, 1998_

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _Glynn Crutchfield_

TITLE: _Secretary / Treasurer_

DATE: _July 8, 1998_

BY: _____

TITLE: _Int'l Sec-Treas._

DATE: _7-8-98_

FOR:
AKAL SECURITY, INC.

BY: _Daya_____

TITLE: _SR V.P._

DATE: _July 9, 1998_

FOR:
AKAL SECURITY, INC.

BY: _Sas Dan Khal_

TITLE: _Dir. HR_

DATE: _2/8/98_

BY: _____

TITLE: _____

DATE: _____

Local #105  -  May 1998-September 2002 CBA                         25

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ALLEN FRY and MIGUEL LOPEZ,           §
                                      §
                Plaintiffs,           §
                                      §
v.                                    §        CIVIL ACTION NO. B-01-CV-72
                                      §
AKAL SECURITY, INC.,                  §
                                      §
                Defendants.           §

## AFFIDAVIT OF SAT NIRMAL KHALSA

STATE OF NEW MEXICO          §
                             §
COUNTY OF SANTA FE           §

I, Sat Nirmal Khalsa, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.     My name is Sat Nirmal Khalsa. I am currently employed by Akal Security, Inc. ("Akal"), as the Chief Executive Officer. In this capacity, I informed Miguel Lopez of his termination from employment with Akal.

2.     Akal is a security company that provides security services primarily to government facilities throughout the United States. One of Akal's primary contracts is with the United States Marshal Service ("USMS") and the Department of Justice ("DOJ") to provide security for federal buildings and courthouses all over the nation. Under its contract with the USMS/DOJ, Akal has the responsibility of providing security personnel, i.e., Court Security Officers ("CSO"), for the United States District Court for the Southern District of Texas, including the Brownsville Division.

3.     The USMS has an active role in employment decisions with respect to CSOs. For example, the USMS must approve all CSO applications before an individual can begin providing services to the USMS. The USMS may also direct Akal to reject an application, remove a CSO from his or her position or impose discipline on a CSO. This direction from the Marshal Service may be formal or informal. In the event the USMS directs Akal to remove a CSO from a contract, Akal is required to do so in order to comply with its contractual obligations. In the event the USMS determines that Akal is not performing under one of its contracts, the USMS has the authority to remove Akal from its contracts in all eight judicial circuits, which constitutes approximately 85 percent of Akal's business.

4.     In December of 1999, I was informed that Supervisor Deputy U.S. Marshal Robert Cervantes reported a situation to Akal personnel in which CSO Miguel Lopez had wrongfully allowed three FBI agents to enter into the federal courthouse in Brownsville, Texas, without first ensuring that their weapons were secured in designated lockers. Akal investigated this situation by discussing the situation with Mr. Cervantes, obtaining a written statement from Mr. Cervantes, obtaining a written statement from the FBI and obtaining a statement from Mr. Lopez. True and correct copies of the statements obtained from Mr. Cervantes, the FBI and Mr. Lopez are attached hereto and incorporated herein.

5.     Additionally, Site Supervisor Louis McDaniel informed me that the Supervisor Deputy U.S. Marshal, Mr. Cervantes, told him that he no longer trusted Mr. Lopez to be employed as a CSO in the Brownsville federal courthouse. Based on my understanding of the USMS, I understood this statement to be a directive to remove Mr. Lopez from his position as a CSO.

6.     In connection with Akal's investigation, I determined that Mr. Lopez violated several CSO performance standards which were sufficient grounds for termination. Accordingly, based on the direction of the U.S. Marshal representative, Robert Cervantes, I terminated Mr. Lopez' employment with Akal.  Mr. Lopez' age played absolutely no role in his termination from Akal.

I have read this affidavit which consists of three pages, including this page, and have been given an opportunity to make any corrections.  I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.

_____2/13/02_____                        _____
Date                                                    Sat Nirmal Khalsa

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Sat Nirmal Khalsa on this the 13th day of February, 2002, to certify which witness my hand and seal of office.

_____
Notary Public, in and for the State of New Mexico

My commission expires:  ___4/6/2002___

Case 1:01-cv-00072  Document 19  Filed in TXSD on 02/15/2002  Page 151 of 154

# UNITED STATES MARSHALS SERVICE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**DATE:**  December 16, 1999

**TO:**    Louis McDaniels
           Court Security Site Supervisor
           Houston, Texas

**FROM:**  Robert Cervantes, SDUSM

**SUBJECT:**    Court Security Officer Miguel LOPEZ


On December 14th, 1999, I observed Court Security Officer Miguel LOPEZ allow three FBI agents entry to the U.S. Courthouse without first ensuring that their weapons were secured in the designated gun lockers nearby.

At approximately 1:15pm, CSO LOPEZ was assigned to the lobby, front entrance security post when FBI Agent Orlando Munoz and two other Agents arrived enroute to the United States Attorney's Office (AUSA). FBI was there to arrest a DEA Agent on a murder for hire charge. I observed the Agents identify themselves to CSO LOPEZ and proceed to walk through the magnetometer. As the Agents walked through, I heard the magnetometer sound off. All three Agents continued on their way unchallenged. One of the agents recognized me and walked over to greet me. As all this occurred, I was in the lobby area on my way back to the USMS office from the snack bar. All three Agents proceeded to the stairwell headed towards the United States Attorney's Office. I immediately approached CSO LOPEZ and asked him if the Agents had any weapons on them. His response was "NO, they are FBI Agents going to the AUSA office for a meeting".

At approximately 1:30pm, agent MUNOZ walked over to the USMS office and advised me that CSO LOPEZ had allowed them to enter the building with their weapons. I immediately advised Agent MUNOZ that their weapons had to be secured in a gun locker and under no circumstance would they be allowed to carry their weapons in the courthouse. Agent MUNOZ went on to say that CSO LOPEZ did ask them if they were armed but then stated "since your going to the AUSA office, I guess it's OK".

I advised Lead CSO Roy ZEPEDA of what occurred and to report this matter to his site supervisor Louis McDaniels in Houston.

cc: USM Contreras, Chief Greason
    Court Security CoOrdinator Wanda Price


Akal/Fry/Lopez
Docs Produced  000601

DEC 30 '99 12:59 FR USMS  COMMAND CENTER  315 715 4526 TO 9)  '01306067    P.02 39

DEC-30-1999  12:24       '(  _, MCALLEN RA                )       956 984 6310    P.02



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

P.O. Box 1630
San Antonio, Texas 78296
December 29, 1999

Mr. Luis McDaniel
District Supervisor
Court Security Southern District of Texas

Dear Mr. McDaniel,

          This communication is being forwarded to you in
response to your request of December 29, 1999, to document the
events of December 14, 1999 that occured at the Federal Court
Building in Brownsville, Texas.

          On December 14, 1999, numerous agents of the FBI Office
in McAllen, Texas travelled to the United States (US) Attorney's
Office in Brownsville, Texas, to effect the arrest of DEA Special
Agent Sal Martinez.  Prior to arriving in Brownsville, FBI
Supervisory Special Agent (SSA) J.L. Cisneros contacted Deputy
Robert Cervantes, supervisor with the United States Marshal
Service and briefed him regarding the operation.

          Upon arriving at the Federal Court Building in
Brownsville, Special Agents Robert Gutierrez, Mirella Nava, and
Orlando G. Munoz entered the building.  When passing through the
building security checkpoint, the court security officer on duty
asked if the agents had any pagers, cellular telephones, or
weapons.  The Agents replied that they had pagers, cellular
telephones and weapons.  The court security officer then advised
that they would have to lock the items in the lock boxes.  He
then asked if the Agents were only going to the US Attorney's
office to which they replied in the affirmative.  He then advised
them that if they were only going there and not to court they
could go on and pass through, without securing the items in a
lock box.

          Immediately after clearing security, the Agents greeted
Deputy Cervantes, who was standing in the hallway observing the
security area. Upon reaching the US Attorney's Office, the Agents
decided to return downstairs to the security area to speak

Akal/Fry/Lopez
Docs Produced  000603

directly to Deputy Cervantes to ensure that the DEA Agent would not be allowed to carry his weapon in with him, as well.  Upon returning downstairs, SA Munoz asked the same court security officer where Deputy Cervantes was and the court security officer advised SA Munoz to lock up his weapon.  SA Munoz advised that he would lock up his weapon as soon as he talked to Deputy Cervantes.  The Court Security Officer then asked SA Munoz not to get him in trouble.

SA Munoz advised Deputy Cervantes that the Agents were concerned that the DEA Agent would be allowed to enter the building armed, just as they were.  Deputy Cervantes advised that the Agents were not supposed to have been allowed to enter the building armed and that all weapons must be secured.  After talking to Deputy Cervantes, all weapons were secured outside the building in order to conduct a safe operation.

Any other questions concerning this matter can be directed to SA Munoz at (956) 984-6300.

Sincerely,

Roderick Beverly
Special Agent in Charge

By: _Carl Whitehead_
Carl Whitehead
Assistant Special Agent in Charge

Akal/Fry/Lopez
Docs Produced  000604

Case 1:01-cv-00072   Document 19   Filed in TXSD on 02/15/2002   Page 154 of 154

# CSO INCIDENT REPORT

| Report Date | Reporting District | Reported By |
|---|---|---|
| 12/17/99 | Southern dist of Tex. | CSO Miguel Lopez, Brownsville, Texas 78520 |

Fax. 713-718-4828   Ph. 713-718-4962

**Type of Incident:** FBI Agents, supposedly entering Fed ct. House, Armed. Attn. Mr. McDaniel Houston, Tex.

**DESCRIPTION OF INCIDENT:** On December 14, 1999, three FBI agents came into the Federal court house. They showed their IDs, They were told to put their weapons if they were armed in the gun locker, pagers or phones, if they were going into the U.S. Attorney's office they could keep, if they were going into court they had to leave them with us or in the gun locker. They walked in and no further screening was done. I was never briefed of the arrest that was going to take place in the U.S. Attorney's office. I have complied by the company's instructions
   I understand by Mr. Cervantes that they were armed. I never saw the weapons or agents locking them up in the gun locker after they went into the U.S. Attorney's office

   I am Requesting a copy of the accusations made by Robert Cervantes, Sup. USM.

   Attn. Louis McDaniel.

_____   _____
**Site Supervisor/ Lead CSO**                     **Witnessed By**