

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION



United States District Court
Southern District of Texas

FEB 1 5 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## ON CLAIMS ASSERTED BY PLAINTIFF ALLEN FRY

---

Raquel G. Pérez
Texas State Bar No. 00784746
Southern District Bar No. 19187
BRACEWELL & PATTERSON, L.L.P.
J. Tullos Wells
Texas State Bar No. 21146500
Southern District Bar No. 8337
106 South St. Mary's Street, Suite 800
San Antonio, Texas 78205-3603
Telephone:  210-226-1166
Facsimile:  210-226-1133

**ATTORNEYS FOR DEFENDANT,
AKAL SECURITY, INC.**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON CLAIMS ASSERTED BY PLAINTIFF ALLEN FRY**

NOW COMES Defendant, Akal Security, Inc. ("Akal"), and pursuant to Fed. R. Civ.

P. 56 respectfully moves the Court to enter judgment in its favor on Plaintiff Allen Fry's claims

on the ground that there is no genuine issue of material fact and Akal is entitled to judgment as a

matter of law. In support of this motion, Akal respectfully shows the court the following:

*PRELIMINARY STATEMENT*

Plaintiff Allen Fry ("Fry") was a Court Security Officer ("CSO") in the United States

District Court for the Southern District of Texas, Brownsville Division, and subject to a

Collective Bargaining Agreement ("CBA") between Akal and the United Government Security

Officers of America, Local 108 ("Union"). On August 20, 1999, Fry walked off the job after he

was requested to take a physical examination to demonstrate his fitness for his CSO position.

Specifically, Fry became upset at Akal's request to take a physical examination, turned in his

firearm, ammunition, government credentials, informed his Lead Court Security Officer

("LCSO") that he did not need "this crap" and could live off of his pension. Fry then walked off

his job. The LCSO informed the Site Supervisor that Fry had walked off the job and, as

instructed by his Site Supervisor, immediately contacted an applicant whose application was

pending for a CSO position.   Approximately five hours later, Fry returned to the Federal

Courthouse and stated that he was willing to take the physical examination.  The Site Supervisor

and the Director of Court Security, in consultation with Akal's Human Resources Department,

decided that they would not allow Fry to return to his position due to his resignation by walking

off the job, Akal's policy to not allow CSOs to return after they have walked off the job, and that

an applicant had been contacted to replace Fry.

Fry failed to bring a grievance in accordance with the CBA, but instead, brought this

lawsuit, asserting claims for (1) age discrimination under the Age Discrimination in Employment

Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and the Texas Commission on Human Rights Act, Texas

Labor Code § 21.001 *et seq.* ("TCHRA"); and (2) intentional infliction of emotional distress.

Fry's primary contention is that he was terminated from his CSO position due to his age (73).

Moreover, Fry contends that during the last two months of his employment with Akal, he was

only assigned to guard the front entrance of the Courthouse, and not rotated to other courthouse

assignments due to his age.

Akal is entitled to judgment as a matter of law on Fry's claims because (1) Fry's state law

claims for age discrimination under the TCHRA and for intentional infliction of emotional

distress are preempted by Section 301 of the Labor Management Relations Act; (2) Fry cannot

establish a *prima facie* case of age discrimination under the ADEA or the TCHRA; (3) even

assuming Fry could establish a *prima facie* case of age discrimination, he has failed to present

sufficient summary judgment evidence that Akal's legitimate, non-discriminatory reasons for not

allowing him to return to his CSO position after he walked off the job (*i.e.*, Akal's policy is to not

allow those employees who walk off the job to return to their position, and Akal had already

contacted an applicant to replace his position at the time that Fry returned) were a pretext for age

-2-

discrimination; and (4) even if his state law claim for intentional infliction of emotional distress is not preempted, Fry has failed to come forward with any evidence to support his tort claim. Namely, Fry has failed to show that Akal's conduct was sufficiently extreme and outrageous or that he suffered severe emotional distress.

## I. STATEMENT OF MATERIAL FACTS.

### A. Company Information and Policies.

Akal is a security company that provides security services primarily to government facilities throughout the United States. One of Akal's primary contracts is with the United States Marshall Service ("USMS") and the Department of Justice ("DOJ") to provide security for federal buildings and courthouses all over the nation. Under its contract with the USMS/DOJ, Akal has the responsibility of providing security personnel, *i.e.*, CSOs for the United States District Court for the Southern District of Texas, including the Brownsville Division. This contract states that the primary function of a CSO is to ensure the safety and security of those individuals inside the courthouse. (Affidavit of Richard Wimberly, ("Wimberly Aff."), ¶ 2, attached under Tab 1)

To achieve total security of the courthouse, CSOs are assigned to different posts including--the front entrance, the courtrooms, roving patrols inside the building, and roving patrols outside the building. Additionally, CSOs are assigned to the command center to monitor surveillance cameras. (Plaintiff's Deposition ("P. Dep.") at 51:21-25; 53:16-20; 54:18-25; 55:1-2, attached under Tab 2) All assignments are important and necessary for the safe protection of the courts. There is no difference in pay or status between the different assignments in the courthouse. (P. Dep. at 71:20-25; 72:1-3; 95:7-11, Tab 2) All areas are dependent upon the other to insure the safety of all persons working in or having business within the courthouse. (Affidavit of Louis McDaniel ("McDaniel Aff.") at ¶ 3, attached under Tab 3)

If any one of the CSOs on duty does not perform there assigned tasks, or is not physically able to perform his or her tasks, the safety of all persons in and around the facility is endangered. Accordingly, the USMS mandates that Akal retain and hire individuals who are physically fit for duty and requires all CSO to submit to and successfully pass medical examination. Continued employment is contingent on successful completion of all required physical examinations. (McDaniel Aff. at ¶ 4, Tab 3)

Should a CSO resign his position and walk off his job, it is the company policy to not allow the employee to return to their position. (Wimberly Aff. at ¶ 3. Tab 1; McDaniel Aff. at ¶ 5, Tab 3) Once a CSO position becomes vacant due to voluntary or involuntary termination, Akal is required by its contract with the USMS to submit a completed application to the USMS to fill the vacant position within 14 calendar days of the vacancies. (Wimberly Aff. at ¶ 3, Tab 1) The submission of the completed application requires that the applicant submit to a medical examination, including blood test and receive the results of the examination. Once the application is completed, it is reviewed for accuracy and completeness and then forwarded to the USMS. Due to the procedure for the submission of the application and the deadline for submission, it is imperative that the process be initiated as soon as a position becomes vacant. If Akal does not submit a completed application within the 14-day deadline, it could be subject to a monetary penalty by the USMS. (Wimberly Aff. at ¶ 3. Tab 1)

Akal has an Equal Employment Opportunity policy that states, in pertinent part, as follows:

> It is the policy of Akal Security, Inc. to provide employment, training, compensation levels, transfer or promotion opportunities, and all other aspects of employment without regard to sex, race, color, religion, national origin, age or for qualified handicap individuals, disabled veterans or Vietnam era veterans.
>
> . . .

> Akal Security affirms to all employees that discrimination in the workplace by supervisors, managers, company agents, or fellow employees will not be tolerated. . . .

(Exhibit 4)  Fry was aware that Akal has a policy prohibiting discrimination.  (P. Dep. at 75:3-5, Tab 2; Exhibit 4)  Moreover, the CBA entered into between Akal and the Union, which governs the employment of all CSOs employed at the Brownsville Federal Courthouse, specifies Akal's obligation to recognize equal employment and enforce its non-discrimination policy as follows:

> The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation.  The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representative nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union.  *Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.*
>
> *The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.*

(Exhibit 5, p. 4)

Due to the extensive experience and training levels required to qualify for the position of Court Security Officer, a majority of the CSOs hired by Akal are retired federal, state, local and military law enforcement officers.  During the 1999 calendar year, of the approximately eleven CSOs assigned to the Brownsville Division, two were over the age of 40, three were over the age of 50, three were over the age of 60, and three were 70 or above.  (McDaniel Aff. at ¶ 6, Tab 3)

**B.     Fry's Employment with Akal.**

Fry began his employment with Akal in January 1993 at the age of 65. (McDaniel Aff. at ¶ 7, Tab 3) Fry was issued a firearm and government credentials which he was required to place in a locker at the end of every shift. (P. Dep. at 90:12-19; 91:4-12, Tab 2)

In mid-March 1999, Fry suffered a stroke. At his request, he was granted Family and Medical Leave from March 15, 1999 through May, 1999. On May 3, 1999 he was released to full duty status by his personal physician, with no restrictions. Shortly thereafter, he returned to his CSO position. (McDaniel Aff. at ¶ 7, Tab 3)

Around the same time Fry returned from his leave, Akal was preparing to move all CSO positions from the old federal courthouse in Brownsville to the new Federal Courthouse. After the new Federal Courthouse officially opened in mid-June, 1999, all CSOs from the old courthouse were moved to the new Courthouse. (P. Dep. at 88: 4-9; 83:10-19, Tab 2)

Approximately three months after Fry's return from FMLA leave, on or about August 19, 1999, CSO Lana Besterio reported to LCSO Roy Zepeda ("Zepeda") that she had observed Fry having a difficult time navigating the stairs. (McDaniel Aff. at ¶ 9, Tab 3; Affidavit of Roy Zepeda ("Zepeda Aff.") at ¶ 2, attached under Tab 6) Zepeda reported the information provided by CSO Besterio to Site Supervisor Louis McDaniel ("McDaniel"). (Zepeda Aff. at ¶ 2, Tab 6) Based on this report, Akal had a duty under the USMS contract to ensure that Fry was fit for duty. (McDaniel Aff. at ¶ 9, Tab 3) Accordingly, McDaniel faxed a letter to Zepeda to present to Fry which informed Fry that he was required to take a physical examination to determine his fitness for duty. (Exhibit 7; McDaniel Aff. at ¶ 9, Tab 3) The letter did not relieve Fry of his duties or take any job action against Fry. The letter merely required Fry to schedule an appointment to have a physical examination. (Exhibit 7; McDaniel Aff. at ¶ 9, Tab 3)

## C.    Fry Walks Off the Job.

On August 20, 1999, at approximately 10:30 a.m., Zepeda presented Fry with the letter from McDaniel. (Zepeda Aff. at ¶ 3, Tab 6)  Fry became very upset, laid his firearm, extra ammunition, credentials, and handcuffs on Zepeda's desk, and asked Zepeda to inventory his gear. (P. Dep. at 114:18-25; 115:1-13, Tab 2)  Importantly, during this conversation, Fry also told Zepeda that he did not need the job or "this crap" and that he could live off his pension and began to leave the building. (P. Dep. at 120:8-20, Tab 2; Zepeda Aff. at ¶ 3, Tab 6)  Zepeda asked Fry if he was resigning.  Zepeda did not hear Fry respond. (Zepeda Aff. at ¶ 3, Tab 6)  Zepeda did not give Fry permission to leave his assignment. (P. Dep. 118: 23-25; 119: 1-2, Tab 2)  Nevertheless, Fry left the premises and did not report to his assignment at his scheduled time. (Zepeda Aff. at ¶ 3, Tab 6)

Immediately after his meeting with Fry, Zepeda reported in writing to McDaniel as follows:

> Today, Friday August 20, 1999, I spoke to Alan Fry.  I showed Mr. Fry your letter requiring he have a medical exam done by an impartial doctor.  Mr. Fry began shaking, and it was so strong that I was afraid something was going to happen to him.  When Mr. Fry finished reading he letter, and after he spoke to you by phone, he took off his weapon, equipment, and credentials, and laid them on my desk. I asked him if he was resigning, but he didn't answer me.  I asked him if he had been fired, and he said no. He said that this was age discrimination and the he was going to talk to his lawyer, and then Mr. Fry walked out.  Since Mr. Fry turned in all of his things, I took that to mean that he had quit.
>
> I took Mr. Fry's equipment, weapon and credentials and turned them over to DUSM Lily Medina.

(Exhibit 8; Zepeda Aff. at ¶ 4, Tab 6)

At 2:31 p.m., McDaniel faxed to the Director of Court Security, Mr. Richard Wimberly ("Wimberly"),[1] the paperwork to process Fry's resignation. (McDaniel Aff. at ¶ 11, Tab 3; Exhibit 9) At 2:55 p.m. Wimberly faxed the paperwork to Akal's corporate headquarters for processing. (Exhibit 9; Wimberly Aff. at ¶ 4, Tab 1)

Due to the short time frame in which Akal is required to submit an application to the USMS to fill a vacant CSO position--14 calendar days--and the length of time required to complete such application, McDaniel instructed Zepeda to begin the process to fill Fry's CSO position. (McDaniel Aff. at ¶ 12, Tab 3) Zepeda immediately contacted Emilio Escobedo, a CSO applicant, to determine if Mr. Escobedo was still interested in a CSO position. Mr. Escobedo expressed interest in the position and Zepeda informed him that he would submit his application to the USMS for approval. (Zepeda Aff. at ¶ 5, Tab 6) At that time, Mr. Escobedo was 57 years old. (Zepeda Aff. at ¶ 5, Tab 6)

Later that day, at around 3:00 p.m., Fry returned to the courthouse and informed Zepeda that he was willing to take the physical examination. (P. Dep. at 108:17-19, Tab 2) Zepeda explained to Fry that he considered Fry to have resigned and that he would have to talk with McDaniel. (Zepeda Aff. at ¶ 6, Tab 6) McDaniel discussed the issue with Wimberly and consulted with Akal's Corporate Human Resources Department. It was decided by McDaniel and Wimberly that Fry would not be allowed to return since he had resigned by walking off the job, Akal's company policy is to not allow employees to return to work after they walk off the job, and the process of filling the vacant position had already been initiated. (McDaniel Aff. at ¶ 13, Tab 3; Wimberly Aff. at ¶ 6, Tab 1)

---

[1] Mr. Wimberly is responsible for Akal's CSO programs in eight out of twelve judicial circuits.

Fry did not file a grievance with the Union as required by Article 5 of the CBA. (McDaniel Aff. at ¶ 14, Tab 3)

## *ARGUMENT AND AUTHORITIES*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment in federal court. The United States Supreme Court has clarified the burdens that a party must meet to obtain summary judgment under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 2552-53 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88, 106 S. Ct. 1348, 1356-57 (1986). The Supreme Court stated in *Celotex* that Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. The moving party must demonstrate that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law. "[T]he plaintiff must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514 (1986) (emphasis added). Speculation, conjecture and surmise by the non-moving party do not constitute the requisite affirmative evidence and cannot serve to defeat a motion for summary judgment. According to the Supreme Court, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex* 477 U.S. at 327, 106 S. Ct. at 2555 (citation omitted).

I.  **AKAL'S MOTION FOR SUMMARY JUDGMENT MUST BE GRANTED ON FRY'S STATE LAW CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND AGE DISCRIMINATION UNDER THE TCHRA BECAUSE SUCH CLAIMS ARE PREEMPTED BY SECTION 301 OF THE LABOR MANAGEMENT RELATIONS ACT.**

Fry's state law claims for intentional infliction of emotional distress and age discrimination under the TCHRA are preempted by § 301 of the Labor Management Relations Act ("LMRA") as the resolution of such claims necessarily requires application of the CBA between Akal and the Union. Namely, the resolution of Fry's state law claims requires application of the CBA's prohibition against discrimination.

In the seminal case of *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962), the Supreme Court held that federal law preempts state law in matters involving CBAs:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might some day be invoked in enforcing the contract.

*Id.* at 103.

Subsequently, in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S. Ct. 1904, 1916 (1985), the Supreme Court held that § 301 preemption applied to a tort action by an employee against an employer and insurer for alleged bad faith in handling a claim under a non-occupational disability insurance plan that was included in a CBA. The Court held "that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor contract law." *Id.* (citation omitted). The Court explained its holding with the following comments:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* at 211. *See also Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987) ("Inasmuch as federal law must control the uniform meaning given to contract terms in a collective-bargaining agreement, however, an employee's state law tort action that necessarily rests on an interpretation of those terms is pre-empted by § 301.").

Here, Fry's claims for intentional infliction of emotional distress and age discrimination under the TCHRA arise from his allegations that Akal terminated him from his CSO position due to his age. While Akal denies that it terminated Fry, Fry maintains that terminating him based on his age and the manner in which he was terminated constitutes the tort of intentional infliction of emotional distress and a violation of the TCHRA. The resolution of these claims necessarily requires the Court to resolve whether Akal violated the terms of the CBA that prohibit discrimination based on age and govern Akal's treatment of its employees.

Section 1.6 of the CBA specifically governs Akal's obligations to its employees with respect to equal employment opportunities and prohibits age-based discrimination as follows:

> The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representative nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. ***Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.***

> *The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.*

(Exhibit 5, p. 4)

Section 1.6 specifically provides the manner in which Akal must conduct itself with respect to equal employment opportunities. Under the terms of the CBA, Akal is strictly prohibited from discriminating against any employee on the basis of age. Because the Court is required to resolve whether Akal engaged in intentional discrimination to resolve Fry's state law claims, it necessarily requires an application of the CBA's non-discrimination provisions. Accordingly, such claims are preempted by § 301 and Akal is entitled to summary judgment on these claims as a matter of law. *See Barrow v. New Orleans S.S. Ass'n.*, 10 F.3d 292, 300 (5th Cir. 1994) (concluding that intentional infliction claim preempted by the LMRA because plaintiff's alleged emotional distress "derived from the age discrimination [plaintiff] says he suffered at the hands of defendants."); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635-36 (5th Cir. 1994) (to determine whether plaintiff had proven intentional infliction claim, court must examine management's conduct under the circumstances, which were contractual, not merely factual; therefore claim preempted by § 301 of LMRA because collective bargaining agreement is crucial component of circumstances to be considered); *Bagby v. Gen. Motors Corp.*, 976 F.2d 919, 921-22 (5th Cir. 1992) (defamation and intentional infliction claims based on employer's investigation of alleged theft preempted by LMRA because employer's actions taken in accordance with provisions of the collective bargaining agreement); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 488 (5th Cir. 1996) (claim for race discrimination under the TCHRA preempted under § 301 because analysis of discrimination claim necessarily required application of the provision set forth in the CBA governing management's conduct).

**II.    AKAL'S MOTION FOR SUMMARY JUDGMENT MUST BE GRANTED ON FRY'S AGE DISCRIMINATION CLAIMS UNDER THE ADEA AND THE TCHRA BECAUSE FRY CANNOT ESTABLISH A PRIMA FACIE CASE AND THERE IS NO EVIDENCE OF PRETEXT.**

Even if the Court finds that Fry's claim for age discrimination under the TCHRA is not preempted under § 301 of the LMRA, Akal remains entitled to summary judgment on Fry's age discrimination claims under both the ADEA and the TCHRA because Fry cannot establish a *prima facie* case and there is no evidence of pretext.

The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prove a violation of the ADEA, the plaintiff must prove that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 149 (5th Cir. 1995).

The evidentiary burdens of each party in an ADEA case are well established. *See Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001) (Title VII and ADEA claims are evaluated within same burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). The plaintiff must first present a *prima facie* case of employment discrimination. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350. If the plaintiff meets this burden, the employer must rebut the presumption of age discrimination by articulating a legitimate nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350. If the employer meets this burden, the plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason is a pretext for age discrimination. *Reeves*, 530 U.S. at 142-43, 120 S. Ct. at 2106; *Evans*, 246 F.3d at 350.

In an ADEA case, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision (citation omitted). That is, the plaintiff's age must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141, 120 S. Ct. at 2105 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 1706 (1993)). *See also Evans*, 246 F.3d at 351 ("In the context of a claim of discrimination, a plaintiff must adduce evidence that the justification was a pretext *for racial and age discrimination*." (emphasis in original)).

Because claims of age discrimination under the ADEA and claims of age discrimination under the TCHRA are evaluated under the same analytical framework, the analysis under the ADEA is equally applicable to Fry's age discrimination claim under the TCHRA. *See id.* at 348.

**A.      Fry Cannot Establish A Prima Facie Case**.

To establish a *prima facie* case of age discrimination, a plaintiff must show that: (i) he was a member of the class protected by the ADEA; (ii) he was otherwise qualified for the position; (iii) he was discharged or subject to an adverse employment decision; and (iv) he was replaced by someone significantly younger or outside his protected class. *O'Connor v. Consol. Coin Catereres Corp.*, 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999); *Evans*, 246 F.3d at 350. Fry cannot establish the third element of his *prima facie* case, *i.e.*, he was not discharged or subject to an adverse employment action.

*1.      Fry's resignation is not an adverse employment action.*

It is undisputed that Akal believed Fry to have resigned his CSO position on August 20, 1999. Indeed, Fry's deposition testimony demonstrates the reasonableness of Akal's belief. Fry admits that he became very angry when Zepeda presented him with the letter requesting for Fry to get a physical, and that he turned in his firearm, extra ammunition and credentials. Fry admits

that this conduct is consistent with a typical resignation of a law enforcement officer. (P. Dep. at 115; 8-16, Tab 2)  Fry further admits that he told Zepeda that he did not need his job because he could live off of his pension and then left the Courthouse. (Pl's Dep. at 113:6-13, Tab 2).  Based on this behavior, Zepeda concluded that Fry had walked off his job and resigned his employment.[2]  (Zepeda Aff. at ¶ 3, Tab 6)  Zepeda relayed that information to McDaniel. (Zepeda Aff at ¶ 4, Tab 6)  Zepeda and McDaniel immediately began the process of replacing the newly-vacant position to ensure compliance with the USMS deadline for submission of an application to fill a vacant position.  (McDaniel Aff. at ¶ 12, Tab 3; Zepeda Aff. at ¶ 5, Tab 6)  When Fry returned later that afternoon agreeing to take the physical, McDaniel informed Zepeda that because Fry had walked off the job thereby resigning his position, he no longer was employed by Akal. (Zepeda Aff. at ¶ 6, 7, Tab 6)

Fry's resignation from his employment by walking off the job is not a discharge or "adverse employment action" taken by Akal. *See Grafton v. Sears Termite & Pest Control, Inc.,* 2000 U.S. Dist. LEXIS 4966 (N.D. Tex. 2000) (plaintiff was not discharged because he

---

[2]Fry testified in his deposition that during his first meeting with Zepeda he told Zepeda that he "would be back." While Fry takes the position that that he did not resign his employment by leaving that morning, during his deposition he describes his action as "quit[ting]" on two separate occasions.  Fry testified:

> Q:    And when did you hear--when did your wife say that Judge Tagle said that?
>
> A:    I don't know. **It was about a month or two after I quit** – or after I was finished.

P. Dep. 181:18-21.

> Q:    When is the last time you talked to Mr. Sherrill?
>
> A:    **I haven't talked to him since I quit.**

P. Dep. 180:2-4.

voluntarily resigned his position due to allegations of discrimination). As such, Fry cannot establish his *prima facie* case of age discrimination.

> ### 2. Fry's assignment to the front entrance of the courthouse is not an adverse employment action.

Fry contends that he was discriminated against on account of his age because he was only assigned to the front entrance of the courthouse and not rotated to other positions. (P. Dep. at 92: 5-9, Tab 2) Fry's assignment to the front entrance of the courthouse is not an "adverse employment action" as a matter of law.

To satisfy the adverse employment action prong of the *prima facie* case, the plaintiff must show that the defendant took ultimate employment action against him. *Jeffrey v. Dallas County Med. Exam'r*, 37 F. Supp. 2d 525, 529 (N.D. Tex. 1999) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705-07 (5th Cir. 1997)); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1060 n. 10 (5th Cir. 1998). Examples of ultimate employment decisions include: (1) hiring; (2) firing; (3) granting leave; (4) discharging; (5) promoting; and (6) compensating. *See* 37 F. Supp 2d at 529. The statute does not reach "other employment-related decisions. Specifically, undesirable assignments are not, as a matter of law, an adverse employment action where they have no effect on pay, schedule, or status. *Watts v. Kroger Co.*, 170 F.3d 505, 511-12 (5th Cir. 1999); *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 123-24 (5th Cir. 1991); *Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 555 (5th Cir. 1997).

Here, Fry admits that his assignment only to the front entrance of the courthouse had no effect on his pay, schedule, or status. Moreover, Fry admits that all of the assignments in the Courthouse are equal and that he did not care where he was assigned. Fry testified as follows:

Q:     Was there any – was there any difference in pay if you worked the front versus the courtroom?

A:     No same pay.

Q:     Same pay?

A:     Yes.

Q:     Or if you were just the working building security, no difference in pay?

A:     No difference in pay.  All CSOs received the same – same salary.

(P. Dep. at 71:20-25; 72:1-3, Tab 2)

Q:     ...I mean, is there anything better about being assigned to the courtroom as opposed to being assigned to the front entrance of the courthouse building?

A:     No, not as far as I know.  I don't know.

(P. Dep. at 95: 7-11, Tab 2)

Q:     But did it matter whether you worked in the control center?

A:     Well, it didn't really matter to me, no.

Q:     Was there any difference in pay as far as you know for working the control center?

A:     No, there wasn't any difference in pay.

Q:     Did you ever ask to work in the control center?

A:     Never did.

. . .

Q:     After you moved to the new courthouse, did you ever ask to work in the-- the courtrooms?

A:     No.

Q:     It didn't make a difference to you.  You just worked where they asked you to work; right?

A:     I just wanted to do my job and earn my pay.  That's what I was there for.

(P. Dep. at 97:14-25; 98: 1-5, Tab 2)

Fry's unequivocal testimony establishes that his assignment to the front entrance of the courthouse was not an adverse employment action as a matter of law.  Accordingly, to the extent

Fry's age discrimination claim is based on his assignment to the front entrance of the courthouse, Akal is entitled to summary judgment as a matter of law.

**B.** **Akal Has Articulated Legitimate, Nondiscriminatory Reasons for Not Allowing Plaintiff To Return After His Resignation and There Is No Evidence of Pretext**

*1.* **Akal's legitimate, nondiscriminatory reasons for not allowing Plaintiff to return to his position after his resignation.**

Even assuming Fry could establish that Akal took an adverse employment action against him when it did not allow him to return to work after he resigned his position by walking off the job, Akal has articulated a legitimate non-discriminatory reasons for its action. Namely, Akal did not allow Fry to return to his position after he walked off his job based on Akal's policy of not reinstating employees after they walk off the job and resign in that manner. Additionally, Akal had already contacted an applicant to replace Fry's position. (McDaniel Aff. at ¶ 13, Tab 3; Wimberly Aff. at ¶ 6, Tab 1)

*2.* **Fry has failed to show that the Akal's reasons are a pretext for age discrimination.**

Fry has not met his burden to come forward with "affirmative evidence" to show that the reasons for not allowing him to return to his position after his resignation are a pretext for age discrimination. Fry asserts the following "evidence" in support of his age discrimination claim:

*(a)* **Fry was required to take a physical.**

Fry testified that he believed he was being discriminated due to his age because Akal required Fry to take a physical. However, Fry admits that given the complaint from CSO Besterio regarding his apparent problems navigating the stairs, Akal was warranted in requesting that Fry take a physical examination. (P. Dep. at 130:7-10, Tab 2) Fry admits that his submission to physical examinations is a condition of his employment. (P. Dep. at 128: 6-12, Tab 2) Moreover, Fry admits that Akal at all times had a continuing duty to ensure that all CSOs

met the applicable health and fitness requirements for the job.  (P. Dep. at 129:7-14, Tab 2)

Based on Fry's own testimony, Akal's request for Fry to submit to a physical was warranted to

ensure that he met the applicable CSO standards and was not a pretext for age discrimination.

> *(b)* **Fry's subjective belief that Akal wanted to "get rid of old people."**

The only other "evidence" that Fry submitted in support of his age discrimination clam is

his own subjective belief that people at Akal wanted to get rid of old people.  Fry testified:

> A:      . . . it's my belief that there were people at Akal that wanted to get rid of
>         the old people.

(P. Dep. at 133: 1-2, Tab 2)

Fry has no competent summary judgment evidence to support his subjective belief, which

is insufficient to create a triable issue of fact.  *See, e.g., Douglass v. United Servs. Auto. Assoc.,*

79 F.3d 1415, 1430 (5th Cir 1996); *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434-35

(5th Cir. 1995); *Armendariz,* 58 F.3d at 152-53.  Indeed, Fry admits that he has no facts or basis

to believe that McDaniel, the primary decision-maker in this case, would take any action against

him based on his age.  Fry testified:

> Q:      Do you have any facts or basis to believe that McDaniel would take any
>         action against you because of your age?
>
> A.      Not at this time – not at this time.

(P. Dep. at 145: 18-21, Tab 2)

Fry has, therefore, failed to meet his evidentiary burden on the issue of pretext, and Akal

is entitled to summary judgment on his age discrimination claim.[3]

---

[3]Fry testified that Judge Vela made a comment that he did not want old men working in his courtroom and that Akal was going change the hiring rules to a limited age.  (P. Dep. at 166:5-25, Tab 2)  However, Fry has no evidence that the alleged comments by Judge Vela, which are inadmissible hearsay, can be imputed to Akal.  (P. Dep. at 166:24-25; 167:1-2, Tab 2)

3. **The undisputed evidence establishes that Akal does not make employment decision based on age.**

The undisputed evidence in this case weighs against a finding of age discrimination. First, Fry was hired by Akal when he was 65 years old and worked without incident until his resignation on August 20, 1999. That Akal hired Fry at 65 demonstrates that age is not a factor in Akal's employment decisions. *See, e.g., Bennett,* 138 F.3d at 1062 (fact that employer hired plaintiff at age 50 and promoted him at ages 52 and 54 weighs against a finding of age discrimination). It is strong evidence of no discriminatory bias by the decision-maker that Akal would hire Fry at the age of 65 and then terminate him based on his age. Situations such as this "give rise to the an inference that age discrimination [is] not the motive behind . . . termination." *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996) (no pretext where employee hired at age 54, then terminated only four years later when 60 years old).

Second, the make-up of the workforce in the Brownsville Division further demonstrates that Akal does not make any decisions on the basis of age. During the 1999 calendar year, of the approximately eleven CSOs assigned to the Brownsville Division, two were over the age of 40, three were over the 50, three were over the age of 60, and three were 70 or above. (McDaniel Aff. at ¶ 6, Tab 3) Given that Akal hired Fry at the age of 65 and that a majority of Akal's workforce in Brownsville were over the age of 60, a finding of age discrimination is without legal or factual basis.

## III.   AKAL IS ENTITLED TO SUMMARY JUDGMENT ON FRY'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

As shown above, Fry's state law claim for intentional infliction of emotional distress is preempted by § 301 of the LMRA. However, even if Fry's state law claim was not preempted, Akal would still be entitled to summary judgment because Fry has failed to come forward with sufficient summary judgment evidence to prove the requisite elements of the claimed tort.

To prove a *prima facie* case of intentional infliction of emotional distress, Fry must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was *extreme and outrageous*; (3) the actions of the defendant caused the Fry *emotional distress*; and (4) the emotional distress was *severe. GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999); *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). In the instant case, Fry's claim for intentional infliction of emotional distress fails because he cannot establish that Akal's conduct was extreme and outrageous or that he suffered severe emotional distress.

### A.    The Complained of Conduct Was Not Extreme or Outrageous.

Liability for intentional infliction of emotional distress is imposed only where the conduct has been so outrageous in character, and so extreme in degree, as "'[to go] beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d. (1965)). Such extreme conduct exists only in the most unusual of circumstances. *Bruce*, 998 S.W.2d at 613. Liability does not extend to insensitive or rude behavior, mere insults, indignities, threats, annoyances, or petty oppressions. *Id.* at 612; *Horton v. Montgomery Ward & Co., Inc.*, 827 S.W.2d 361, 369 (Tex. App.--San Antonio 1992, writ denied). *See also Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994) ("Rude behavior does not equate to outrageousness . . ."). Even conduct which may be illegal in an employment context may not constitute extreme and outrageous conduct. *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993). *See also Southwestern Bell Mobile Sys. v. Franco*, 971 S.W.2d 52, 54-55 (Tex. 1998) (termination of employees for complaining of sexual harassment not extreme and outrageous); *Natividad*, 875 S.W.2d at 699 ("[B]ehavior is not outrageous simply because it may be tortious."). Moreover, it is well established that termination from employment, in itself, cannot as a matter of law, constitute outrageous conduct.

*See Sebesta v. Kent Elecs. Corp.*, 886 S.W.2d 459, 463 (Tex. App.--Houston [1st Dist.] 1994, writ denied). "Whether the defendant's conduct was extreme and outrageous is initially a question of law." *Shaheen v. Motion Industries, Inc.*, 880 S.W.2d 88, 92 (Tex. App.--Corpus Christi 1994, writ denied).

In the present action, Fry has completely failed to establish that Akal's behavior constituted extreme and outrageous conduct. Fry complains of one incident of conduct which he characterizes as outrageous. Fry testified that he believed it was outrageous conduct when he was told by Zepeda that he was "history." (P. Dep. at 159: 18-25, Tab 2) Fry testified as follows:

> Q:   Do you think that when you were—you testified earlier that you were told you were history on August 23?
>
> A:   That's right.
>
> Q:   Do you believe that that was – that act of telling you were history was outrageous?
>
> A:   Yes, I think it was an outrageous thing for one person to say to another one.
>
> Q:   And why is that?
>
> A:   Why is that?
>
> Q:   Yes.
>
> A.   It's just  --it didn't – isn't decent to talk to anybody like that.
>
> Q.   Is there anything else you believe was outrageous?
>
> A:   No, nothing outrageous that's –
>
> Q:   Sir , so nothing else?
>
> A:   No.

(P. Dep. at 159:18-25; 160:1-10, Tab 2)

Under no circumstance does the conduct alleged by Fry rise to the level of "extreme and outrageous" conduct sufficient to state a claim for intentional infliction of emotional distress. Accordingly, Akal is entitled to summary judgment as a matter of law.

**B.     Fry Did Not Suffer Severe Emotional Distress.**

Even if Fry could prove the requisite "extreme and outrageous" conduct, his claim fails because there is no evidence that Fry suffered "severe" emotional distress.  To establish a claim for intentional infliction of emotional distress, Fry must also establish that he suffered "severe" emotional distress. *See Twyman*, 855 S.W.2d at 621; *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 668 (Tex. App.--Corpus Christi 1997, no pet.).  "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it without undergoing considerable suffering. *Huerta*, 964 S.W.2d at 668; *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex. App.--Corpus Christi 1992, writ denied).  Any party seeking recovery for mental anguish, even when advancing a cause of action that does not require the "severe" damages required for intentional infliction of emotional distress, must prove more than "mere worry, anxiety, vexation, embarrassment or anger." *Huerta*, 964 S.W.2d at 668.  "Severity of distress is an element of the cause of action, not simply a matter of damages." *Moore*, 848 S.W.2d at 195.  "The court determines whether the evidence produced establishes a fact question for the jury." *Id.*

In this case, Fry has presented no evidence that he has suffered severe emotional distress. While Fry testified generally that he became depressed, lost his desire to see people, and became moody and angry, he admits that he never sought professional counseling for any emotional distress and continued to have a good relationship with his family and friends.  (P. Dep. at 182:23-25; 183:1-25, Tab 2)  Given this undisputed evidence, Fry has failed to come forward with sufficient summary judgment evidence that he suffered "severe" emotional distress and Akal is entitled to summary judgment on Fry's claim for intentional infliction of emotional

distress. *See Moore*, 848 S.W.2d at 195-96 (where plaintiff admitted that she had not consulted any mental health professionals and that she was dealing with the anguish and stress herself showed that her distress was not severe); *Huerta*, 964 S.W.2d at 668-69 (evidence that plaintiff's wife ejected him from the house because he did not have job, that he no longer took children on outings, that he could not concentrate, and that he felt insecure and embarrassed about losing his job, held insufficient to establish severe emotional distress).

**IV.   AKAL IS ENTITLED TO SUMMARY JUDGMENT ON FRY'S CLAIM FOR LOST WAGES AFTER AUGUST 1999, BECAUSE HE FAILED TO SEEK EMPLOYMENT AFTER THAT DATE.**

A plaintiff in an employment discrimination case claiming lost wages has a duty to mitigate those damages by making a good faith effort to obtain and retain employment. *Huerta*, 964 S.W.2d at 669 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-34, 102 S. Ct. 3057, 3065-67 (1982)). To satisfy this duty, the plaintiff must exercise reasonable diligence to find other suitable employment. *Ford Motor Co.*, 458 U.S. at 230-31, 102 S. Ct. at 3065; *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex. 1983). The law prohibits recovery of damages that could have been avoided or were incurred as a result of the failure to mitigate. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 581 (Tex. App.--Houston [1st Dist.] 1992, no writ).

Normally, to meet its burden of showing a plaintiff's failure to mitigate, an employer must "demonstrate that substantially equivalent work was available and that the . . . claimant did not exercise reasonable diligence to obtain it." *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). However, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *Id. See also Badeen v. Burns Int'l Sec. Servs., Inc.*, 765 F. Supp. 341, 349 (E.D. Tex. 1991).

Courts have found a failure to satisfy the duty of mitigation based on the fact that the plaintiff only completed a small number of employment application over a period of months. *See, e.g., Sellers*, 902 F.2d at 1194-96; *Coleman v. Lane*, 949 F. Supp. 604, 611-12 (N.D. Ill. 1996).

In this case, Fry admits that after leaving Akal in August, 1999, he made no efforts to find other employment, preferring to stay at home and do as he wishes. (P. Dep. at 163:23-25; 164:1-9, Tab 2) Accordingly, Fry's own testimony establishes that beginning in August 1999, he failed to make reasonable efforts to obtain work. Therefore, Akal is entitled to summary judgment on Fry's claim for lost wages after August 1999.

## CONCLUSION

As shown herein, Akal Security, Inc. is entitled to summary judgment as a matter of law on each claim asserted by Plaintiff Allen Fry. Accordingly, Akal respectfully requests that this Court grant Akal's Motion in its entirety, that Plaintiff Allen Fry, take nothing by this action; and that Akal recover its costs herein and be granted such other and further relief to which it may show itself to be justly entitled.

Dated: February 14, 2002

Respectfully submitted,

Raquel G. Pérez
Attorney-in-Charge
Texas State Bar No. 00784746
Southern District Bar No. 19187
J. Tullos Wells
Texas State Bar No. 21146500
Southern District Bar No. 8337
106 South St. Mary's Street, Suite 800
San Antonio, Texas 78205-3603
Telephone: 210-226-1166
Facsimile: 210-226-1133

OF COUNSEL:

BRACEWELL & PATTERSON, L.L.P.

**ATTORNEYS FOR DEFENDANT,
AKAL SECURITY, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Allen Fry is being sent by certified mail, return receipt requested, to counsel of record for Plaintiffs, Michael R. Cowen, 765 East 7th Street, Suite A, Brownsville, Texas 78520 on the 15th day of February, 2002.

Raquel G. Pérez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF RICHARD WIMBERLY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

I, Richard Wimberly, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.      My name is Richard Wimberly and I am employed as the Director of Judicial Security for Akal Security, Inc. In that capacity, I oversee the security programs in eight of the twelve Judicial Circuits in the United States.

2.      Akal is a security company that provides security services primarily to government facilities throughout the United States. One of Akal's primary contracts is with the United States Marshall Service ("USMS") and the Department of Justice ("DOJ") to provide security for federal buildings and courthouses all over the nation. Under its contract with the USMS/DOJ, Akal has the responsibility of providing security personnel, i.e., Court Security Officers ("CSO"), for the United States District Court for the Southern District of Texas, including the Brownsville Division. This contract states that the primary function of a CSO is to ensure the safety and security of those individuals inside the courthouse.

3.      Should a CSO walk off his job or resign from employment, it is the company policy to not allow the employee to return to their position. Once a CSO position becomes vacant due to voluntary or involuntary termination, Akal is required by its contract with the USMS to submit a completed application to the USMS to fill the vacant position within 14 calendar days of the vacancies. The submission of the completed application requires that the applicant submit to a medical examination, including blood test and receive the results of the examination. Once the application is completed, it is thoroughly reviewed for accuracy and completeness, and then forwarded to the USMS. Due to the procedure for the submission of the application and the deadline for submission, it is imperative that the process be initiated as soon as a position becomes vacant. If Akal does not submit a completed application within the 14-day deadline, it could be subject to a monetary penalty by the USMS.

4.      On August 20, 1999, it was reported to me by the Site Supervisor for the Southern District of Texas, Brownsville Division, Louis McDaniel that CSO Allen Fry turned in this firearm, extra ammunition, credentials, and handcuffs to his LCSO in the Brownsville Division, told the LCSO that he did not need his job that he could live off of his pension, and walked off the job. At 2:31p.m. McDaniel faxed me the paperwork to process Fry's resignation. At 2:55 p.m. I faxed the paperwork to Akal's corporate headquarters for processing.

5.      Due to the short time frame in which Akal is required to submit an application to the USMS to fill a vacant CSO position--14 calendar days--and the length of time required to complete such application, I instructed Site Supervisor McDaniel to immediately begin the process to fill Fry's CSO position.

6.      At approximately 3:00 p.m., I was informed that Fry returned to the courthouse and wanted to come back to work. McDaniel discussed the issue with me and we consulted with Akal's corporate Human Resources Department. It was decided that Fry would not be allowed to return since (1) he had resigned by walking off his job, (2) Akal's consistently applied company policy is to not allow employees to return to work after they walk off the job, and (3) the process of filling the vacant position had already been initiated.

7.    The decision to not allow Fry to return to his CSO position was based on these legitimate, nondiscriminatory reason. Fry's age played no factor in our decision to not allow Fry to return to his CSO position. In fact, I was not aware of Fry's age at the time we made the decision to not allow him to return to his CSO position after he walked off his job.

I have read this affidavit which consists of three pages, including this page, and have been given an opportunity to make any corrections. I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.



_2-11-01_
Date

Richard Wimberly

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Richard Wimberly on this the 12th day of February, 2002, to certify which witness my hand and seal of office.

Notary Public, in and for the State of Texas

My commission expires: _____

MARK P. JOHNSON
MY COMMISSION EXPIRES
December 27, 2004

1

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3

4   ALLEN FRY AND MIGUEL LOPEZ,  *
        Plaintiffs,               *

5

6   VS.                          *   CASE NO. B-01-CV-72

7

8   AKAL SECURITY, INC.,          *
        Defendant.               *

9

10

11

12

13

14                    ORAL DEPOSITION

15                         OF

16                     ALLEN FRY

17                  DECEMBER 10, 2001

18

19

20

21

22

23

24

25

EDDIE MORRIS-COURT REPORTERS, INC.
22193 IH-10 West   (210) 698-2727  San Antonio, Texas 78257

2

1              A P P E A R A N C E S

2

3    MICHAEL R. COWEN, P.C.
     ATTORNEY AT LAW
4    SUITE A
     765 EAST 7TH STREET
5    BROWNSVILLE, TEXAS   78520
     BY: MR. RICK WOOD              FOR THE PLAINTIFFS
6

7

     BRACEWELL & PATTERSON, L.L.P.
8    ATTORNEYS AT LAW
     106 SOUTH ST. MARY'S STREET
9    SUITE 800
     SAN ANTONIO, TEXAS   78205
10   BY: MS. RAQUEL G. PEREZ        FOR THE DEFENDANT

11

     ALLEN FRY                      WITNESS
12

13

     SHAN MORRIS BLANCHARD          CERTIFIED SHORTHAND
14                                  REPORTER

15

16            ORAL ANSWERS AND DEPOSITIONS of the

     witness, **ALLEN FRY**, who resides in Brownsville, Cameron

17   County, Texas, in answer to questions propounded to him

18   in the above styled and numbered cause, taken on behalf

19   of the Defendant, before SHAN MORRIS BLANCHARD, a

20   Certified Shorthand Reporter in and for the State of

21   Texas, on DECEMBER 10, 2001, in the offices of Michael

22   R. Cowen, P.C., Suite A, 765 E. 7th Street,

23   Brownsville, Texas, 78520, between the hours of 9:48

24   o'clock a.m. and 5:17 o'clock p.m. of said day,

25   pursuant to notice and the Rules.

| | | |
|---|---|---|
| 09:48:03 | 1 | (Time 9:48.) |
| | 2 | **ALLEN FRY**, the witness, being duly |
| | 3 | cautioned and sworn to tell the truth, the whole truth |
| | 4 | and nothing but the truth, testified as follows: |
| | 5 | EXAMINATION |
| 09:48:07 | 6 | BY MS. PEREZ: |
| 09:48:07 | 7 | Q.   Good morning, Mr. Fry. |
| | 8 | A.   Morning. |
| 09:48:09 | 9 | Q.   My name is Raquel Perez.  I'm one of the |
| 09:48:12 | 10 | attorneys for to Akal Security, and 1'm going to be |
| 09:48:16 | 11 | asking you some questions today in connection with your |
| 09:48:17 | 12 | lawsuit; okay? |
| | 13 | A.   Okay. |
| 09:48:20 | 14 | Q.   And as the court reporter noted before we went |
| 09:48:22 | 15 | on the record, this deposition is being taken pursuant |
| 09:48:26 | 16 | to the federal rules.  Can you please tell me your full |
| 09:48:29 | 17 | name? |
| 09:48:30 | 18 | A.   Allen, A-l-l-e-n, H. Fry, F-r-y. |
| 09:48:38 | 19 | Q.   What is your current address, Mr. Fry? |
| 09:48:44 | 20 | A.   My current address 102 South Clubhouse Road, |
| 09:48:53 | 21 | Brownsville, Texas. |
| 09:48:54 | 22 | Q.   What is the zip code there? |
| 09:48:57 | 23 | A.   78120. |
| 09:49:00 | 24 | Q.   78120? |
| 09:49:03 | 25 | A.   No.  781 -- it was 120 -- I think it's still |

**A FRY - BY MS PEREZ**

| | | |
|---|---|---|
| 11:14:09 | 1 | And when court was going on, we checked people that |
| 11:14:12 | 2 | were in the halls around the courtroom. |
| 11:14:21 | 3 | Q. What do you mean you checked people in the |
| 11:14:23 | 4 | halls? |
| 11:14:25 | 5 | A. Well, I mean, we -- we observed who was -- who |
| 11:14:29 | 6 | was in the building. And -- |
| 11:14:41 | 7 | Q. Is there anything else, other than what you |
| 11:14:46 | 8 | just told me, that you did in the old federal |
| 11:14:51 | 9 | courthouse with respect to the security of the |
| 11:14:54 | 10 | building? |
| 11:14:54 | 11 | A. I can't think of anything at the time. |
| 11:14:57 | 12 | Q. And you also mentioned -- you said "security of |
| 11:15:00 | 13 | the courts." Is that different from security of the |
| 11:15:05 | 14 | building? |
| 11:15:06 | 15 | A. Well, it's -- we worked in the -- while court |
| 11:15:09 | 16 | is going on, we worked in the -- in the -- in the |
| 11:15:14 | 17 | courtrooms. |
| 11:15:23 | 18 | Q. So the other things that you just mentioned to |
| 11:15:26 | 19 | me with respect to the security of the building, that's |
| 11:15:30 | 20 | while you're not working in the courts; is that right? |
| 11:15:34 | 21 | A. Well, we worked in the -- we would rotate |
| 11:15:37 | 22 | working in the courts or working in the -- at the door |
| 11:15:42 | 23 | or working -- or waiting for the judges to arrive or |
| 11:15:47 | 24 | escort the judges out or -- we all rotated with these |
| 11:15:59 | 25 | duties. |

| | | |
|---|---|---|
| '1:17:48 | 1 | to guard the judges, did you do anything else when you |
| 11:17:53 | 2 | were in the courts? |
| 11:17:55 | 3 | A.    We escorted the jurors. |
| 11:18:07 | 4 | Q.    Anything else? |
| 11:18:16 | 5 | A.    I can't think of -- right offhand, I can't |
| 11:18:19 | 6 | think of any. |
| 11:18:21 | 7 | Q.    Anything else?  What about when there were |
| 11:18:30 | 8 | federal prisoners, did you deal at all with the |
| 11:18:33 | 9 | prisoners? |
| 11:18:34 | 10 | A.    Not -- we would -- we would assist if it was |
| 11:18:37 | 11 | necessary, but the marshal handled -- handled the |
| 11:18:45 | 12 | prisoners, generally. |
| 11:18:51 | 13 | Q.    But occasionally you would assist? |
| ı1:18:55 | 14 | A.    We -- if the marshals asked us for help, we |
| 11:19:02 | 15 | would help them. |
| 11:19:20 | 16 | Q.    You also mentioned checking the perimeter of |
| 11:19:26 | 17 | the area.  Did that -- can you tell me what you mean? |
| 11:19:29 | 18 | Did you mean you -- when you say "the area," did you |
| 11:19:33 | 19 | mean inside the courthouse or outside the courthouse? |
| 11:19:36 | 20 | A.    Outside the courthouse. |
| 11:19:37 | 21 | Q.    So does that mean that you would walk around |
| 11:19:40 | 22 | to -- |
| 11:19:40 | 23 | A.    You would walk around. |
| 11:19:45 | 24 | Q.    You just walked around the courthouse parking |
| 11:19:49 | 25 | lot? |

| | | |
|---|---|---|
| 11:19:50 | 1 | A.    Well, it didn't have a parking.  The old |
| 11:19:52 | 2 | courthouse didn't have a parking.  It had a small area |
| 11:19:54 | 3 | where the judges parked, but we had to see that the |
| 11:19:58 | 4 | alley stayed clear so that the -- in order for the |
| 11:20:06 | 5 | judges to get in and out. |
| 11:20:14 | 6 | Q.    Other than going out and looking at the alley, |
| 11:20:17 | 7 | did you do anything else with respect to checking the |
| 11:20:20 | 8 | perimeter of the area? |
| 11:20:22 | 9 | A.    We would walk around the building. |
| 11:20:25 | 10 | Q.    Okay.  Anything else? |
| 11:20:27 | 11 | A.    I can't think of anything.  Checked -- checked |
| 11:20:34 | 12 | the vehicles that were parked in the area, if there was |
| 11:20:40 | 13 | anything that looked to be dangerous to the building. |
| 11:20:47 | 14 | In other words, if there had been a truck that pulled |
| 11:20:51 | 15 | up there and the driver got out and run or if the |
| 11:20:55 | 16 | driver would leave the truck parked there, we would |
| 11:20:59 | 17 | have to take care of it. |
| 11:21:18 | 18 | Q.    You also mentioned working at the entrance.  Is |
| 11:21:23 | 19 | that just when people would come in, you would check? |
| 11:21:27 | 20 | A.    Check them through magnetometer and the -- and |
| 11:21:33 | 21 | check their bags. |
| 11:21:35 | 22 | Q.    What did you call that, check them through |
| 11:21:37 | 23 | the -- |
| 11:21:39 | 24 | A.    Magnetometer, that was the -- the one you walk |
| 11:21:42 | 25 | through to -- |

Case 1:01-cv-00072   Document 20   Filed in TXSD on 02/15/2002   Page 37 of 140

A FRY - BY MS. PEREZ

| | | |
|---|---|---|
| '1:21:43 | 1 | Q.   To see if it beeps to see if there's any metal? |
| 11:21:48 | 2 | A.   Yeah.  If it beeps, they have metal on them. |
| 11:22:15 | 3 | Q.   Did you ever run into any sticky situations |
| 11:22:19 | 4 | when you worked at the old federal courthouse? |
| 11:22:24 | 5 | A.   Well, marshals tried to bring a pistol through |
| 11:22:31 | 6 | and -- to bring it -- run a ringer through, a guy had a |
| 11:22:40 | 7 | pistol on him and he was -- and the marshals were |
| 11:22:50 | 8 | checking us, in other words, to see if we found the |
| 11:22:56 | 9 | pistol. |
| 11:22:58 | 10 | Q.   The marshals were checking? |
| 11:23:00 | 11 | A.   Yeah. |
| 11:23:01 | 12 | Q.   And why would the marshals check? |
| 11:23:04 | 13 | A.   Well, just checking -- I guess they were |
| 11:23:06 | 14 | checking to see if -- for security. |
| 11:23:10 | 15 | Q.   To make sure things were secure? |
| 11:23:13 | 16 | A.   Uh-huh. |
| 11:23:13 | 17 | Q.   Is that a "yes"? |
| 11:23:14 | 18 | A.   That would be a yes, uh-huh. |
| 11:23:19 | 19 | Q.   Was that one -- just one time that they checked |
| 11:23:23 | 20 | you?  You said something about a pistol.  I didn't |
| 11:23:26 | 21 | quite get that. |
| 11:23:28 | 22 | A.   Well, I -- yeah, I intercepted the pistol |
| 11:23:31 | 23 | coming through.  The marshal happened to be standing |
| 11:23:36 | 24 | there.  And when I -- when I saw that he had the |
| 11:23:39 | 25 | pistol -- I saw the pistol in the screen.  And I told |

| | | |
|---|---|---|
| 13:21:03 | 1 | A.    Whoever worked -- wherever it was needed.  I |
| 13:21:09 | 2 | mean, we -- there wasn't any -- you know, in other |
| 13:21:18 | 3 | words, covered us where we were needed. |
| 13:21:21 | 4 | Q.    Okay.  Did you -- |
| 13:21:22 | 5 | A.    Yes, I worked Judge Black's court, yes. |
| 13:21:24 | 6 | Q.    Did you work Judge Recio's court? |
| 13:21:27 | 7 | A.    Recio's court, yes. |
| 13:21:28 | 8 | Q.    And did you work Judge Vela's court? |
| 13:21:33 | 9 | A.    That's right. |
| 13:21:33 | 10 | Q.    And did you work Tagle's court? |
| | 11 | A.    Yes. |
| 13:21:38 | 12 | Q.    What about the bankruptcy judge, did you work |
| 13:21:40 | 13 | that court, as well? |
| 13:21:42 | 14 | A.    Yes, if it required a CSO. |
| 13:21:44 | 15 | Q.    And when you -- when you say you worked the |
| 13:21:45 | 16 | court, was that really just when a trial was going on |
| 13:21:48 | 17 | or a hearing? |
| 13:21:49 | 18 | A.    Well, if -- if you had any activity in the |
| 13:21:51 | 19 | courtroom. |
| 13:22:14 | 20 | Q.    Was there any -- was there any difference in |
| 13:22:18 | 21 | pay if you worked the front versus the courtroom? |
| 13:22:26 | 22 | A.    No same pay. |
| 13:22:27 | 23 | Q.    Same pay? |
| | 24 | A.    Yes. |
| 13:22:32 | 25 | Q.    Or if you were just the working building |

| 13:22:35 | 1 | security, no difference in pay? |

13:22:38    2    A. No difference in pay. All CSOs received the

13:22:43    3    same -- same salary.

13:22:45    4    Q. And how do you know that?

13:22:47    5    A. Huh?

13:22:48    6    Q. How do you know all CSOs received the same

13:22:52    7    salary?

13:22:57    8    A. Well, it's -- I -- I don't know if one of them

13:23:04    9    was getting paid more, but I'm sure they weren't.

13:23:07    10    Q. Is that -- okay. But is that your

13:23:08    11    understanding, that all CSOs were supposed to be paid

13:23:11    12    the same?

13:23:12    13    A. That's right. That's right.

.3:23:13    14    Q. Is that pursuant to a union contract?

13:23:16    15    A. It's in the contract, yes.

13:23:18    16    Q. Is that the union contract?

13:23:19    17    A. I don't know. I never did mess with the union

13:23:22    18    contract. I never did even see it.

13:23:24    19    Q. Okay. But when you say "it's in the contract,"

13:23:32    20    is that what you meant?

13:23:32    21    A. Well, it's in the contract that we -- I mean,

13:23:32    22    we work -- when we sign up, that's in the -- we all get

13:23:36    23    the same salary.

13:24:05    24    Q. But you're aware that there was -- there was a

13:24:08    25    union there; correct?

A    FRY - BY MS    PEREZ

| | | |
|---|---|---|
| 13:30:14 | 1 | Q.    Is that a "yes"? |
| | 2 | A.    Yes. |
| 13:30:16 | 3 | Q.    So you were aware that Akal had a policy |
| 13:30:19 | 4 | prohibiting discrimination; correct? |
| 13:30:22 | 5 | A.    Yes. |
| 13:30:38 | 6 | Q.    Let me hand you what I've marked as Deposition |
| 13:30:41 | 7 | Exhibit Number 4, and ask you if that is your signature |
| 13:30:44 | 8 | on the right-hand side of this document? |
| 13:31:05 | 9 | A.    Yes, it is. |
| 13:31:06 | 10 | Q.    What day did you sign that document? |
| 13:31:09 | 11 | A.    5/5/98. |
| 13:31:13 | 12 | Q.    And can you tell me what that document is? |
| | 13 | A.    Yes. |
| 13:31:31 | 14 | Q.    What is it? |
| 13:31:33 | 15 | A.    Standards of performance. |
| 13:31:36 | 16 | Q.    So you were required to meet standards of |
| 13:31:40 | 17 | performance while you were employed with Akal; correct? |
| 13:31:45 | 18 | A.    Yes. |
| 13:31:45 | 19 | Q.    And you received a copy of those; correct? |
| 13:31:48 | 20 | A.    Yes. |
| 13:31:58 | 21 | Q.    Okay.  I'm going to hand you what I'm going to |
| 13:32:00 | 22 | mark as Deposition Exhibit 5.  I'm actually marking |
| 13:32:04 | 23 | this on the back of the front page because there's |
| 13:32:07 | 24 | really no place I can put this on there that won't |
| 13:32:10 | 25 | cover up some of the -- some of the language on that |

Case 1:01-cv-00072   Document 20   Filed in TXSD on 02/15/2002   Page 41 of 140

| | | |
|---|---|---|
| 13:43:43 | 1 | There might have been one that was transferred over or |
| 13:43:46 | 2 | whatever, but -- |
| 13:43:47 | 3 | Q.   But as far as you know, all were needed -- |
| | 4 | A.   Yes. |
| 13:43:50 | 5 | Q.   -- to continue keeping the security at the old |
| 13:43:55 | 6 | federal courthouse until it closed? |
| | 7 | A.   Yes. |
| | 8 | Q.   Is that correct? |
| | 9 | A.   Yes. |
| 13:44:00 | 10 | Q.   Okay.  Then you had the new -- the new federal |
| 13:44:01 | 11 | courthouse opened? |
| 13:44:02 | 12 | A.   That's right. |
| 13:44:02 | 13 | Q.   And you went -- you transferred over there; |
| | 14 | correct? |
| 13:44:11 | 15 | A.   Yes, uh-huh. |
| 13:44:11 | 16 | Q.   And did all these gentlemen that you just |
| 13:44:11 | 17 | listed; Bill Sherrill, Paul Infante, yourself, Mike |
| 13:44:11 | 18 | Lopez, Carl Oakley, and Salinas, did they also transfer |
| 13:44:14 | 19 | over? |
| | 20 | A.   Yes. |
| 13:44:19 | 21 | Q.   I guess in the meantime while y'all were still |
| 13:44:22 | 22 | taking care of the old federal courthouse because it |
| 13:44:25 | 23 | was still functioning -- |
| 13:44:27 | 24 | A.   Uh-huh. |
| 13:44:28 | 25 | Q.   -- there were people setting up in the new |

| 13:49:29 | 1 | A. That's a yes. |
| 13:49:31 | 2 | Q. -- for the record? |
| 13:49:33 | 3 | A. No complaints. |
| 13:49:40 | 4 | Q. Okay. Do you remember what day you went -- |
| 13:49:42 | 5 | what day the new federal courthouse opened that you |
| 13:49:45 | 6 | started working there? |
| 13:49:47 | 7 | A. No, I don't. |
| 13:49:52 | 8 | Q. Does mid June of 1999 sound about right? |
| 13:49:57 | 9 | A. Sounds about right. |
| 13:50:14 | 10 | Q. Was training conducted on May 12th and 13th |
| 13:50:18 | 11 | regarding x-ray machines and a few other things in |
| 13:50:21 | 12 | McAllen? |
| 13:50:22 | 13 | A. Yes, we had a meeting. |
| 13:50:24 | 14 | Q. Tell me about that. |
| 13:50:29 | 15 | A. It turned out to be -- it was -- it was a |
| 13:50:31 | 16 | training meeting. |
|  | 17 | Q. Okay. |
| 13:50:35 | 18 | A. Turned out to be a meeting about -- |
| 13:50:39 | 19 | Mr. Wimberly has a presentation he makes on bombs and |
| 13:50:46 | 20 | all that stuff, and concealment of bombs and all that. |
| 13:50:51 | 21 | It turned -- we had -- we had gone through one of these |
| 13:50:54 | 22 | schools before. And that's -- we went -- they called |
| 13:51:01 | 23 | us over there. We all went over there and it was the |
| 13:51:04 | 24 | same thing he had gone -- he had presented before. It |
| 13:51:07 | 25 | had nothing at all to do with the new court in |

A. FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 13:52:34 | 1 | Q. Had you had other similar types of trainings in |
| 13:52:38 | 2 | the past? |
| 13:52:38 | 3 | A. We had only had this one -- this one day of |
| 13:52:42 | 4 | training on the same thing before. I don't know when |
| 13:52:45 | 5 | it was. It was after Akal took over. |
| 13:53:10 | 6 | Q. So when you worked generally in -- let's say |
| 13:53:15 | 7 | back in the old federal courthouse, you went in that -- |
| 13:53:19 | 8 | you said 11:30? |
| 13:53:22 | 9 | A. Yeah. |
| 13:53:22 | 10 | Q. And you were done at 7:00? |
| | 11 | A. Yes. |
| 13:53:25 | 12 | Q. And did you carry a gun? |
| 13:53:28 | 13 | A. Yes. Every -- every agent carried a gun. |
| 13:53:30 | 14 | Q. And did you have a badge? |
| 13:53:31 | 15 | A. Yes. They issue a badge, pocket badge. |
| 13:53:34 | 16 | Q. And do you have something called credentials? |
| | 17 | A. Yes. |
| 13:53:36 | 18 | Q. What are credentials? |
| 13:53:38 | 19 | A. Well, I guess they're the badge. |
| 13:53:41 | 20 | Q. Is that kind of the same as the badge? |
| 13:53:44 | 21 | A. Yeah. |
| 13:53:44 | 22 | Q. And you had that; right? |
| | 23 | A. Yes. |
| 13:53:46 | 24 | Q. Did you have to turn those in at the end of |
| 13:53:49 | 25 | each day? |

| | | |
|---|---|---|
| 13:53:49 | 1 | A.    Absolutely.  You didn't take any of them |
| 13:53:52 | 2 | outside the -- off the premises. |
| 13:54:01 | 3 | Q.    And who did you turn them in to? |
| 13:54:05 | 4 | A.    You just put them in -- there were lockers |
| 13:54:09 | 5 | furnished for us.  You put them in your locker and lock |
| 13:54:12 | 6 | them up. |
| 13:54:12 | 7 | Q.    You had your own locker and you would lock -- |
| | 8 | A.    Yes. |
| 13:54:14 | 9 | Q.    -- lock them up? |
| | 10 | A.    Yes. |
| 13:54:16 | 11 | Q.    You just wouldn't take them off premises? |
| | 12 | A.    Yes. |
| 13:54:19 | 13 | Q.    Did anybody have to check what you were putting |
| 13:54:21 | 14 | in the locker? |
| | 15 | A.    No. |
| 13:54:49 | 16 | Q.    Do you think you performed your duties well? |
| 13:54:54 | 17 | A.    What? |
| 13:54:55 | 18 | Q.    Do you believe you performed your duties well |
| 13:54:58 | 19 | while you worked for Akal? |
| 13:55:00 | 20 | A.    I thought I performed my duties perfectly. |
| 13:55:06 | 21 | Q.    Perfectly.  You never had any -- you never did |
| 13:55:09 | 22 | one thing wrong? |
| | 23 | A.    No. |
| | 24 | Q.    Is that correct? |
| 13:55:13 | 25 | A.    That's right. |

A   FRY  -  BY MS.  PEREZ

| | | |
|---|---|---|
| 13:55:13 | 1 | Q.    So what changed when you went to the -- to the |
| 13:55:19 | 2 | new courthouse? |
| 13:55:22 | 3 | A.    What changed? |
| | 4 | Q.    Right. |
| 13:55:25 | 5 | A.    We were assigned to this -- old men were |
| 13:55:29 | 6 | assigned to the entrance.  We had no other duties |
| 13:55:47 | 7 | assigned anytime during -- any of these other duties |
| 13:55:50 | 8 | that I mentioned in the old courthouse, we didn't -- |
| 13:55:54 | 9 | never performed any of those. |
| 13:55:57 | 10 | Q.    You mean working in the courtroom? |
| 13:55:59 | 11 | A.    Working in the courtroom or the halls or the |
| 13:56:02 | 12 | control or -- or anything. |
| 13:56:08 | 13 | Q.    Or walking judges to their cars? |
| | 14 | A.    No. |
| 13:56:13 | 15 | Q.    Is that what you're saying you didn't do? |
| 13:56:16 | 16 | A.    We -- we quit walking the judges to their car, |
| 13:56:19 | 17 | yeah. |
| 13:56:20 | 18 | Q.    When you say "we," who are you talking about? |
| 13:56:23 | 19 | A.    I'm talking about the guys that were assigned |
| 13:56:27 | 20 | to the front entrance. |
| 13:56:33 | 21 | Q.    Okay.  Who was assigned to the front entrance? |
| 13:56:36 | 22 | A.    Well, it was -- |
| 13:56:39 | 23 | Q.    And when you say "assigned to the -- |
| | 24 | A.    There's Oakley. |
| | 25 | Q.    Okay. |

A. FRY - BY MS. PEREZ

| | | |
|---|---|---|
| '3:59:18 | 1 | Q. Okay. Is working in the courtroom preferable |
| 13:59:21 | 2 | to working in the front? |
| 13:59:31 | 3 | A. It would -- yes, it would be, I guess, if |
| 13:59:34 | 4 | you -- depending on -- I can't actually answer that. I |
| 13:59:40 | 5 | mean, I -- I don't know what -- what we're getting at |
| 13:59:43 | 6 | here. |
| 13:59:45 | 7 | Q. Is it -- I mean, is there anything better about |
| 13:59:49 | 8 | being assigned to the courtroom as opposed to being |
| 13:59:53 | 9 | assigned to the front entrance of the courthouse |
| 13:59:55 | 10 | building? |
| 13:59:57 | 11 | A. No, not as far as I know. I don't know. |
| 14:00:26 | 12 | Q. Do you know Louis McDaniel? |
| | 13 | A. Yes. |
| 14:00:29 | 14 | Q. Who is he? |
| 14:00:30 | 15 | A. He was the -- I think his title was on-site |
| 14:00:36 | 16 | supervisor or something. He came down and set up the |
| 14:00:41 | 17 | new court. |
| 14:00:42 | 18 | Q. He set up the new courthouse? |
| 14:00:44 | 19 | A. Yeah. |
| 14:00:45 | 20 | Q. Did you get along with him? |
| | 21 | A. Yes. |
| 14:00:48 | 22 | Q. No complaints about him? |
| 14:01:01 | 23 | A. No, no complaint. |
| 14:01:24 | 24 | Q. Tell me about the -- there was something called |
| 14:01:26 | 25 | the control center? |

| | | |
|---|---|---|
| '4:02:31 | 1 | Q.    What was happening? |
| 14:02:33 | 2 | A.    Yeah. |
| 14:02:34 | 3 | Q.    Kind of who was coming in and who was going |
| 14:02:36 | 4 | out? |
| 14:02:37 | 5 | A.    Yeah.   Well, anything that was happening inside |
| 14:02:40 | 6 | the cameras, of course, you know. |
| 14:02:41 | 7 | Q.    Okay.   And was it your understanding that that |
| 14:02:43 | 8 | was to better secure -- to increase security? |
| 14:02:45 | 9 | A.    Well, yes, it's better security.   It's |
| 14:02:48 | 10 | necessary now days. |
| 14:02:58 | 11 | Q.    Did you want to work the control center? |
| 14:03:01 | 12 | A.    Well, I -- I would have worked it if they'd |
| 14:03:07 | 13 | assigned -- if they'd assigned me on it. |
| 14:03:09 | 14 | Q.    But did it matter to you whether you worked the |
| 14:03:12 | 15 | control center? |
| 14:03:15 | 16 | A.    Well, it didn't really matter to me, no. |
| 14:03:20 | 17 | Q.    Was there any difference in pay as far as you |
| 14:03:22 | 18 | know for working the control center? |
| 14:03:25 | 19 | A.    No, there wasn't any difference in the pay. |
| 14:03:28 | 20 | Q.    Did you ever ask to work the control center? |
| 14:03:31 | 21 | A.    Never did. |
| 14:03:33 | 22 | Q.    Never did? |
| | 23 | A.    No. |
| 14:03:38 | 24 | Q.    After you moved to the new courthouse, did you |
| 14:03:41 | 25 | ever ask to work in the -- in the courtrooms? |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | A.   No.                                               |
| 14:03:50 | 2  | Q.   It didn't make a difference to you.  You just     |
| 14:03:52 | 3  | worked where they asked you to work; right?            |
| 14:03:57 | 4  | A.   I just wanted to do my job and earn my pay.        |
| 14:04:01 | 5  | That's what I was there for.                           |
| 14:04:02 | 6  | Q.   Okay.  So wherever they asked you to work, you    |
| 14:04:04 | 7  | were fine with working there?                          |
| 14:04:06 | 8  | A.   Right.                                            |
| 14:04:07 | 9  | Q.   Is that correct?                                  |
| 14:04:08 | 10 | A.   Well, that's right.                               |
| 14:04:52 | 11 | Q.   At some point, you had a stroke; correct?         |
| 14:04:56 | 12 | A.   Yes.                                              |
| 14:04:57 | 13 | Q.   Tell me about that.                               |
| 14:05:03 | 14 | A.   It was in March or April.                         |
| 14:05:07 | 15 | Q.   Of 1999?                                          |
|          | 16 | A.   Yes.                                              |
| 14:05:11 | 17 | Q.   And what had happened?  How did the stroke        |
| 14:05:16 | 18 | manifest the itself?                                   |
| 14:05:18 | 19 | A.   Well, I had a clot in the -- that went to my      |
| 14:05:23 | 20 | brain, I guess.                                        |
| 14:05:25 | 21 | Q.   You had a clot in your -- in your brain?          |
| 14:05:28 | 22 | A.   Yeah, uh-huh.                                     |
| 14:05:33 | 23 | Q.   So how did you know you had had a stroke?  Did    |
| 14:05:37 | 24 | you have difficulty breathing or did you faint or what |
| 14:05:41 | 25 | happened?                                              |

A. FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 14:20:07 | 1 | injuring myself and the people around me.  So I said |
| 14:20:16 | 2 | I'm -- I want -- I said, "I want a couple hours off to |
| 14:20:22 | 3 | talk to a lawyer."  And I don't know whether he said |
| 14:20:34 | 4 | okay or not, but -- or what he said.  But anyway, I |
| 14:20:39 | 5 | left.  And I came back at 3:00 o'clock.  And he said -- |
| 14:20:54 | 6 | no, I did say when I -- when I took my gear off, I |
| 14:20:58 | 7 | said, "You can -- you know, you can inventory this |
| 14:21:09 | 8 | stuff."  In other words, because I wasn't going to be |
| 14:21:13 | 9 | using it for the time being until I cleared up this |
| 14:21:18 | 10 | mess I was in.  And then I told him I would be back at |
| 14:21:21 | 11 | 3:00.  And I came back at 3:00.  And he said, "No, |
| 14:21:27 | 12 | you -- said something about -- "I talked to Mike |
| 14:21:31 | 13 | Daniel, and he said you -- by you turning your gear in |
| 14:21:41 | 14 | he said you -- you resigned."  And I told him before |
| 14:21:44 | 15 | that, as I left, I said, "I'm not resigning."  And |
| 14:21:49 | 16 | before I left and walked out, you know, to take the two |
| 14:21:53 | 17 | hours of leave without pay, I said, "I'm not resigning. |
| 14:21:56 | 18 | I'm going to be back in a couple of hours," I said. |
| 14:22:02 | 19 | And when I came back at 3:00, he said, "No, you're -- I |
| 14:22:06 | 20 | just talked to McDaniel and he says that you -- you |
| 14:22:10 | 21 | resigned, and you're not with us anymore."  And I tried |
| 14:22:18 | 22 | to talk to him.  That was on Friday.  And I said, "I |
| 14:22:24 | 23 | didn't resign.  And I'll take the physical."  But I |
| 14:22:33 | 24 | said, "We can -- I'll be back Monday morning to work, |
| 14:22:41 | 25 | if we can get this thing straightened out." |

A FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 14:28:15 | 1 | Q.   And what -- what remark did you make? |
| 14:28:19 | 2 | A.   I made a remark about I earned enough |
| 14:28:26 | 3 | retirement to get by or something.  And then I left and |
| 14:28:34 | 4 | I told him, "I'll be back."  I mean, as I was leaving I |
| 14:28:40 | 5 | told him, "I'll be back." |
| 14:28:44 | 6 | Q.   Now, you said -- did you say something like "I |
| 14:28:46 | 7 | don't need this.  I have enough pension"? |
| 14:28:52 | 8 | A.   I may have said, "I don't need the job."  I |
| 14:28:57 | 9 | don't know.  It's possible I said that.  I don't know. |
| 14:29:01 | 10 | Q.   But you do recall saying that you earned enough |
| 14:29:06 | 11 | requirement to get by on? |
| 14:29:08 | 12 | A.   I said something to that effect.  I'm not sure |
| 14:29:11 | 13 | what I said. |
| 14:29:19 | 14 | Q.   Why didn't -- why didn't you just put your gear |
| 14:29:26 | 15 | in your locker? |
| 14:29:28 | 16 | A.   In my locker? |
| 14:29:29 | 17 | Q.   Yeah. |
| 14:29:30 | 18 | A.   Well, he was -- I had been in the situation |
| 14:29:37 | 19 | before in the Border Patrol where I had to relieve a |
| 14:29:41 | 20 | guy of his pistol, when he didn't want to be relieved |
| 14:29:44 | 21 | of his pistol.  And it's a careful -- it's a thing |
| 14:29:48 | 22 | that's kind of shaky.  So, you know, in other words, |
| 14:29:52 | 23 | the guy was -- and I was afraid that he might think |
| 14:30:00 | 24 | that -- in other words, I don't know what I'd have done |
| 14:30:04 | 25 | to be a danger to myself or the people around me.  And |

| 14:30:12 | 1 | I'm sure that he was going to ask me to give me the key |

14:30:12  1  I'm sure that he was going to ask me to give me the key

14:30:18  2  if I -- you know, even if I'd have put it -- locked it

14:30:24  3  up -- or he would relieve me of it because that's what

14:30:30  4  you do when you -- when he said I was shaky and acting

14:30:35  5  wild, so the best thing you do if somebody is shaky an

14:30:42  6  acting wild is to relieve them of their firearm.

14:30:48  7      Q.   He didn't tell you he was going relieve you of

14:30:51  8  your firearm?

14:30:52  9      A.   No, he didn't tell me.

14:30:53  10     Q.   You assumed that he was going to relieve you of

14:30:56  11  your firearm?

14:30:58  12     A.   Well, I assumed that would have been the proper

14:30:59  13  action to take.

14:31:00  14     Q.   To relieve you of your firearm?

14:31:04  15     A.   Yeah.

14:31:05  16     Q.   But he didn't?

          17     A.   No.

14:31:07  18     Q.   You just put your -- you put your weapon?

14:31:10  19     A.   Yeah, and my handcuffs.

14:31:12  20     Q.   And your handcuffs.  And what else?

14:31:20  21     A.   And my badge.

14:31:20  22     Q.   And your badge?

14:31:20  23     A.   And the -- we had an extra clip of cartridges

14:31:24  24  that we carried.

14:31:27  25     Q.   Extra clip of bullets?

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | A.    Yeah, uh-huh.                                       |
| 14:31:29 | 2  | Q.    So the handgun, the bullets, the badge, and the    |
| 14:31:33 | 3  | handcuffs, you put all that down on the table; correct?  |
| 14:31:36 | 4  | A.    Yeah.                                               |
| 14:31:36 | 5  | Q.    And you told him he could inventory it;            |
|          | 6  | correct?                                                 |
| 14:31:39 | 7  | A.    Yes.                                                |
| 14:31:40 | 8  | Q.    Isn't it true, Mr. Fry, that when people in law    |
| 14:31:43 | 9  | enforcement-type jobs resign, they simply put -- they    |
| 14:31:49 | 10 | simply turn in their credentials and their badge and     |
| 14:31:54 | 11 | their -- and their gun?  Isn't that typically how it's   |
| 14:31:58 | 12 | done?  Is that true?                                      |
| 14:32:01 | 13 | A.    They -- well, I guess they take the -- you turn     |
| 14:32:06 | 14 | in your equipment, yeah.                                  |
| 14:32:07 | 15 | Q.    You turn in your equipment; right?                  |
| 14:32:09 | 16 | A.    Yeah.                                               |
| 14:32:10 | 17 | Q.    When you resign?                                    |
| 14:32:11 | 18 | A.    But by me saying that I was going to consult a      |
| 14:32:19 | 19 | lawyer that sounds like -- in other words, I didn't      |
| 14:32:28 | 20 | realize that -- that I had any -- that they were going    |
| 14:32:32 | 21 | to just cut me off like that.  In other words, if I was  |
| 14:32:36 | 22 | going to see a lawyer about the situation, I think that  |
| 14:32:40 | 23 | they -- it was right to let me have a couple of hours     |
| 14:32:44 | 24 | after 14 years before they -- before they cut me off.    |
| 14:32:52 | 25 | Of course, I had worked different situations and this     |

| | | |
|---|---|---|
| 14:35:46 | 1 | it, Mr. Fry? |
| 14:35:49 | 2 | A.   No.   No, I guess not. |
| 14:35:50 | 3 | Q.   And this is the memo that you were referring to |
| 14:35:54 | 4 | earlier that you were given by Zepeda? |
| 14:35:57 | 5 | A.   Yeah.   Yes. |
| 14:35:57 | 6 | Q.   And this memo doesn't say that you were going |
| 14:36:00 | 7 | to be relieved -- |
| | 8 | A.   No. |
| 14:36:01 | 9 | Q.   -- of your duties; does it? |
| 14:36:04 | 10 | A.   No, it doesn't say it. |
| 14:36:05 | 11 | Q.   Could it be, Mr. Fry, that you got upset when |
| 14:36:08 | 12 | you got the memo, and so you thought it was saying that |
| 14:36:13 | 13 | they were going to relieve you? |
| 14:36:15 | 14 | A.   I was upset. |
| 14:36:16 | 15 | Q.   When they handed you the memo, you were upset? |
| 14:36:18 | 16 | A.   I was upset when I read it. |
| 14:36:35 | 17 | Q.   And you didn't obtain permission to go see a |
| 14:36:38 | 18 | lawyer; correct? |
| 14:36:40 | 19 | A.   I didn't -- well, he didn't -- I told him that |
| 14:36:43 | 20 | I was going to go see one and I asked him to put me |
| 14:36:50 | 21 | down with leave without pay because I need -- I wanted |
| 14:36:53 | 22 | to go see a lawyer. |
| 14:36:58 | 23 | Q.   He did.   But he didn't give you permission to |
| 14:37:01 | 24 | go see a lawyer; correct? |
| 14:37:04 | 25 | A.   Well, he -- I assumed that I was getting leave |

A  FRY  -  BY  MS.  PEREZ

| 14:37:07 | 1 | without pay.  He didn't say anything.  I don't remember |
| 14:37:10 | 2 | what he said as I was leaving. |
| 14:37:14 | 3 | Q.   Isn't it true that he asked you if you were |
| 14:37:16 | 4 | resigning and you would not respond? |
| 14:37:20 | 5 | A.   I did -- I did tell him that I wasn't |
| 14:37:24 | 6 | resigning -- |
|  | 7 | Q.   So if he says -- |
| 14:37:28 | 8 | A.   -- as I was leaving. |
| 14:37:30 | 9 | Q.   So if he says that you didn't respond, are you |
| 14:37:34 | 10 | saying he's lying? |
| 14:37:38 | 11 | MR. WOOD:  Object to the form. |
| 14:37:43 | 12 | THE WITNESS:  Huh? |
| 14:37:44 | 13 | MR. WOOD:  I just said that I was objecting to |
| 14:37:47 | 14 | the form of the question. |
| 14:37:58 | 15 | A.   I think that at that time, I thought that he |
| 14:38:01 | 16 | was giving me leave without pay when I -- when I -- to |
| 14:38:06 | 17 | go do this because I thought at the time that I needed |
| 14:38:14 | 18 | to consult somebody. |
|  | 19 | BY MS. PEREZ: |
| 14:38:18 | 20 | Q.   You thought he was giving you leave without pay |
| 14:38:21 | 21 | to go see a lawyer during working hours? |
| 14:38:25 | 22 | A.   Well, to see what my rights were or whatever |
| 14:38:34 | 23 | or -- |
| 14:38:34 | 24 | Q.   But I guess my question is, is that your |
| 14:38:34 | 25 | understanding that you thought he was giving you leave |

A  FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 14:38:35 | 1 | without pay to go see a lawyer during working hours? |
| | 2 | A.    Yes. |
| 14:38:49 | 3 | Q.    Mr. Fry, isn't it true that when you received |
| 14:38:53 | 4 | this memorandum, you were upset? |
| 14:38:56 | 5 | MR. WOOD:  He's already said that. |
| 14:38:57 | 6 | A.    I said that I was upset. |
| | 7 | BY MS. PEREZ: |
| 14:39:00 | 8 | Q.    And you said earlier that you also put your |
| 14:39:03 | 9 | gear down; correct? |
| 14:39:06 | 10 | A.    Yeah. |
| 14:39:07 | 11 | Q.    And you asked him to inventory that gear? |
| | 12 | A.    Yeah. |
| 14:39:13 | 13 | Q.    Is that "yes"? |
| 14:39:14 | 14 | MR. WOOD:  She wants you to say answer out loud |
| 14:39:17 | 15 | "yes" or "no," and not say "uh-huh" or "huh-uh." |
| 14:39:20 | 16 | A.    Oh, that's right. |
| | 17 | BY MS. PEREZ: |
| 14:39:21 | 18 | Q.    And you also -- you said you mumbled "I don't |
| 14:39:25 | 19 | need this.  I have a big pension" or "I have a |
| 14:39:27 | 20 | $45,000.00 pension" or something to that effect? |
| 14:39:31 | 21 | A.    Yeah, I may have.  Yeah. |
| 14:39:33 | 22 | Q.    Wouldn't you agree, Mr. Fry, that by those |
| 14:39:35 | 23 | actions, you were upset, you put your gear down, you |
| 14:39:41 | 24 | told him to inventory your gear, you were leaving |
| 14:39:46 | 25 | without being given permission to leave, and you're |

| | | |
|---|---|---|
| 15:03:56 | 1 | Deposition Exhibit Number 7.  Is that your handwriting |
| 15:03:59 | 2 | on that exhibit? |
| 15:04:04 | 3 | A.   Yes, it is. |
| 15:04:06 | 4 | Q.   What day did you sign that? |
| 15:04:10 | 5 | A.   3/12/93. |
| 15:04:14 | 6 | Q.   And in that exhibit, you recognize that to be a |
| 15:04:19 | 7 | court security officer you'll need to take physicals; |
| 15:04:25 | 8 | correct? |
| | 9 | A.   Yes. |
| 15:04:26 | 10 | Q.   That was a part of every court security |
| 15:04:29 | 11 | officer's job? |
| | 12 | A.   Yes. |
| 15:04:57 | 13 | Q.   I'm handing you back Deposition Exhibit Number |
| 15:05:00 | 14 | 5.  Let me ask you to look at the bottom right-hand |
| 15:05:05 | 15 | corner of the paragraph that says B2. |
| 15:06:02 | 16 | MR. WOOD:  Stops right there. |
| 15:06:04 | 17 | THE WITNESS:  Yeah. |
| | 18 | BY MS. PEREZ: |
| 15:06:09 | 19 | Q.   Were you able to read paragraph B2 on Exhibit |
| 15:06:13 | 20 | 5? |
| | 21 | A.   Yes. |
| 15:06:14 | 22 | Q.   So you -- and you had received this document |
| 15:06:16 | 23 | before; correct? |
| 15:06:21 | 24 | A.   I don't remember for sure. |
| 15:06:22 | 25 | Q.   Well, those are the CSO performance standards, |

15:06:25    1    we had talked about that earlier; correct?

           2       A.    Yeah.

15:06:28    3       Q.    And you signed --

15:06:29    4       A.    Yeah.

15:06:30    5       Q.    -- Exhibit 4 saying that you received them?

15:06:32    6       A.    Yeah.   Okay.

15:06:33    7       Q.    So you understood that Akal had a continuing

15:06:37    8    duty to ensure that all CSOs met the applicable health

15:06:43    9    and fitness requirements for the job --

          10       A.    Yes.

          11       Q.    -- right?

          12       A.    Yes.

15:06:46    13       Q.    You understood that?

          14       A.    Yes.

15:06:48    15       Q.    You also said that Lana Besterio had reported

15:06:55    16    that you were having problems with the stairs; correct?

15:07:00    17       A.    Yes.

15:07:03    18       Q.    So if you -- if she reported that you were

15:07:06    19    having physical problems, Akal was under a duty to make

15:07:10    20    sure that you could perform your job.   You'll agree

15:07:13    21    with that; right?

15:07:14    22         MR. WOOD:    I'm going to object to form.

15:07:23    23       A.    I don't -- I feel that if she thought I was

15:07:33    24    having trouble, she should have notified me at the

15:07:38    25    time.

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | BY MS. PEREZ:                                           |
| 15:07:39 | 2  |     Q.    That Ms. Besterio should have?               |
|          | 3  |     A.    Yes.                                          |
| 15:07:45 | 4  |     Q.    But it's your understanding that she told Akal? |
| 15:07:51 | 5  |     A.    That's my understanding.  I assume that's what |
| 15:07:56 | 6  | caused all of this.                                    |
| 15:08:00 | 7  |     Q.    So do you dispute that Akal had a basis to ask |
| 15:08:04 | 8  | you to take the physical?                              |
| 15:08:12 | 9  |     A.    They -- yes, they had a basis to ask me to take |
| 15:08:17 | 10 | it.  I'm not arguing that.                             |
| 15:08:20 | 11 |     Q.    Okay.  And you understood that they have a duty |
| 15:08:22 | 12 | to make sure that all CSOs can perform the -- can meet |
| 15:08:27 | 13 | the physical requirements of the job?                  |
|          | 14 |     A.    Yes.                                          |
| 15:08:39 | 15 |     Q.    You don't have any facts or basis to believe |
| 15:08:41 | 16 | that you were asked to take a physical on August 20th  |
| 15:08:45 | 17 | of 1999 because of your age?                           |
| 15:09:15 | 18 |     A.    Well, it appears that I was asked to take a   |
| 15:09:18 | 19 | physical because of one of my CSO peers deciding to do |
| 15:09:29 | 20 | a physical for me on the -- through the cameras.  She  |
| 15:09:35 | 21 | should have told me that -- that's what I feel.  I feel |
| 15:09:49 | 22 | that I was able to perform my duties at that time.     |
| 15:09:57 | 23 |     Q.    And so you feel that she should have told you? |
| 15:10:01 | 24 |     A.    Well, someone should have told me before -- I |
| 15:10:04 | 25 | mean, if there's something dire wrong with me.         |

A FRY - BY MS. PEREZ

15:14:02  1   it's my belief that there were people at Akal that

15:14:11  2   wanted to get read of the old people.

          3   BY MS. PEREZ:

15:14:32  4       Q.   Are you done?

15:14:33  5       A.   That's all.

15:14:34  6            MS. PEREZ:   I'm going to object as

15:14:36  7   nonresponsive.

          8   BY MS. PEREZ:

15:14:38  9       Q.   Okay.  I'm not going to refer to the exhibit

15:14:46  10  anymore.  Let me just ask it to you this way.  What

15:14:49  11  facts or basis do you have to believe that you were

15:14:53  12  asked to take a physical on August 20th of 1999 because

15:15:00  13  of your age?

15:15:08  14      A.   Because I felt that we were being discriminated

15:15:12  15  against by being separated and work projects in the --

15:15:21  16  in the work duties.  And I felt at that time that we

15:15:26  17  were being discriminated against because of age.

15:15:35  18      Q.   Okay.  Do you have any other -- other than what

15:15:37  19  you've just said, do you have any other facts or basis

15:15:40  20  to believe that you were asked to take a physical on

15:15:42  21  August 20th of 1999 because of your age?

15:15:48  22      A.   No.  That's -- that covers it, I guess.

15:16:03  23      Q.   You testified earlier that you had -- it was

15:16:06  24  your belief that there were people in Akal that wanted

15:16:09  25  to get rid of the old people.  Do you recall saying

A FRY - BY MS. PEREZ

| | | |
|---|---|---|
| 15:35:58 | 1 | A. As far as I remember, I told him that I was |
| 15:36:11 | 2 | ready to take the physical, that I would take the |
| 15:36:13 | 3 | physical. And he told me at that time that McDaniel |
| 15:36:17 | 4 | had said that I had quit by -- when I turned in my |
| 15:36:25 | 5 | gear. |
| 15:36:27 | 6 | Q. Was anything else said? |
| 15:36:35 | 7 | A. I don't remember. |
| 15:36:35 | 8 | Q. That's all you recall being said? |
| | 9 | A. Yes. |
| 15:36:39 | 10 | Q. And did you leave then after that? |
| | 11 | A. Yes. |
| 15:36:44 | 12 | Q. So Zepeda stayed with your -- with your gear? |
| | 13 | A. Yes. |
| 15:36:49 | 14 | Q. Do you have any facts or basis to believe that |
| 15:36:52 | 15 | McDaniel would take any action against you because of |
| 15:36:55 | 16 | your age? |
| 15:36:56 | 17 | A. My what? |
| 15:36:58 | 18 | Q. Do you have any facts or basis to believe that |
| 15:37:00 | 19 | McDaniel would take any action against you because of |
| 15:37:04 | 20 | your age? |
| 15:37:17 | 21 | A. Not at this time -- not at this time. |
| 15:38:01 | 22 | Q. I'm going to hand you what I'm marking as |
| 15:38:04 | 23 | Deposition Exhibit Number 9. Do you recall what that |
| 15:38:06 | 24 | document is? |
| 15:38:54 | 25 | A. Yeah, I remember this document. |

A. FRY - BY MS. PEREZ

|  |  |  |
|--|--|--|
| | 1 | BY MS. PEREZ: |
| 16:13:43 | 2 | Q.   Do you think asking you to take a physical was |
| 16:13:46 | 3 | outrageous? |
| | 4 | A.   No. |
| 16:13:53 | 5 | Q.   Do you think that when you were told you were |
| 16:13:56 | 6 | history on August 23rd of 1999, that that was |
| 16:14:00 | 7 | outrageous? |
| 16:14:03 | 8 | A.   I felt it wasn't a nice thing to tell anybody |
| 16:14:07 | 9 | that was ending their career. |
| 16:14:18 | 10 | Q.   And I understand that you don't think it was a |
| 16:14:21 | 11 | nice thing.  But do you believe that was outrageous? |
| 16:14:25 | 12 | A.   What? |
| 16:14:25 | 13 | Q.   I understand you said that it wasn't a nice |
| 16:14:28 | 14 | thing to tell people.  But do you believe that it was |
| 16:14:30 | 15 | outrageous? |
| 16:14:54 | 16 | A.   You're going to have to run that one by me |
| 16:14:57 | 17 | again. |
| 16:14:58 | 18 | Q.   Do you think that when you were -- you |
| 16:15:00 | 19 | testified earlier that you were told you were history |
| 16:15:04 | 20 | on August 23rd? |
| 16:15:05 | 21 | A.   That's right. |
| 16:15:06 | 22 | Q.   Do you believe that that was -- that act of |
| 16:15:07 | 23 | telling you you were history was outrageous? |
| 16:15:14 | 24 | A.   Yes, I think it was an outrageous thing for one |
| 16:15:20 | 25 | person to say to another one. |

| | | |
|---|---|---|
| 16:15:21 | 1 | Q.   And why is that? |
| 16:15:26 | 2 | A.   Why is that? |
| 16:15:28 | 3 | Q.   Yes. |
| 16:15:30 | 4 | A.   It's just -- it didn't -- isn't decent to talk |
| 16:15:34 | 5 | to anybody like that. |
| 16:15:36 | 6 | Q.   Is there anything else you believe was |
| 16:15:40 | 7 | outrageous? |
| 16:15:42 | 8 | A.   No, nothing outrageous that's -- |
| 16:15:49 | 9 | Q.   Sir, so nothing else? |
| | 10 | A.   No. |
| | 11 | Q.   Is that correct? |
| 16:15:51 | 12 | A.   I can't think of anything right at the moment. |
| 16:16:09 | 13 | Q.   So after your separation from Akal, were you |
| 16:16:13 | 14 | able to continue going on with your life? |
| 16:16:17 | 15 | A.   Well, I managed to. |
| 16:16:22 | 16 | Q.   And, again, you were able to continue being a |
| 16:16:26 | 17 | good husband and a good father? |
| 16:16:29 | 18 | A.   Well, may have been awhile sometimes, otherwise |
| 16:16:38 | 19 | I'm okay. |
| 16:16:39 | 20 | Q.   Otherwise you were okay. |
| 16:16:42 | 21 | A.   Yeah. |
| 16:16:43 | 22 | Q.   I'm sorry.  Was that a "yeah"? |
| 16:16:45 | 23 | A.   Otherwise I was okay, I guess. |
| 16:17:34 | 24 | Q.   I'm handing you what I'm marking as Deposition |
| 16:17:38 | 25 | Exhibit Number 14.  This is some type of certificate of |

| | | |
|---|---|---|
| 16:20:47 | 1 | one of these certificates of medical examination |
| 16:20:51 | 2 | performed on you? |
| 16:20:54 | 3 | A. Well, should be in the records here. |
| 16:20:58 | 4 | Q. When's the last time you recall having one? |
| 16:21:01 | 5 | A. Huh? I can't -- I don't know. It would have |
| 16:21:08 | 6 | been in 1997, '98. |
| 16:21:21 | 7 | Q. But at any rate, with regard to Deposition |
| 16:21:24 | 8 | Exhibits Numbers 14 and 15, you recall going several |
| 16:21:28 | 9 | times during your employment with Akal to obtain |
| 16:21:31 | 10 | certificates of medical -- |
| 16:21:33 | 11 | A. Yes, that's right. |
| 16:21:34 | 12 | Q. -- examination; is that correct? |
| 16:21:40 | 13 | A. Yes. |
| 16:21:41 | 14 | Q. Are you currently employed? |
| 16:21:43 | 15 | A. No, I'm not. |
| 16:21:43 | 16 | Q. Have you worked anywhere since leaving Akal? |
| 16:21:48 | 17 | A. No, I haven't. |
| 16:21:50 | 18 | Q. Did you apply for unemployment benefits when |
| 16:21:53 | 19 | you left Akal? |
| 16:21:56 | 20 | A. No, I didn't. |
| 16:21:59 | 21 | Q. Other -- have you ever been fired from any job |
| 16:22:02 | 22 | before? |
| 16:22:03 | 23 | A. Never. |
| 16:22:15 | 24 | Q. Have you applied anywhere to work since your |
| 16:22:18 | 25 | separation from Akal? |

| | | | |
|---|---|---|---|
| '6:22:20 | 1 | A. | No, I haven't. |
| 16:22:21 | 2 | Q. | Why not? |
| 16:22:23 | 3 | A. | Because I haven't got around to it. |
| 16:22:31 | 4 | Q. | What -- what do you do? |
| 16:22:40 | 5 | A. | What do I do? |
| 16:22:40 | 6 | Q. | Yeah, on a daily basis. |
| 16:22:40 | 7 | A. | Do whatever I wish. |
| 16:22:40 | 8 | Q. | I'm sorry? |
| 16:22:40 | 9 | A. | I do whatever I wish. |
| 16:22:55 | 10 | Q. | What sources of income have you had since your |
| 16:23:03 | 11 | separation from Akal? | |
| 16:23:04 | 12 | A. | I've got Social Security and federal |
| 16:23:06 | 13 | retirement. | |
| 16:23:08 | 14 | Q. | And how much do you get from Social Security? |
| 16:23:10 | 15 | A. | I don't know. About 700 a month. |
| 16:23:19 | 16 | Q. | And how much do you get in your retirement? |
| 16:23:23 | 17 | A. | I don't know. Around 40,000 a year. |
| 16:23:28 | 18 | Q. | 40,000 a year? |
| 16:23:29 | 19 | A. | Yeah. |
| 16:23:30 | 20 | Q. | Is that a "yes"? |
| | 21 | A. | Yes. |
| 16:23:36 | 22 | Q. | It's 40,000 plus Social Security; correct? |
| 16:23:39 | 23 | A. | That's right. |
| 16:23:40 | 24 | Q. | And then you also have income -- or your wife |
| 16:23:43 | 25 | has income because she works; correct? | |

16:25:50   1   Do you remember any allegations about Judge Vela?

16:25:52   2       A.   Yes.  Yes.

16:25:57   3       Q.   Tell me what you recall about the allegations

16:26:01   4   with respect to Judge Vela?

16:26:02   5       A.   Well, he made the statement that he didn't want

16:26:05   6   any old men working in his courtroom.  That's what I

16:26:09   7   had heard.

16:26:11   8       Q.   You heard that from whom?

16:26:13   9       A.   I don't know.  It was going around.

16:26:16   10      Q.   You didn't hear Judge Vela say it directly;

11   correct?

16:26:21   12      A.   No.  In fact, he was asked if he had said it at

16:26:24   13   a meeting we had.  And he said, no, he hadn't said it.

16:26:32   14   But he said they were probably going to change the

16:26:35   15   law -- Akal was going to change the -- the hiring rules

16:26:44   16   to a limited age.  I forget just how he stated it,

16:26:49   17   but --

16:26:50   18      Q.   He said that Akal was going to do what?

16:26:53   19      A.   Change the age of -- that people could be

16:26:57   20   hired.  In other words, set an age limit on who could

16:27:01   21   be hired.

16:27:02   22      Q.   That's what Judge Vela said?

16:27:05   23      A.   He made the -- that statement.

16:27:09   24      Q.   You don't know whether he had talked to anybody

16:27:11   25   at Akal about that before making that statement;

A FRY - BY MS. PEREZ

|  |  |  |
|---|---|---|
|  | 1 | correct? |
| 16:27:15 | 2 | A.    No. |
|  | 3 | Q.    Is that correct? |
| 16:27:16 | 4 | A.    That's correct. |
| 16:27:26 | 5 | Q.    Now, tell me about this meeting with Judge Vela |
| 16:27:28 | 6 | where he made this statement.  Did somebody call a |
| 16:27:31 | 7 | meeting with Judge Vela or what happened? |
| 16:27:34 | 8 | A.    No.  Judge Vela called a meeting with us three |
| 16:27:37 | 9 | or four old men. |
| 16:27:39 | 10 | Q.    Who was at the meeting? |
| 16:27:40 | 11 | A.    Huh? |
| 16:27:40 | 12 | Q.    Who was at the meeting? |
| 16:27:42 | 13 | A.    Myself and Oakley and Infante.  Sherrill had |
| 16:27:46 | 14 | gone home.  He wasn't there.  And I don't remember |
| 16:27:52 | 15 | whether Mike was there or not. |
| 16:27:55 | 16 | Q.    What was the second name you said?  Yourself, |
| 16:27:58 | 17 | Oakley -- |
| 16:28:00 | 18 | A.    And Infante. |
| 16:28:02 | 19 | Q.    Infante, okay.  And you don't remember if Mike |
| 16:28:06 | 20 | Lopez was at the meeting? |
|  | 21 | A.    No. |
| 16:28:08 | 22 | Q.    And Judge Vela called that? |
|  | 23 | A.    Yes. |
| 16:28:11 | 24 | Q.    What else was said during that meeting with |
| 16:28:12 | 25 | Judge Vela? |

16:48:12   1   witnessed it.

16:48:13   2      Q.   When is the last time you talked to Mr.

16:48:16   3   Sherrill?

16:48:17   4      A.   I haven't talked to him since I quit.

16:48:19   5      Q.   Richard Wimberly?

16:48:21   6      A.   He's the one that -- he and McDaniel were the

16:48:25   7   ones making jokes about the old men, where they could

16:48:29   8   sleep if they wanted to.

16:48:31   9      Q.   And, again, that's hearsay you say you heard

16:48:34   10   from the EEOC investigator?

16:48:37   11      A.   It was -- I heard it from Earwood, he was the

16:48:44   12   investigator.

16:48:45   13      Q.   You heard it from Earwood?

16:48:47   14      A.   Yeah.   And he told me that's what they said in

16:48:51   15   front of them.   He said he didn't know why it would

16:48:59   16   come out as something as ridiculous as that.

16:49:03   17      Q.   Did Earwood say anything else with respect to

16:49:06   18   those comments allegedly made by Richard Wimberly and

19   Louis McDaniel?

20      A.   No.

16:49:21   21      Q.   Roy Zepeda, we've already talked about;

22   correct?

16:49:23   23      A.   Yes.

16:49:24   24      Q.   Judge Vela we've talked about?

16:49:26   25      A.   Yeah.

A   FRY - BY MS   PEREZ

| | | |
|---|---|---|
| 16:49:26 | 1 | Q.   Did you list Judge Vela for any reason other |
| 16:49:28 | 2 | than what you've discussed today? |
| | 3 | A.   No. |
| 16:49:37 | 4 | Q.   And Judge Tagle? |
| 16:49:38 | 5 | A.   To go. |
| 16:49:39 | 6 | Q.   Did you list -- why did you list her? |
| 16:49:40 | 7 | A.   I listed her because she run into my wife at a |
| 16:49:46 | 8 | social function and she asked her Fry is getting along, |
| 16:49:51 | 9 | is he -- they say he's in horrible shape and all that. |
| 16:49:56 | 10 | And it's going around that he's on his death bed.  So |
| 16:50:07 | 11 | that's what was spreading around the courthouse. |
| 16:50:10 | 12 | That's kind of hard on a guy that is feeling all right. |
| 16:50:17 | 13 | Q.   And, again, that's you didn't hear Judge Tagle |
| 16:50:21 | 14 | personally say that? |
| 16:50:22 | 15 | A.   No. |
| 16:50:22 | 16 | Q.   That's what you heard from your wife? |
| | 17 | A.   Yes. |
| 16:50:25 | 18 | Q.   And when did you hear -- when did your wife say |
| 16:50:26 | 19 | that Judge Tagle said that? |
| 16:50:29 | 20 | A.   I don't know.  It was about a month or two |
| 16:50:31 | 21 | after I quit -- or after I was finished. |
| 16:50:39 | 22 | Q.   After you finished at Akal? |
| 16:50:42 | 23 | A.   Yeah. |
| 16:50:58 | 24 | Q.   Do you have medical insurance? |
| 16:50:59 | 25 | A.   Yes, I do. |

'6:51:01   1     Q.   Is that -- is that Medicaid or is that --

16:51:07   2     A.   No.  It's -- I've got regular government

16:51:13   3  employees' health benefits.

16:51:19   4     Q.   Okay.  Talked earlier about the retirement that

16:51:22   5  you receive.  How long -- is there a time limit is when

16:51:25   6  you stop receiving your retirement?

            7     A.   No.

16:51:29   8     Q.   You get that for the rest of your life?

16:51:32   9     A.   Until I die, yeah.

16:52:06  10     Q.   I'm going to ask you to go to interrogatory

16:52:09  11  number 3.

16:52:27  12       MR. WOOD:  That's the question and that's what

16:52:28  13  you answered.

         14  BY MS. PEREZ:

16:52:32  15     Q.   Yeah.  The question is, if you contend you have

16:52:34  16  been injured or damaged, describe injuries or damages.

16:52:35  17  You see your response there; correct?  I'll give you a

16:52:39  18  minute to read it.

16:52:55  19       MR. WOOD:  Are you through reading it.

16:52:58  20       THE WITNESS:  Yes.

         21  BY MS. PEREZ:

16:52:58  22     Q.   Okay.  I'm looking on the second line of your

16:53:00  23  response.  It says, "I became depressed and lost all

16:53:03  24  desire to see people."

16:53:06  25     A.   Yeah.

| | | |
|---|---|---|
| 16:53:06 | 1 | Q. You were never diagnosed with depression; |
| | 2 | right? |
| 16:53:10 | 3 | A. No. |
| 16:53:10 | 4 | Q. So is that correct? |
| 16:53:11 | 5 | A. I never went to a doctor for depression. |
| 16:53:16 | 6 | Q. Okay. So you were never diagnosed? |
| | 7 | A. No. |
| 16:53:18 | 8 | Q. That's just your claim that you were depressed? |
| 16:53:21 | 9 | A. Yeah. |
| 16:53:22 | 10 | Q. Says you lost desire to see people? |
| 16:53:25 | 11 | A. Yeah. |
| 16:53:29 | 12 | Q. But that was only for awhile because you said |
| 16:53:32 | 13 | that you had continued your good relationship with your |
| 16:53:36 | 14 | wife and your sons; right? |
| 16:53:38 | 15 | A. Well, generally. |
| 16:53:39 | 16 | Q. I'm sorry? |
| 16:53:39 | 17 | A. Yes, generally. |
| 16:53:40 | 18 | Q. And you continued your relationships with your |
| 16:53:44 | 19 | friends? |
| 16:53:45 | 20 | A. Right. When I see them. |
| 16:53:46 | 21 | Q. I'm sorry? |
| 16:53:47 | 22 | A. Yeah, when I see them. |
| 16:53:50 | 23 | Q. Okay. And it also says, "I became very moody |
| 16:53:52 | 24 | and was always angry." |
| 16:53:55 | 25 | A. Yeah. |

# ERRATA SHEET

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| 42/24 | FROM KINGSVILLE TO KING CITY | I DIDN'T SAY KINGSVILLE |
| 47/19 | SETTING TO SITTING | MISUNDERSTOOD PRONUN?? |
| 76/24 | 11:30 TO 10:30 | GAVE THE WRONG TIME |
| 90/9 | 11:30 TO 10:30 | I AGAIN GAVE WRONG TIME |
| 106/11 | 1975 TO 1985 | I WAS SHOT IN 1975 BUT DEVELOPED DIABETES IN 198? |
| 107/8 | 11:30 TO 10:30 | I CAME IN AT 10:30 DAILY |
| 108/12 | MIKE TO MC | PART OF A NAME "MC DANIEL" |
| 133/2 | READ TO RID | |
| 160/18 | AWHILE TO A LITTLE WILD | COURT REPORTER MIS-UNDERSTOOD WHAT I SAID. |
| 180/15 | THEM TO HIM | |

EDDIE MORRIS-COURT REPORTERS, INC.
22193 I?-?? West   (210) 698-1??   San Antonio, Texas  78257

1        I HEREBY CERTIFY that I have read the

2  foregoing deposition; and that this deposition,

3  together with any corrections noted on the errata

4  sheet, is a true record of my testimony given at this

5  deposition and all answers are within my personal

6  knowledge and are true and correct.

7

8

9                _____

               ALLEN FRY

10

11        BEFORE ME the undersigned authority,

12  personally appeared ALLEN FRY who, upon his oath,

13  states that all answers given by him in the foregoing

14  deposition are within his personal knowledge and are

15  true and correct.

16        SUBSCRIBED AND SWORN TO BEFORE ME, this

17  _16th_ day of _January_____, A.D. ~~2001~~. 2002

18

19

20                _____

21       JOSIE O. LUCIO    NOTARY PUBLIC IN AND FOR

       Notary Public,      THE STATE OF TEXAS

22       State of Texas

       My Comm Exp 08-22-2004

23  MY COMMISSION EXPIRES _08-22-2004_ .

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3

 4   ALLEN FRY AND MIGUEL LOPEZ,   *
          Plaintiffs,             *
 5

 6   VS.                          *   CASE NO. B-01-CV-72

 7

 8   AKAL SECURITY, INC.,         *
          Defendant.             *
 9   _____
     STATE OF TEXAS               *
10   COUNTY OF BEXAR              *

11                       I, SHAN MORRIS BLANCHARD,

12   Certified Shorthand Reporter in and for the State of

13   Texas, do hereby certify that the facts stated and set

14   forth on the caption hereto are true; that after the

15   witness, ALLEN FRY, had been by me first duly cautioned

16   and sworn to tell the truth, the whole truth and

17   nothing but the truth, the foregoing questions were

18   propounded to him by the attorneys named in the caption

19   hereto, and that the foregoing answers were made by

20   said witness at said time in response to said questions

21   so propounded to him; that the said questions so

22   propounded to the said witness and the said answers in

23   response thereto were by me, at said time and place,

24   taken down in shorthand on the 10th day of December

25   A.D. 2001, and that the foregoing is a true record of
```

1    the testimony given by the witness.

2              Pursuant to information given at the time

3    said testimony was taken, the following includes all

4    parties of record and the amount of time used by each

5    party at the deposition:

6    Ms. Raquel G. Perez            5 hours 17 minutes
     Mr. Rick Wood                  0 hours 0 minutes
7              I do further certify that the said

8    deposition, along with all exhibits, was delivered on

9    the _17th_ day of _December_, A.D. 2001 to MR.

10   WOOD for review and signature of the witness, with

11   instructions that the deposition be returned to me

12   within ~~20~~ 3C days of receipt thereof, and that said

13   deposition ~~was~~/was not returned, along with the changes

14   annotated by the witness on the attached errata sheet,

15   and that the charge for the completed deposition is

16   $_____, charged to MS. PEREZ, who has been

17   furnished a true and correct copy of said deposition,

18   along with any exhibits thereto.

19             Said original deposition, ~~having~~

20   ~~been~~/having not been returned to us, ~~was~~/was not

21   forwarded to the custodial attorney for safekeeping on

22   the _17th_ day of _January_, A.D. 2002, and that

23   notification of such action was forwarded to all

24   parties.

25

```
 1              WITNESS MY HAND AND SEAL OF OFFICE this the

 2   __17th__ day of __January__, A.D. 200̸1.

 3

 4

 5                          _Shan Morris Blanchard_

 6   DLF                    SHAN MORRIS BLANCHARD
     Certificate No. 3863   Certified Shorthand Reporter
 7   Exp. Date: 12/31/02    in and for the State of Texas

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF LOUIS MCDANIEL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

I, Louis McDaniel, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.      My name is Louis McDaniel and I am employed by Akal Security, Inc., as the District Site Supervisor for the United States District Courts in the Southern District of Texas. In that capacity, I oversee the Court Security Officers in the Southern District of Texas, including the Brownsville Division.

2.      Akal is a security company that provides security services primarily to government facilities throughout the United States. One of Akal's primary contracts is with the United States Marshall Service ("USMS") and the Department of Justice ("DOJ") to provide security for federal buildings and courthouses all over the nation. Under its contract with the USMS/DOJ, Akal has the responsibility of providing security personnel, i.e., Court Security Officers ("CSO"), for the United States District Court for the Southern District of Texas,

including the Brownsville Division. This contract states that the primary function of a CSO is to ensure the safety and security of those individuals inside the courthouse.

3.    To achieve total security of the courthouse, CSOs are assigned to different posts including – the front entrance, the courtrooms, roving patrols inside the building, and roving patrols outside the building. Additionally, CSOs are assigned to the command center to monitor surveillance cameras. All assignments are important and necessary for the safe protection of the courts. All areas are dependent upon the other to insure the safety of all persons working in or having business within the courthouse.

4.    If any one of the CSOs on duty does not perform there assigned tasks, or is not physically able to perform their tasks, the safety of all persons in and around the facility is endangered. Accordingly, the USMS mandates that Akal retain and hire individuals who are physically fit for duty and requires all CSO to submit to and successfully pass medical examination. Continued employment is contingent on successful completion of all required physical examinations.

5.    Should a CSO walk off his job or resign from employment, it is the company policy to not allow the employee to return to their position. Once a CSO position becomes vacant due to voluntary or involuntary termination, Akal is required by its contract with the USMS to submit a completed application to the USMS to fill the vacant position within 14 calendar days of the vacancies. The submission of the completed application requires that the applicant submit to a medical examination, including blood test and receive the results of the examination. Once the application is completed, it is reviewed for accuracy and completeness, and then forwarded to the USMS. Due to the procedure for the submission of the application and the deadline for submission, it is imperative that the process be initiated as soon as a position becomes vacant. If Akal does not submit a completed application within the 14-day deadline, it could be subject to a monetary penalty by the USMS.

6.    Due to the extensive experience and training levels required to qualify for the position of Court Security Officer, a majority of the CSOs hired by Akal are retired or former

federal, state, local or military law enforcement officers. In fact, during the time period relevant to this lawsuit, of the approximately eleven CSOs assigned to the Brownsville Division, two were over the age of 40, three were over the age of 50, three were over the age of 60, and three were 70 or above.

7.      Allen Fry ("Fry") began his employment with Akal in January 1993 at the age of 64. In mid-March 1999, Fry suffered a stroke. At his request, he was granted Family and Medical Leave from March 15, 1999 through May, 1999. On May 3, 1999 he was released to full duty status by his personal physician, with no restrictions and returned to his CSO position.

8.      Around the same time Fry returned from his leave, Akal was preparing to move all CSO positions from the old federal courthouse in Brownsville to the new federal Courthouse. After the new federal courthouse officially opened in mid-June, 1999, all CSOs from the old courthouse were moved to the new Courthouse. Additionally, several new CSOs were hired due to the additional needs of the new Courthouse.

9.      Approximately three months after his return from FMLA leave, on or about August 19, 1999, CSO Lana Besterio reported to Lead Court Security Officer Zepeda and myself that she had observed Fry having a difficult time navigating the stairs. Based on this report, Akal had a duty under the USMS contract to ensure that Fry was fit for duty. Accordingly, I faxed a letter to Zepeda to present to Fry which informed Fry that he was required to take a physical examination to determine fitness for duty. The letter did not relieve Fry of his duties or take any job action against Fry. The letter merely required Fry to schedule an appointment to have a physical examination. A copy of the letter is attached hereto.

10.     On August 20, 1999, Zepeda presented Fry with the letter. Zepeda reported to me that Fry became very upset, laid his firearm, extra ammunition, credentials, and handcuffs on Zepeda's desk, and asked Zepeda to inventory his gear. Fry also told Zepeda that he did not need the job and that he could live off his pension and began to leave the building. Fry left the premises and did not report to his assignment at his scheduled time. I reported to Richard

Wimberly, Head of Court Security ("Wimberly") and Akal's Human Resources Department that CSO Fry had walked off the job.

11.     Later, at 2:31 p.m., I faxed to Wimberly the paperwork to process Fry's resignation

12.     Due to the short time frame in which Akal is required to submit an application to the USMS to fill a vacant CSO position--14 calendar days--and the length of time required to complete such application, Mr. Wimberly instructed me to immediately begin the process of filling Fry's CSO Position. I then instructed Zepeda to begin the process.

13.     Later that day, at approximately 3:00 p.m., Zepeda reported to me that Fry returned to the courthouse and informed Zepeda that he was willing to take the physical examination.  I discussed the issue with Mr. Wimberly and Akal's Human Resources Department, and it was decided that Fry would not be allowed to return since (1) his walking off the job without permission was considered a resignation, (2) Akal's consistently applied company policy is to not allow employees to return to work after they walk off the job, and (3) the process of filling the vacant position had already been initiated.

14.     Akal and the International Government Security Officers of America Local 108 entered into a Collective Bargaining Agreement ("CBA") which governs the employment of all CSOs employed at the Brownsville Federal Courthouse, a true and correct copy of which is attached hereto. Fry did not file a grievance with the Union as required by Article 5 of the CBA.

15.     Mr. Emilio Escobedo (57) replaced Fry.

16.     The decision to not allow Fry to return to his CSO position was based on the legitimate, nondiscriminatory reasons stated in my affidavit.  Fry's age played no factor in our decision to not allow Fry to return to his CSO position.

I have read this affidavit which consists of five pages, including this page, and have been given an opportunity to make any corrections. I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.



_____
Date

_____
Louis McDaniel

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Louis McDaniel on this the 12th day of February, 2002, to certify which witness my hand and seal of office.

_____
Notary Public, in and for the State of Texas

My commission expires: __10/8/03__

ANA MARIE GONZALEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-08-2003

FEB 24 '00 07:28 FF  MS-COMMAND CENTER  713 718 4828 TO  9565747490  P.02/13

# ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1 RECOGNITION-BARGAINING UNIT

A.  The Employer hereby recognizes the Union as the sole and exclusive bargaining agent for the purpose of collective bargaining as outlined in this Agreement, with respect to wages, hours, overtime, leaves of absence, uniform allowances and any and all other conditions of employment for all full-time and regular shared position USMS credentialed court security officers (CSOs), lead court security officers, and assistant lead court security officers assigned to the federal courthouses and other United States Justice Department related office buildings pursuant to the Employer's contract(s) with the United States Marshals Service for security within the jurisdictional boundaries of the Southern District of Texas, excluding all managers, supervisors as defined by the NLRB, office and/or clerical Employees, temporarily assigned Employees and substitute Employees and all other Employees of the Employer.

B.  The term "Employee" when used in this Agreement shall refer to the Employees in the bargaining unit described in Article 1, Section 1.1 of this Agreement.

### SECTION 1.2 NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of three members and one alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3 STEWARD SYSTEM

The Company agrees to recognize a steward system.

The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to all the business of the Grievance Procedure as outlined in Article 5 of this Agreement.

If the Employee requests, the Company will call for a steward prior to any disciplinary action taken whether it be written or verbal. The supervisor at the request of the Employee will release the steward as soon as possible. The Company will not be responsible for paying the steward for time spent in this regard.

### SECTION 1.4 MANAGERS AND SALARIED PERSONNEL

Managerial and salaried Employees shall not perform the duties of the Employees in the bargaining unit, except as necessary to fulfill the work under the US Marshals Service contract.

Local #108    N__ 1998-September 2001 CBA

DEPOSITION
EXHIBIT
2

EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

## SECTION 1.5 DUES CHECK-OFF

The Company agrees to deduct monthly dues and lawful assessments as designated by the Union on a monthly basis from the paycheck of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. The Employee upon 30 days' written notice served upon the Company and the Union may revoke such authorization. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to what the Union membership dues are.

The Company will remit all such deductions to the Financial Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name and amount of dues and initiation fees within seven (7) days of each remittance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for Check-Off Dues. The Company shall accept no other form unless the parties mutually agree to the substitution.

## SECTION 1.6 INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representatives nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.

The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

# ARTICLE 2

## SENIORITY

### SECTION 2.1 SENIORITY DEFINED

Union seniority shall be the length of continuous service from the Employee's last date of hire or transfer to all sites within Local #108 as a Special Deputy US Marshal Court Security Officer for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the employee has successfully completed his/her probationary period. Seniority shall be applicable in determining the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose his/her union seniority as it applies to the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

### SECTION 2.2 SENIORITY LISTS

Seniority Lists shall be furnished by the Company to the proper Union officials within a reasonable time, upon written request by the Union, each March and September of each contract year. The Union President or the President's designated representative must make the request for these lists to the Company in writing. The updated and current Seniority List shall be posted and maintained by the Company at each work location. An Employee's standing on the posted Seniority List will be final unless protested in writing to the Site Supervisor or Contract Manager in districts where a "Site Supervisor" is not authorized, no later than thirty (30) calendar days after the list has been posted.

### SECTION 2.3 PERSONAL DATA

Employees shall notify the Employer in writing, on the company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

### SECTION 2.4 TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is promoted to a non-bargaining unit position for more than four (4) weeks shall lose his/her union seniority. If he/she returns to the bargaining unit at a later date, his/her seniority will start on that return date.

### SECTION 2.5 PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a ninety (90) day period after their hire date. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers,

suspensions, discipline, layoffs or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement. Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The ninety (90) day period referred to in this section may be extended if the Company encounters a delay in the US Marshals Service performing background checks and granting written authorization on newly hired Employees.

## SECTION 2.6 TERMINATION OF SENIORITY

The seniority of an Employee shall be terminated for any of the following reasons:

a) the Employee quits or retires;
b) the Employee is discharged;
c) a settlement with an Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;
d) the Employee is laid off for a continuous period of one hundred eighty (180 ) days; or the Government terminates the Employee's credentials as a Special Deputy Marshal, or the Employee is otherwise asked to be removed from working under the Employer's contract with the Government.
e) Employee is permanently transferred out of the bargaining unit.

## ARTICLE 3

## JOB OPPORTUNITIES

## SECTION 3.1 FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of three (3) working days (excluding Saturdays, Sundays and holidays). Shared position Employees at the site where an opening occurs will be notified in writing at their last known address. The Site Supervisor will notify the Union President in writing of such openings. The Union President will then verify that all shared position CSOs have been notified. When a vacancy occurs, the Employer will fill the position with the senior-most Employee, who will be trained if required to fill any necessary qualifications for the new position.

Should the filling of a vacancy under this Article create a second vacancy, that vacancy will be filled under this Article as well. Any Employee who wishes to apply for the open position shall do so in writing. Vacancy postings and vacancy notifications will be site specific, however union posting at other sites in the Local is permitted, i.e., only Employees at the site where the vacancy occurs will be required to be notified.

## SECTION 3.1A SHARED POSITION EMPLOYEES

Shared positions will be filled as described in Section 3.1

## SECTION 3.1B LAYOFF AND RECALL

In the event of layoff or recall, when full-time or shared positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by calling the last laid off Employee first and so on.

## SECTION 3.2 TEMPORARY ASSIGNMENTS

In the interest of maintaining continuous operations, the Employer may temporarily assign an Employee to a vacant or new position until the job is filled in accordance with Articles 2 and 3, including temporarily assigning an Employee to a work site within or outside of the area defined by this Agreement; to the extent feasible the assignment shall be a voluntary selection based on seniority. In the absence of volunteers, assignments shall be made on a reverse seniority basis. Employees so assigned will receive the higher of the base hourly wage available to Employees regularly assigned to the site to which they are being transferred, or their regular hourly wage they receive at their regular site under this Agreement.

Due to the changing work environment, all Employees are subject to assignment anywhere within the district on an as-needed basis from present on-duty personnel. Failure to comply with the aforementioned schedule changes may lead to disciplinary action up to and including dismissal.

## SECTION 3.3 APPOINTMENT OF LEAD CSOs
*May 1*
The US Government in its contract with the Company creates specific guidelines for the selection of Lead CSOs. Based on these criteria, all appointments of Lead CSOs will be made on the basis of ability. Ability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.


## ARTICLE 4

## MANAGEMENT RIGHTS


Except as limited by the specific undertakings expressed in this Agreement, the Company shall continue to have the right to take any action it deems appropriate in the management of the business in accordance with its judgement.

# ARTICLE 5

# GRIEVANCE PROCEDURE

## SECTION 5.1 INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any disciplinary action directed by the US Marshals Service or by Judicial personnel. This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties. In addition, the grievance procedures outlined herein shall not apply to any situation where the Company is acting under the directives of the US Marshals Service or any member of the judiciary. In any such situation, however, the Employee will be provided with copies of any written complaints or existing transcripts of verbal complaints that require the Company to take any form of disciplinary action towards the Employee, if the Employee requests such materials. The term "days" shall not include Saturdays, Sundays, or holidays when used in this Article

## SECTION 5.2 GENERAL PROVISIONS

The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.

## SECTION 5.3 GRIEVANCE PROCEDURE

All grievances shall be presented and processed in accordance with the following procedures:

> Informal Step - Both the Company and the Union agree that the Employee will first discuss his/her complaint with his/her immediate supervisor within five working (5) days of the incident being grieved to start the informal procedure. If the informal procedure is not invoked within five working days of Employee's knowledge of a grieveable issue, then is agreed by both parties that no further action can be taken. If, during the course of this discussion either the Employee or the supervisor deems it desirable, a steward or other Union representative will be called in. If the complaint is not satisfactorily adjusted within three (3) working days of the informal discussion, it may be submitted in writing to the Contract Manager or his/her designee in accordance with Step One.

> Step One - If the matter is not resolved informally, the Employee shall, not later than ten (10) days after the informal discussion with the immediate supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved Employee and the steward, and shall be submitted to the Contract Manager or his/her designee. The Contract Manager or his/her designee shall have ten (10) days from the date the grievance was presented to him/her to return his/her decision in writing with a copy to the aggrieved Employee and the steward.

Step Two - If the grievance is not settled in Step One, the grievance may be appealed in writing to the Director of Human Resources or his/her designee not later than ten (10) days from the denial by the Contract Manager or his/her designee. The Director of Human Resources or his/her designee will have ten (10) days from the date the grievance was presented to him/her, to return his/her decision, in writing, with a copy to the aggrieved Employee and the Steward.

**Grievance for Discipline** - Any grievance involving discharge or other discipline may be commenced at Step One of this procedure. The written grievance shall be presented to the Contract Manager through the Site Supervisor or his/her designee within ten (10) days after the occurrence of the facts giving rise to the grievance.

## SECTION 5.4 ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Akal Director of Human Resources written notice of its desire to proceed to arbitration not later than fifteen (15) days after rejection of the grievance in Step Two. Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:

**Pre-Arbitration Hearing** – The parties agree to hold a pre-arbitration hearing requiring a senior manager of the Company and Union President (or designee) to make a final effort to settle the grievance before arbitration.

**Selection of an Arbitrator** - Within fifteen (15) days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet or telephonically jointly attempt to agree upon the selection of a neutral arbitrator. If, within fifteen (15) days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Mediation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

**Decision of the Arbitrator** - The arbitrator shall commence the hearing at the earliest possible date. The decision of the arbitrator shall be final and binding upon the parties to the Agreement. Any decision shall be complied with, without undue delay after the decision is rendered. It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

**Arbitration Expense** - The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each party to the arbitration will be responsible for its own expenses and compensation incurred in bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

Time Limits - The decision of the arbitrator shall be rendered as soon as possible after the dispute has been submitted to him/her.

## SECTION 5.5 CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6 INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1 GROUNDS FOR DISMISSAL

After completion of the probationary period, no Employee shall be dismissed or suspended without just cause, unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service. The Company's contract with the US Government sets out performance standards for CSOs and all employees are required to comply with these standards.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

## SECTION 7.1 WORKDAY AND WORKWEEK

For the purposes of this Article, a regular workweek of forty (40) hours of work, excluding lunch periods, shall constitute a normal full-time workweek for full-time Employees. Employees working a minimum of eight (8) consecutive hours shall normally receive an unpaid lunch period of at least thirty (30) minutes unless work conditions preclude scheduling of this period. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

## SECTION 7.2 OVERTIME

An overtime rate of time and one-half (1 1/2) of an Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of forty (40) hours in a work week.

## SECTION 7.3 OVERTIME REQUIREMENT

If requested to work overtime (i.e. over forty [40] hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice, the Employee shall be required to do so unless the Employee is excused for good cause.

## SECTION 7.4 OVERTIME DISTRIBUTION

Overtime will be distributed as equitably and fairly as practicable among Employees regularly assigned to the particular work location (including shared position Employees), subject to the direction of the judges and/or Marshals Service. Seniority shall be used in the assignment of overtime, except when the Employer is directed by the US Marshals Service or judges, or in situations dictated by availability of personnel and amount of notice given for overtime.

Excluding: Site Supervisors cannot be assigned to cover CSO overtime positions or posts except in emergency situations, or when directed by the US Marshal Service or judiciary, or in situations dictated by availability of personnel and amount of notice given for overtime. The Company will permit Site Supervisors to work overtime assignments only when there is no bargaining unit member available or in situations described above due to the rapidly changing court environment. The Employer will attempt to rectify overtime inequalities through the future scheduling of overtime work. Overtime records will be made available to the Union by the Company upon request.

## SECTION 7.5 SHARED POSITION EMPLOYEES

Hours of work for shared position Employees shall be determined by the Employer, to insure the orderly and efficient operation of court security services. Shared position Employees shall be required to work all scheduled work hours, unless the Employee is excused for good cause. Shared position Employees will be required to sign the Akal Shared Officer Agreement.

## SECTION 7.6 REST PERIODS

There shall be two (2) fifteen (15) minute paid rest periods when properly relieved and one (1) thirty (30) minute unpaid lunch for each eight (8) hour shift. One rest period shall be in the first half of the shift and the second rest period shall be in the last half of the shift. On occasion, due to exceptional authorized work requirements, Employees may have to work through their unpaid lunch breaks, and, if so, they will be compensated at the appropriate rate of pay. The Company recognizes the requirement to provide regularly scheduled breaks. It is not the intent of the Company to deny, avoid, or abuse this requirement.

## SECTION 7.7 CALL-IN PAY

An Employee called in to work will be guaranteed a minimum of three (3) hours of work or pay.

# ARTICLE 8

## WAGES

### SECTION 8.1 WAGE SCHEDULE

The base rate of pay for Court Security Officers Southern Texas, Local #108 will be, by site:

**For Houston**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.72 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $16.12 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $16.57 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.88 | $16.25 |

**For Galveston**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.25 |

**For Corpus Christi**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $15.42 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.81 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $16.25 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $16.55 | $15.88 |

**For McAllen, Laredo and Brownsville**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.88 |

| For Victoria | | |
|---|---|---|
| Year | CSO Wage | Lead CSO Wage |
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.50 |
| October 1, 1999-September 30, 2000 | $14.64 | $14.89 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.33 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.63 |

## SECTION 8.2 PAYDAY

Payday for all hourly Employees will be after 11 a.m. on Friday following the pay period ending on Saturday, subject to change by mutual agreement.

## SECTION 8.3 UNDISPUTED ERROR

In case of an undisputed error on the part of the company as to an Employee's rate of pay, proper adjustment will be made from the date the error occurred.

## SECTION 8.4 LEAD CSO RATES

If additional Lead CSOs are added to the contract any time after this Agreement goes into effect, they will be paid the base rate set out above in Section 8.1, based on the location.

## ARTICLE 9

## HOLIDAYS

## SECTION 9.1. HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day.

## SECTION 9.2 MISCELLANEOUS HOLIDAY PROVISIONS

A. A full-time Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift or premium for that holiday. The Employee will be paid holiday pay only if the Employee is not laid off, or on an unpaid leave of absence.

B. Any full-time Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked and in addition shall receive eight (8) hours holiday pay at the straight time rate, providing the Employee meets the requirements above in Section 9.2A.

C. Any shared position Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked plus prorated holiday pay up to 8 hours based on their average weekly hours for the previous four weeks' work.

D. Holiday pay for shared position Employees who do not work on a holiday and meet the eligibility requirements set out in Section 9.2A above shall be paid a proration of the full-time benefit based on their average weekly hours for the previous four weeks' work.

## ARTICLE 10

## VACATIONS

### SECTION 10.1 ELIGIBLE FULL-TIME EMPLOYEES

Eligible full-time Employees shall be entitled to annual vacation pay, based on their continuous years of service with the Employer at their individual hourly rate at the time payment is made in accordance with the following schedule:

| | |
|---|---|
| Upon completion of one year of service: | 80 hours |
| Upon completion of five years of service: | 120 hours |
| Upon completion of 15 years of service: | 160 hours |

### SECTION 10.1a ELIGIBLE SHARED POSITION EMPLOYEES

A. Eligible shared position Employees who work a regular half-time schedule shall be entitled to one-half the full-time vacation benefit at their individual hourly rate.

B. Eligible shared position Employees who work other than a regular part-time schedule shall be entitled to a prorated vacation pay at their individual hourly rate based on the number of hours worked in the previous contract year.

### SECTION 10.2 SCHEDULING VACATIONS

Each Employee who qualifies for a vacation in accordance with the provisions of this Article shall notify his/her Lead CSO, in writing, prior to April 1st of each year of his or her first and second choice for desired vacation periods, if any. If vacation time is required to be used differently than as per requested prior to April 1, Employee must give their immediate supervisor a written request at least seven (7) days prior to the requested vacation time.

** TX STATUS REPORT **                    AS OF   FEB 23 '00 16:12   PAGE.01

USMS BROWNSVILLE

|    | DATE  | TIME  | TO/FROM      | MODE  | MIN/SEC | PGS | CMD# | STATUS |
|----|-------|-------|--------------|-------|---------|-----|------|--------|
| 19 | 02/23 | 16:12 | 956 550 7221 | EC--S | 00'26"  | 001 |      | OK     |

Case 1:01-cv-00072   Document 20   Filed in TXSD on 02/15/2002   Page 94 of 140

## PREAMBLE

THIS AGREEMENT is made and entered into on ___July 8, 1998___ by and
between AKAL SECURITY, INCORPORATED, a New Mexico corporation, and its successors,
hereinafter referred to as the "Employer" or "Company," and UNITED GOVERNMENT
SECURITY OFFICERS OF AMERICA, LOCAL #108 hereinafter referred to as the "Union." All
non-economic provisions of this contract shall be in effect as of May 1, 1998. All economic
provisions of this contract shall be in effect as of 11:45 p.m. on September 30, 1998, including, but
not limited to compensation and fringe benefits.

1-800-572-6103

303-650-8515

The Employer will recognize union seniority when scheduling Employees for vacation in accordance with Section 2.1. The Employer will allow the maximum amount of personnel off at any one time for vacation that allows the Company to maintain efficient operations. The final allocation of vacation periods shall rest exclusively with the Employer in order to insure orderly and efficient operations and meet Government contract requirements.

## SECTION 10.3 PAY OPTIONS

Earned vacation pay shall be paid on the pay day following the Employee's return to the job after his/her vacation.

## SECTION 10.4 UNUSED VACATION

Vacations shall not be cumulative from one year to the next. Any earned but unused vacation time remaining at the end of a year of service (i.e. anniversary date of employment) shall be paid to the Employee.

## SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

Any time during the year, Employees may request in writing to be paid for earned vacation pay in lieu of taking actual vacation leave.

## SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employee will be paid at their individual hourly rate for any legally accrued but unused vacation time, as entitled by the Service Contract Act.

## SECTION 10.7 VACATION - LAID OFF EMPLOYEES

Length of service with the Employer shall not accrue for the purposes of vacation benefits while an Employee is on laid-off status.

## SECTION 10.8 VACATION INCREMENTS

Vacation days may be used in one (1) day increments, if so desired by the Employees and approved by the Employer.


### ARTICLE 11

### LEAVES OF ABSENCE

## SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30

days, unless approved by the Employer. Employee on any unpaid leave of absence may be required to use available vacation or personal leave time. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over 30 days. The Employer will make every reasonable effort to maintain an Employee's position while on a non-statutory unpaid leave of absence.

## SECTION 11.2 MEDICAL LEAVE

An Employee shall be granted an unpaid medical leave of absence for a specified period not to exceed 16 weeks within a 12-month period. Employee's disability must be made known to the Employer in accordance with the provisions of this Article, and be supported by a doctor's certificate showing the nature of the illness and the estimated length of time the Employee will be unable to perform his/her job.

The 16-week period may be extended at the discretion of the Employer. During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Employee will be required to use accrued vacation or personal leave time during the medical leave. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work.

## SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated or drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or the Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

## SECTION 11.4 UNION LEAVE

A Union officer or delegate will be granted an unpaid leave of absence upon written request for the purpose of attending Union conventions or other meetings of vital interest to the United Government Security Officers of America. The maximum number of days given for union leave is not to exceed five (5) days per contract year and the maximum number of union officers or delegates to be granted leave of absence is not to exceed two (2) Employees per Local Union.

## SECTION 11.5 FAMILY MEDICAL LEAVE

The Family and Medical Leave Act of 1993 is incorporated herein by reference.

## SECTION 11.6 PERSONAL LEAVE

Each full-time seniority Employee shall be eligible to use a maximum of six (6) days of personal leave (forty-eight hours) per 12-month Government contract year worked. Employees who begin

employment after the inception of the contract year will be eligible to use a prorated amount of personal leave, based upon the following rate (see **Personal Leave Eligibility Table** below):

| Personal Leave Eligibility Table | | | |
|---|---|---|---|
| **START DATE** | **RATE OF PERSONAL LEAVE ELIGIBLE TO USE** | | |
| (Date Employee begins working on the contract, based on an October 1 contract start date.) | **FULL-TIME** | **SHARED POSITION** | |
| October 1-31 | 48 hours | 24 hours | 3 days |
| November 1-30 | 44 hours | 22 hours | 2 day 4 Hes |
| December 1-31 | 40 hours | 20 hours | 2 days 4 Hr |
| January 1-31 | 36 hours | 18 hours | 2 Days 2 Hr |
| February 1-29 | 32 hours | 16 hours | 2 days |
| March 1-31 | 28 hours | 14 hours | 1 day 4 Hes |
| April 1-30 | 24 hours | 12 hours | 1 day 4 Hr |
| May 1-31 | 20 hours | 10 hours | 1 day 2 Hr |
| June 1-30 | 16 hours | 8 hours | 1 day |
| July 1-31 | 12 hours | 6 hours | |
| August 1-31 | 8 hours | 4 hours | |
| September 1-30 | 4 hours | 2 hours | |

A. Personal days shall be used in not less than four-hour increments and shall be paid when taken by the Employee as approved in advance by the Site Supervisor or District Supervisor.

B. Shared position Employees will receive one-half the full-time personal leave per full contract year worked. At the end of the contract year, any shared position Employee who worked more than half the full-time hours (1,040 hours) will receive additional prorated personal leave based upon the number of actual hours Employee worked during that contract year. Therefore, for each additional 87 hours worked over 1,040 hours during the contract year, Employee will receive an additional 2 hours of personal leave, up to a possible maximum of 48 hours total personal leave for the contract year.

C. Unused personal days shall not be cumulative from year to year. Any unused, earned personal leave pay will be paid to Employee at the end of the contract year.

D. Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that contract year. (Example: An Employee who terminates work after six months at the full-time rate during the current contract year and earns three (3) days personal leave, but only uses two (2) days, would be eligible upon termination to be paid for the third, unused personal day.) If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract (4 hours per full month worked), the amount of the overage will be

deducted from the Employee's final paycheck. (Example: If Employee works only six months and therefore earns three days (24 hours) personal leave, but actually uses four days personal leave, the extra 8 hours' pay will be deducted from Employee's final paycheck.)

E.  Personal leave (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least two (2) hours prior to the beginning of his/her regular shift in order to be eligible for paid personal leave benefits. Disciplinary action may result from excessive, unapproved absenteeism.

## SECTION 11.7 PROCESSING LEAVES OF ABSENCE

A leave of absence must be processed in the following manner:

A. All requests for any unpaid leaves of absence shall be submitted in writing to the Site Supervisor at least ten (10) calendar days prior to the date that the leave will take effect, except in cases of emergencies, and shall include:

1. The reasons for such leave;
2. The effective dates of such leave;
3. The estimated date of return to work.

B. The written request for leave of absence shall be submitted to the Contract Manager by the Site Supervisor for final approval.

C. If the request for the leave of absence is approved by the Contract Manager, a copy of the approved leave of absence will be given to the Employee involved.

D. Extensions of the leave of absence may be granted at the discretion of the Employer upon written request by the Employee within ten (10) calendar days prior to the expiration of the leave of absence when feasible. Extensions when granted shall not total more than thirty (30) days.

## SECTION 11.9 BEREAVEMENT LEAVE

All non-probationary Employees shall be entitled to three days unpaid bereavement leave per full Government contract year for purposes of attending, on a day normally scheduled to work, the funeral of a parent, parent-in-law, spouse, child, sibling, or sibling-in-law. Employee will notify Lead CSO, whenever possible, of the need for bereavement leave.

## SECTION 11.10 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of Article 2 of this Agreement.

# ARTICLE 12

## HEALTH, WELFARE AND UNIFORM ALLOWANCES

### SECTION 12.1 PAYMENTS

For the life of this Agreement, the Employer will make health and welfare payments to Employees on all hours paid up to forty (40) hours per week in accordance with the following schedule at the hourly rate:

| | |
|---|---|
| Effective October 1, 1998 through September 30, 1999 | $1.41/hour |
| Effective October 1, 1999 through September 30, 2000 | $1.66/hour |
| Effective October 1, 2000 through September 30, 2001 | $1.91/hour |
| Effective October 1, 2001 through September 30, 2002 | $2.00/hour |

### SECTION 12.2 MINIMUM BENEFITS

The amounts required by Section 12.1 shall serve as the minimum health and welfare benefits for Employees.

### SECTION 12.3 OTHER BENEFITS

The Employer will offer Employees the opportunity to participate in other Employee-paid fringe benefit programs made available to all Court Security Officers employed by the Company. These programs include cafeteria plans, payroll deduction plans, retirement plans, insurance plans, 401(k) plans, and any other plan mentioned in this Agreement.

### SECTION 12.4 UNIFORM MAINTENANCE

The Employer will pay the Employee $.10625 per hour worked up to 40 hours per week for uniform maintenance allowance. A shoe allowance of $62.50 per contract year will be sent with uniforms annually for the purchase of USMS-required CSO uniform shoes.

### SECTION 12.5 GROUP DISABILITY INSURANCE

The Company agrees to deduct any fees or premium payments and lawful assessments designated by the Union for a Group Disability Insurance plan set up by and administered by the Union from the first paycheck of each month of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. Such authorization may be revoked by the Employee upon 30 days' written notice served upon the Company and the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to amount of fees, and any other costs for this insurance.

The Company will remit all such deductions to the International Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit would be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the International Secretary/Treasurer with a deduction list, setting forth the name and amount of fees, and any other costs for this insurance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are corrective and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for insurance deductions. The Company shall accept no other form unless the parties mutually agree to a substitute.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

### SECTION 13.1 BULLETIN BOARDS

The Employer will make its best effort to obtain a space from the government for the use of the CSOs to locate a Union-provided bulletin board that will be used by the Union for posting notices pertaining to Union affairs. The providing of these facilities is the prerogative of the US Government.

### SECTION 13.2 PHYSICAL EXAMINATIONS

The Employer shall pay for all physical/medical examinations that are required by the Employer at Employer designated clinic(s) or physicians. In those selected areas where there is not a designated clinic or physician, the Employer will provide an allowance to the Employee of up to a maximum of eighty dollars ($80) per examination. Receipts must be furnished by Employee in order to process reimbursement.

Physical/medical exams may be required by operation of the government contract or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic, at its discretion. Employer shall pay Employee up to two hours for time spent taking an employer-requested medical examination.

### SECTION 13.3 TRAVEL EXPENSES

The Company will provide advance payments for approved travel expenses if requested by an Employee. Any hours to include travel over twelve (12) hours will require the Employee to stay

overnight and the appropriate per diem will be paid. All hours in travel will be counted as work hours with the appropriate overtime wages provided for under Article 7 of this Agreement. Employees will be reimbursed for all authorized expenditures of any authorized travel within twenty (20) days from the day Employer receives the travel voucher and all required receipts.

## SECTION 13.4 BREAK ROOMS

The Employer will make its best effort to obtain from the government break rooms for CSOs for breaks and lunch without management using the room as an office and will make its best effort to have the government equip the room with water. The providing of these facilities is the prerogative of the US Government.

## SECTION 13. 5 LOCKERS

The Employer will make its best effort to obtain lockers from the government for the use of the CSOs. The providing of these facilities is the prerogative of the US Government.

## SECTION 13.6 UNION MEETINGS

Neither Union officials nor Union members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings of any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances to the extent such work time activity is specifically allowed by the Employer.

## ARTICLE 14

### 401 (k) PLAN

## SECTION 14.1 401 (K) PLAN

The Company shall provide a 401(k) plan to which Court Security Officers are eligible to contribute, whether Union or Non-Union. Employees shall be subject to the eligibility requirements and rules of the Plan.

## ARTICLE 15

### TRAINING

## SECTION 15.1 TRAINING

The Company will make its best effort to implement its advanced CSO training program to enhance the professional capabilities of the Employees. Actual scheduling of training is subject to approval by the US Government and may be subject to funding by the US Government.

# ARTICLE 16

## SAFETY

### SECTION 16.1 SAFETY POLICY

It is the policy of the Company to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. The Company agrees to permit one (1) bargaining unit member selected by the Union to participate in any locally scheduled safety meetings.

### SECTION 16.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any government provided CSO work stations and break rooms.

# ARTICLE 17

## CONTINUITY OF OPERATIONS

### SECTION 17.1 NO STRIKES

Both the Company and the Union agree that continuity of operations is of utmost importance to the Company's security operations. Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns or secondary boycotts during the term of this Agreement and that the Union will not cause, nor permit its members to cause, nor will any member of the Union take part in, any strike, including a sympathy strike, slowdown, stoppage of work, planned inefficiency or any other curtailment of work or restriction or interference with the Employer's or Government's operations for any reason whatsoever. Nor will the Union authorize or sanction the same.

Upon hearing of any unauthorized strike, slowdown, stoppage or work, planned inefficiency or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such activity to a prompt termination. Any Employee who violates this provision may be immediately discharged. Furthermore, it is agreed and understood that in addition to other remedies, the provisions of this Article may be judicially enforced including specific performance by way of injunctive relief.

### SECTION 17.2 LOCKOUTS

During the life of this Agreement, the Employer shall not lockout any Employees covered in this Agreement.

## ARTICLE 18

## SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, such parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to the decree or government statutes so long as they shall remain legally effective. It is the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

## ARTICLE 19

## SERVICE CONTRACT PROCEDURES AND OBLIGATIONS

The parties recognize that they are providing a service to the Unites States Government. Therefore, the terms of this agreement are subject to the directives of the Government, and, except as provided herein, <u>there shall be no recourse against the Employer with regard to its actions taken to comply with those directives.</u> In the event a directive necessitates a deviation from the obligations or procedures contained in this Agreement, the Union may request that the parties hereto meet and confer with regard to the effects, if any, of the deviation necessitated by the Government's directive. A copy of a written directive covered by this provision shall be provided to the International UGSOA president upon request.

## ARTICLE 20

## ENTIRE AGREEMENT

The parties acknowledge that during the negotiation which resulted in the Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and all understandings and agreements reach by the parties are set forth in this Agreement. Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the term of this Agreement except as specifically provided for in other provisions of this Agreement.

# ARTICLE 21

# DURATION

This Agreement shall be effective upon its execution by both parties and supersedes any and all prior agreements or understandings between the parties. The Agreement shall remain in force until 2400 hours on September 30, 2002 with the provision that should either party desire to terminate this Agreement or any provision thereof, it shall give written notice to the other party of not less than sixty (60) days and not more than seventy-five (75 days) prior to the expiration. In the event such notice is given, the existing Agreement may be continued by mutual consent of both parties until an Agreement is reached. This Agreement may also be changed or amended by agreement of both parties.

IN WITNESS WHEREOF, the parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _____

TITLE: _PRESIDENT_

DATE: _July 8, 1998_

FOR:
AKAL SECURITY, INC.

BY: _____

TITLE: _SR V.P._

DATE: _July 9, 1998_

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _____

TITLE: _Secretary / Treasurer_

DATE: _July 8, 1998_

BY: _____

TITLE: _Int'l Sec.-Treas._

DATE: _7-8-98_

FOR:
AKAL SECURITY, INC.

BY: _____

TITLE: _Dir. HR_

DATE: _7/8/98_

BY: _____

TITLE: _____

DATE: _____

** TOTAL PAGE.11 **

## *AKAL SECURITY IS AN EQUAL OPPORTUNITY EMPLOYER*

It is the policy of Akal Security, Inc. to provide employment, training, compensation levels, transfer or promotion opportunities, and all other aspects of employment without regard to sex, race, color, religion, national origin, age or for qualified handicapped individuals, disabled veterans or Vietnam era veterans.

When hiring or promotion activity occurs, and in those job categories where we have identified underutilization, we will take affirmative action to seek out qualified applicants without regard to sex, race, color, religion, national origin, age, handicap, or veteran status.

At Akal Security, Inc. all terms and conditions of employment are and will continue to be established on the basis of the individual's qualifications and ability to perform the job.

I hereby appoint Sat Nirmal Kaur as the Equal Employment Opportunity Officer of Akal Security, Inc. I have charged her with the responsiblity for communicating and implementing this policy.

Akal Security affirms to all employees that discrimination in the workplace by supervisors, managers, company agents or fellow employees is not tolerated. Any form of harassment of one individual by another that is rooted in the victim's race, color, sex, age, mental or physcial disability, national origin or religious affiliation is an offense against every employee in this organization and will not be tolerated. This includes acts of sexual harassment. Charges of discrimination or harassment are addressed by swift and corrective action.

Complaints of discrimination or harassment will be investigated immediately and impartially. The investigation is kept as confidential as possible. If formal investigation finds an accused person guilty of discrimination or harassment as charged, appropriate disciplinary action will be taken.

Sexual harassment on the basis of sex is defined as follows: Unwelcome sexual advances, requests for sexual favors, and other verbal or physcial conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working enviornment.

An employee who wishes to make a formal complaint about harassment or discrimination should contact the Lead CSO (LCSO) at his/her facility. If there is no designated LCSO, the employee should contact the contract manager. If the LCSO or contract manager is the subject of the employee's complaint, then the employee should call the corporate headquarters of Akal Security at 505-753-7832 and contact the Director of Administration. To protect victims and accused alike, Akal Security will use the utmost discretion in investigating complaints.

No notation of a complaint will be included in a complainant's personnel file. All records and documentation will be kept separately, and the complaint will receive immediate attention.

_Sirikarm kaur khalsa_
Siri Karm Kaur Khalsa, Chief Executive Officer

-------------------------------------------------------------------------------------------------------

I have read the above and understood its contents.

Employee signature

Date    3-12-93

DEPOSITION
EXHIBIT
3

EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

# ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1 RECOGNITION-BARGAINING UNIT

A.    The Employer hereby recognizes the Union as the sole and exclusive bargaining agent for the purpose of collective bargaining as outlined in this Agreement, with respect to wages, hours, overtime, leaves of absence, uniform allowances and any and all other conditions of employment for all full-time and regular shared position USMS credentialed court security officers (CSOs), lead court security officers, and assistant lead court security officers assigned to the federal courthouses and other United States Justice Department related office buildings pursuant to the Employer's contract(s) with the United States Marshals Service for security within the jurisdictional boundaries of the Southern District of Texas, excluding all managers, supervisors as defined by the NLRB, office and/or clerical Employees, temporarily assigned Employees and substitute Employees and all other Employees of the Employer.

B.    The term "Employee" when used in this Agreement shall refer to the Employees in the bargaining unit described in Article 1, Section 1.1 of this Agreement.

### SECTION 1.2 NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of three members and one alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3 STEWARD SYSTEM

The Company agrees to recognize a steward system.

The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to all the business of the Grievance Procedure as outlined in Article 5 of this Agreement.

If the Employee requests, the Company will call for a steward prior to any disciplinary action taken whether it be written or verbal. The supervisor at the request of the Employee will release the steward as soon as possible. The Company will not be responsible for paying the steward for time spent in this regard.

### SECTION 1.4 MANAGERS AND SALARIED PERSONNEL

Managerial and salaried Employees shall not perform the duties of the Employees in the bargaining unit, except as necessary to fulfill the work under the US Marshals Service contract.

DEPOSITION
EXHIBIT
2
EDDIE MORRIS
COURT REPORTERS, INC
(210) 698-2727

## SECTION 1.5 DUES CHECK-OFF

The Company agrees to deduct monthly dues and lawful assessments as designated by the Union on a monthly basis from the paycheck of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. The Employee upon 30 days' written notice served upon the Company and the Union may revoke such authorization. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to what the Union membership dues are.

The Company will remit all such deductions to the Financial Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name and amount of dues and initiation fees within seven (7) days of each remittance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for Check-Off Dues. The Company shall accept no other form unless the parties mutually agree to the substitution.

## SECTION 1.6 INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representatives nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.

The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

Case 1:01-cv-00072  Document 20  Filed in TXSD on 02/15/2002  Page 109 of 140

# ARTICLE 2

## SENIORITY

### SECTION 2.1 SENIORITY DEFINED

Union seniority shall be the length of continuous service from the Employee's last date of hire or transfer to all sites within Local #108 as a Special Deputy US Marshal Court Security Officer for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the employee has successfully completed his/her probationary period. Seniority shall be applicable in determining the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose his/her union seniority as it applies to the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

### SECTION 2.2 SENIORITY LISTS

Seniority Lists shall be furnished by the Company to the proper Union officials within a reasonable time, upon written request by the Union, each March and September of each contract year. The Union President or the President's designated representative must make the request for these lists to the Company in writing. The updated and current Seniority List shall be posted and maintained by the Company at each work location. An Employee's standing on the posted Seniority List will be final unless protested in writing to the Site Supervisor or Contract Manager in districts where a "Site Supervisor" is not authorized, no later than thirty (30) calendar days after the list has been posted.

### SECTION 2.3 PERSONAL DATA

Employees shall notify the Employer in writing, on the company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

### SECTION 2.4 TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is promoted to a non-bargaining unit position for more than four (4) weeks shall lose his/her union seniority. If he/she returns to the bargaining unit at a later date, his/her seniority will start on that return date.

### SECTION 2.5 PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a ninety (90) day period after their hire date. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers,

suspensions, discipline, layoffs or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement. Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The ninety (90) day period referred to in this section may be extended if the Company encounters a delay in the US Marshals Service performing background checks and granting written authorization on newly hired Employees.

## SECTION 2.6 TERMINATION OF SENIORITY

The seniority of an Employee shall be terminated for any of the following reasons:

a) the Employee quits or retires;
b) the Employee is discharged;
c) a settlement with an Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;
d) the Employee is laid off for a continuous period of one hundred eighty (180) days; or the Government terminates the Employee's credentials as a Special Deputy Marshal, or the Employee is otherwise asked to be removed from working under the Employer's contract with the Government.
e) Employee is permanently transferred out of the bargaining unit.


## ARTICLE 3

## JOB OPPORTUNITIES


## SECTION 3.1 FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of three (3) working days (excluding Saturdays, Sundays and holidays). Shared position Employees at the site where an opening occurs will be notified in writing at their last known address. The Site Supervisor will notify the Union President in writing of such openings. The Union President will then verify that all shared position CSOs have been notified. When a vacancy occurs, the Employer will fill the position with the senior-most Employee, who will be trained if required to fill any necessary qualifications for the new position.

Should the filling of a vacancy under this Article create a second vacancy, that vacancy will be filled under this Article as well. Any Employee who wishes to apply for the open position shall do so in writing. Vacancy postings and vacancy notifications will be site specific, however union posting at other sites in the Local is permitted, i.e., only Employees at the site where the vacancy occurs will be required to be notified.

## SECTION 3.1A SHARED POSITION EMPLOYEES

Shared positions will be filled as described in Section 3.1

## SECTION 3.1B LAYOFF AND RECALL

In the event of layoff or recall, when full-time or shared positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by calling the last laid off Employee first and so on.

## SECTION 3.2 TEMPORARY ASSIGNMENTS

In the interest of maintaining continuous operations, the Employer may temporarily assign an Employee to a vacant or new position until the job is filled in accordance with Articles 2 and 3, including temporarily assigning an Employee to a work site within or outside of the area defined by this Agreement; to the extent feasible the assignment shall be a voluntary selection based on seniority. In the absence of volunteers, assignments shall be made on a reverse seniority basis. Employees so assigned will receive the higher of the base hourly wage available to Employees regularly assigned to the site to which they are being transferred, or their regular hourly wage they receive at their regular site under this Agreement.

Due to the changing work environment, all Employees are subject to assignment anywhere within the district on an as-needed basis from present on-duty personnel. Failure to comply with the aforementioned schedule changes may lead to disciplinary action up to and including dismissal.

## SECTION 3.3 APPOINTMENT OF LEAD CSOs

*may 1*

The US Government in its contract with the Company creates specific guidelines for the selection of Lead CSOs. Based on these criteria, all appointments of Lead CSOs will be made on the basis of ability. Ability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.

# ARTICLE 4

# MANAGEMENT RIGHTS

Except as limited by the specific undertakings expressed in this Agreement, the Company shall continue to have the right to take any action it deems appropriate in the management of the business in accordance with its judgement.

Case 1:01-cv-00072  Document 20  Filed in TXSD on 02/15/2002  Page 112 of 140

# ARTICLE 5

# GRIEVANCE PROCEDURE

## SECTION 5.1 INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any disciplinary action directed by the US Marshals Service or by Judicial personnel. This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties. In addition, the grievance procedures outlined herein shall not apply to any situation where the Company is acting under the directives of the US Marshals Service or any member of the judiciary. In any such situation, however, the Employee will be provided with copies of any written complaints or existing transcripts of verbal complaints that require the Company to take any form of disciplinary action towards the Employee, if the Employee requests such materials. The term "days" shall not include Saturdays, Sundays, or holidays when used in this Article

## SECTION 5.2 GENERAL PROVISIONS

The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.

## SECTION 5.3 GRIEVANCE PROCEDURE

All grievances shall be presented and processed in accordance with the following procedures:

Informal Step - Both the Company and the Union agree that the Employee will first discuss his/her complaint with his/her immediate supervisor within five working (5) days of the incident being grieved to start the informal procedure. If the informal procedure is not invoked within five working days of Employee's knowledge of a grieveable issue, then is agreed by both parties that no further action can be taken. If, during the course of this discussion either the Employee or the supervisor deems it desirable, a steward or other Union representative will be called in. If the complaint is not satisfactorily adjusted within three (3) working days of the informal discussion, it may be submitted in writing to the Contract Manager or his/her designee in accordance with Step One.

Step One - If the matter is not resolved informally, the Employee shall, not later than ten (10) days after the informal discussion with the immediate supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved Employee and the steward, and shall be submitted to the Contract Manager or his/her designee. The Contract Manager or his/her designee shall have ten (10) days from the date the grievance was presented to him/her to return his/her decision in writing with a copy to the aggrieved Employee and the steward.

Step Two - If the grievance is not settled in Step One, the grievance may be appealed in writing to the Director of Human Resources or his/her designee not later than ten (10) days from the denial by the Contract Manager or his/her designee. The Director of Human Resources or his/her designee will have ten (10) days from the date the grievance was presented to him/her, to return his/her decision, in writing, with a copy to the aggrieved Employee and the Steward.

**Grievance for Discipline** - Any grievance involving discharge or other discipline may be commenced at Step One of this procedure. The written grievance shall be presented to the Contract Manager through the Site Supervisor or his/her designee within ten (10) days after the occurrence of the facts giving rise to the grievance.

## SECTION 5.4 ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Akal Director of Human Resources written notice of its desire to proceed to arbitration not later than fifteen (15) days after rejection of the grievance in Step Two. Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:

**Pre-Arbitration Hearing** – The parties agree to hold a pre-arbitration hearing requiring a senior manager of the Company and Union President (or designee) to make a final effort to settle the grievance before arbitration.

**Selection of an Arbitrator** - Within fifteen (15) days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet or telephonically jointly attempt to agree upon the selection of a neutral arbitrator. If, within fifteen (15) days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Mediation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

**Decision of the Arbitrator** - The arbitrator shall commence the hearing at the earliest possible date. The decision of the arbitrator shall be final and binding upon the parties to the Agreement. Any decision shall be complied with, without undue delay after the decision is rendered. It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

**Arbitration Expense** - The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each party to the arbitration will be responsible for its own expenses and compensation incurred in bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

Time Limits - The decision of the arbitrator shall be rendered as soon as possible after the dispute has been submitted to him/her.

## SECTION 5.5 CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6 INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1 GROUNDS FOR DISMISSAL

After completion of the probationary period, no Employee shall be dismissed or suspended without just cause, unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service. The Company's contract with the US Government sets out performance standards for CSOs and all employees are required to comply with these standards.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

## SECTION 7.1 WORKDAY AND WORKWEEK

For the purposes of this Article, a regular workweek of forty (40) hours of work, excluding lunch periods, shall constitute a normal full-time workweek for full-time Employees. Employees working a minimum of eight (8) consecutive hours shall normally receive an unpaid lunch period of at least thirty (30) minutes unless work conditions preclude scheduling of this period. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

## SECTION 7.2 OVERTIME

An overtime rate of time and one-half (1 1/2) of an Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of forty (40) hours in a work week.

## SECTION 7.3 OVERTIME REQUIREMENT

If requested to work overtime (i.e. over forty [40] hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice, the Employee shall be required to do so unless the Employee is excused for good cause.

## SECTION 7.4 OVERTIME DISTRIBUTION

Overtime will be distributed as equitably and fairly as practicable among Employees regularly assigned to the particular work location (including shared position Employees), subject to the direction of the judges and/or Marshals Service. Seniority shall be used in the assignment of overtime, except when the Employer is directed by the US Marshals Service or judges, or in situations dictated by availability of personnel and amount of notice given for overtime.

Excluding: Site Supervisors cannot be assigned to cover CSO overtime positions or posts except in emergency situations, or when directed by the US Marshal Service or judiciary, or in situations dictated by availability of personnel and amount of notice given for overtime. The Company will permit Site Supervisors to work overtime assignments only when there is no bargaining unit member available or in situations described above due to the rapidly changing court environment. The Employer will attempt to rectify overtime inequalities through the future scheduling of overtime work. Overtime records will be made available to the Union by the Company upon request.

## SECTION 7.5 SHARED POSITION EMPLOYEES

Hours of work for shared position Employees shall be determined by the Employer, to insure the orderly and efficient operation of court security services. Shared position Employees shall be required to work all scheduled work hours, unless the Employee is excused for good cause. Shared position Employees will be required to sign the Akal Shared Officer Agreement.

## SECTION 7.6 REST PERIODS

There shall be two (2) fifteen (15) minute paid rest periods when properly relieved and one (1) thirty (30) minute unpaid lunch for each eight (8) hour shift. One rest period shall be in the first half of the shift and the second rest period shall be in the last half of the shift. On occasion, due to exceptional authorized work requirements, Employees may have to work through their unpaid lunch breaks, and, if so, they will be compensated at the appropriate rate of pay. The Company recognizes the requirement to provide regularly scheduled breaks. It is not the intent of the Company to deny, avoid, or abuse this requirement.

## SECTION 7.7 CALL-IN PAY

An Employee called in to work will be guaranteed a minimum of three (3) hours of work or pay.

ARTICLE 8

WAGES

## SECTION 8.1 WAGE SCHEDULE

The base rate of pay for Court Security Officers Southern Texas, Local #108 will be, by site:

**For Houston**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.72 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $16.12 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $16.57 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.88 | $16.25 |

**For Galveston**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.25 |

**For Corpus Christi**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $15.42 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.81 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $16.25 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $16.55 | $15.88 |

**For McAllen, Laredo and Brownsville**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.88 |

| For Victoria | | |
|---|---|---|
| Year | CSO Wage | Lead CSO Wage |
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.50 |
| October 1, 1999-September 30, 2000 | $14.64 | $14.89 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.33 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.63 |

## SECTION 8.2 PAYDAY

Payday for all hourly Employees will be after 11 a.m. on Friday following the pay period ending on Saturday, subject to change by mutual agreement.

## SECTION 8.3 UNDISPUTED ERROR

In case of an undisputed error on the part of the company as to an Employee's rate of pay, proper adjustment will be made from the date the error occurred.

## SECTION 8.4 LEAD CSO RATES

If additional Lead CSOs are added to the contract any time after this Agreement goes into effect, they will be paid the base rate set out above in Section 8.1, based on the location.

## ARTICLE 9

## HOLIDAYS

## SECTION 9.1. HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day.

## SECTION 9.2 MISCELLANEOUS HOLIDAY PROVISIONS

A. A full-time Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift or premium for that holiday. The Employee will be paid holiday pay only if the Employee is not laid off, or on an unpaid leave of absence.

B. Any full-time Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked and in addition shall receive eight (8) hours holiday pay at the straight time rate, providing the Employee meets the requirements above in Section 9.2A.

C. Any shared position Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked plus prorated holiday pay up to 8 hours based on their average weekly hours for the previous four weeks' work.

D. Holiday pay for shared position Employees who do not work on a holiday and meet the eligibility requirements set out in Section 9.2A above shall be paid a proration of the full-time benefit based on their average weekly hours for the previous four weeks' work.

## ARTICLE 10

## VACATIONS

### SECTION 10.1 ELIGIBLE FULL-TIME EMPLOYEES

Eligible full-time Employees shall be entitled to annual vacation pay, based on their continuous years of service with the Employer at their individual hourly rate at the time payment is made in accordance with the following schedule:

| | |
|---|---|
| Upon completion of one year of service: | 80 hours |
| Upon completion of five years of service: | 120 hours |
| Upon completion of 15 years of service: | 160 hours |

### SECTION 10.1a ELIGIBLE SHARED POSITION EMPLOYEES

A. Eligible shared position Employees who work a regular half-time schedule shall be entitled to one-half the full-time vacation benefit at their individual hourly rate.

B. Eligible shared position Employees who work other than a regular part-time schedule shall be entitled to a prorated vacation pay at their individual hourly rate based on the number of hours worked in the previous contract year.

### SECTION 10.2 SCHEDULING VACATIONS

Each Employee who qualifies for a vacation in accordance with the provisions of this Article shall notify his/her Lead CSO, in writing, prior to April 1st of each year of his or her first and second choice for desired vacation periods, if any. If vacation time is required to be used differently than as per requested prior to April 1, Employee must give their immediate supervisor a written request at least seven (7) days prior to the requested vacation time.

```
             ** TX STATUS REPORT **          AS OF   FEB 23 '00 16:12   PAGE.01

                                             USMS BROWNSVILLE


         DATE  TIME        TO/FROM      MODE    MIN/SEC    PGS    CMD#  STATUS
    19   02/23 16:12 956 550 7221       EC--S   00'26"     001          OK
```

## PREAMBLE

THIS AGREEMENT is made and entered into on ___July 8, 1998___ by and between AKAL SECURITY, INCORPORATED, a New Mexico corporation, and its successors, hereinafter referred to as the "Employer" or "Company," and UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, LOCAL #108 hereinafter referred to as the "Union." All non-economic provisions of this contract shall be in effect as of May 1, 1998. All economic provisions of this contract shall be in effect as of 11:45 p.m. on September 30, 1998, including, but not limited to compensation and fringe benefits.

1-800-572-6103

303-650-8515

The Employer will recognize union seniority when scheduling Employees for vacation in accordance with Section 2.1. The Employer will allow the maximum amount of personnel off at any one time for vacation that allows the Company to maintain efficient operations. The final allocation of vacation periods shall rest exclusively with the Employer in order to insure orderly and efficient operations and meet Government contract requirements.

## SECTION 10.3 PAY OPTIONS

Earned vacation pay shall be paid on the pay day following the Employee's return to the job after his/her vacation.

## SECTION 10.4 UNUSED VACATION

Vacations shall not be cumulative from one year to the next. Any earned but unused vacation time remaining at the end of a year of service (i.e. anniversary date of employment) shall be paid to the Employee.

## SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

Any time during the year, Employees may request in writing to be paid for earned vacation pay in lieu of taking actual vacation leave.

## SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employee will be paid at their individual hourly rate for any legally accrued but unused vacation time, as entitled by the Service Contract Act.

## SECTION 10.7 VACATION - LAID OFF EMPLOYEES

Length of service with the Employer shall not accrue for the purposes of vacation benefits while an Employee is on laid-off status.

## SECTION 10.8 VACATION INCREMENTS

Vacation days may be used in one (1) day increments, if so desired by the Employees and approved by the Employer.

ARTICLE 11

LEAVES OF ABSENCE

## SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30

( )                                                        )

days, unless approved by the Employer. Employee on any unpaid leave of absence may be required to use available vacation or personal leave time. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over 30 days. The Employer will make every reasonable effort to maintain an Employee's position while on a non-statutory unpaid leave of absence.

## SECTION 11.2 MEDICAL LEAVE

An Employee shall be granted an unpaid medical leave of absence for a specified period not to exceed 16 weeks within a 12-month period. Employee's disability must be made known to the Employer in accordance with the provisions of this Article, and be supported by a doctor's certificate showing the nature of the illness and the estimated length of time the Employee will be unable to perform his/her job.

The 16-week period may be extended at the discretion of the Employer. During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Employee will be required to use accrued vacation or personal leave time during the medical leave. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work.

## SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated or drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or the Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

## SECTION 11.4 UNION LEAVE

A Union officer or delegate will be granted an unpaid leave of absence upon written request for the purpose of attending Union conventions or other meetings of vital interest to the United Government Security Officers of America. The maximum number of days given for union leave is not to exceed five (5) days per contract year and the maximum number of union officers or delegates to be granted leave of absence is not to exceed two (2) Employees per Local Union.

## SECTION 11.5 FAMILY MEDICAL LEAVE

The Family and Medical Leave Act of 1993 is incorporated herein by reference.

## SECTION 11.6 PERSONAL LEAVE

Each full-time seniority Employee shall be eligible to use a maximum of six (6) days of personal leave (forty-eight hours) per 12-month Government contract year worked. Employees who begin

employment after the inception of the contract year will be eligible to use a prorated amount of personal leave, based upon the following rate (see **Personal Leave Eligibility Table** below):

| Personal Leave Eligibility Table | | | |
|---|---|---|---|
| **START DATE** | **RATE OF PERSONAL LEAVE ELIGIBLE TO USE** | | |
| (Date Employee begins working on the contract, based on an October 1 contract start date.) | **FULL-TIME** | **SHARED POSITION** | |
| October 1-31 | 48 hours | 24 hours | 3 days |
| November 1-30 | 44 hours | 22 hours | 2day 6 Hes |
| December 1-31 | 40 hours | 20 hours | 2days 4 Hr |
| January 1-31 | 36 hours | 18 hours | 2 days 2 He |
| February 1-29 | 32 hours | 16 hours | 2 days |
| March 1-31 | 28 hours | 14 hours | 1 day 6 Hes |
| April 1-30 | 24 hours | 12 hours | 1 day 4 Hes |
| May 1-31 | 20 hours | 10 hours | 1 day 2 Hr |
| June 1-30 | 16 hours | 8 hours | 1 day |
| July 1-31 | 12 hours | 6 hours | . |
| August 1-31 | 8 hours | 4 hours | - |
| September 1-30 | 4 hours | 2 hours | - |

A. Personal days shall be used in not less than four-hour increments and shall be paid when taken by the Employee as approved in advance by the Site Supervisor or District Supervisor.

B. Shared position Employees will receive one-half the full-time personal leave per full contract year worked. At the end of the contract year, any shared position Employee who worked more than half the full-time hours (1,040 hours) will receive additional prorated personal leave based upon the number of actual hours Employee worked during that contract year. Therefore, for each additional 87 hours worked over 1,040 hours during the contract year, Employee will receive an additional 2 hours of personal leave, up to a possible maximum of 48 hours total personal leave for the contract year.

C. Unused personal days shall not be cumulative from year to year. Any unused, earned personal leave pay will be paid to Employee at the end of the contract year.

D. Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that contract year. (Example: An Employee who terminates work after six months at the full-time rate during the current contract year and earns three (3) days personal leave, but only uses two (2) days, would be eligible upon termination to be paid for the third, unused personal day.) If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract (4 hours per full month worked), the amount of the overage will be

deducted from the Employee's final paycheck. (Example: If Employee works only six months and therefore earns three days (24 hours) personal leave, but actually uses four days personal leave, the extra 8 hours' pay will be deducted from Employee's final paycheck.)

E. Personal leave (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least two (2) hours prior to the beginning of his/her regular shift in order to be eligible for paid personal leave benefits. <u>Disciplinary action may result from excessive, unapproved absenteeism.</u>

## SECTION 11.7 PROCESSING LEAVES OF ABSENCE

A leave of absence must be processed in the following manner:

A. All requests for any unpaid leaves of absence shall be submitted in writing to the Site Supervisor at least ten (10) calendar days prior to the date that the leave will take effect, except in cases of emergencies, and shall include:

1. The reasons for such leave;
2. The effective dates of such leave;
3. The estimated date of return to work.

B. The written request for leave of absence shall be submitted to the Contract Manager by the Site Supervisor for final approval.

C. If the request for the leave of absence is approved by the Contract Manager, a copy of the approved leave of absence will be given to the Employee involved.

D. Extensions of the leave of absence may be granted at the discretion of the Employer upon written request by the Employee within ten (10) calendar days prior to the expiration of the leave of absence when feasible. Extensions when granted shall not total more than thirty (30) days.

## SECTION 11.9 BEREAVEMENT LEAVE

All non-probationary Employees shall be entitled to three days unpaid bereavement leave per full Government contract year for purposes of attending, on a day normally scheduled to work, the funeral of a parent, parent-in-law, spouse, child, sibling, or sibling-in-law. Employee will notify Lead CSO, whenever possible, of the need for bereavement leave.

## SECTION 11.10 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of Article 2 of this Agreement.

# ARTICLE 12

## HEALTH, WELFARE AND UNIFORM ALLOWANCES

### SECTION 12.1 PAYMENTS

For the life of this Agreement, the Employer will make health and welfare payments to Employees on all hours paid up to forty (40) hours per week in accordance with the following schedule at the hourly rate:

| | |
|---|---|
| Effective October 1, 1998 through September 30, 1999 | $1.41/hour |
| Effective October 1, 1999 through September 30, 2000 | $1.66/hour |
| Effective October 1, 2000 through September 30, 2001 | $1.91/hour |
| Effective October 1, 2001 through September 30, 2002 | $2.00/hour |

### SECTION 12.2 MINIMUM BENEFITS

The amounts required by Section 12.1 shall serve as the minimum health and welfare benefits for Employees.

### SECTION 12.3 OTHER BENEFITS

The Employer will offer Employees the opportunity to participate in other Employee-paid fringe benefit programs made available to all Court Security Officers employed by the Company. These programs include cafeteria plans, payroll deduction plans, retirement plans, insurance plans, 401(k) plans, and any other plan mentioned in this Agreement.

### SECTION 12.4 UNIFORM MAINTENANCE

The Employer will pay the Employee $.10625 per hour worked up to 40 hours per week for uniform maintenance allowance. A shoe allowance of $62.50 per contract year will be sent with uniforms annually for the purchase of USMS-required CSO uniform shoes.

### SECTION 12.5 GROUP DISABILITY INSURANCE

The Company agrees to deduct any fees or premium payments and lawful assessments designated by the Union for a Group Disability Insurance plan set up by and administered by the Union from the first paycheck of each month of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. Such authorization may be revoked by the Employee upon 30 days' written notice served upon the Company and the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to amount of fees, and any other costs for this insurance.

The Company will remit all such deductions to the International Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit would be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the International Secretary/Treasurer with a deduction list, setting forth the name and amount of fees, and any other costs for this insurance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are corrective and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for insurance deductions. The Company shall accept no other form unless the parties mutually agree to a substitute.


## ARTICLE 13

## MISCELLANEOUS PROVISIONS

### SECTION 13.1 BULLETIN BOARDS

The Employer will make its best effort to obtain a space from the government for the use of the CSOs to locate a Union-provided bulletin board that will be used by the Union for posting notices pertaining to Union affairs. The providing of these facilities is the prerogative of the US Government.

### SECTION 13.2 PHYSICAL EXAMINATIONS

The Employer shall pay for all physical/medical examinations that are required by the Employer at Employer designated clinic(s) or physicians. In those selected areas where there is not a designated clinic or physician, the Employer will provide an allowance to the Employee of up to a maximum of eighty dollars ($80) per examination. Receipts must be furnished by Employee in order to process reimbursement.

Physical/medical exams may be required by operation of the government contract or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic, at its discretion. Employer shall pay Employee up to two hours for time spent taking an employer-requested medical examination.

### SECTION 13.3 TRAVEL EXPENSES

The Company will provide advance payments for approved travel expenses if requested by an Employee. Any hours to include travel over twelve (12) hours will require the Employee to stay

overnight and the appropriate per diem will be paid. All hours in travel will be counted as work hours with the appropriate overtime wages provided for under Article 7 of this Agreement. Employees will be reimbursed for all authorized expenditures of any authorized travel within twenty (20) days from the day Employer receives the travel voucher and all required receipts.

## SECTION 13.4 BREAK ROOMS

The Employer will make its best effort to obtain from the government break rooms for CSOs for breaks and lunch without management using the room as an office and will make its best effort to have the government equip the room with water. The providing of these facilities is the prerogative of the US Government.

## SECTION 13. 5 LOCKERS

The Employer will make its best effort to obtain lockers from the government for the use of the CSOs. The providing of these facilities is the prerogative of the US Government.

## SECTION 13.6 UNION MEETINGS

Neither Union officials nor Union members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings of any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances to the extent such work time activity is specifically allowed by the Employer.

## ARTICLE 14

## 401 (k) PLAN

## SECTION 14.1 401 (K) PLAN

The Company shall provide a 401(k) plan to which Court Security Officers are eligible to contribute, whether Union or Non-Union. Employees shall be subject to the eligibility requirements and rules of the Plan.

## ARTICLE 15

## TRAINING

## SECTION 15.1 TRAINING

The Company will make its best effort to implement its advanced CSO training program to enhance the professional capabilities of the Employees. Actual scheduling of training is subject to approval by the US Government and may be subject to funding by the US Government.

# ARTICLE 16

## SAFETY

### SECTION 16.1 SAFETY POLICY

It is the policy of the Company to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. The Company agrees to permit one (1) bargaining unit member selected by the Union to participate in any locally scheduled safety meetings.

### SECTION 16.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any government provided CSO work stations and break rooms.

## ARTICLE 17

## CONTINUITY OF OPERATIONS

### SECTION 17.1 NO STRIKES

Both the Company and the Union agree that continuity of operations is of utmost importance to the Company's security operations. Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns or secondary boycotts during the term of this Agreement and that the Union will not cause, nor permit its members to cause, nor will any member of the Union take part in, any strike, including a sympathy strike, slowdown, stoppage of work, planned inefficiency or any other curtailment of work or restriction or interference with the Employer's or Government's operations for any reason whatsoever. Nor will the Union authorize or sanction the same.

Upon hearing of any unauthorized strike, slowdown, stoppage or work, planned inefficiency or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such activity to a prompt termination. Any Employee who violates this provision may be immediately discharged. Furthermore, it is agreed and understood that in addition to other remedies, the provisions of this Article may be judicially enforced including specific performance by way of injunctive relief.

### SECTION 17.2 LOCKOUTS

During the life of this Agreement, the Employer shall not lockout any Employees covered in this Agreement.

# ARTICLE 18

## SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, such parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to the decree or government statutes so long as they shall remain legally effective. It is the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

# ARTICLE 19

## SERVICE CONTRACT PROCEDURES AND OBLIGATIONS

The parties recognize that they are providing a service to the Unites States Government. Therefore, the terms of this agreement are subject to the directives of the Government, and, except as provided herein, there shall be no recourse against the Employer with regard to its actions taken to comply with those directives. In the event a directive necessitates a deviation from the obligations or procedures contained in this Agreement, the Union may request that the parties hereto meet and confer with regard to the effects, if any, of the deviation necessitated by the Government's directive. A copy of a written directive covered by this provision shall be provided to the International UGSOA president upon request.

# ARTICLE 20

## ENTIRE AGREEMENT

The parties acknowledge that during the negotiation which resulted in the Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and all understandings and agreements reach by the parties are set forth in this Agreement. Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the term of this Agreement except as specifically provided for in other provisions of this Agreement.

# ARTICLE 21

## DURATION

This Agreement shall be effective upon its execution by both parties and supersedes any and all prior agreements or understandings between the parties. The Agreement shall remain in force until 2400 hours on September 30, 2002 with the provision that should either party desire to terminate this Agreement or any provision thereof, it shall give written notice to the other party of not less than sixty (60) days and not more than seventy-five (75 days) prior to the expiration. In the event such notice is given, the existing Agreement may be continued by mutual consent of both parties until an Agreement is reached. This Agreement may also be changed or amended by agreement of both parties.

IN WITNESS WHEREOF, the parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _____

TITLE: _PRESIDENT_____

DATE: _July 8, 1998_____

FOR:
AKAL SECURITY, INC.

BY: _____

TITLE: _SR V.P._____

DATE: _July 9, 1998_____

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _____

TITLE: _Secretary / Treasurer_

DATE: _July 8, 1998_____

BY: _____

TITLE: _Int'l Sec.-Treas._

DATE: _7-8-98_____

FOR:
AKAL SECURITY, INC.

BY: _____

TITLE: _Dir. HR_____

DATE: _7/8/98_____

BY: _____

TITLE: _____

DATE: _____

** TOTAL PAGE.11 **

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF ROY ZEPEDA

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

I, Roy Zepeda, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.     My name is Roy Zepeda and I am employed by Akal Security, Inc. as the Lead Court Security Officer ("CSO") in the United States District Court, Southern District of Texas, Brownsville Division. In that capacity, I oversee the Court Security Officers in the United Sates District Court - Brownsville Division. However, I do not have the authority to make employment decisions. In my position, I report all employment situations to the Site Supervisor for the Southern District, Mr. Louis McDaniel. Mr McDaniel and other Akal officials are charged with the responsibility of making employment decisions. I have been employed by Akal since June 7, 1999.

2.     On or about August 19, 1999, CSO Lana Besterio reported to me that that she had observed Court Security Officers Allen Fry having a difficult time navigating the stairs. Because of Akal's duty to ensure that all CSOs, including Fry, are fit for duty, I reported the information I

received from CSO Besterio to my Site Supervisor Louis McDaniel. McDaniel then faxed me a letter to present to Fry which informed Fry that he was required to take a physical examination to determine fitness for duty. The letter did not relieve Fry of his duties or take any employment action against Fry. The letter merely required Fry to schedule an appointment to have a physical examination. A true and correct copy of the letter is attached hereto.

3.     On August 20, 1999, I presented Fry with the letter. Fry became very upset, laid his firearm, extra ammunition, credentials, and handcuffs on my desk. Fry told me that he did not need "this crap" and that he was getting $45,000.00 from his retirement, and began to leave the building. Fry left the premises and did not report to his assignment at his scheduled time. I asked Fry if he was resigning and I did not hear Fry respond. I understood Fry to have resigned his job.

4.     I immediately reported to McDaniel that Fry had resigned his CSO position. I explained to McDaniel that Fry had turned his gear, told me that he did not need "this crap" and that he was getting $45,000.00 from his retirement, and left the building.

5.     McDaniel instructed me to begin the process of filling Fry's CSO position. I immediately contacted Emilio Escobedo, a CSO applicant, to determine whether Mr. Escobedo was still interested in the position. Mr. Escobedo expressed interest in the position and I informed him that he would submit his application to the USMS for approval. At that time, Mr. Escobedo was 57 years old.

6.     Later that day, at around 3:00 p.m., Fry returned to the courthouse and informed me that he was willing to take the physical examination. I explained to Fry that I considered Fry to have resigned and that he would have to talk with McDaniel. I relayed to McDaniel that Fry had returned and was now willing to take the physical examination. McDaniel asked me if I had contacted any CSO applicants and I informed him that I had already contacted Emilio Escobedo to fill Fry's position.

7.     After discussing the issue with other Akal officials, McDaniel called me and informed me that it was decided that Fry would not be allowed to return since he had resigned,

Akal's company policy is to not allow employees to return to work after they walk off the job, and the process of filling the vacant position had already been initiated.

8.     I informed Fry that he was no longer employed by Akal due to his resignation.

I have read this affidavit which consists of three pages, including this page, and have been given an opportunity to make any corrections. I have given this affidavit voluntarily and of my own free choice and, by my signature below, swear that it is true and correct.

_2/12/02_
Date

_Roy Zepeda_ (signature)
Roy Zepeda

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid Roy Zepeda on this the 12th day of February, 2002, to certify which witness my hand and seal of office.

_Maria Luisa Perez_ (signature)
Notary Public, in and for the State of Texas

My commission expires: _2/16/03_

MARIA LUISA PEREZ
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEB. 16, 2003

# UNITED STATES MARSHALS SERVICE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**DATE:**  August 20, 1999

**TO:**  Louis McDaniel, Site Supervisor

**FROM:**  Roy Zepeda, LCSO

**SUBJECT:**  Alan Fry, CSO

Louis,

Today, Friday August 20, 1999, I spoke to CSO Alan Fry. I showed Mr. Fry your letter that requested he have a medical exam done by an impartial doctor. Mr. Fry began shaking, and it was so strong that I was afraid something was going to happen to him. When Mr. Fry finished reading the letter, and after he spoke to you by phone, he took off his weapon, equipment and credentials and laid them on my desk. I asked him if he was resigning, but he didn't answer me. I asked him if he had been fired, and he said no. He said that this was age discrimination and that he was going to talk to his lawyer, and then Mr. Fry walked out. Since Mr. Fry turned in all of his things, I took that to mean he had quit.

I took Mr. Fry's equipment, weapon, and credentials and turned them over to DUSM Lily Medina.

Respectfully,

Roy Zepeda, LCSO

cc: Robert Cervantes, SDUSM

At al Internal 00256

Date.   20-August-1999

To      CSO Allen H  Fry

From:   Louis McDaniel
        Site Supervisor
        Southern Texas
        Akal Security, Inc

Akal Security, Inc. is requesting that you take a physical under the conditions of the contract signed between U.S  Justice Department and Akal Security, Inc  MS-98-D-0005 Section C 14.0 CONTRACTOR CONTINUING RESPONSIBILITY TO PROVIDE SUITABLE CSOs  An appointment will be set up for you by the LCSO this will be in accordance with the doctor's appointment schedule. Please take this letter with you for the doctor to sign along with SF #78 to also be filled out

To.     Examining Physician

Court Security Officers are required to be in good physical condition due to strenuous duties. Persons in these positions are required to make arrest, restore order, and protect federal judges, jurors, court personnel and the general public in case of riot or mob situations  They are subject to irregular hours of standing or walking for long periods of time. The general physical conditions must in no way involve any defect which might become a hazard to themselves or others

```
------------------------------------
```
Doctor's Signature

Doctors comment



DEPOSITION
EXHIBIT
6
EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

# UNITED STATES MARSHALS SERVICE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

**DATE:**     August 20, 1999

**TO:**       Louis McDaniel, Site Supervisor

**FROM:**     Roy Zepeda, LCSO

**SUBJECT:**  Alan Fry, CSO

Louis,

Today, Friday August 20, 1999, I spoke to CSO Alan Fry. I showed Mr. Fry your letter that requested he have a medical exam done by an impartial doctor. Mr. Fry began shaking, and it was so strong that I was afraid something was going to happen to him. When Mr. Fry finished reading the letter, and after he spoke to you by phone, he took off his weapon, equipment and credentials and laid them on my desk. I asked him if he was resigning, but he didn't answer me. I asked him if he had been fired, and he said no. He said that this was age discrimination and that he was going to talk to his lawyer, and then Mr. Fry walked out. Since Mr. Fry turned in all of his things, I took that to mean he had quit.

I took Mr. Fry's equipment, weapon, and credentials and turned them over to DUSM Lily Medina.

Respectfully,

Roy Zepeda, LCSO

cc: Robert Cervantes, SDUSM

Akal Internal 00256

AUG 20 '99 14:31 FR USI COMMAND CENTER 713 718 1828 TO J. JIMBERLY   P.04/05

# POSTED

nxt
PR.

## COURT SECURITY OFFICER
## TRANSFER/RESIGNATION/TERMINATION SHEET

This form should be completed and forwarded to the Chief, CSO Program, with any required paperwork, whenever a CSO resigns or is terminated by the Contractor or Contracting Officer for any reason.

DISTRICT: Southern          DATE SUBMITTED: 08/20/99

FACILITY ADDRESS: Brownsville/600 East Harrison rm 1017 Brownsville Tx 78520

### INFORMATION ON CSO

NAME OF CSO: Allen H. Fry

SSN: 558 34 7396

DATE OF TRANSFER/RESIGNATION/TERMINATION: 8/20/99

WORK SITE ADDRESS: 600 East Harrison rm 1017
Brownsville Tx 78520

REASON FOR LEAVING: retired

REMARKS:

CSO FORM 009
(March 1997)

Akal Internal 00258

# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and ALLEN FRY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF RAQUEL G. PÉREZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

I, Raquel G. Pérez, am over eighteen years of age and am competent to make this affidavit. Having first been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge, true and correct.

1.      I am an attorney of record for Akal Security, Inc., Defendant in the above-entitled and numbered action. On behalf of Defendant, I took the oral deposition of Plaintiff Allen Fry on December 10, 2001, before a certified shorthand court reporter and notary public in and for the state of Texas.

2.      We have received copies of the court reporter's transcript of the oral deposition of Allen Fry together with the exhibits attached thereto.

3.      Attached to Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Allen Fry are excerpted portions of the transcript and selected exhibits of the deposition of Allen Fry. I certify that the transcript excerpts and selected deposition exhibits attached to Defendant's Motion for Summary Judgment on Claims Asserted by Plaintiff Allen Fry are true

and correct copies of the transcription and exhibits of said deposition provided to us by the court

reporter.

I have read this affidavit which consists of two pages, including this page, and have been

given an opportunity to make any corrections.  I  have given this affidavit voluntarily and of my

own free choice and, by my signature below, swear that it is true and correct.



_February 14, 2002_
Date

Raquel G. Pérez

SWORN TO AND SUBSCRIBED before the undersigned notary public by the aforesaid
Raquel G. Pérez on this the 14th day of February, 2002, to certify which witness my hand and
seal of office.



Notary Public, in and for the State of Texas

My commission expires: _9 - 1 - 02_

JANET WILLSON
Notary Public, State of Texas
My Commission Expires 09-01-2002