IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ALLEN FRY and MIGUEL LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-CV-72 |
| | § | |
| AKAL SECURITY, INC., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S OBJECTIONS AND ANSWERS TO
PLAINTIFF MIGUEL LOPEZ' FIRST SET OF INTERROGATORIES**

TO:    Plaintiff Miguel Lopez
By and through his counsel of record:
Michael R. Cowen
Suite A
765 East 7th Street
Brownsville, Texas 78520

NOW COMES Akal Security, Inc., Defendant in the above-styled civil action, and makes

the following Objections and Answers to Plaintiff's First Set of Interrogatories.

Dated: January 8, 2002

Respectfully submitted,

Raquel G. Pérez
Attorney-in-Charge
State Bar No. 00784746
Southern District Bar No. 19187
J. Tullos Wells
State Bar No. 21146500
Southern District Bar No. 8337
Bracewell & Patterson, L.L.P.
106 South St. Mary's Street
Suite 800
San Antonio, Texas 78205
Telephone: (210) 226-1166
Facsimile: (210) 226-1133

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendant's Objections and Answers to Plaintiff Miguel Lopez' First Set of Interrogatories is being sent by facsimile and certified mail, return receipt requested, to counsel of record for Plaintiff, Michael R. Cowen, 765 East 7th Street, Suite A, Brownsville, Texas 78520 on this the 8th day of January, 2002.

Raquel G. Pérez

## DEFENDANT'S OBJECTIONS AND ANSWERS
## TO PLAINTIFF MIGUEL LOPEZ'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1**: Did you terminate Miguel Lopez's employment? If so, please state when you did so, and all the reasons that you did so.

**ANSWER**:    Defendant objects to this Interrogatory as overly broad to the extent that it asks Defendant to state "all the reasons that you did so."

Subject to and without waiving the foregoing objection, Defendant responds as follows: Defendant terminated Plaintiff Lopez's employment on or about January 6, 2000 based on the circumstances surrounding an incident on December 14, 1999, in which Plaintiff permitted FBI agents to enter the federal courthouse building without requiring them to secure their weapons. *See* Defendant's Statement of Position and Plaintiff's termination letter which are being produced by Defendant.

**INTERROGATORY NO. 2**: For every person who worked as a CSO at the Brownsville Federal Courthouse from January 1, 1996 to the present, please state that person's:

    a.     name;

    b.     date of birth;

    c.     dates of employment;

    d.     rate of pay;

    e.     current or last known address;

    f.     current of [sic] last known telephone number.

**ANSWER**:    Defendant objects to this Interrogatory on the grounds that it is over broad in time in that it seeks information spanning a period of 5 years and post-dates Plaintiff Miguel Lopez's separation from employment with Defendant.

Defendant further objects on the grounds that this Interrogatory seeks information which is irrelevant to the claims made by Plaintiff Lopez in this action and not reasonably calculated to lead to the discovery of admissible evidence. For example, rate of pay is not at issue in this lawsuit.

Defendant further objects to this Request to the extent that it seeks private and confidential information relating to persons other than Plaintiffs and thus constitutes an unwarranted invasion of privacy.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

| Name | Date of Birth | Start Date | End Date |
|------|---------------|------------|----------|
| Lana L. Besteiro | 04/29/43 | 05/03/99 | |
| Emilio Escobedo | 12/18/42 | 10/20/99 | |
| Daniel Figeroa | 06/30/52 | 11/15/99 | |
| Allen Fry | 02/07/28 | 01/06/93 | 08/20/99 |
| Pablo Infante | 07/19/24 | 01/06/93 | 11/06/00 |
| Ramon Longoria | 01/06/30 | 06/07/99 | |
| Miguel Lopez | 05/08/29 | 10/15/95 | 01/06/00 |
| Karl R. Oakley | 04/16/36 | 08/19/92 | |
| Ruben C. Salinas | 03/12/48 | 11/23/98 | |
| William Sherrill | 09/24/31 | 03/01/84 | |
| Roy Zepeda | 09/29/52 | 06/07/99 | |

**INTERROGATORY NO. 3**: Did Miguel Lopez perform satisfactorily in his CSO position? If not, what was unsatisfactory about his position.

**ANSWER**:    Defendant objects on the ground that this Interrogatory is overly broad in that it is not limited in time.

Subject to and without waiving the foregoing objections, Defendant responds as follows: Plaintiff Lopez did not perform his duties satisfactorily. *See* documents produced by Defendant in response to Plaintiffs' Request for Production, including Defendant's Position Statement to the EEOC and Plaintiff's termination letter.

**INTERROGATORY NO. 4**: Has anyone ever sued, or filed a complaint against, Akal Security, Inc. alleging age discrimination? If so, for each such lawsuit and/or complaint, please state:

a.      The name, address, and telephone number of the complainant;

b.      When they made the complaint;

c.   The cause number or EEOC number, and where the complaint was made or the lawsuit was filed;

d.   The outcome of the lawsuit or complaint.

**ANSWER**:   Defendant objects to this Interrogatory to the extent that it seeks documents or other information protected by the attorney-client privilege, work product privilege, documents prepared in anticipation of litigation, or documents that are otherwise exempt from discovery. Fed. R. Civ. P. 26(b).

Defendant further objects to this Interrogatory to the extent that it requests information which is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. Complaints of age discrimination filed by other individuals, if any, are unrelated to Plaintiff's individualized claims of age discrimination in this action.

Defendant further objects on the ground that this Interrogatory is over broad and unduly burdensome in that it is not limited in time, location, work unit or by personnel action (i.e., termination).

Defendant further objects to this Interrogatory on the ground that it is vague.

Subject to and without waiving the foregoing objections, Defendant responds as follows: With the exception of the Plaintiffs in the instant suit, there have been no EEOC/TCHR discrimination charges or lawsuits alleging age discrimination from the facility at which Plaintiff Lopez was employed.

**INTERROGATORY NO. 5**: Has any other CSO employed by Akal Security, Inc. ever allowed a federal law enforcement officer to enter a courthouse carrying a firearm? If so, please state where the incident occurred, when it occurred, the name of the CSO involved, and what action was taken against the CSO.

**ANSWER**:   Defendant objects to this Interrogatory on the ground that it is over broad and unduly burdensome in that it is not limited in time, location, or work unit.

Defendant further objects on the ground that this Interrogatory seeks information which is irrelevant to the claims made by Plaintiff Lopez in this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to this Request to the extent that it seeks private and confidential information relating to persons other than Plaintiffs and thus, if produced, would constitute an unwarranted invasion of privacy.

Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant is not aware of any other such incident.

**INTERROGATORY NO. 6**: What instructions and/or training had you given Miguel Lopez with respect to whether federal law enforcement officers were allowed to take their firearms into the Federal Courthouse?

**ANSWER**:     Defendant objects to this Interrogatory on the ground that it is overly broad and unduly burdensome in that it is not limited in time.

Defendant further objects to this Interrogatory to the extent that the information requested is equally available to Plaintiff.

Subject to and without waiving the foregoing objections, Defendant responds as follows:  Post orders were issued by the US Marshal H.A. Confreres for all of South Texas. *See* Post Orders being produced by Defendant as well as Plaintiff's deposition testimony on this issue.

STATE OF TEXAS         §
                             §
COUNTY OF HARRIS      §

## VERIFICATION

BEFORE ME, the undersigned notary public, on this day personally appeared Louis McDaniel, who, being by me duly sworn, on his oath, deposed and stated that he is over twenty-one years of age; duly qualified and authorized in all respects to make this affidavit; that he has read the foregoing document entitled Defendant's Objections and Answers to Plaintiff Miguel Lopez' First Set of Interrogatories; that he either has personal knowledge of the facts upon which the foregoing answers are based, or he has access to records and information upon which said answers are made; that he is authorized to answer these interrogatories on behalf of Defendant; and to the extent he is required to verify the answers under the Federal Rules of Civil Procedure, the foregoing answers are true and correct.


                                         LOUIS McDANIEL


SUBSCRIBED AND SWORN TO BEFORE ME this ____ day of January 2002, to certify which witness my hand and official seal.

Notary Public, State of Texas

ANA I. RUIZ
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
09-08-2003

# Exhibit 4

# ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1 RECOGNITION-BARGAINING UNIT

A.  The Employer hereby recognizes the Union as the sole and exclusive bargaining agent for the purpose of collective bargaining as outlined in this Agreement, with respect to wages, hours, overtime, leaves of absence, uniform allowances and any and all other conditions of employment for all full-time and regular shared position USMS credentialed court security officers (CSOs), lead court security officers, and assistant lead court security officers assigned to the federal courthouses and other United States Justice Department related office buildings pursuant to the Employer's contract(s) with the United States Marshals Service for security within the jurisdictional boundaries of the Southern District of Texas, excluding all managers, supervisors as defined by the NLRB, office and/or clerical Employees, temporarily assigned Employees and substitute Employees and all other Employees of the Employer.

B.  The term "Employee" when used in this Agreement shall refer to the Employees in the bargaining unit described in Article 1, Section 1.1 of this Agreement.

### SECTION 1.2 NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of three members and one alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3 STEWARD SYSTEM

The Company agrees to recognize a steward system.

The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to all the business of the Grievance Procedure as outlined in Article 5 of this Agreement.

If the Employee requests, the Company will call for a steward prior to any disciplinary action taken whether it be written or verbal. The supervisor at the request of the Employee will release the steward as soon as possible. The Company will not be responsible for paying the steward for time spent in this regard.

### SECTION 1.4 MANAGERS AND SALARIED PERSONNEL

Managerial and salaried Employees shall not perform the duties of the Employees in the bargaining unit, except as necessary to fulfill the work under the US Marshals Service contract.

DEPOSITION
EXHIBIT
2
EDDIE MORRIS
COURT REPORTERS, INC.
(210) 698-2727

## SECTION 1.5 DUES CHECK-OFF

The Company agrees to deduct monthly dues and lawful assessments as designated by the Union on a monthly basis from the paycheck of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. The Employee upon 30 days' written notice served upon the Company and the Union may revoke such authorization. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to what the Union membership dues are.

The Company will remit all such deductions to the Financial Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name and amount of dues and initiation fees within seven (7) days of each remittance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for Check-Off Dues. The Company shall accept no other form unless the parties mutually agree to the substitution.

## SECTION 1.6 INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient operation. The Union and the Company agree that they will use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company, and that neither their representatives nor their members will intimidate, coerce or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union. Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, or disability.

The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

## ARTICLE 2

## SENIORITY

### SECTION 2.1 SENIORITY DEFINED

Union seniority shall be the length of continuous service from the Employee's last date of hire or transfer to all sites within Local #108 as a Special Deputy US Marshal Court Security Officer for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the employee has successfully completed his/her probationary period. Seniority shall be applicable in determining the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose his/her union seniority as it applies to the order of layoff and recall, vacation schedules, extra work and other matters as provided for in this Agreement.

### SECTION 2.2 SENIORITY LISTS

Seniority Lists shall be furnished by the Company to the proper Union officials within a reasonable time, upon written request by the Union, each March and September of each contract year. The Union President or the President's designated representative must make the request for these lists to the Company in writing. The updated and current Seniority List shall be posted and maintained by the Company at each work location. An Employee's standing on the posted Seniority List will be final unless protested in writing to the Site Supervisor or Contract Manager in districts where a "Site Supervisor" is not authorized, no later than thirty (30) calendar days after the list has been posted.

### SECTION 2.3 PERSONAL DATA

Employees shall notify the Employer in writing, on the company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

### SECTION 2.4 TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is promoted to a non-bargaining unit position for more than four (4) weeks shall lose his/her union seniority. If he/she returns to the bargaining unit at a later date, his/her seniority will start on that return date.

### SECTION 2.5 PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a ninety (90) day period after their hire date. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers,

suspensions, discipline, layoffs or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement. Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The ninety (90) day period referred to in this section may be extended if the Company encounters a delay in the US Marshals Service performing background checks and granting written authorization on newly hired Employees.

## SECTION 2.6 TERMINATION OF SENIORITY

The seniority of an Employee shall be terminated for any of the following reasons:

a) the Employee quits or retires;
b) the Employee is discharged;
c) a settlement with an Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;
d) the Employee is laid off for a continuous period of one hundred eighty (180) days; or the Government terminates the Employee's credentials as a Special Deputy Marshal, or the Employee is otherwise asked to be removed from working under the Employer's contract with the Government.
e) Employee is permanently transferred out of the bargaining unit.


# ARTICLE 3

## JOB OPPORTUNITIES


## SECTION 3.1 FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of three (3) working days (excluding Saturdays, Sundays and holidays). Shared position Employees at the site where an opening occurs will be notified in writing at their last known address. The Site Supervisor will notify the Union President in writing of such openings. The Union President will then verify that all shared position CSOs have been notified. When a vacancy occurs, the Employer will fill the position with the senior-most Employee, who will be trained if required to fill any necessary qualifications for the new position.

Should the filling of a vacancy under this Article create a second vacancy, that vacancy will be filled under this Article as well. Any Employee who wishes to apply for the open position shall do so in writing. Vacancy postings and vacancy notifications will be site specific, however union posting at other sites in the Local is permitted, i.e., only Employees at the site where the vacancy occurs will be required to be notified.

## SECTION 3.1A SHARED POSITION EMPLOYEES

Shared positions will be filled as described in Section 3.1

## SECTION 3.1B LAYOFF AND RECALL

In the event of layoff or recall, when full-time or shared positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by calling the last laid off Employee first and so on.

## SECTION 3.2 TEMPORARY ASSIGNMENTS

In the interest of maintaining continuous operations, the Employer may temporarily assign an Employee to a vacant or new position until the job is filled in accordance with Articles 2 and 3, including temporarily assigning an Employee to a work site within or outside of the area defined by this Agreement; to the extent feasible the assignment shall be a voluntary selection based on seniority. In the absence of volunteers, assignments shall be made on a reverse seniority basis. Employees so assigned will receive the higher of the base hourly wage available to Employees regularly assigned to the site to which they are being transferred, or their regular hourly wage they receive at their regular site under this Agreement.

Due to the changing work environment, all Employees are subject to assignment anywhere within the district on an as-needed basis from present on-duty personnel. Failure to comply with the aforementioned schedule changes may lead to disciplinary action up to and including dismissal.

## SECTION 3.3 APPOINTMENT OF LEAD CSOs
*may 1*
The US Government in its contract with the Company creates specific guidelines for the selection of Lead CSOs. Based on these criteria, all appointments of Lead CSOs will be made on the basis of ability. Ability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.


## ARTICLE 4

## MANAGEMENT RIGHTS


Except as limited by the specific undertakings expressed in this Agreement, the Company shall continue to have the right to take any action it deems appropriate in the management of the business in accordance with its judgement.

# ARTICLE 5

## GRIEVANCE PROCEDURE

### SECTION 5.1 INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any disciplinary action directed by the US Marshals Service or by Judicial personnel. This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties. In addition, the grievance procedures outlined herein shall not apply to any situation where the Company is acting under the directives of the US Marshals Service or any member of the judiciary. In any such situation, however, the Employee will be provided with copies of any written complaints or existing transcripts of verbal complaints that require the Company to take any form of disciplinary action towards the Employee, if the Employee requests such materials. The term "days" shall not include Saturdays, Sundays, or holidays when used in this Article

### SECTION 5.2 GENERAL PROVISIONS

The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.

### SECTION 5.3 GRIEVANCE PROCEDURE

All grievances shall be presented and processed in accordance with the following procedures:

Informal Step - Both the Company and the Union agree that the Employee will first discuss his/her complaint with his/her immediate supervisor within five working (5) days of the incident being grieved to start the informal procedure. If the informal procedure is not invoked within five working days of Employee's knowledge of a grieveable issue, then is agreed by both parties that no further action can be taken. If, during the course of this discussion either the Employee or the supervisor deems it desirable, a steward or other Union representative will be called in. If the complaint is not satisfactorily adjusted within three (3) working days of the informal discussion, it may be submitted in writing to the Contract Manager or his/her designee in accordance with Step One.

Step One - If the matter is not resolved informally, the Employee shall, not later than ten (10) days after the informal discussion with the immediate supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved Employee and the steward, and shall be submitted to the Contract Manager or his/her designee. The Contract Manager or his/her designee shall have ten (10) days from the date the grievance was presented to him/her to return his/her decision in writing with a copy to the aggrieved Employee and the steward.

Step Two - If the grievance is not settled in Step One, the grievance may be appealed in writing to the Director of Human Resources or his/her designee not later than ten (10) days from the denial by the Contract Manager or his/her designee. The Director of Human Resources or his/her designee will have ten (10) days from the date the grievance was presented to him/her, to return his/her decision, in writing, with a copy to the aggrieved Employee and the Steward.

Grievance for Discipline - Any grievance involving discharge or other discipline may be commenced at Step One of this procedure. The written grievance shall be presented to the Contract Manager through the Site Supervisor or his/her designee within ten (10) days after the occurrence of the facts giving rise to the grievance.

## SECTION 5.4 ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Akal Director of Human Resources written notice of its desire to proceed to arbitration not later than fifteen (15) days after rejection of the grievance in Step Two. Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:

Pre-Arbitration Hearing – The parties agree to hold a pre-arbitration hearing requiring a senior manager of the Company and Union President (or designee) to make a final effort to settle the grievance before arbitration.

Selection of an Arbitrator - Within fifteen (15) days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet or telephonically jointly attempt to agree upon the selection of a neutral arbitrator. If, within fifteen (15) days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Mediation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

Decision of the Arbitrator – The arbitrator shall commence the hearing at the earliest possible date. The decision of the arbitrator shall be final and binding upon the parties to the Agreement. Any decision shall be complied with, without undue delay after the decision is rendered. It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

Arbitration Expense - The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each party to the arbitration will be responsible for its own expenses and compensation incurred in bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

**Time Limits** - The decision of the arbitrator shall be rendered as soon as possible after the dispute has been submitted to him/her.

## SECTION 5.5 CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6 INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1 GROUNDS FOR DISMISSAL

After completion of the probationary period, no Employee shall be dismissed or suspended without just cause, unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service. The Company's contract with the US Government sets out performance standards for CSOs and all employees are required to comply with these standards.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

## SECTION 7.1 WORKDAY AND WORKWEEK

For the purposes of this Article, a regular workweek of forty (40) hours of work, excluding lunch periods, shall constitute a normal full-time workweek for full-time Employees. Employees working a minimum of eight (8) consecutive hours shall normally receive an unpaid lunch period of at least thirty (30) minutes unless work conditions preclude scheduling of this period. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

## SECTION 7.2 OVERTIME

An overtime rate of time and one-half (1 1/2) of an Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of forty (40) hours in a work week.

## SECTION 7.3 OVERTIME REQUIREMENT

If requested to work overtime (i.e. over forty [40] hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice, the Employee shall be required to do so unless the Employee is excused for good cause.

## SECTION 7.4 OVERTIME DISTRIBUTION

Overtime will be distributed as equitably and fairly as practicable among Employees regularly assigned to the particular work location (including shared position Employees), subject to the direction of the judges and/or Marshals Service. Seniority shall be used in the assignment of overtime, except when the Employer is directed by the US Marshals Service or judges, or in situations dictated by availability of personnel and amount of notice given for overtime.

Excluding: Site Supervisors cannot be assigned to cover CSO overtime positions or posts except in emergency situations, or when directed by the US Marshal Service or judiciary, or in situations dictated by availability of personnel and amount of notice given for overtime. The Company will permit Site Supervisors to work overtime assignments only when there is no bargaining unit member available or in situations described above due to the rapidly changing court environment. The Employer will attempt to rectify overtime inequalities through the future scheduling of overtime work. Overtime records will be made available to the Union by the Company upon request.

## SECTION 7.5 SHARED POSITION EMPLOYEES

Hours of work for shared position Employees shall be determined by the Employer, to insure the orderly and efficient operation of court security services. Shared position Employees shall be required to work all scheduled work hours, unless the Employee is excused for good cause. Shared position Employees will be required to sign the Akal Shared Officer Agreement.

## SECTION 7.6 REST PERIODS

There shall be two (2) fifteen (15) minute paid rest periods when properly relieved and one (1) thirty (30) minute unpaid lunch for each eight (8) hour shift. One rest period shall be in the first half of the shift and the second rest period shall be in the last half of the shift. On occasion, due to exceptional authorized work requirements, Employees may have to work through their unpaid lunch breaks, and, if so, they will be compensated at the appropriate rate of pay. The Company recognizes the requirement to provide regularly scheduled breaks. It is not the intent of the Company to deny, avoid, or abuse this requirement.

## SECTION 7.7 CALL-IN PAY

An Employee called in to work will be guaranteed a minimum of three (3) hours of work or pay.

# ARTICLE 8

## WAGES

### SECTION 8.1 WAGE SCHEDULE

The base rate of pay for Court Security Officers Southern Texas, Local #108 will be, by site:

**For Houston**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.72 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $16.12 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $16.57 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.88 | $16.25 |

**For Galveston**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.59 | $15.09 |
| October 1, 1999-September 30, 2000 | $14.99 | $15.49 |
| October 1, 2000-September 30, 2001 | $15.44 | $15.94 |
| October 1, 2001-September 30, 2002 | $15.75 | $16.25 |

**For Corpus Christi**

| Year | CSO Wage | Lead #1 Wage | Lead #2 Wage |
|---|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $15.42 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.81 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $16.25 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $16.55 | $15.88 |

**For McAllen, Laredo and Brownsville**

| Year | CSO Wage | Lead CSO Wage |
|---|---|---|
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.75 |
| October 1, 1999-September 30, 2000 | $14.64 | $15.14 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.58 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.88 |

| For Victoria | | |
|---|---|---|
| Year | CSO Wage | Lead CSO Wage |
| September 30, 1998 (11:45 p.m.)-September 30, 1999 | $14.25 | $14.50 |
| October 1, 1999-September 30, 2000 | $14.64 | $14.89 |
| October 1, 2000-September 30, 2001 | $15.08 | $15.33 |
| October 1, 2001-September 30, 2002 | $15.38 | $15.63 |

## SECTION 8.2 PAYDAY

Payday for all hourly Employees will be after 11 a.m. on Friday following the pay period ending on Saturday, subject to change by mutual agreement.

## SECTION 8.3 UNDISPUTED ERROR

In case of an undisputed error on the part of the company as to an Employee's rate of pay, proper adjustment will be made from the date the error occurred.

## SECTION 8.4 LEAD CSO RATES

If additional Lead CSOs are added to the contract any time after this Agreement goes into effect, they will be paid the base rate set out above in Section 8.1, based on the location.

## ARTICLE 9

## HOLIDAYS

## SECTION 9.1. HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day.

## SECTION 9.2 MISCELLANEOUS HOLIDAY PROVISIONS

A. A full-time Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift or premium for that holiday. The Employee will be paid holiday pay only if the Employee is not laid off, or on an unpaid leave of absence.

Local #108   -   May 1998-September 2002 CBA                                   15

B. Any full-time Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked and in addition shall receive eight (8) hours holiday pay at the straight time rate, providing the Employee meets the requirements above in Section 9.2A.

C. Any shared position Employee who works as scheduled on a holiday shall receive the Employee's straight time rate for all hours worked plus prorated holiday pay up to 8 hours based on their average weekly hours for the previous four weeks' work.

D. Holiday pay for shared position Employees who do not work on a holiday and meet the eligibility requirements set out in Section 9.2A above shall be paid a proration of the full-time benefit based on their average weekly hours for the previous four weeks' work.

# ARTICLE 10

# VACATIONS

## SECTION 10.1 ELIGIBLE FULL-TIME EMPLOYEES

Eligible full-time Employees shall be entitled to annual vacation pay, based on their continuous years of service with the Employer at their individual hourly rate at the time payment is made in accordance with the following schedule:

| | |
|---|---|
| Upon completion of one year of service: | 80 hours |
| Upon completion of five years of service: | 120 hours |
| Upon completion of 15 years of service: | 160 hours |

## SECTION 10.1a ELIGIBLE SHARED POSITION EMPLOYEES

A. Eligible shared position Employees who work a regular half-time schedule shall be entitled to one-half the full-time vacation benefit at their individual hourly rate.

B. Eligible shared position Employees who work other than a regular part-time schedule shall be entitled to a prorated vacation pay at their individual hourly rate based on the number of hours worked in the previous contract year.

## SECTION 10.2 SCHEDULING VACATIONS

Each Employee who qualifies for a vacation in accordance with the provisions of this Article shall notify his/her Lead CSO, in writing, prior to April 1st of each year of his or her first and second choice for desired vacation periods, if any. If vacation time is required to be used differently than as per requested prior to April 1, Employee must give their immediate supervisor a written request at least seven (7) days prior to the requested vacation time.

** TX STATUS REPORT **                    AS OF   FEB 23 '00 16:12   PAGE.01

USMS BROWNSVILLE

| | DATE | TIME | TO/FROM | MODE | MIN/SEC | PGS | CMD# | STATUS |
|---|---|---|---|---|---|---|---|---|
| 19 | 02/23 | 16:12 | 956 550 7221 | EC—S | 00'26" | 001 | | OK |

## PREAMBLE

THIS AGREEMENT is made and entered into on ___July 8, 1998___ by and between AKAL SECURITY, INCORPORATED, a New Mexico corporation, and its successors, hereinafter referred to as the "Employer" or "Company," and UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, LOCAL #108 hereinafter referred to as the "Union." All non-economic provisions of this contract shall be in effect as of May 1, 1998. All economic provisions of this contract shall be in effect as of 11:45 p.m. on September 30, 1998, including, but not limited to compensation and fringe benefits.

*1-800-572-6103*

*303-650-8515*

The Employer will recognize union seniority when scheduling Employees for vacation in accordance with Section 2.1. The Employer will allow the maximum amount of personnel off at any one time for vacation that allows the Company to maintain efficient operations. The final allocation of vacation periods shall rest exclusively with the Employer in order to insure orderly and efficient operations and meet Government contract requirements.

## SECTION 10.3 PAY OPTIONS

Earned vacation pay shall be paid on the pay day following the Employee's return to the job after his/her vacation.

## SECTION 10.4 UNUSED VACATION

Vacations shall not be cumulative from one year to the next. Any earned but unused vacation time remaining at the end of a year of service (i.e. anniversary date of employment) shall be paid to the Employee.

## SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

Any time during the year, Employees may request in writing to be paid for earned vacation pay in lieu of taking actual vacation leave.

## SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employee will be paid at their individual hourly rate for any legally accrued but unused vacation time, as entitled by the Service Contract Act.

## SECTION 10.7 VACATION - LAID OFF EMPLOYEES

Length of service with the Employer shall not accrue for the purposes of vacation benefits while an Employee is on laid-off status.

## SECTION 10.8 VACATION INCREMENTS

Vacation days may be used in one (1) day increments, if so desired by the Employees and approved by the Employer.

## ARTICLE 11

## LEAVES OF ABSENCE

## SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30

Case 1:04-cv-00735 FROM DSUSA COMMAND CENTER in TXSB on 03/19/2002 Page 24 of 33

days, unless approved by the Employer. Employee on any unpaid leave of absence may be required to use available vacation or personal leave time. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over 30 days. The Employer will make every reasonable effort to maintain an Employee's position while on a non-statutory unpaid leave of absence.

### SECTION 11.2 MEDICAL LEAVE

An Employee shall be granted an unpaid medical leave of absence for a specified period not to exceed 16 weeks within a 12-month period. Employee's disability must be made known to the Employer in accordance with the provisions of this Article, and be supported by a doctor's certificate showing the nature of the illness and the estimated length of time the Employee will be unable to perform his/her job.

The 16-week period may be extended at the discretion of the Employer. During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Employee will be required to use accrued vacation or personal leave time during the medical leave. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work.

### SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated or drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or the Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

### SECTION 11.4 UNION LEAVE

A Union officer or delegate will be granted an unpaid leave of absence upon written request for the purpose of attending Union conventions or other meetings of vital interest to the United Government Security Officers of America. The maximum number of days given for union leave is not to exceed five (5) days per contract year and the maximum number of union officers or delegates to be granted leave of absence is not to exceed two (2) Employees per Local Union.

### SECTION 11.5 FAMILY MEDICAL LEAVE

The Family and Medical Leave Act of 1993 is incorporated herein by reference.

### SECTION 11.6 PERSONAL LEAVE

Each full-time seniority Employee shall be eligible to use a maximum of six (6) days of personal leave (forty-eight hours) per 12-month Government contract year worked. Employees who begin

employment after the inception of the contract year will be eligible to use a prorated amount of personal leave, based upon the following rate (see **Personal Leave Eligibility Table** below):

| Personal Leave Eligibility Table | | |
|---|---|---|
| **START DATE** | **RATE OF PERSONAL LEAVE ELIGIBLE TO USE** | |
| (Date Employee begins working on the contract, based on an October 1 contract start date.) | **FULL-TIME** | **SHARED POSITION** |
| October 1-31 | 48 hours | 24 hours   3 days |
| November 1-30 | 44 hours | 22 hours   2 day 4 Hes |
| December 1-31 | 40 hours | 20 hours   2 days 4 Hr |
| January 1-31 | 36 hours | 18 hours   2 days 2 He |
| February 1-29 | 32 hours | 16 hours   2 days |
| March 1-31 | 28 hours | 14 hours   1 day 2 Hes |
| April 1-30 | 24 hours | 12 hours   1 day 4 Hes |
| May 1-31 | 20 hours | 10 hours   1 day 2 Hr |
| June 1-30 | 16 hours | 8 hours   1 day |
| July 1-31 | 12 hours | 6 hours    . |
| August 1-31 | 8 hours | 4 hours   - |
| September 1-30 | 4 hours | 2 hours   - |

A. Personal days shall be used in not less than four-hour increments and shall be paid when taken by the Employee as approved in advance by the Site Supervisor or District Supervisor.

B. Shared position Employees will receive one-half the full-time personal leave per full contract year worked. At the end of the contract year, any shared position Employee who worked more than half the full-time hours (1,040 hours) will receive additional prorated personal leave based upon the number of actual hours Employee worked during that contract year. Therefore, for each additional 87 hours worked over 1,040 hours during the contract year, Employee will receive an additional 2 hours of personal leave, up to a possible maximum of 48 hours total personal leave for the contract year.

C. Unused personal days shall not be cumulative from year to year. Any unused, earned personal leave pay will be paid to Employee at the end of the contract year.

D. Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that contract year. (Example: An Employee who terminates work after six months at the full-time rate during the current contract year and earns three (3) days personal leave, but only uses two (2) days, would be eligible upon termination to be paid for the third, unused personal day.) If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract (4 hours per full month worked), the amount of the overage will be

deducted from the Employee's final paycheck. (Example: If Employee works only six months and therefore earns three days (24 hours) personal leave, but actually uses four days personal leave, the extra 8 hours' pay will be deducted from Employee's final paycheck.)

E. Personal leave (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least two (2) hours prior to the beginning of his/her regular shift in order to be eligible for paid personal leave benefits. Disciplinary action may result from excessive, unapproved absenteeism.

## SECTION 11.7 PROCESSING LEAVES OF ABSENCE

A leave of absence must be processed in the following manner:

A. All requests for any unpaid leaves of absence shall be submitted in writing to the Site Supervisor at least ten (10) calendar days prior to the date that the leave will take effect, except in cases of emergencies, and shall include:

1. The reasons for such leave;
2. The effective dates of such leave;
3. The estimated date of return to work.

B. The written request for leave of absence shall be submitted to the Contract Manager by the Site Supervisor for final approval.

C. If the request for the leave of absence is approved by the Contract Manager, a copy of the approved leave of absence will be given to the Employee involved.

D. Extensions of the leave of absence may be granted at the discretion of the Employer upon written request by the Employee within ten (10) calendar days prior to the expiration of the leave of absence when feasible. Extensions when granted shall not total more than thirty (30) days.

## SECTION 11.9 BEREAVEMENT LEAVE

All non-probationary Employees shall be entitled to three days unpaid bereavement leave per full Government contract year for purposes of attending, on a day normally scheduled to work, the funeral of a parent, parent-in-law, spouse, child, sibling, or sibling-in-law. Employee will notify Lead CSO, whenever possible, of the need for bereavement leave.

## SECTION 11.10 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of Article 2 of this Agreement.

# ARTICLE 12

## HEALTH, WELFARE AND UNIFORM ALLOWANCES

### SECTION 12.1 PAYMENTS

For the life of this Agreement, the Employer will make health and welfare payments to Employees on all hours paid up to forty (40) hours per week in accordance with the following schedule at the hourly rate:

| | |
|---|---|
| Effective October 1, 1998 through September 30, 1999 | $1.41/hour |
| Effective October 1, 1999 through September 30, 2000 | $1.66/hour |
| Effective October 1, 2000 through September 30, 2001 | $1.91/hour |
| Effective October 1, 2001 through September 30, 2002 | $2.00/hour |

### SECTION 12.2 MINIMUM BENEFITS

The amounts required by Section 12.1 shall serve as the minimum health and welfare benefits for Employees.

### SECTION 12.3 OTHER BENEFITS

The Employer will offer Employees the opportunity to participate in other Employee-paid fringe benefit programs made available to all Court Security Officers employed by the Company. These programs include cafeteria plans, payroll deduction plans, retirement plans, insurance plans, 401(k) plans, and any other plan mentioned in this Agreement.

### SECTION 12.4 UNIFORM MAINTENANCE

The Employer will pay the Employee $.10625 per hour worked up to 40 hours per week for uniform maintenance allowance. A shoe allowance of $62.50 per contract year will be sent with uniforms annually for the purchase of USMS-required CSO uniform shoes.

### SECTION 12.5 GROUP DISABILITY INSURANCE

The Company agrees to deduct any fees or premium payments and lawful assessments designated by the Union for a Group Disability Insurance plan set up by and administered by the Union from the first paycheck of each month of each member of the Union. These deductions will be made only upon receipt of written authorization from the Employee on a form provided by supervision or the Union. Such authorization may be revoked by the Employee upon 30 days' written notice served upon the Company and the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to amount of fees, and any other costs for this insurance.

The Company will remit all such deductions to the International Secretary/Treasurer within 72 hours from the date the deduction was made via direct deposit unless it is technically impossible to do so. All costs related to direct deposit would be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the International Secretary/Treasurer with a deduction list, setting forth the name and amount of fees, and any other costs for this insurance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions commenced by an Employee against the Company, and assumes full responsibility for the disposition of the funds so deducted once they are paid over to the Union. Errors made by the Company in the deduction or remittance of moneys shall not be considered by the Union as a violation of this provision, providing such errors are corrective and corrected when brought to the Company's attention.

The Check-off Authorization Card to be executed and furnished to the Company by the Union and the Employees, shall be the official Union Authorization for insurance deductions. The Company shall accept no other form unless the parties mutually agree to a substitute.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

### SECTION 13.1 BULLETIN BOARDS

The Employer will make its best effort to obtain a space from the government for the use of the CSOs to locate a Union-provided bulletin board that will be used by the Union for posting notices pertaining to Union affairs. The providing of these facilities is the prerogative of the US Government.

### SECTION 13.2 PHYSICAL EXAMINATIONS

The Employer shall pay for all physical/medical examinations that are required by the Employer at Employer designated clinic(s) or physicians. In those selected areas where there is not a designated clinic or physician, the Employer will provide an allowance to the Employee of up to a maximum of eighty dollars ($80) per examination. Receipts must be furnished by Employee in order to process reimbursement.

Physical/medical exams may be required by operation of the government contract or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic, at its discretion. Employer shall pay Employee up to two hours for time spent taking an employer-requested medical examination.

### SECTION 13.3 TRAVEL EXPENSES

The Company will provide advance payments for approved travel expenses if requested by an Employee. Any hours to include travel over twelve (12) hours will require the Employee to stay

overnight and the appropriate per diem will be paid. All hours in travel will be counted as work hours with the appropriate overtime wages provided for under Article 7 of this Agreement. Employees will be reimbursed for all authorized expenditures of any authorized travel within twenty (20) days from the day Employer receives the travel voucher and all required receipts.

## SECTION 13.4 BREAK ROOMS

The Employer will make its best effort to obtain from the government break rooms for CSOs for breaks and lunch without management using the room as an office and will make its best effort to have the government equip the room with water. The providing of these facilities is the prerogative of the US Government.

## SECTION 13. 5 LOCKERS

The Employer will make its best effort to obtain lockers from the government for the use of the CSOs. The providing of these facilities is the prerogative of the US Government.

## SECTION 13.6 UNION MEETINGS

Neither Union officials nor Union members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings of any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances to the extent such work time activity is specifically allowed by the Employer.

## ARTICLE 14

### 401 (k) PLAN

## SECTION 14.1 401 (K) PLAN

The Company shall provide a 401(k) plan to which Court Security Officers are eligible to contribute, whether Union or Non-Union. Employees shall be subject to the eligibility requirements and rules of the Plan.

## ARTICLE 15

### TRAINING

## SECTION 15.1 TRAINING

The Company will make its best effort to implement its advanced CSO training program to enhance the professional capabilities of the Employees. Actual scheduling of training is subject to approval by the US Government and may be subject to funding by the US Government.

## ARTICLE 16

### SAFETY

### SECTION 16.1 SAFETY POLICY

It is the policy of the Company to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. The Company agrees to permit one (1) bargaining unit member selected by the Union to participate in any locally scheduled safety meetings.

### SECTION 16.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any government provided CSO work stations and break rooms.

## ARTICLE 17

### CONTINUITY OF OPERATIONS

### SECTION 17.1 NO STRIKES

Both the Company and the Union agree that continuity of operations is of utmost importance to the Company's security operations. Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns or secondary boycotts during the term of this Agreement and that the Union will not cause, nor permit its members to cause, nor will any member of the Union take part in, any strike, including a sympathy strike, slowdown, stoppage of work, planned inefficiency or any other curtailment of work or restriction or interference with the Employer's or Government's operations for any reason whatsoever. Nor will the Union authorize or sanction the same.

Upon hearing of any unauthorized strike, slowdown, stoppage or work, planned inefficiency or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such activity to a prompt termination. Any Employee who violates this provision may be immediately discharged. Furthermore, it is agreed and understood that in addition to other remedies, the provisions of this Article may be judicially enforced including specific performance by way of injunctive relief.

### SECTION 17.2 LOCKOUTS

During the life of this Agreement, the Employer shall not lockout any Employees covered in this Agreement.

## ARTICLE 18

### SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through government regulations or decree, such parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to the decree or government statutes so long as they shall remain legally effective. It is the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

## ARTICLE 19

### SERVICE CONTRACT PROCEDURES AND OBLIGATIONS

The parties recognize that they are providing a service to the Unites States Government. Therefore, the terms of this agreement are subject to the directives of the Government, and, except as provided herein, there shall be no recourse against the Employer with regard to its actions taken to comply with those directives. In the event a directive necessitates a deviation from the obligations or procedures contained in this Agreement, the Union may request that the parties hereto meet and confer with regard to the effects, if any, of the deviation necessitated by the Government's directive. A copy of a written directive covered by this provision shall be provided to the International UGSOA president upon request.

## ARTICLE 20

### ENTIRE AGREEMENT

The parties acknowledge that during the negotiation which resulted in the Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and all understandings and agreements reach by the parties are set forth in this Agreement. Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the term of this Agreement except as specifically provided for in other provisions of this Agreement.

## ARTICLE 21

## DURATION

This Agreement shall be effective upon its execution by both parties and supersedes any and all prior agreements or understandings between the parties. The Agreement shall remain in force until 2400 hours on September 30, 2002 with the provision that should either party desire to terminate this Agreement or any provision thereof, it shall give written notice to the other party of not less than sixty (60) days and not more than seventy-five (75) days prior to the expiration. In the event such notice is given, the existing Agreement may be continued by mutual consent of both parties until an Agreement is reached. This Agreement may also be changed or amended by agreement of both parties.

IN WITNESS WHEREOF, the parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _Nathan McCoy Sr._

TITLE: _PRESIDENT_

DATE: _July 8, 1998_

FOR:
AKAL SECURITY, INC.

BY: _Dajal_

TITLE: _SR V.P._

DATE: _July 9, 1998_


FOR:
UNITED GOVERNMENT
SECURITY OFFICERS OF
AMERICA, INTERNATIONAL

BY: _Glynnis Crunkleford_

TITLE: _Secretary / Treasurer_

DATE: _July 8, 1998_

BY: _W Prochak_

TITLE: _Int'l Sec - Treas._

DATE: _7-8-98_

FOR:
AKAL SECURITY, INC.

BY: _Sado Dan Khalsa_

TITLE: _Dir. HR_

DATE: _7/8/98_

BY: _____

TITLE: _____

DATE: _____

** TOTAL PAGE.11 **